# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACOB CORMAN, in his official
capacity as Majority Leader of the
Pennsylvania Senate, MICHAEL
FOLMER, in his official capacity as
Chairman of the Pennsylvania Senate
State Government Committee, LOU
BARLETTA, RYAN COSTELLO,
MIKE KELLY, TOM MARINO, SCOTT
PERRY, KEITH ROTHFUS, LLOYD
SMUCKER, and GLENN THOMPSON,

       Plaintiffs,

   v.

ROBERT TORRES, in his official
capacity as Acting Secretary of the
Commonwealth, and JONATHAN M.
MARKS, in his official capacity as
Commissioner of the Bureau of
Commissions, Elections, and Legislation,

       Defendants.

No._____

(*filed electronically*)

THREE JUDGE COURT
REQUESTED PURSUANT TO
28 U.S.C. § 2284(a)

## <u>VERIFIED COMPLAINT</u>

Plaintiffs Jacob Corman, Michael Folmer (the "State Plainiffs"), Lou Barletta,
Ryan Costello, Mike Kelly, Tom Marino, Scott Perry, Keith Rothfus, Lloyd
Smucker and Glenn Thompson (the "Federal Plaintiffs") (collectively, the
"Plaintiffs"), by and through their undersigned counsel, bring this Verified

Complaint for Injunctive relief against Defendants Robert Torres, Acting Secretary of the Commonwealth, and Jonathan M. Marks, Commissioner of the Bureau of Commissions, Elections, and Legislation (collectively, the "Defendants"), and in support thereof aver as follows:

## I.      PRELIMINARY STATEMENT

1.      This is an action concerning, *inter alia*, the Pennsylvania Supreme Court's striking of a validly-enacted congressional districting plan and issuance of a substitute plan, each action in direct violation of the Elections Clause of the United States Constitution (the "Elections Clause").

2.      The Elections Clause provides, in relevant part, that "[t]he Times, Places and Manner" of holding congressional elections "shall be prescribed in each State by the Legislature thereof[,]"or by an act of Congress. *See* U.S. Const. art. I, § 4, cl. 1.

3.      As detailed herein, the Elections Clause vests Pennsylvania's General Assembly (or the people by way of constitutional amendment) with exclusive authority to enact a Congressional districting plan, *see Arizona State Leg. v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015), and mandates that the General Assembly be afforded an "adequate opportunity" to craft a substitute plan should an initial plan be stricken for any reason. *See Upham v. Seamon*, 456 U.S. 37 (1982).

4.      As detailed herein, by Order dated January 22, 2018 the Pennsylvania Supreme Court struck down the Pennsylvania Congressional Redistricting Act of 2011, 25 P.S. §§ 3596.101, *et seq*. (the "2011 Plan") as unconstitutional based upon its purported violation of "mandatory" districting criteria found nowhere within Pennsylvania's Constitution or legislative enactments – a direct violation of the Elections Clause (as noted by multiple Justices of the Pennsylvania Supreme Court).

5.      Thereafter, the Pennsylvania Supreme Court compounded the violation by failing to afford the General Assembly the requisite "adequate opportunity" to craft a substitute Congressional districting plan–another direct violation of the Elections Clause (as noted by multiple Justices of the Pennsylvania Supreme Court). Instead, the court was plainly intent on usurping the General Assembly's delegated authority and crafting a plan of its own (which it has now done).

6.      The Pennsylvania Supreme Court's violations of the Elections Clause cannot be countenanced.

7.      Plaintiffs seek immediate injunctive relief: (A) prohibiting Defendants from implementing the Congressional districting plan recently crafted by the Pennsylvania Supreme Court; and (B) directing the Pennsylvania Department of State to conduct the 2018 May congressional primary and subsequent general election in accordance with the boundaries contained within the 2011 Plan.

Inasmuch as nominating petitions for the 2018 primary are due to be circulated on February 27, Plaintiffs' need for relief is immediate.

## II.  <u>JURISDICTION AND VENUE</u>

8.     Because this action alleges a violation of the United States Constitution, *see* U.S. Const. art. I, § 4, cl. 1, and federal law, *see* 52 U.S.C. §§ 20301, *et seq.*, it raises a federal question, thereby conferring jurisdiction on this Court pursuant to 28 U.S.C. § 1331.

9.     Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b)(1), since Defendants reside in the district; alternatively venue is proper under Section 1391(b)(2) because a substantial portion of the events or omissions giving rise to the present claim occurred in the district. *See id.* at § 1391(b)(2).

10.     A three judge district court is requested pursuant to 28 U.S.C. § 2284(a), as Plaintiffs' action "challeng[es] the constitutionality of the apportionment of congressional districts." in Pennsylvania.

## III.  <u>PARTIES</u>

11.     Plaintiff, Jacob Corman, is an elected member of the Pennsylvania Senate who represents the 34th Senatorial District. He is also the Majority Leader of the Pennsylvania Senate. The Pennsylvania Senate is one of the two chambers of the Pennsylvania General Assembly, which is vested with the legislative authority of the Commonwealth of Pennsylvania. The Pennsylvania General Assembly, of which

Plaintiff is a member, is the body responsible for passing legislative enactments including redistricting and reapportionment legislation.

12.     Plaintiff, Michael Folmer, is an elected member of the Pennsylvania Senate who represents the 48th Senatorial District. He is also the Chairman of the Senate State Government Committee, a Committee entrusted with, among other things, Congressional redistricting. The Pennsylvania General Assembly, of which Plaintiff is a member, is the body responsible for passing legislative enactments including redistricting and reapportionment legislation.

13.     Plaintiff Lou Barletta is a Congressman representing the 11th Congressional District of Pennsylvania in the United States House of Representatives. Congressman Barletta's District will be substantially altered by the Congressional districting plan recently crafted by the Pennsylvania Supreme Court.

14.     Plaintiff Ryan Costello is a Congressman representing the 6th Congressional District of Pennsylvania in the United States House of Representatives. Congressman Costello is currently running for reelection in the 6th Congressional District, which has drastically changed due to the actions of the Pennsylvania Supreme Court. Under the Congressional districting plan recently crafted by the Pennsylvania Supreme Court, approximately 50% of the 6th district encompasses new constituents and divides communities that he has served for years. For example, in the new map, almost the entirety of Berks County will reside in a

different district and the Township of Exeter will now be split. This has destroyed any incumbency advantage that Congressman Costello may have once held and the Congressman's District now contains a majority of voters from the Democratic Party, where it once was a majority Republican district. He has been actively campaigning for reelection, having participated in numerous forums and town-hall meetings, and raising over $1.6 million for his candidacy. Congressman Costello spent approximately $450,000 for his re-election in 2017, of which over $220,000 was spent in efforts to engage with voters he will no longer represent.[1] Congressman Costello is currently providing services to 325 constituents in order to resolve various issues with the federal government. Approximately 144 of these constituents will find themselves in new districts which will likely delay the resolution of those issues.

15.    Plaintiff Mike Kelly is a Congressman representing the 3rd Congressional District of Pennsylvania in the United States House of Representatives. Congressman Kelly is currently running for reelection in the 3rd Congressional District, which has drastically changed due to the actions of the Pennsylvania Supreme Court. Under the Congressional districting plan recently crafted by the Pennsylvania Supreme Court, the Congressman's district now

---

[1] All figures reflecting dollars spent or raised toward reelection efforts are available at the FEC website. *See* https://classic.fec.gov/finance/disclosure/candcmte_info.shtml.

contains a majority of voters from the Democratic party, where it once was a majority Republican district (interestingly, this is despite the fact that the core of the Congressman's district remained more intact than any other district). He has been actively campaigning for reelection, having participated in numerous forums and town-hall meetings, and raising over $1.1 million for his candidacy. Congressman Kelly, through his committee, spent approximately $490,000 for his reelection in 2017, much of which was spent in efforts to engage with voters he will no longer represent.

16.     Plaintiff Thomas "Tom" Marino is a Congressman representing the 10th Congressional District of Pennsylvania in the United States House of Representatives. Congressman Marino is currently running for reelection in the 10th Congressional District, which has drastically changed due to the actions of the Pennsylvania Supreme Court. Under the Congressional districting plan recently crafted by the Pennsylvania Supreme Court, Congressman Marino will no longer represent 30% of the residents from his current district if the new map takes effect. He has been actively campaigning for reelection, having participated in numerous forums and town-hall meetings, and raising over $160,000 for his candidacy. Congressman Marino, through his committee, spent approximately $140,000 for his reelection in 2017, much of which was spent in efforts to engage with voters he will no longer represent.

17.     Plaintiff Scott Perry is a Congressman representing the 4th Congressional District of Pennsylvania in the United States House of Representatives. Congressman Perry is currently running for reelection in the 4th Congressional District, which has drastically changed due to the actions of the Pennsylvania Supreme Court. Under the Congressional districting plan recently crafted by the Pennsylvania Supreme Court, Congressman Perry will only represent 59% of the voters from his previous district. As such, the new map destroys any incumbent advantage he enjoyed under the previous plan. For example, the new map removes Adams County entirely and the vast majority of York County from his district. He has been actively campaigning for reelection, having participated in numerous forums and town-hall meetings, and raising over $319,000 for his candidacy. Congressman Perry, through his committee, spent approximately $150,000 for his reelection in 2017, much of which was spent in efforts to engage with voters he will no longer represent. Congressman Perry is currently providing services to 260 constituents in order to resolve various issues with the federal government. These constituents reside primarily in York and Adams Counties, York being the current population center of his district. The new map removes Adams County entirely and the vast majority of York County from his district and, therefore, these constituents will find themselves in new districts which will inevitably delay the resolution of those issues.

18.    Plaintiff Keith Rothfus is a Congressman representing the 12th Congressional District of Pennsylvania in the United States House of Representatives. Congressman Rothfus is currently running for reelection in the 12th Congressional District, which has drastically changed due to the actions of the Pennsylvania Supreme Court. Under the Congressional districting plan recently crafted by the Pennsylvania Supreme Court, the Congressman will now represent only 55% of his current constituents in this new district. Because of these changes the Congressman will lose any incumbency advantage he had previously held. In fact, the Congressman's district has become *substantially* more Democratic than before. The Congressman's old district had a 5.5% Democratic registration advantage. The new plan has a 13.8% Democratic registration majority. He has been actively campaigning for reelection, having participated in numerous forums and town-hall meetings, and raising over $900,000 for his candidacy. Congressman Rothfus, through his committee, spent approximately $270,000 for his reelection in 2017 much of which was spent in efforts to engage with voters he will no longer represent.

19.    Plaintiff Lloyd Smucker is a Congressman representing the 16th Congressional District of Pennsylvania in the United States House of Representatives. Congressman Smucker is currently running for reelection in the 16th Congressional District, which has drastically changed due to the actions of the

Pennsylvania Supreme Court. Under the Congressional districting plan recently crafted by the Pennsylvania Supreme Court, the Congressman would represent only 68% of the constituents from his previous district, which destroys any incumbency advantage he once had. He has been actively campaigning for reelection, having participated in numerous forums and town-hall meetings, and raising over $450,000 for his candidacy. Congressman Smucker, through his committee, spent approximately $290,000 for his reelection in 2017, much of which was spent in efforts to engage with voters he will no longer represent.

20.    Plaintiff Glenn Thompson is a Congressman representing the 5th Congressional District of Pennsylvania in the United States House of Representatives. Congressman Thompson is currently running for reelection in the 5th Congressional District, which has drastically changed due to the actions of the Pennsylvania Supreme Court. Under the Congressional districting plan recently crafted by the Pennsylvania Supreme Court, the Congressman will represent only 57% of his previous constituents, which destroys any incumbency advantage he once had. He has been actively campaigning for reelection, having participated in numerous forums and town-hall meetings, and raising over $650,000 for his candidacy. Congressman Thompson, through his committee, spent approximately $530,000 for his reelection in 2017, much of which was spent in efforts to engage with voters he will no longer represent.

21.     Defendant, Robert Torres, is Acting Secretary of the Commonwealth, the chief administrative officer of the Pennsylvania Department of State (the "Department"). Defendant Torres is a party in his official capacity.

22.     Among other things, the Department is responsible for overseeing elections in the Commonwealth and ensuring that such elections are conducted consistent with the Pennsylvania Election Code, and all other duly enacted laws. *See* 25 P.S. §§ 2621-26.

23.     Defendant, Jonathan Marks, is the Commissioner of the Bureau of Commissions, Elections and Legislation (the "Bureau"), a key constituent of the Department tasked with, *inter alia*, carrying out the all duties relative to elections identified in the preceding paragraph. Defendant Marks is a party in his official capacity.

## IV.   **FACTUAL ALLEGATIONS**

### A.   **The 2011 Plan And Challenge Thereto**

24.     On December 22, 2011, the 2011 Plan was signed into law following the decennial congressional reapportionment. *See* 25 P.S. §§ 3596.101, *et seq*.

25.     Since its enactment, the Department has conducted seven elections under the 2011 Plan (three primary elections, three general elections, and one special election).

26.    In June 2017, various individuals (collectively, the "Petitioners") brought an action in the Commonwealth Court of Pennsylvania challenging the 2011 Plan on various state constitutional grounds (the "Challenge").

27.    Joseph Scarnati III, the President Pro Tempore of the Pennsylvania Senate and Michael Turzai, the Speaker of the Pennsylvania House of Representatives were two of the named respondents to that Challenge (collectively, the "Legislative Respondents").

28.    Prior to June 2017, the 2011 Plan had not been challenged in any state or federal court.

29.    In the Challenge, Petitioners argued that the 2011 Plan violated: (a) the Equal Protection provisions of the Pennsylvania Constitution; *see* Pa. Const. art. I §§ 1 & 26; (b) the Free and Equal Elections Clause of the Pennsylvania Constitution; *see id*. at § 5; and (c) their rights to free expression and association under the Pennsylvania Constitution. *See id.* at § 7.

## B.    The Supreme Court's Granting of Extraordinary Relief, And The Proceedings Before The Commonwealth Court

30.    In October 2017, upon a Motion by Legislative Respondents, the Commonwealth Court stayed the Challenge pending a decision from the United States Supreme Court in *Gill v. Whitford*, No. 16-1161 (U.S.) (argued Oct. 3, 2017).

31.    Petitioners subsequently filed an application for extraordinary relief in the Pennsylvania Supreme Court.

32.    On November 9, 2017, in a *per curiam* Order joined by only four of the seven justices, the Pennsylvania Supreme Court granted the application, assumed plenary jurisdiction over the Challenge, and remanded the matter to the Commonwealth Court with instructions to take all necessary steps to develop an evidentiary record and to submit its findings of fact and recommended conclusions of law by December 31, 2017. A copy of the Pennsylvania Supreme Court's November 9, 2017 Order is attached hereto as **Exhibit A**.

33.    The Commonwealth Court conducted proceedings and submitted a report on December 29, 2017, finding that the 2011 Plan was driven by certain partisan motives, but concluding that it complied with Pennsylvania's Constitution. In so concluding, the Commonwealth Court recognized that a judicially manageable standard for differentiating between permissible and impermissible partisan considerations had not been identified. In the absence of such a rubric, the Commonwealth Court opined that it would be inappropriate to invalidate the 2011 Plan.

34.    Shortly thereafter, the Pennsylvania Supreme Court ordered expedited briefing, and heard argument with regard to the Challenge on January 17, 2018.

**C.    The Pennsylvania Supreme Court's January 22, 2018 Orders And Attendant Statements**

35.    By Per Curiam Order dated January 22, 2018, the Pennsylvania Supreme Court determined that the 2011 Plan violated Pennsylvania's Constitution,

13

and enjoined its use in connection with the upcoming primary election scheduled for May 15, 2018. A copy of the January 22, 2018 Per Curiam Order ("PCO") is attached hereto as **Exhibit B.**

36.    The PCO afforded Pennsylvania's General Assembly 18 days (14 business days) to submit to Pennsylvania's Governor for consideration "a congressional districting plan that satisfies the requirements of the Pennsylvania Constitution, …" as set forth by the Court and afforded the Governor another six days thereafter to decide whether to "accept" such plan and submit it to the Court. *Id*. at 2 (paragraph "Second").

37.    The PCO also stated that if: (a) the General Assembly did not submit a plan to the Governor; or (b) the Governor did not accept that plan by February 15, 2018, the Court would create its own plan. *Id.* (paragraph "Third").

38.    While the PCO advised that an "[o]pinion [would] follow," *id.* at 3, it noted: "[T]o comply with this Order, any congressional districting plan shall consist of: congressional districts composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population." *Id.* (paragraph "Fourth").

39.    The PCO was accompanied by two Dissenting Statements, one issued by Chief Justice Saylor and another by Justice Mundy, as well as a Concurring and

Dissenting Statement issued by Justice Baer. Copies of these Statements are attached hereto as **Exhibits C, D and E**, respectively.

40.     Chief Justice Saylor, in dissent, cited the Elections Clause, noting that "[t]he crafting of congressional district boundaries is quintessentially a political endeavor assigned to state legislatures by the United States Constitution." **Exhibit C** at 2 (citing U.S. Const. art. 1, § 4).

41.     The Chief Justice further explained: "I would not presently upset those districts, in such an extraordinarily compressed fashion, and without clarifying – for the benefit of the General Assembly and the public – the constitutional standards by which districting is now being adjudged in Pennsylvania." *Id.* at 3.

42.     Justice Mundy, in dissent, also cited the Elections Clause, explaining: "In my view, the implication that this Court may undertake the task of drawing a congressional map on its own *raises a serious federal constitutional concern*." **Exhibit D** at 2 (citing U.S. Const. art. 1, § 4) (emphasis added); *see also id.* at 3.

43.     Further, she explained that "[t]he Court's order fails to give essential guidance to the General Assembly and the Governor, or this Court on how to create a constitutional, non-gerrymandered map." *Id.* at 2; *see also id.* (expressing "concern with the vagueness of the Court's [PCO].").

44.     In his Concurring and Dissenting Statement, Justice Baer "recognize[ed] that redistricting is a legislative function." **Exhibit E** at 2 (citing

15

*Butcher v. Bloom*, 203 A.2d 556, 559 (Pa. 1964) ("The task of reapportionment is not only the responsibility of the Legislature, it is also a function which can be best accomplished by that elected branch of government.")).

45.     He voiced serious concerns about the disruption, "if not chaos," that he foresaw occurring in the event that the 2011 Plan was not utilized in connection with the upcoming elections, *id.* at 2-4, and thus stated his belief that it would be "more prudent to apply our holding in this case to the 2020 election cycle, which would allow ample time for our sister branches of government to comply with our holding with guidance from our forthcoming opinion ..." *Id* at 4.

46.     Justice Baer also indicated his concerns with the Court's contemplated process, i.e. his due process concerns resulting from such contemplated procedure. *Id.*[2]

---

[2] Nor are the named Plaintiffs and the dissenting Justices the only parties concerned about the Constitutional crisis precipitated by the PCO and the subsequent orders. The Wall Street Journal's Opinion page describes the Supreme Court's "unvarnished political hubris" in invading legislative territory as nothing less than a "judicial coup d'etat" that could have implications far beyond the Commonwealth. See Wall Street Journal, Wall Street Journal, February 21, 2018, https://www.wsj.com/articles/pennsylvanias-redistricting-coup-1519170870?emailToken=37a2f67f915bf9741c577d67a4d02dcaCts5XER0BS8SyoWQwetedrCc5qpScfIhwcNZF1WQ4IaWh7nBecSLgqXfx8jxRbp4VdReJqCARjs1KhIMzDjT%2Fg%3D%3D (last visited Feb 21, 2018). Allowing a successful power grab by the Supreme Court here provides a road map and precedent for other state's high courts to continue on this dangerous vector.

47.     As a result, only four of the seven Justices of the Pennsylvania Supreme Court agreed with the PCO's remedy requiring that the newly crafted Congressional districting plan go into effect prior to the 2018 primary election cycle.[3]

### D.     The Legislative Process In Pennsylvania

48.     The PCO's requirement that the General Assembly pass a law in only 18 days created an impossible task for the General Assembly.

49.     The legislative authority of the Commonwealth of Pennsylvania is vested in the General Assembly, which consists of a State Senate and a State House of Representatives. *See* Pa. Const. art. II, § 1.

50.     Article III of Pennsylvania's Constitution governs the lawmaking process generally and, as relevant herein, includes the following requirements:

      a.  No law may be enacted unless it is passed in the form of a "bill;" Pa. Const. art. III, § 1;

      b.  A bill may not be considered unless it is "referred to a committee," and "printed for the use of the members[;]" Pa. Const. art III, § 2;

---

Similarly, the Pittsburgh Post-Gazette's Editorial Board opined that the Supreme Court "mishandled virtually every ... aspect of the case. It gave the Legislature an unrealistic timetable for drawing a new map — as Justice Baer noted — and its decision to craft its own was a naked usurpation of the Legislature's authority over the redistricting process." Map of Confusion: The Supreme Court moved too fast on new districts, Pittsburgh Post-Gazette, February 21, 2018, http://www.post-gazette.com/opinion/editorials/2018/02/21/Map-of-confusion-The-Supreme-Court-moved-too-fast-on-new-districts/stories/201802280036 (last visited Feb 21, 2018).

    c.  A bill cannot become law unless it is "considered on three different days in each House" and "on its final passage the vote [on the bill] is taken by yeas and nays[;]" Pa. Const. art. III, § 4; and

    d.  On final passage, "[t]he names of the persons voting for and against" the bill must be entered in the official journal, which must show that "a majority of the members elected to each House" voted in its favor. *Id.*

51.    Article III of Pennsylvania's Constitution also requires all legislative enactments to be submitted to the Governor for his approval before they become effective. *See* Pa. Const. art. III, § 9.

52.    The foregoing provision, however, affords the General Assembly the power to override a gubernatorial veto upon the vote of two-thirds of both chambers of the General Assembly. *See id*.

53.    Article IV, § 15 of the Pennsylvania Constitution – which further explicates the process for vetoing legislation and, if necessary, overriding such a veto – grants the Governor ten days to consider a bill and decide whether to exercise the power. *See* Pa. Const. art. IV, § 15.

54.    Collectively, these provisions of the Pennsylvania Constitution establish numerous requirements attendant to the passage of any legislation in Pennsylvania, including any legislation contemplated by the PCO.

E.     **The General Assembly's Efforts To Comply With The Supreme Court's January 22, 2018 Order**

55.     Shortly after entry of the PCO, Legislative Respondents sought a stay from the Pennsylvania Supreme Court because, among other things, the PCO did not provide sufficient guidance regarding what criteria a new map would need to satisfy to comply with Pennsylvania's Constitution.

56.     Legislative Respondents also explained that the Order provided inadequate time to enact a new map.

57.     The application for a stay was denied.

58.     On January 29, 2018, notwithstanding the Pennsylvania Supreme Court's failure to issue an opinion in support of the PCO, Senate Bill 1034 ("SB 1034") was introduced.

59.     SB 1034 was a shell bill intended to initiate the legislative process to enable the General Assembly to comply with the PCO.

60.     Then, in order to further facilitate the legislative process, on February 6, 2018 Legislative Respondents met with Governor Wolf to discuss new congressional districting legislation.

61.     On February 9, 2018, Legislative Respondents presented Governor Wolf with a new Congressional districting plan which, if it met with the Governor's approval, would form the basis legislation to be embarked upon the following week (via SB 1034).

62.    Governor Wolf waited four days, until February 13, to respond to Legislative Respondents regarding whether he would agree to their proposal.

63.    He rejected the proposed map, adding that he would veto the proposed map even if it passed the General Assembly.

64.    Legislation for a new congressional districting plan has not been enacted.

**F.    The Pennsylvania Supreme Court's February 7, 2018 Opinions**

65.    On February 7, 2018 – 16 days into the 18 day period that the Court afforded the General Assembly to draft a new congressional plan – the Court issued the promised Majority Opinion (consisting of 137 pages) as well as two Dissenting Opinions, and a Concurring and Dissenting Opinion. Copies of the Majority Opinion, the two Dissenting Opinions and the Concurring and Dissenting Opinion are attached hereto as **Exhibits F**, **G**, **H** and **I**, respectively.

66.    The Majority Opinion sets forth at length the factual history of the 2011 Plan's enactment, the results of elections conducted under the Plan, the procedural history of the Challenge, and the history of the Free and Equal Elections Clause of Pennsylvania's Constitution. *See* **Exhibit F** at 1-118.

67.    Notably, the Majority Opinion identified the historic use of certain neutral criteria in connection with crafting Pennsylvania's *legislative districts*, *id.* at 119; *see generally id.* at 119-122, before then concluding that even though these

20

criteria are memorialized nowhere within Pennsylvania's Constitution or legislative scheme for use in connection with congressional districting, their use is nevertheless mandatory:

> Consequently . . . we adopt these measures as appropriate in determining whether a congressional redistricting plan violates the Free and Equal Elections Clause of the Pennsylvania Constitution. *Therefore, an essential part of such an inquiry is an examination of whether the congressional districts created under the redistricting plan are*:
>
>> Composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population.

*Id.* at 123 (emphasis added).

68. The Majority Opinion explained that "[t]hese neutral criteria provide a 'floor' of protection for an individual against the dilution of his or her vote in the creation of such districts." *Id.*

69. The Majority Opinion also provided—for the first time in Pennsylvania's Jurisprudence—previously absent guidance concerning proper compliance with the Free and Equal Elections Clause and these newly-established mandatory criteria:

- "When … it is demonstrated that, in the creation of congressional districts, these neutral criteria have been subordinated, in whole or in part, to extraneous considerations such as gerrymandering for unfair partisan advantage, a congressional districting plan

violates [the Free and Equal Elections Clause] of the Pennsylvania Constitution." *Id.*;

- "[T]his standard does not require a showing that the creators of congressional districts intentionally subordinated these traditional criteria to other considerations in the creation of the district in order for it to violate [the Free and Equal Elections Clause]; rather, it is sufficient to establish a violation of this section to show that these traditional criteria were subordinated to other factors." *Id.* at 124;

- A congressional plan violates the Free and Equal Elections Clause when it splits 28 counties and 68 municipalities. *Id.* at 126, 128, 130;

- A congressional plan violates the Free and Equal Elections Clause when its "mean-median vote gap" is 5.9% or higher (as an acceptable range is between 0 and 4%). *Id.* at 128, 130; and

- A congressional plan violates the Free and Equal Elections Clause when its "efficiency gap" is between 15% and 24% relative to statewide vote share. *Id.* at 128, 129, 130.

- A proportional representation requirement where "all voters have an equal opportunity to translate their votes into representation." *Id.* at 100.

70.    Chief Justice Saylor, within his Dissenting Opinion, articulated profound concerns about the PCO and the Majority Opinion, concerns arising primarily from the majority's unilateral grafting of criteria applicable to Pennsylvania's legislative districts onto congressional districting in contravention of the U.S. Constitution's Elections Clause. *See* **Exhibit G**.

71.    Chief Justice Saylor explained that "the majority proceeds to overlay factors delineated by the Pennsylvania Constitution in relation to state-level

reapportionment upon congressional districting," and that "[s]ince these considerations are not constitutional commands applicable to congressional districting, the majority's approach amounts to a non-textual, judicial imposition of a prophylactic rule." *Id.* at 4; *see also id.* at 5 n.3 ("My concern is with the manner in which the majority rigidifies these factors in the congressional districting context."); *id.* ("This circumstance appears particularly troublesome because, although the state charter speaks directly to the constraints for state legislative districts, it does not mention congressional districts at all.").

72.     He also explained that "the majority opinion fails to sufficiently account for the fundamental character of redistricting, *its allocation under the United States Constitution to the political branch*, *and the many drawbacks of constitutionalizing a non-textual judicial rule*," **Exhibit G** at 7 (emphasis added), and warned: "The consideration of whether this sort of rule should be imposed by the judiciary upon *a process committed by the federal Constitution* to another branch of government seems to me to require particular caution and restraint." *Id.* at 6 (emphasis added).[4]

---

[4] Chief Justice Saylor also noted the majority's determination deviated directly from the Court's precedent, i.e. *Erfer v. Commonwealth*, 794 A.2d 325 (2002); *see also Id.* at 6 n.4, 7.

73.     Chief Justice Saylor was not alone in his concerns. Justice Mundy, too, articulated great concerns about the PCO and the Majority Opinion within her separate Dissenting Opinion. *See* **Exhibit H**.

74.     Justice Mundy's concerns are grounded primarily in two areas: (a) the majority's violation of the Elections Clause through the imposition of mandatory criteria found nowhere within Pennsylvania's Constitution or statutes on congressional districting; and (b) the extremely limited amount of time afforded the General Assembly to remedy the situation, i.e. create and enact a substitute districting plan. **Exhibit G**.

75.     With regard to the majority's application of these mandatory criteria to congressional districting, Justice Mundy explained: "The Majority concedes, '[n]either [the Free and Equal Elections Clause], nor any other provision of our Constitution, articulates explicit standards which are to be used in the creation of congressional districts' . . . . Nevertheless, the Majority holds that 'certain neutral criteria' are to be utilized in drawing congressional districts in this Commonwealth." *Id.* at 2 (internal citations omitted); *see also id.* at 3 (identifying majority's three-part test utilizing the newly-hatched mandatory criteria).[5]

---

[5] Justice Mundy also noted her puzzlement that the majority was deviating from the Court's prior decision in *Erfer*. *Id.* at 2-3.

76.     Justice Mundy also explained her "grave concerns" arising from the majority's remedy, *id.* at 3, *a remedy "inconsistent with the restraints imposed by federal law,*" *id.* at 4 (emphasis added), and a remedy Justice Mundy explained equated with "the Majority … *bestowing the task of drawing a new Congressional map onto itself in the face of a clear legislative alternative.*" *Id.* (emphasis added).

77.     Justice Mundy commenced her analysis with a discussion of the U.S. Constitution's Elections Clause, which she explained "grants the authority to draw a state's congressional districts to the state legislatures, Congress, or an independent redistricting commission." *Id.* at 5 (citing *Arizona State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2667-68 (2015)).

78.     Next, she explained the "truism that this Court possesses neither legislative function, nor authority[,]" **Exhibit G** at 6, and that the court "may not remedy any violations of [Pennsylvania's] state charter *in a manner* that the Federal Constitution prohibits. After all, federal law is supreme." *Id.* at 6 (citing U.S. Const. art. VI, cl. 2 (emphasis in original)).

79.     Justice Mundy dedicated the remainder of her Dissenting Opinion to explaining why Pennsylvania Supreme Court and federal precedent weighed strongly in favor of conducting the 2018 elections pursuant to the 2011 Plan, and why the Court should not endeavor to craft a new map in the first instance. *See generally* **Exhibit G** at 3-9; *see id.* at 3 ("I am troubled by the Majority's decision

to strike down the 2011 congressional map on the eve of the 2018 midterm election. [sic] Particularly its disregard for precedent which supports deferring redistricting until after the 2018 election."); *id.* at 5 n.3 ("But it is quite another matter for this Court to put the General Assembly on a three-week timeline without articulating the complete criteria necessary to be constitutionally compliant."); *id.* at 7 ("The [U.S. Supreme] Court's opinion in *Growe* sheds no light on whether a state court may take on the task of drawing a federal congressional map in the first instance.").

80.     Finally, while Justice Baer joined the majority in concluding that the 2011 Plan violated Pennsylvania Constitution's Free and Equal Elections Clause, within his Concurring and Dissenting Opinion he articulated his concern regarding the majority's "impos[ition of] court-designated criteria on the Legislature," *see* **Exhibit I** at 2, *id.* at 3 n.5, as well as his concern that:

> the Court's remedy threatens the separation of powers dictated by [the Elections Clause] of the United States Constitution by failing to allow our sister branches sufficient time to legislate a new congressional districting map, potentially impinges upon the due process rights of the parties at bar as well as other interested parties, and foments unnecessary confusion in the current election cycle.

*Id.* at 3.

81.     Justice Baer first noted that the Elections Clause does not imbue courts with legislative authority, *id.* at 4, and thereafter explained that because Pennsylvania's "Constitution is silent in regard to the criteria to be applied by the

Legislature in establishing congressional districts for Representatives to the United States Congress[,]" *id.* at 5:

> I am unwilling to engraft into the Pennsylvania Constitution criteria for the drawing of congressional districts when the framers chose not to include such provisions despite unquestionably being aware of both the General Assembly's responsibility for congressional districting and the dangers of gerrymandering. *It is not this Court's role to instruct the Legislature as to the 'manner of holding elections,' including the relative weight of districting criteria.*

*Id.* at 5-6 (emphasis added).

82.     Justice Baer then expressed his significant concerns arising from the remedy directed by the majority "given the substantial uncertainty, if not outright chaos" arising from such remedy. *Id.* at 8.

83.     He explained that "*the Legislature does not have a fair opportunity to act 'in the first instance' where it has less than three weeks to develop a plan,*" *id.* (emphasis added), and that "[r]ather than providing the General Assembly a reasonable opportunity to create a map and pass legislation to adopt it, the Majority has taken steps in preparation for the 'possible eventuality' that the Legislature cannot act in this compressed time frame." *Id.* at 9; *see also id.* at 8-9 (explaining why less than three weeks is not reasonable), *id.* at 10 ("[T]his Court has provided the Legislature three weeks from the initial order to produce a new map. In my view, this does not constitute a reasonable time for the Legislature to act.").

84.     And he explained that "the unambiguous grant of redistricting authority to the state legislature under [the Elections Clause] of the Federal Constitution mandates judicial restraint to allow a legislature a reasonable period of time, which should be measured in months rather than weeks, to redistrict following a determination of unconstitutionality by a court, which preferably would provide the legislative bodies a clear understanding of the nature of the original plan's unconstitutionality." *Id.* at 9; *see also id.* at 9-10 (explaining why the 2018 elections could and should be conducted under the 2011 Plan).

85.     Additionally, Justice Baer explained the grave "constitutionally-mandated due process", *id.* at 11, concerns arising from "the Court's procedure for drawing the map should the Legislature and Governor fail to produce one by the dates set forth in the January 22nd Order …" *Id.* at 10; *see generally id.* at 10-12 (detailing concerns); *id.* at 12 ("The litigation and resulting confusion that has ensued since the release of the January 22nd Order confirm my initial concerns.").

### G.     The Pennsylvania Supreme Court's February 19, 2018 Congressional Districting Plan

86.     On February 19, 2018, the Pennsylvania Supreme Court issued a congressional districting plan, ordering that it be used for use in the upcoming primary and general elections (the "Court Drawn Plan"). A copy of the Court Drawn Plan is attached hereto as **Exhibit J**.

87.     Astoundingly, the Court Drawn Plan does not appear to comply with the PCO or the Majority Opinion.

88.     Far from being free of politics, it appears that every choice made in the Court Drawn Plan was to pack Republicans into as few districts as possible, while advantaging Democrats.

89.     For example, this graphic from Nate Cohn, a professional political analyst, helps to illustrate this point:

**Tweet**

 **Nate Cohn** ✔
@Nate_Cohn

Since some have asked, here are some of the Democratic-friendly choices on the new PA map, along with the more Republican alternatives. All are defensible, but it's hard to find anything that broke the GOP's away. (and these are mainly micro-level choices, not big picture)



2/20/18, 6:04 PM from Manhattan, NY

90. Similarly, political analyst David Wasserman of the Cook Political Report explained:



**Dave Wasserman** ✔
@Redistrict

Bottom line: the PA Supreme Court's map doesn't just undo the GOP's gerrymander. It goes further, actively helping Dems compensate for their natural geographic disadvantage in PA.

2/19/18, 4:25 PM

**302** Retweets **640** Likes

91.    Below are three additional graphics showing a similar analysis using[6]:

- 2016 Presidential data only, Figure 1, 2008 – 2010 statewide election data, Figure 2, and 2012, 2014 and 2016 election data, Figure 3.

---

[6] The arrows on the maps indicate those areas that are most egregiously altered in order to overcome Republicans' natural geographic political advantage for the benefit of Democrats.



*Figure 1: Pennsylvania 2016 Presidential Votes Only.*



*Figure 2: 2008 – 2010 Statewide Election Data*



*Figure 3: 2012, 2014 and 2016 Election Data.*

92.    The Defendants in this case are now charged with implementing a Congressional districting plan developed in violation of the U.S. Constitution.

## COUNT I
### Violation of the Elections Clause -- Usurpation of Legislative Authority

93.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

94.    The U.S. Constitution's Elections Clause provides that "[t]he Times, Places and Manner" of congressional elections "shall be prescribed in each State by the Legislature thereof" unless "Congress" should "make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1.

95.    The U.S. Supreme Court has consistently held "that redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking." *Arizona State Leg.*, 135 S. Ct. at 2668.

96.    The state legislature of Pennsylvania is the General Assembly, which is comprised of two chambers: the House of Representatives and the Senate.

97.    The Pennsylvania Supreme Court does not exercise a legislative function when it decides cases. *See Watson v. Witkin*, 22 A.2d 17, 23 (Pa. 1941); *see also Agre v. Wolf*, No. CV 17-4392, 2018 WL 351603 (E.D. Pa. Jan. 10, 2018) Smith, CJ,) (detailing the Elections Clause, including its origins and history, and ultimately concluded that it proscribed judicial legislation of this nature).

98. Through the PCO and the Majority Opinion, the Pennsylvania Supreme Court has legislated criteria the Pennsylvania General Assembly must satisfy when drawing a congressional districting plan, i.e. contiguity, compactness and limitation of political subdivision splits, *see* **Exhibits B** and **F**, and seized upon these very criteria in invalidating the 2011 Plan.

99. These standards amount to mandatory redistricting criteria found nowhere within Pennsylvania's Constitution or legislative scheme.

100. No Pennsylvania legislative process—not the General Assembly itself, not a constitutional convention, not a referendum, not even an administrative agency with delegated rulemaking authority—adopted or ratified these legislative criteria newly-adopted by the Pennsylvania Supreme Court.

101. Indeed, the Pennsylvania Supreme Court has previously confirmed that, in the "context of Congressional reapportionment," there are "*no analogous, direct textual references to such neutral apportionment criteria.*" *Erfer*, 794 A.2d at 334 n.4 (emphasis added).

102. Moreover, the PCO establishes that the Court would assume supervisory authority over the General Assembly because even if the General Assembly and the Governor enacted a new congressional districting plan, the Pennsylvania Supreme Court reserved for itself the right to strike that plan—thereby only further injecting itself into the legislative process. *See* **Exhibit F**.

36

103.   For these reasons, the Pennsylvania Supreme Court has impermissibly usurped the Election Clause's express grant of exclusive authority to the General Assembly (and the people of Pennsylvania) – as noted by multiple Justices of the Pennsylvania Supreme Court.

## COUNT II
### Violation of the Elections Clause -- Failing to Afford the General Assembly an Adequate Opportunity to Enact a Remedial Plan

104.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

105.   The United States Supreme Court has held that "[i]n fashioning a reapportionment plan or in choosing among plans," a court "should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" *Upham v. Seamon*, 102 S. Ct. at 1521 (internal citations omitted).

106.   Thus, before assuming the legislature's role and implementing a reapportionment plan, a court is required to initially provide the legislature with an "adequate opportunity to" draft a plan. *Id*.

107.   The Pennsylvania Supreme Court provided the General Assembly with only 18 days (14 business days) to pass new congressional districting legislation. *See* **Exhibit B**.

108.   Moreover, the Pennsylvania Supreme Court did not issue its Majority Opinion – and the guidance contained therein as to the parameters it would use to adjudicate constitutionality – until February 7, 2018. *See* **Exhibit F**.

109.   As a result, the General Assembly did not know the criteria that any new Congressional districting plan would have to satisfy to be constitutional until only 2 days before the General Assembly was required to pass legislation containing that plan.

110.   As described above, passage of legislation through both chambers of the Pennsylvania General Assembly requires that several steps be satisfied, steps which would be impossible to complete given the Court's actions.

111.   Because the Majority Opinion describing the constitutional deficiencies in the 2011 Plan was issued only two days before the deadline imposed by the PCO for the passage of remedial legislation, it was impossible for the General Assembly to pass legislation that simultaneously: (A) accounted for and incorporated the Pennsylvania Supreme Court's analysis; (B) complied with the PCO and Majority Opinion; and (C) satisfied the Pennsylvania Constitution's requirement that legislation be considered on three separate days prior to its enactment. *See* Pa. Const. art. III, § 4 ("Every bill shall be considered on three different days in each House.").

112.   While Legislative Respondents made every effort to pass remedial legislation, the Pennsylvania Supreme Court did not provide an adequate opportunity for them to do so.

113.   In addition to leaving insufficient time to properly enact legislation, the Pennsylvania Supreme Court's actions also eliminated any opportunity for Pennsylvania's legislative process to properly run its course by leaving insufficient time for any proposed legislation to be vetoed by the Governor and overridden by the General Assembly.

114.   As a result, the Pennsylvania Supreme Court, through the PCO and otherwise, violated the Elections Clause – as noted by multiple Justices of the Pennsylvania Supreme Court, who dissented from the Court's imposition of a judicial map. Copies of the Dissenting Opinions are attached hereto as **Exhibits K, L** and **M**, respectively.

115.   For instance, Justice Baer "conclude[d] that the compressed schedule failed to provide a reasonable opportunity for the General Assembly to legislate a new map in compliance with the federal Constitution's delegation of redistricting authority to state legislatures." **Exhibit M, at 2** (citing U.S. Const. art. I, § 4).

116.   Justice Mundy noted her continued objection to the PCO and the ensuing chaos, writing "I cannot agree that the Legislature was afforded the time

necessary to accomplish the immense task of redistricting in accordance with the criteria imposed by this Court." **Exhibit L, at 2.**

117.   And Chief Justice Saylor wrote that "the displacement to the judiciary of the political responsibility for redistricting -- which is assigned to the General Assembly by the United States Constitution -- *appears to me to be unprecedented*." **Exhibit K, at 2** (Emphasis added)

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court render a judgment in their favor and grant the following relief:

(1)   Enjoining Defendants from implementing any congressional redistricting scheme arising from the Pennsylvania Supreme Court's Court Drawn Plan;

(2)   Ordering Defendants to conduct the 2018 primary and general Congressional elections in full accordance with the 2011 Plan; and

(3)   Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/Brian S. Paszamant
Brian S. Paszamant (PA 78410)
Jason A. Snyderman (PA 80239)
BLANK ROME LLP
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Ph: (215) 569-5791
Fax: (215) 832-5791
Email: paszamant@blankrome.com
snyderman@blankrome.com

Matthew H. Haverstick
  (PA 85072)
Mark E. Seiberling (PA 91256)
Paul G. Gagne (PA 42009)
Shohin H. Vance (PA 323551)
KLEINBARD LLC
One Liberty Place, 46th Floor
1650 Market Street
Philadelphia, PA 19103
Ph: (215) 568-2000
Email: mhaverstick@kleinbard.com
mseiberling@kleinbard.com
pgagne@kleinbard.com
svance@kleinbard.com

Jason Torchinsky (*pro hac vice application pending*)
Shawn Sheehy (*pro hac vice application pending*)
HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Ph: (540) 341-8808
Fax: (540) 341-8809
Email: jtorchinsky@hvjt.law
ssheehy@hvjt.law

Joshua J. Voss (PA 306853)
KLEINBARD LLC
115 State Street, 2nd Floor
Harrisburg, PA 17101
Ph: (717) 836-7492
Fax: (215) 568-0140
Email: jvoss@kleinbard.com

*Counsel for Federal Plaintiffs*

Dated: February 22, 2018

*Counsel for State Plaintiffs*

## **VERIFICATION**

I, Jacob Corman, on behalf of Plaintiffs in this matter, do hereby verify that the facts and information set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements made herein are subject to the penalties of 28 U.S.C. § 1746 relating to unsworn declarations to authorities.

Dated: 2/21/18

Jacob Corman

## **VERIFICATION**

I, Michael Folmer, on behalf of Plaintiffs in this matter, do hereby verify

that the facts and information set forth in the foregoing Complaint are true and

correct to the best of my knowledge, information and belief. I understand that

false statements made herein are subject to the penalties of 28 U.S.C. § 1746

relating to unsworn declarations to authorities.

Dated: 2/21/18

Michael Folmer

## VERIFICATION

I, Ryan Costello, on behalf of Plaintiffs in this matter, do hereby verify that the facts and information set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements made herein are subject to the penalties of 28 U.S.C. § 1746 relating to unsworn declarations to authorities.


Dated:  ___2|21|18___          _____
                                Ryan Costello