maintains serves as a good guide, claiming that it meets or exceeds the 2011 Plan based on traditional redistricting criteria, and provides sufficient data to judge its compliance with traditional districting criteria, as well as federal Voting Rights Act requirements. Stack Brief at 10-15, 39. Respondent Stack offers that this Court should retain a special master, who could reference Dr. Chen's map as a guide in drawing a new map, should the legislature fail to produce a map in a timely fashion.

*Amicus* Common Cause, like Petitioners, contends that the 2011 Plan violates the Free and Equal Elections Clause of the Pennsylvania Constitution, asserting that this clause provides greater protections to the right to vote than the federal Equal Protection Clause.

Relying upon our seminal decision in *Edmunds*, *supra*,[57] which provides the framework for analyzing whether a right under the Pennsylvania Constitution is more expansive than its federal counterpart, Common Cause first argues that the text of the Free and Equal Elections Clause demonstrates that it should be viewed as independent from the Equal Protection Clause of the United States Constitution. Common Cause notes that, in contrast to the more general provisions of the Pennsylvania Constitution such as Article I, Sections I and 26, which implicate, but do not specifically address, the

---

[57] *Edmunds* instructs that an analysis of whether a right under the Pennsylvania Constitution affords greater protection than the United States Constitution encompasses the following four factors:

1) text of the Pennsylvania constitutional provision;

2) history of the provision, including Pennsylvania case-law;

3) related case-law from other states;

4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.

*Edmunds*, 586 A.2d at 895.

right to vote, Article I, Section 5's proclamation that "[e]lections shall be free and equal" and that "no power . . . shall at any time interfere to prevent the free exercise of the right of suffrage" is direct and specific, indicating that the clause should not be "subsumed into Sections 1 and 26, let alone federal jurisprudence."  Common Cause Brief at 6-7.

Second, Common Cause argues that the history of the Free and Equal Elections Clause supports giving it independent effect.  Specifically, Common Cause highlights that, since as early as 1776, Pennsylvania has recognized the importance of the right to vote, providing in Chapter I, Section VII of the Declaration of Rights that "all elections ought to be free; and that all free men having a sufficient evident common interest with, and attachment to the community, have a right to elect officers, or to be elected into office."  *Id.* (quoting Pa. Const. of 1776, ch. I, § VII).  Common Cause continues that, in 1790, Pennsylvania adopted the Free and Equal Elections Clause into its Constitution, but the federal Constitution was, and continued to be, largely silent regarding the right to free and equal elections, containing no comparable provision and leaving "the selection of representatives and senators largely to the states, subject to minimum age and eligibility requirements."  *Id.* at 8-9.  While the United States later adopted the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Common Cause stresses that it did not do so until 1868 — many decades after Pennsylvania had declared free and equal elections a fundamental right.  Thus, in light of the temporal differences between the two provisions and the fact that the federal Equal Protection Clause does not specifically address elections, Common Cause maintains that the Free and Equal Elections Clause and the federal Equal Protection Clause should not be viewed as coterminous.

Common Cause also suggests that Pennsylvania case law supports giving the Free and Equal Elections Clause independent effect, noting that this Court has

interpreted the clause since as early as the 1860s, when the Court explained that elections are made equal by "laws which shall arrange all the qualified electors into suitable districts, and make their votes equally potent in the election; so that some shall not have more votes than others, and that all shall have an equal share in filling the offices of the Commonwealth." *Id.* at 11 (quoting *Patterson v. Barlow*, 60 Pa. 54, 75 (Pa. 1869)). This Court further provided, with respect to the concept of legislative deference under the Free and Equal Elections Clause, that, although the General Assembly enjoys discretion in creating laws to ensure that elections are equal, the legislature's actions in this regard may be reviewed "in a case of plain, palpable, and clear abuse of the power which actually infringes on the rights of the electors." *Id.* (quoting *Patterson*, 60 Pa. at 75). Common Cause additionally highlights that our case law historically has recognized that the creation of "suitable districts" in accordance with the Free and Equal Elections Clause relies heavily on "the guiding principles respecting compactness, contiguity, and respect for the integrity of political subdivisions." *Id.* at 13 (quoting *Holt I*, 38 A.3d at 745). Given the significant amount of time between the passage of the Free and Equal Elections Clause and the Fourteenth Amendment to the United States Constitution, as well as the separate attention that our Court has given to the Free and Equal Elections Clause, Common Cause suggests that "[i]t is incoherent to assume that Pennsylvania's jurisprudence under the [Free and Equal Elections Clause] disappeared into the Fourteenth Amendment." *Id.* at 11.

Third, Common Cause argues that the relative dearth of case law from other jurisdictions regarding free and equal elections illustrates that Pennsylvania was a "trailblazer in guaranteeing the right to vote," noting that, of the original 13 states, only the Pennsylvania, Delaware, and Massachusetts Constitutions contained a clause guaranteeing free and equal elections. *Id.* at 14. While Common Cause offers that at

least one other state — Alaska — has found that its state constitution provides greater protection against gerrymandering than the federal Constitution, *see Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1371 (Alaska 1987), Common Cause suggests that the general lack of comparable provisions in other state constitutions indicates that, "[a]s in 1776, Pennsylvania should lead the states in declaring the right to free and fair elections, this time by stamping out gerrymandering."  Common Cause Brief at 14.

Lastly, Common Cause asserts that the Pennsylvania Constitution defeats traditional policy arguments made in support of the practice of gerrymandering, such as the purported difficulty in identifying a workable standard to assess constitutional violations and the notion of legislative deference in drawing congressional districts. More specifically, with respect to the difficulty of identifying a standard, Common Cause submits that the three criteria long used for drawing voting districts in Pennsylvania — compactness, contiguity, and integrity of political subdivisions — provide a sufficient standard by which to assess whether an electoral map violates the Free and Equal Elections Clause.  Common Cause stresses that, because these criteria are specifically written into the Pennsylvania Constitution, *see* Pa Const. art. II, § 16 ("representative districts . . . shall be composed of compact and continuous territory as nearly equal in population as practicable . . . . Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district"), and have provided the basis for invalidating state legislative district maps in the past, *see Holt I*, *supra*, they are sufficiently precise as to present a feasible standard for evaluating the constitutionality of a congressional district map under the Free and Equal Elections Clause.  Additionally, regarding the principle of legislative deference, Common Cause argues that legislative deference does not give the General Assembly unfettered discretion to engage in partisan gerrymandering

without judicial interference, noting that, unlike the federal Constitution, Pennsylvania's Constitution specifically requires the Court to review challenges to state legislative district maps. *See* Pa. Const. art. II, § 17(d). While Common Cause concedes that the legislature typically enjoys substantial deference in redistricting matters, it maintains that such deference is not warranted in circumstances, such as in the instant case, where the "faction in control of the legislature" used its authority to create political advantage, rather than to create a map which reflects the "true will of the people." Common Cause Brief at 17.

Asserting that the four *Edmunds* factors support giving the Free and Equal Elections Clause independent effect, Common Cause concludes that the 2011 Plan violates that provision because, as exhibited by Petitioners' evidence, it is not compact or contiguous, nor does it respect political subdivision boundaries. Moreover, Common Cause asserts that the secretive manner in which the Plan was created strongly suggests that the legislature drew the congressional districts with the improper, highly partisan motive of benefitting the Republican Party, rather than doing so with the will of the people in mind. Under these circumstances, Common Cause argues that this Court should uphold the democratic principles of the Pennsylvania Constitution and strike down the gerrymandered Plan pursuant to the Free and Equal Elections Clause.

*Amicus* Brennan Center for Justice ("Brennan Center") likewise argues on behalf of Petitioners that this Court can, and indeed should, strike down the 2011 Plan as unconstitutional. In so asserting, Brennan Center emphasizes that, although some degree of good faith political "give-and-take" is bound to occur with the redistricting process, this case presents a particularly extreme, unconstitutional form of partisan gerrymander which must be remedied by this Court. While the Commonwealth Court below highlighted the difficulty with identifying a workable standard to assess when,

precisely, partisan gerrymandering becomes unconstitutional, Brennan Center maintains that "judicial action to stamp out extreme gerrymanders can be focused and limited," Brennan Center Brief at 6, explaining that cases of extreme, unconstitutional gerrymandering are relatively rare and are easily detectable based upon two, objective indicia: single-party control of the redistricting process and a recent history of competitive statewide elections.  *Id.* at 7.  Brennan Center observes that these factors have been present in every state in the past decade which had a congressional districting map showing extreme partisan bias, including Pennsylvania during the creation of the 2011 Plan.  Brennan Center further offers that other accepted quantitative metrics, such as the efficiency gap, the seats-to-votes curve, and the mean-median vote share, can measure the level of partisan bias in a state and assist in identifying extreme gerrymandering, noting that the 2011 Plan performed poorly under each of these metrics.

While Brennan Center acknowledges that federal courts have been hesitant to exercise jurisdiction over partisan gerrymandering claims because of concerns over federalism and excessive burdens on the federal docket, Brennan Center suggests that this Court is not subject to the same constraints.  Moreover, Brennan Center highlights that the political question doctrine, which has also hamstrung federal courts in partisan gerrymandering cases, does not restrict this Court from acting in such cases, as this Court held that the political question doctrine renders a case non-justiciable only when the Pennsylvania Constitution "explicitly or implicitly" demonstrates "the clear intent to entrust the legislature with the sole prerogative to assess the adequacy of its own effort[s]," *id.* at 19 (quoting *William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 170 A.3d 414, 439 (Pa. 2017)), and the Pennsylvania Constitution contains no such limitation with regard to interpreting the constitutionality of partisan congressional redistricting.

Finally, Brennan Center contends that extreme partisan gerrymandering, such as in the instant case, is "contrary to fundamental constitutional and democratic values," undermining both legislative accountability to the people and legislative representativeness. *Id.* at 15. Brennan Center asserts that finding the Plan unconstitutional in this case will "enhance the legitimacy of Pennsylvania's democracy" and restore confidence among Pennsylvanians in the political process. *Id.* at 23.

Similar to the points raised by Petitioners, as *amicus*, the AFL-CIO argues that the 2011 Plan is unconstitutional under Article I, Sections 7 and 20 and Article I, Section 5 of the Pennsylvania Constitution, which it asserts provides an independent basis for relief. The AFL-CIO further suggests that Article I, Section 1 of the Pennsylvania Constitution, which ensures equality under the law, and Article I, Section 26 of the Pennsylvania Constitution, which protects Pennsylvanians against the denial or discrimination of their civil rights, provide additional bases for relief under state law and support reviewing the Plan under strict scrutiny.

Analyzing each of these provisions pursuant to the *Edmunds* factors, the AFL-CIO highlights the rich history of the Pennsylvania Constitution, including, most notably, that the Pennsylvania Constitution was at the forefront of ensuring robust rights associated with representational democracy, such as the right to freedom of speech and association, the right to equality under the law, and the right to vote in free and equal elections, which the AFL-CIO notes Pennsylvania extended, quite remarkably, to those individuals who did not own property. Moreover, with respect to the Free and Equal Elections Clause, the AFL-CIO emphasizes that this Court has specifically stated that elections are free and equal:

> when they are public and open to all qualified electors alike:
> when every voter has the same right as any other voter;
> when each voter under the law has the right to cast his ballot
> and have it honestly counted; when the regulation of the

> right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him.

AFL-CIO Brief at 20-21 (quoting *Winston v. Moore*, 91 A. 520 at 523 (Pa. 1914)). The AFL-CIO maintains that the unique history of these provisions demonstrates that they "provide heightened protections beyond any analogous provisions in the federal constitution," and, thus, provide a separate legal basis for finding the 2011 Plan unconstitutional. *Id.* at 4.

*Amici* Bernard Grofman, professor of political science at the University of California, and Keith Gaddie, professor of political science at the University of Oklahoma, echo the call of Petitioners, Executive Respondents, and other *amici* for this Court to act and provide a check on extreme partisan gerrymandering, highlighting its pernicious nature. Grofman and Gaddie also provide a suggested standard for assessing partisan gerrymandering cases, proposing that a partisan gerrymander is unconstitutional if each of the following three elements is shown: (1) partisan asymmetry, meaning the districting map had a "disparate impact on voters based on political affiliation," as measured by degree of partisan bias and mean-median gap, Grofman Gaddie Brief at 14; (2) lack of responsiveness of electoral outcomes to voters' decisions, meaning representation does not change despite a change in voter preference from one political party to another; and (3) causation, meaning intentional discrimination, rather than other, neutral causes, led to the asymmetry and lack of responsiveness. Grofman and Gaddie maintain that their standard is judicially manageable, as it can be applied by courts "coherently and consistently" across cases, and they urge this Court to adopt it. *Id.* at 36.

Also, as *amicus*, the American Civil Liberties Union ("ACLU") argues in support of Petitioners that the 2011 Plan violates the free expression and association clauses of

the Pennsylvania Constitution, asserting, consistent with Petitioners' position, that the Pennsylvania Constitution provides greater protections for these rights than does the First Amendment to the United States Constitution. The ACLU also notes the unique nature of the Pennsylvania Constitution's Free and Equal Elections Clause, which, it suggests, grants more robust protections for the right to vote than the federal Constitution. Further, as a matter of policy, the ACLU suggests that greater protections for speech, associational, and voting rights are consistent with the "marketplace of ideas" concept developed by Justice Oliver Wendell Holmes, which, the ACLU notes, highlights the importance of government viewpoint neutrality in maintaining the free exchange of ideas critical to our democracy, particularly where the electoral process is at stake. ACLU Brief at 6-9.

Similar to Petitioners, the ACLU maintains that extreme partisan gerrymandering is unconstitutional, explaining that unconstitutional partisan gerrymandering is "distinct from the inevitable incidental political considerations and partisan effects that may occur," *id.* at 22, and, instead, occurs when a state acts with an intent to "entrench" by drawing district "lines for the purpose of locking in partisan advantage regardless of the voters' likely choices." *Id.* at 22-23 (citing *Arizona State Legislature*, 135 S. Ct. at 2658). The ACLU suggests that such political entrenchment was present in the instant case, and it maintains that the General Assembly's deliberate effort to discriminate against minority-party voters triggers strict scrutiny, which the ACLU notes the Legislative Respondents have made no effort to satisfy. Thus, the ACLU argues that this Court should find the Plan violates the Pennsylvania Constitution.

Additionally, Political Science Professors,[58] the Pittsburgh Foundation,[59] and Campaign Legal Center have each filed *amicus curiae* briefs in support of Petitioners. These *amici* focus largely on the increasing prevalence of partisan gerrymandering occurring across the United States, which they attribute to sophisticated, ever-evolving technology which makes it more feasible than ever to gather specific data about voters and to utilize that data to "tailor durably biased maps." Political Science Professors' Brief at 12. These *amici* warn that instances of extreme partisan gerrymandering will only worsen as this technology continues to develop.

Turning to the 2011 Plan, these *amici* all agree that it represents a particularly egregious form of partisan gerrymandering. They suggest that the challenge to the Plan is justiciable under the Pennsylvania Constitution, and they assert that judicially manageable standards exist by which to assess the constitutionality of the Plan. More specifically, the Pittsburgh Foundation offers that a congressional redistricting plan is unconstitutional if it: "(1) was intentionally designed predominantly to attain a partisan result; (2) largely disregards traditional and accepted districting criteria; and (3) has been demonstrated (or is reliably predicted) to have an actual disparate and unfair impact on a substantial number of Pennsylvania voters." Pittsburgh Foundation Brief at

---

[58] Political Science Professors identify themselves as "nationally recognized university research scholars and political scientists from some of the foremost academic institutions in Pennsylvania and from across the country whose collective studies on electoral behavior, voter identity, and redistricting in the United States have been published in leading scholarly journals and books." Political Science Professors' Brief at 1.

[59] The Pittsburgh Foundation is a non-profit organization which "works to improve the quality of life in the Pittsburgh region by evaluating and addressing community issues, promoting responsible philanthropy, and connecting donors to the critical needs of the community." The Pittsburgh Foundation, http://pittsburghfoundation.org (last visited Jan. 29, 2018).

13. Political Science Professors submit that courts should use computer simulations, as well as objective, social science measures, to assess a districting map's partisan bias, such as the efficiency gap and the mean-median difference. Lastly, Campaign Legal Center argues that this Court should adopt Petitioners' proposed standard.[60]

## B. Legislative Respondents

We now turn to the arguments of the Legislative Respondents. They contend that districting legislation, such as the 2011 Plan at issue, does not implicate, let alone violate, free speech or associational rights because it "is not directed to voter speech or conduct." Legislative Respondents' Brief at 23. Rather, according to Legislative Respondents, the Plan creates "18 equipopulous districts," giving Petitioners' votes the same weight as other Pennsylvania voters and fully allowing Petitioners to participate in the political process by voting for the candidate of their choice and associating with any political party or candidate they so choose. *Id.*

Regarding Petitioners' reliance on cases involving laws which made speech less effective, Legislative Respondents suggest those decisions are inapplicable to the case at bar because they concern laws which actually restricted speech, whereas the Plan in the instant case allows Democrats to communicate as desired through such means as voting for their preferred candidates, joining the Democratic Party, contacting their representatives, and financially supporting causes they care about. Although Legislative Respondents concede that the Plan might make it more difficult for Petitioners to "persuade a majority of the other 705,000+ voters in their districts to agree with them on the candidate they prefer," *id.* at 25, they emphasize that Petitioners have no free speech or associational right to "an agreeable or more persuadable audience,"

---

[60] The application to file an amicus brief *nunc pro tunc*, filed by Concerned Citizens for Democracy, is granted.

*id.* at 26, citing a variety of federal cases holding that the redistricting plans challenged therein did not violate voters' First Amendment rights. *Id.* (citing, *e.g.*, *League of Women Voters v. Quinn*, No. 1:11-CV-5569, 2011 WL 5143044, *12-13 (N.D. Ill. Oct. 28, 2011); *Comm. for a Fair and Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp.2d 563, 575 (N.D. Ill. 2011)).

Moreover, relying on this Court's decision in *Holt v. 2011 Reapportionment Commission*, 67 A.3d 1211 (Pa. 2013) ("*Holt II*"), Legislative Respondents highlight the "inherently political" nature of redistricting, which, they note, this Court found constitutionally permissible. Legislative Respondents' Brief at 27 (quoting *Holt II,* 67 A.3d at 1234). Further, to the extent that Petitioners distinguish in their argument between permissible "political considerations" and what they deem impermissible "partisan intent," Respondents maintain that "the two concepts are inextricably intertwined," as "political parties are comprised of constituencies, which in part includes 'communities of interest' — what Petitioners argue is the 'good' side of 'political.'" *Id.* at 28. As such, Legislative Respondents contend that Petitioners' argument that no partisan considerations should be permitted during the redistricting process runs afoul of *Holt II* and necessarily must fail. They suggest that, to find otherwise, would allow any Pennsylvania voter to challenge, and potentially invalidate, a plan designed to protect an incumbent or to protect "communities of interest" — a "sweeping rule" that Respondents contend is not justified by the law, the facts, or public policy. *Id.* at 29-30.

Next, Respondents assert that Petitioners cannot satisfy the requirements of a retaliation claim. Relying upon the *Uniontown Newspapers* test, Legislative Respondents first argue that Petitioners fail to provide record evidence establishing that the 2011 Plan was enacted with a retaliatory motive to coerce Democratic voters into voting differently than they would otherwise vote. To the contrary, Respondents

maintain that no legislature would reasonably believe that gerrymandering would coerce voters to vote differently, and they further submit that the record demonstrates that the Plan was passed with bipartisan support, indicating the Plan was not drawn with a "dastardly motive." *Id.* at 31. Respondents also contend that Petitioners failed to prove that the Plan "chilled" a person from continuing to participate in the political process, as the evidence of record did not show a decrease in voter turnout or civil participation following the Plan's enactment. Lastly, Legislative Respondents highlight the fact that political gerrymandering is not typically the type of government conduct associated with a case of retaliation; rather, Respondents note that retaliation claims typically involve overt actions intended to invoke fear in the target, such as police intimidation tactics or organized harassment campaigns.

Next, Legislative Respondents assert that Petitioners failed to prove that the 2011 Plan violated the equal protection and Free and Equal Elections clauses of the Pennsylvania Constitution. Relying upon *Erfer*, Respondents contend that Petitioners produced no evidence that the Plan was designed to intentionally discriminate against Democratic voters, emphasizing the bipartisan manner in which the Plan was adopted, and claiming that Petitioners' statistical data does not account for the various non-partisan factors considered in drawing the Plan, such as preserving the core of existing districts, preserving communities of interest, and protecting incumbents. Respondents also suggest that Democratic voters do not constitute an "identifiable political group" because they encompass a wide range of people beyond those who belong to the Democratic Party, and because Pennsylvania voters frequently split their tickets between Democratic and Republican candidates, making it difficult to clearly identify a voter as solely "Democratic."

With respect to the second *Erfer* prong, Respondents maintain that Petitioners failed to establish that the Plan had a discriminatory effect on Democratic voters and, more specifically, failed to prove that the Plan resulted in a lack of political power which effectively shut out Democrats from the political process. Respondents argue that, contrary to Petitioners' assertions, this Court specifically found that merely voting for a political candidate who loses an election does not shut out a voter from the political process*, see Erfer*, 794 A.2d at 333, and they submit that, in any event, the five "safe" Democratic seats in the congressional delegation demonstrate that Democrats are not shut out. Respondents further observe that, although Petitioners suggest, due to congressional polarization, that Democrats' interests are not adequately represented by their congressmen, they fail to provide evidence substantiating this claim and fail to identify the interests of Democratic voters which allegedly are not represented in congress, particularly those Democrats who are "split ticket" voters.

Moreover, to the extent that Petitioners suggest that the second element of the *Erfer* test should be eliminated as unworkable, Respondents maintain that we should deny their request, claiming that Petitioners seek to eliminate that element because they are simply unable to meet it. Respondents further argue that, in advocating for the removal of the second element, Petitioners essentially are seeking a state constitutional right to proportional representation, which the United States Supreme Court expressly rejected in *Bandemer*. *See Bandemer*, 478 U.S. at 139. In any event, Respondents emphasize that Petitioners have not met their burden of establishing that this Court should depart from *Erfer* and the federal precedent upon which it relies, as the equal protection guarantees under the United States and Pennsylvania Constitutions are coterminous, and Petitioners do not suggest otherwise.

Respondents further assert that, even if this Court were to abandon the standard articulated in *Erfer*, Petitioners' claim would nevertheless fail because, pursuant to recent United States Supreme Court precedent, there is no judicially manageable standard by which to evaluate claims involving equal protection violations due to partisan gerrymandering. *See Vieth*, 541 U.S. at 292. Respondents observe that Petitioners do not attempt to offer a judicially manageable standard to apply in place of the *Erfer* standard, and they note that the standards proposed by *amici* are similarly unavailing, as they each are incompatible with each other.

Additionally, Legislative Respondents contend that policy considerations weigh heavily against this Court creating a new standard for evaluating partisan gerrymandering claims under Pennsylvania's equal protection clause, as they claim the legislature is uniquely competent to engage in redistricting, and judicial oversight in this area implicates separation-of-powers concerns. Respondents further suggest that there are a variety of positive elements to using political considerations in redistricting, including preserving "core constituencies" and incumbency, as well as the states' right to establish their districts in the manner they so choose. Moreover, Legislative Respondents highlight various checks on the state redistricting process, such as the "Make or Alter" provision of the federal Elections Clause of the United States Constitution,[61] the threat of political retaliation when the political tides turn, and, as in Pennsylvania, legislation which establishes a bi-partisan commission to draw district lines. Nevertheless, should this Court decide to select a new standard, Legislative Respondents submit that they should receive a new trial.

---

[61] See supra p. 5.

Legislative Respondents conclude by cautioning that this Court should not adopt legal criteria for redistricting beyond those in Pennsylvania's Constitution, claiming that doing so would infringe on the legislative function and run afoul of the federal Elections Clause. Accordingly, Respondents ask our Court to affirm the Commonwealth Court's decision and find that Petitioners did not demonstrate that the 2011 Plan clearly, plainly, and palpably violates the Constitution.

## C. Intervenors

Intervenors — Republican voters, candidates for office, committee chairpersons, and other active members of the Republican Party — stress that they have invested substantial time, money, and effort in preparing for the upcoming election deadlines based upon the 2011 Plan, and they suggest that this Court should not require a new congressional map before the 2018 primaries, as it would be a "monumental task" to educate voters about changes in the congressional districts in time for the election. Intervenors' Brief at 17. Intervenors also highlight potential problems with overall voter confusion, as well as various challenges congressional candidates would face as a result of changes to the 2011 Plan during this election cycle, including potentially having to circulate new nomination petitions and having to direct their campaign activities to potentially new voters and demographics. While Executive Respondents maintain that the date of the primary could be extended, Intervenors contend that an extension imposed this late in the election cycle would "result in significant logistical challenges for county election administrators," as well as substantially increase the costs borne by state and county governments. *Id.* at 29. According to Intervenors, the above-described challenges would be particularly pronounced with respect to the special election for the 18th Congressional District, scheduled for March 13 of this year.

While Intervenors would find, based upon *Vieth*, that Petitioners have not shown that their partisan gerrymandering claims are justiciable, should this Court nevertheless find the claims justiciable and the 2011 Plan unconstitutional, they argue that we must give the legislature the first opportunity to correct the Plan, as ordering new districts without giving the legislature the chance to rectify any constitutional violations would raise separation-of-powers concerns. In doing so, Intervenors assert that our Court should follow the standard for relief that this Court endorsed in *Butcher v. Bloom*, 203 A.2d 556 (Pa. 1964), wherein, after finding that the state redistricting plan violated *Reynolds*, *supra*, our Court declined to order immediate redistricting in light of the "[s]erious disruption of orderly state election processes and basic governmental functions" that would result from the Court's immediate action. Intervenors' Brief at 17 (quoting *Butcher*, 203 A.2d at 568). Instead, Intervenors note this Court opted to leave the plan in place until after the upcoming election so as to allow the legislature to have a "reasonable opportunity to enact new reapportionment legislation," giving the legislature almost a full year to do so. *Id.* at 23 (quoting *Butcher*, 203 A.2d at 569).

Claiming that the same concerns in *Butcher* are present in the instant case, Intervenors submit that we should likewise give the legislature a reasonable and adequate time in which to correct the Plan, which they suggest could be in place for the 2020 elections. Further counseling against the immediate remedying of the 2011 Plan's constitutional deficiencies, Intervenors highlight the fact that Petitioners, without explanation, waited three election cycles (almost seven years) to bring their claims, indicating that any constitutional issues are not pressing. Intervenors also cite the United States Supreme Court's pending decision in *Gill*, which they note may impact the resolution of this case.

## V. Analysis

We begin our analysis of the challenge to the 2011 Plan with the presumption that the General Assembly did not intend to violate the Pennsylvania Constitution, "in part because there exists a judicial presumption that our sister branches take seriously their constitutional oaths." *Stilp v. Commonwealth*, 905 A.2d 918, 938-39 (Pa. 2006); *see also* 1 Pa.C.S. § 1922(3). Accordingly, a statute is presumed to be valid, and will be declared unconstitutional only if the challenging parties carry the heavy burden of proof that the enactment "clearly, palpably, and plainly violates the Constitution." *See West Mifflin Area School District v. Zahorchak,* 4 A.3d 1042, 1048 (Pa. 2010).

Upon review,[62] and for the following reasons, we are persuaded by Petitioners and the other presentations before us that the 2011 Plan clearly, plainly, and palpably violates the Free and Equal Elections Clause of our Constitution.[63]

### A. Free and Equal Elections Clause

Pennsylvania's Constitution, when adopted in 1776, was widely viewed as "the most radically democratic of all the early state constitutions." Ken Gormley, "Overview of Pennsylvania Constitutional Law," as appearing in Ken Gormley, ed., *The Pennsylvania Constitution A Treatise on Rights and Liberties*, 3 (2004). Indeed, our Constitution, which was adopted over a full decade before the United States Constitution, served as the foundation — the template — for the federal charter. *Id.* Our autonomous state Constitution, rather than a "reaction" to federal constitutional

---

[62] Given that this case is before us following our grant of extraordinary jurisdiction, our standard of review is *de novo*. Further, although the findings of fact made by Judge Brobson are not binding on this Court, "we will afford them due consideration, as the jurist who presided over the hearings was in the best position to determine the facts." *Annenberg v. Commonwealth*, 757 A.2d 338, 343 (Pa. 2000) (citations omitted).

[63] Given that we base our decision on the Free and Equal Elections Clause, we need not address the free expression or equal protection arguments advanced by Petitioners.

jurisprudence, stands as a self-contained and self-governing body of constitutional law, and acts as a wholly independent protector of the rights of the citizens of our Commonwealth.

The touchstone of interpretation of a constitutional provision is the actual language of the Constitution itself. *Ieropoli v. AC & S Corp.*, 842 A.2d 919, 925 (Pa. 2004). "[T]he Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Id.* In doing so, reading the provisions of the Constitution in any "strained or technical manner" is to be avoided. *Jubelirer v. Rendell*, 953 A.2d 514, 528 (Pa. 2008). Consistent therewith, "we must favor a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers and which reflects the views of the ratifying voter." *Commonwealth ex rel. Paulinski v. Isaac*, 397 A.2d 760, 766 (Pa. 1979).

Further, if, in the process of undertaking explication of a provision of the Pennsylvania Constitution, any ambiguity becomes apparent in the plain language of the provision, we follow the rules of interpretation similar to those generally applicable when construing statutes. *See, e.g., Robinson Township v. Commonwealth*, 83 A.3d 901, 945 (Pa. 2013); *Commonwealth v. Omar*, 981 A.2d 179, 185 (Pa. 2009). If the constitutional language is clear and explicit, we will not "delimit the meaning of the words used by reference to a supposed intent." *Robinson Township*, 83 A.3d at 945 (quoting *Commonwealth ex rel. MacCallum v. Acker*, 162 A. 159, 160 (Pa. 1932)). If the words of a constitutional provision are not explicit, we may resort to considerations other than the plain language to discern intent, including, in this context, the occasion and necessity for the provision; the circumstances under which the amendment was ratified; the mischief to be remedied; the object to be attained; and the contemporaneous

legislative history. 1 Pa.C.S. §§ 1921, 1922; *accord* Robert F. Williams, *The Brennan Lecture: Interpreting State Constitutions as Unique Legal Documents*, 27 Okla. City U. L. Rev. 189, 195 & 200 (2002) (state constitutions, ratified by electorate, are characterized as "voice of the people," which invites inquiry into "common understanding" of provision; relevant considerations include constitutional convention debates that reflect collective intent of body, circumstances leading to adoption of provision, and purpose sought to be accomplished).

Moreover, the Free and Equal Elections Clause has no federal counterpart, and, thus, our seminal comparative review standard described in *Commonwealth v. Edmunds*, *supra*, is not directly applicable.[64]   Nonetheless, certain of the *Edmunds* factors obviously may assist us in our analysis.   *Jubelirer*, 953 A.2d at 524-25; *Edmunds*, 586 A.2d at 895.  Indeed, we have recently employed certain of these factors when analyzing the Environmental Rights Amendment.  *See Robinson Township* 83 A.3d at 944 ("The Environmental Rights Amendment has no counterpart in the federal charter and, as a result, the seminal, comparative review standard described in [*Edmunds*] is not strictly applicable here. Nonetheless, some of the *Edmunds* factors obviously are helpful in our analysis.").  Thus, in addition to our analysis of the plain language, we may consider, as necessary, any relevant decisional law and policy considerations argued by the parties, and any extra-jurisdictional case law from states that have identical or similar provisions, which may be helpful and persuasive.  *See Jubelirer,* 953 A.2d at 525 n.12.

---

[64] As noted above, our landmark decision in *Edmunds,* our Court set forth a four-part test which we routinely follow in examining and interpreting a provision of our Commonwealth's organic charter.   This test examines (1) the relevant text of the provision of Pennsylvania Constitution; (2) the history of the provision, including Pennsylvania case law; (3) relevant case law from other jurisdictions interpreting similar provisions of that jurisdiction's constitution; and (4) policy considerations.

Finally, we emphasize that Article I is the Commonwealth's Declaration of Rights, which spells out the social contract between government and the people which is of such "general, great and essential" quality as to be ensconced as "inviolate." Pa. Const. art. I, Preamble & § 25; *see also* Pa. Const. art. I, § 2 ("All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness."). Although plenary, the General Assembly's police power is not absolute, as legislative power is subject to restrictions enumerated in the Constitution and to limitations inherent in the form of government chosen by the people of this Commonwealth. *See* Pa. Const. art. III, §§ 28-32 (enumerating restrictions). Specifically, under our Constitution, the people have delegated general power to the General Assembly, with the express exception of certain fundamental rights reserved to the people in Article I of our Constitution. *See* Pa. Const. art. I, § 25 ("[t]o guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate."); *see generally Robinson Township*, 83 A.3d at 946-48.

Thus, with this context in hand, we begin with the actual language of Article I, Section 5.

### 1. Language

Article I, Section 5 of the Pennsylvania Constitution, entitled "Elections," is contained within the Pennsylvania Constitution's "Declaration of Rights," which, as noted above, is an enumeration of the fundamental individual human rights possessed by the people of this Commonwealth that are specifically exempted from the powers of Commonwealth government to diminish.[65] As noted above, this section provides:

---

[65] *See* Pa. Const. art. I, § 25 ("To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate.").

Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.

Pa. Const. art. I, § 5. This clause first appeared, albeit in different form, in our Commonwealth's first organic charter of governance adopted in 1776, 11 years before the United States Constitution was adopted. By contrast, the United States Constitution – which furnishes no explicit protections for an individual's electoral rights, nor sets any minimum standards for a state's conduct of the electoral process – does not contain, nor has it ever contained, an analogous provision. *See* Joshua A. Douglas, *The Right to Vote Under State Constitutions*, 67 Vand. L. Rev. 89, 100 (2014) (observing that "the U.S. Constitution does not grant the right to vote. It instead defines the right through a negative gloss, detailing the various reasons states cannot limit the franchise.").

The broad text of the first clause of this provision mandates clearly and unambiguously, and in the broadest possible terms, that *all* elections conducted in this Commonwealth must be "free and equal." In accordance with the plain and expansive sweep of the words "free and equal," we view them as indicative of the framers' intent that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government. Thus, Article I, Section 5 guarantees our citizens an equal right, on par with every other citizen, to elect their representatives. Stated another way, the actual and plain language of Section 5 mandates that all voters have an equal opportunity to translate their votes into representation. This interpretation is consistent with both the historical reasons for the inclusion of this provision in our Commonwealth's Constitution and the meaning we have ascribed to it through our case law.

### 2. History

Our Commonwealth's centuries-old and unique history has influenced the evolution of the text of the Free and Equal Elections Clause, as well as our Court's interpretation of that provision. Although the general character of our Commonwealth during the colonial era was reflective of the fundamental desire of Pennsylvania's founder, William Penn, that it be a haven of tolerance and non-discrimination for adherents of various religious beliefs, the manner in which the colony was governed from its inception nevertheless excluded certain groups from participation in its official government. Roman Catholics, for example, could not hold office in the colony from 1693 to 1776, due to the requirement in the Charter of Privileges, a precursor to our Constitution in which Penn set forth the manner of governance for the colony,[66] that every candidate for office was required to swear "that he did not believe in the doctrine of transubstantiation, that he regarded the invocation of the Virgin Mary and the saints as superstitious and the Popish Mass as idolatrous." J. Paul Selsam, *The Pennsylvania Constitution of 1776*, 179 (1971). Thus, although successive waves of European immigrants were attracted to the Pennsylvania colony after its founding by the promise of religious tolerance, not every group which settled in Pennsylvania was afforded the equal legal right to participate in its governance. Related thereto, the colony became divided over time by the geographical areas in which these immigrants settled, as well as their religious beliefs.

English and Quaker immigrants fleeing persecution in England were the first to arrive and settled in the eastern part of the colony in and around the City of Philadelphia and in Chester and Bucks Counties. German immigrants arrived thereafter in sizable

---

[66] *William Penn Sch. Dist.,* 170 A.3d at 418–19.

numbers and settled primarily in the central and northeastern part of the colony, and finally came a large influx of Scots-Irish Presbyterians who lived primarily in the interior and frontier regions of the colony: first in Lancaster, York and Cumberland Counties, and then expanding westward to the areas beyond the Allegheny mountains, congregating in and near the settlement which became modern day Pittsburgh. *Id.* at 4-5.

These groups were divided along economic and religious lines. The English and Quakers who engaged in extensive commerce and banking became the most wealthy and aristocratic elements in the colony. *Id.* at 6. German immigrants reaped a comfortable living from farming the fertile lands of their settlement. Rosalind Branning, *Pennsylvania Constitutional Development*, 10 (1960). The Scots-Irish, who occupied the frontier regions, eked out an existence through hunting, trapping, and subsistence farming; however, they also became skilled tradesmen, highly proficient in construction, masonry, and ironworking, and began to be described as "the leather aprons," which, although intended as a pejorative by members of the colony's aristocracy, they proudly adopted as a badge of honor reflective of their considerable skills and abilities in their chosen professions. Robert Brunhouse, *The Counter-Revolution in Pennsylvania* 1776-1790, 16 (1942).

These various groups began to align themselves into nascent political factions which, by the 1760s, exerted varying degrees of control over the colonial government. The eastern Presbyterian adherents formed a group known as "the Proprietary Party," so named because of their faithfulness to the tenets of William Penn's religious and political philosophy, and they were joined by the Anglicans who had also settled in the Philadelphia region. The Quakers, disillusioned by Penn's embrace of the Anglican faith, united with German pietistic religious sects to form a party known as the Quaker or

"Anti-Proprietary Party."  Selsam at 6-7; Branning, at 10.  The Scots-Irish, who were angry at having their pleas for assistance during the French and Indian War ignored by the colonial assembly, which was dominated by the Proprietary Party, aligned with the Anti-Proprietary party as a means of achieving their goal of fair representation in the assembly.  Branning at 10.

Although these political alliances remained intact until the early 1770s, they began to unravel with the tensions occasioned by the general colonial revulsion at the heavy-handed tactics of the British Crown — *e.g.*, the imposition of the Stamp Act and the use of writs of assistance to enforce the Revenue Act — which ultimately culminated in the Revolutionary War.  The Quakers and the Anglicans remained loyal to the British Crown as these tensions rose.  However, the Scots-Irish in the western region, who dominated the Anti-Proprietary Party, were strongly supportive of the cause of the opponents of the crown, and they began to demand reforms be made by the colonial assembly, controlled by the Proprietary Party, including reapportionment of representation to the west.  *Id.* at 11. They were joined in this effort by a large segment of the working-class population of the City of Philadelphia, disenfranchised by the requirement of the Charter of Privileges that imposed a property ownership requirement for the right to vote. This, coupled with the Charter's restriction of representation in the assembly to counties, resulted in the underrepresentation of the City of Philadelphia in colonial affairs, as well as the denial of representation to the western region due to the assembly's deliberately slow pace in recognizing new counties in that area.  *Id.*  Thus, by the early 1700s, colonial government remained dominated by the counties of Philadelphia, Chester, and Bucks, even though they had been eclipsed in population by the western regions of the colony and the City of Philadelphia.  Selsam at 31-33. Although, in an effort to placate these groups, the assembly granted a concession by

giving the west 28 seats in the assembly, while retaining 30 for the east, this did little to mollify the fervor of these groups for further reform. Branning at 11.

The opportunity for such reform arose with the formal adoption of the Declaration of Independence by the Continental Congress in 1776. This same Congress also adopted a resolution suggesting that the colonies adopt constitutions in the event that they had "no government sufficient to the exigencies of their affairs." *Id.* at 12. For the Pennsylvania colony, this was the catalyst which enabled the reformers from the western regions and the City of Philadelphia, who were now known as "the radicals," to achieve the calling of a constitutional convention. This convention, which was presided over by Benjamin Franklin, who also was serving at the same time in the Continental Congress, adopted our Commonwealth's Constitution of 1776, which, for its time, was considered very forward thinking. *Id.* at 13. Many of its provisions reflected the prevailing sentiment of the radical delegates from the frontier and the City of Philadelphia for a devolution of centralized political power from the hands of a very few, in order to form a government more directly responsive to the needs of the people. Thus, it adopted a unicameral legislature on the belief that bicameral legislatures with one house dominated by elites who were elected on the basis of monetary or property qualifications would thwart the will of the people, as expressed through their representatives in the lower chamber, whose members were elected by those whose right of suffrage was not similarly constrained. Joseph S. Foster, *The Politics of Ideology: The Pennsylvania Constitutional Convention of 1789-1790*, 123 Pennsylvania J. of History, Vol. 59, No. 2 (April 1992). Even though concerned with foundational matters such as the structure of government, the delegates, in response to their experience of being excluded from participation in the colonial government, included

two explicit provisions to establish protections of the right of the people to fair and equal representation in the governance of their affairs.

The first requirement was that representation be proportional to population and that reapportionment of legislative seats be done every seven years. *See* Pa. Const. of 1776, art. I, § IV. As noted by one commentator, this was the direct product of the personal history of the majority of the delegates, and the requirement of equal representation was, thus, intended to protect future individuals against the exclusion from the legislative process "by persons who gained power and intended to keep it." John L. Gedid, "*History of the Pennsylvania Constitution"* as appearing in Ken Gormley, ed., "*The Pennsylvania Constitution A Treatise on Rights and Liberties*, 48 (2004).

Concomitant with this requirement, the delegates also deliberately incorporated into that Constitution the Declaration of Rights – which they considered to be an integral part of its framework – and therein the first version of Article I, Section 5, which declared that "all elections ought to be free; and that all free men having a sufficient evident common interest with, and attachment to the community, have a right to elect officers, or to be elected into office." Pa. Const. of 1776, art. I, § VII.

This section reflected the delegates' desire to secure access to the election process by all people with an interest in the communities in which they lived — universal suffrage — by prohibiting exclusion from the election process of those without property or financial means. It, thus, established a critical "leveling" protection in an effort to establish the uniform right of the people of this Commonwealth to select their representatives in government. It sought to ensure that this right of the people would forever remain equal no matter their financial situation or social class. Gedid, at 51; *see also* Selsam, at 190 ("The long struggle by the people for the control of their affairs was finally rewarded.").

Opposition to the new Constitution arose almost immediately, driven chiefly by the Quakers, Episcopalians, and Germans who had not fought in the Revolution, and the commercial interests in the City of Philadelphia. Branning at 17. These groups felt excluded from participation in the new government just as the factions who had written the 1776 Constitution previously did. Moreover, significant resentment grew over the increasing political power and attainment of elected office by those of lower socioeconomic status in the period after 1776. The social and commercial aristocracy of the Commonwealth resented the acquisition of political control of state government by the "leather aprons." Brunhouse at 16. Further, the exclusion of some of the population through the requirement of "test oaths" in the 1776 Constitution, which required all voters, candidates for office, and office holders to swear allegiance to uphold the new frame of government, further alienated those groups, chiefly from the eastern part of the state, for whom such oaths violated their religious beliefs. *Id.* These groups united and became known as the "Anti-Constitutionalists," and later by the designation Republicans and, later still, Federalists.[67] Supporters of the new charter of governance were allied into a political faction known as the Constitutionalists.

The strife between these two groups, and deficiencies in the structure of the new government — *i.e.*, the lack of a strong executive and an ill-defined role for a putative executive body created by the 1776 Constitution and given power over the legislature, the Council of Censors — rapidly intensified, such that the Commonwealth's government became paralyzed by dysfunction, so much so that the Continental Congress threatened to take it over. Gedid, at 52. These two factions vied for control

---

[67] As utilized in this history, this designation referred only to their views on the proper structure of governance, and does not refer to the modern Republican Party which came into being 60 years later. Gedid, at 52.

of the Council of Censors and the General Assembly throughout the late 1770s and 1780s.  The Republicans, though well represented on the Council of Censors, could not garner the necessary votes to call a constitutional convention under its rules. However, popular dissatisfaction with the chaotic state of the Commonwealth's governance grew to such a degree that the Republicans gained control of the General Assembly in 1788, and, in November 1789, they passed legislation to call a constitutional convention. Branning, at 19.

Although there was some opposition to the calling of the convention by the Constitutionalists, given that the 1776 Constitution contained no explicit authorization for the assembly to do so, they, nevertheless, agreed to participate in the convention which began on November 24, 1789.  Rather than continuing the internecine strife that had continually threatened the new Commonwealth's government, the leaders of the Constitutionalists, who were prominent political leaders with deep experience serving in the Commonwealth government, such as William Findley, forged what was regarded as an unexpected alliance with powerful members of the leadership of the Republicans, particularly James Wilson.  Foster, at 128-29.  The coalition of delegates shepherded by Findley and Wilson in producing a new Constitution was remarkable, given the regional and ideological strife which had preceded the convention.  Its members represented 16 of the state's 21 counties, and they came from widely divergent geographic regions of the Commonwealth, ranging from Northampton County in the northeastern region of the state to Allegheny and Washington counties in the west. These delegates thus represented a wide spectrum of people with diverse political, ideological, and religious views. *Id.* at 131. Their work yielded a Constitution which, while making the structural reforms to the Commonwealth's government favored by the Republicans, such as the adoption of a bicameral legislature and the creation of the office of chief executive with

veto power over legislation, also preserved the principle cherished most by the Constitutionalists – namely, popular elections in which the people's right to elect their representatives in government would be equally available to all, and would, hereinafter, not be intentionally diminished by laws that discriminated against a voter based on his social or economic status, geography of his residence, or his religious and political beliefs. *Id.* at 137-38.

Consequently, popular election of representatives was maintained by the new Constitution, and applicable in all elections for both houses of the bicameral legislature. Importantly, consistent with the evident desire of the delegates to neutralize the factors which had formerly given rise to such rancorous division amongst the people in the selection of their representatives, the language of Article I, Section 5 was revised to remove all prior ambiguous qualifying language. In its place, the delegates adopted the present language of the first clause of Article I, Section 5, which has remained unchanged to this day by the people of this Commonwealth.[68] It states, simply and plainly, that "elections shall be free and equal."[69]

When viewed against the backdrop of the intense and seemingly unending regional, ideological, and sectarian strife detailed above, which bitterly divided the people of various regions of our state, this provision must be understood then as a salutary effort by the learned delegates to the 1790 convention to end, once and for all,

---

[68] The 1790 Constitution was never ratified by popular vote; however, all subsequent constitutions in which this language is included have been ratified by the people of the Commonwealth.

[69] Indeed, the majority of delegates expressly rejected a proposal to remove the "and equal" language from the revised amendment. Minutes of the Constitutional Convention of 1789 at 377. Ours, thus, became the first constitution to utilize this language, and other states such as Delaware, following our lead, adopted the same language into their constitution a mere two years later in 1792. Eleven other states since then have included a "free and equal" clause in their constitutions.

the primary cause of popular dissatisfaction which undermined the governance of Pennsylvania: namely, the dilution of the right of the people of this Commonwealth to select representatives to govern their affairs based on considerations of the region of the state in which they lived, and the religious and political beliefs to which they adhered. These historical motivations of the framers have undergirded our Court's interpretation of the Free and Equal Elections Clause throughout the years since its inclusion in our Constitution.

### 3. Pennsylvania Case Law

As one noted commentator on the Pennsylvania Constitution, Charles Buckalew, himself a delegate to the 1873 Constitutional Convention, opined, given the aforementioned history, the words "free and equal" as used in Article I, Section 5 have a broad and wide sweep:

> They strike not only at privacy and partiality in popular elections, but also at corruption, compulsion, and other undue influences by which elections may be assailed; at all regulations of law which shall impair the right of suffrage rather than facilitate or reasonably direct the manner of its exercise, and at all its limitations, unproclaimed by the Constitution, upon the eligibility of the electors for office. And they exclude not only all invidious discriminations between individual electors, or classes of electors, but also between different sections or places in the State.

Charles R. Buckalew, *An Examination of the Constitution of Pennsylvania. Exhibiting The Derivation and History of Its Several Provisions*, Article I at 10 (1883).

Our Court has ascribed the same expansive meaning to the terms "free and equal" in Article I, Section 5. Although our Court has infrequently relied on this provision to strike down acts of the legislature pertaining to the conduct of elections, the qualifications of voters to participate therein, or the creation of electoral districts, our view as to what constraints Article I, Section 5 places on the legislature in these areas

has been consistent over the years. Indeed, nearly 150 years ago, in considering a challenge to an act of the legislature establishing eligibility qualifications for electors to vote in all elections held in Philadelphia, and specifying the manner in which those elections are to be conducted, we recognized that, while our Constitution gives to the General Assembly the power to promulgate laws governing elections, those enactments are nonetheless subject to the requirements of the Free and Equal Elections Clause of our Constitution, and, hence, may be invalidated by our Court "in a case of plain, palpable and clear abuse of the power which actually infringes the rights of the electors." *Patterson*, 60 Pa. at 75.

In answering the question of how elections must be made equal, we stated: "Clearly by laws which shall arrange all the qualified electors into suitable districts, and make their votes equally potent in the election; so that some shall not have more votes than others, and that all shall have an equal share in filling the offices of the Commonwealth." *Id.* Thus, with this decision, our Court established that any legislative scheme which has the effect of impermissibly diluting the potency of an individual's vote for candidates for elective office relative to that of other voters will violate the guarantee of "free and equal" elections afforded by Article I, Section 5. *See City of Bethlehem*, 515 A.2d at 1323-24 (recognizing that a legislative enactment which "dilutes the vote of any segment of the constituency" will violate Article I, Section 5). This interpretation is wholly consonant with the intent of the framers of the 1790 Constitution to ensure that each voter will have an equally effective power to select the representative of his or her choice, free from any discrimination on the basis of his or her particular beliefs or views.

In the nearly 150 years since *Patterson*, our Court has not retreated from this interpretation of the Free and Equal Elections Clause. In 1914, our Court, in the case of *Winston, supra*, considered a challenge under the Free and Equal Elections Clause to

an act of the legislature which set standards regulating the nominations and elections for judges and elective offices in the City of Philadelphia. Although our Court ultimately ruled that the act did not violate this clause, we again reaffirmed that the clause protected a voter's individual right to an equal, nondiscriminatory electoral process. In describing the minimum requirements for "free and fair" elections, we stated:

> [E]lections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as every other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself, or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him.

*Winston*, 91 A. at 523.

We relied on these principles in the case of *In re New Britain Borough School District*, 145 A. 597 (Pa. 1929), to strike down the legislative creation of voting districts for elective office which, although not overtly depriving electors therein of their right to choose candidates for office secured by the Free and Equal Elections Clause, nevertheless operated to impair that right. In that case, the legislature created a new borough from parts of two existing townships and created a school district which overlapped the boundaries of the new borough. The new district, thus, encompassed part of the school district in each of the townships from which it was created. Pursuant to other acts of the legislature then in force, the court of common pleas of the county in which the district was situated, upon petition of taxpayers and electors in the newly created borough, appointed a board of school directors. The creation of the new school district was ultimately not approved as required by other legislation mandating the assent of the state board of elections for the creation of the district, and, thus, technically the residents of the new borough remained within their old school districts.

Residents of each of the former townships challenged the constitutionality of the effect of the combination of their former respective school districts under the Free and Equal Elections Clause, arguing that they had been deprived of their right to select school directors. Our Court agreed, and found that the residents of the two former school districts were effectively denied their right to elect representatives of their choosing to represent them on a body which would decide how their tax monies were spent. We noted that the residents of the newly created school district could not lawfully vote for representatives on the school boards of their prior districts, given that they were no longer legally residents thereof, and they also could not lawfully vote for school directors in the newly created school district, given that the ballot for every voter was required to be the same, and, because the new school district had not been approved, the two groups of borough residents would each have to be given separate ballots for their former districts. In our discussion of the Free and Equal Elections Clause, our Court emphasized that the rights protected by this provision may not be taken away by an act of the legislature, and that that body is prohibited by this clause from interfering with the exercise of those rights, even if the interference occurs by inadvertence. *Id.* at 599.

While it is true that our Court has not heretofore held that a redistricting plan violates the Free and Equal Elections Clause – for example, because it is the product of politically-motivated gerrymandering – we have never precluded such a claim in our jurisprudence. Our Court considered a challenge under Article I, Section 5 rooted in alleged political gerrymandering in the creation of state legislative districts in *In re 1991 Pennsylvania Legislative Reapportionment Comm'n*, *supra*. In that case, we entertained and rejected a claim that political gerrymandering operated to deny a candidate's claimed right to run for state legislative office under this provision. We found that the

individual's constitutionally protected right to run for state legislative office was protected by the redistricting plan, but concluded that right did not extend so far as to require that a reapportionment plan be tailored to allow him to challenge the incumbent of his choice.

More saliently, in *Erfer*, our Court specifically held that challenges to the enactment of a congressional redistricting plan predicated on claims of impermissible political gerrymandering may be brought under Article I, Section 5. Therein, we rebuffed the argument that Article I, Section 5 was limited in its scope of application to only elections of Commonwealth officials, inasmuch as there was nothing in the plain text of this provision which would so limit it. Likewise, our own review of the historical circumstances surrounding its inclusion in the 1790 Constitution, discussed above, supports our interpretation.

Moreover, in *Erfer*, we rejected the argument, advanced by Legislative Respondents in their post-argument filing seeking a stay of our Court's order of January 22, 2018,[70] that, because Article I, Section 4 of the United States Constitution confers on state legislatures the power to enact congressional redistricting plans, such plans are not subject to the requirements of the Pennsylvania Constitution:

> It is true that the U.S. Constitution has granted our legislature the power to craft congressional reapportionment plans. Yet, we see no indication that such a grant of power simultaneously suspended the constitution of our Commonwealth *vis à vis* congressional reapportionment. Without clear support for the radical conclusion that our Commonwealth's Constitution is nullified in challenges to congressional reapportionment plans, it would be highly inappropriate for us to circumscribe the operation of the organic legal document of our Commonwealth.

---

[70] *See supra* note 8.

*Id.* at 331.

Ultimately, in *Erfer*, we did not opine on whether, under our prior decisions interpreting Article I, Section 5, a congressional redistricting plan would be violative of the Free and Equal Elections Clause because of political gerrymandering.  Although the petitioners in that case alleged that the redistricting plan at issue therein violated Article I, Section 5, our Court determined that they had not provided sufficient reasons for us to interpret our constitutional provision as furnishing additional protections of the right to vote beyond those recognized by the United States Supreme Court as conferred by the Equal Protection Clause of the United States Constitution.  *See id.* at 332 ("Petitioners provide us with no persuasive argument as to why we should, at this juncture, interpret our constitution in such a fashion that the right to vote is more expansive than the guarantee found in the federal constitution.").  Thus, we adjudicated the Article I, Section 5 challenge in that case solely on federal equal protection grounds, and rejected it, based on the test for such claims articulated by the plurality of the United States Supreme Court in *Bandemer, supra*.

Importantly, however, our Court in *Erfer* did not foreclose future challenges under Article I, Section 5 resting solely on independent state grounds.  Indeed, the unique historical reasons discussed above, which were the genesis of Article I, Section 5, and its straightforward directive that "elections shall be free and equal" suggests such a separate analysis is warranted.  The Free and Equal Elections Clause was specifically intended to equalize the power of voters in our Commonwealth's election process, and it explicitly confers this guarantee; by contrast, the Equal Protection Clause was added to the United States Constitution 78 years later with the ratification of the Fourteenth Amendment to address manifest legal inequities which were contributing causes of the

Civil War, and which persisted in its aftermath, and it contains no such unambiguous protections.

Moreover, and importantly, when properly presented with the argument, our Court entertains as distinct claims brought under the Free and Equal Elections Clause of our Constitution and the federal Equal Protection Clause, and we adjudicate them separately, utilizing the relevant Pennsylvania and federal standards. In *Shankey v. Staisey*, 257 A.2d 897 (Pa. 1969), a group of third-party voters challenged a Pennsylvania election statute which specified that, in order for an individual's vote for a third-party candidate for a particular office in the primary election to be counted, the total number of aggregate votes by third-party voters for that office had to equal or exceed the number of signatures required on a nominating petition to be listed on the ballot as a candidate for that office. The voters' challenge, which was brought under both the Free and Equal Elections Clause of the Pennsylvania Constitution and the Equal Protection Clause of the United States Constitution, alleged that these requirements wrongfully equated public petitions with ballots, thereby imposing a more stringent standard for their vote to be counted than that which voters casting ballots for major party candidates had to meet.

Our Court applied different constitutional standards in deciding these claims. In considering and rejecting the Article I, Section 5 claim – that the third-party candidates' right to vote was diminished because of these special requirements – our Court applied the interpretation of the Free and Equal Elections Clause set forth in *Winston*, *supra*, and ruled that, because the statute required major party candidates and third party candidates to demonstrate the same numerical level of voter support for their votes to be counted, the fact that this demonstration was made by ballot as opposed to by petition did not render the election process unequal. By contrast, in adjudicating the

equal protection claim, our Court utilized the test for an equal protection clause violation articulated by the United States Supreme Court and examined whether the statute served to impermissibly classify voters without a reasonable basis to do so.

Given the nature of the petitioners' argument in *Erfer*, which was founded on their apparent belief that the protections of Article I, Section 5 and Article 1, Section 26 were coextensive, our Court was not called upon, therein, to reassess the validity of the *Shankey* Court's use of a separate and distinct standard for adjudicating a claim that a particular legislative enactment involving the electoral process violates the Free and Equal Elections Clause, from that used to determine if the enactment violates the federal Equal Protection Clause. Thus, we reject Justice Mundy's assertion that *Erfer* requires us, under the principles of *stare decisis*, to utilize the same standard to adjudicate a claim of violation of the Free and Equal Elections Clause and the federal Equal Protection Clause. *See* Dissenting Opinion (Mundy, J.) at 2-3. To the extent that *Erfer* can be read for that proposition, we expressly disavow it, and presently reaffirm that, in accord with *Shankey* and the particular history of the Free and Equal Elections Clause, recounted above, the two distinct claims remain subject to entirely separate jurisprudential considerations.[71]

---

[71] Like Pennsylvania, a number of other states go further than merely recognizing the right to vote, and provide additional and independent protections through provisions in their constitutions guaranteeing that their elections shall be "free and equal." Pa. Const. art. I, § 5. More specifically, the constitutions of twelve additional states contain election clauses identical to our charter, requiring elections to be "free and equal." These twelve other states are: Arizona, Ariz. Const. art. II, § 21; Arkansas, Ark. Const. art. 3, § 2; Delaware, Del. Const. art. I, § 3; Illinois, Ill. Const. art. III, § 3; Indiana, Ind. Const. art. 2, § 1; Kentucky, Ky. Const. § 6; Oklahoma, Okla. Const. art. III, § 5; Oregon, Or. Const. art. II, § 1; South Dakota, S.D. Const. art. VI, § 19; Tennessee, Tenn. Const. art. I, § 5; Washington, Wash. Const. art. I, § 19; and Wyoming, Wy. Const. art. I, § 27. While few have faced reapportionment challenges, state courts have breathed meaning into these unique constitutional provisions, a few of which are set forth below by way of example. Specifically, last year, the Court of Chancery of Delaware, in an in-depth treatment of Delaware's Constitution, much like that engaged in by our Court today, considered a (continued…)

### 4. Other Considerations

In addition to the occasion for the adoption of the Free and Equal Elections Clause, the circumstances in which the provision was adopted, the mischief to be remedied, and the object to be obtained, as described above, the consequences of a particular interpretation are also relevant in our analysis. Specifically, partisan gerrymandering dilutes the votes of those who in prior elections voted for the party not

---

(…continued)
challenge to family-focused events at polling places on election day which induced parents of students to vote, but which operated as impediments to voting by the elderly and disabled. In concluding such conduct violated the Delaware Constitution's Elections Clause, the court reasoned that an election which provided a targeted group specific incentives to vote was neither free nor equal, noting the historical concerns in Delaware regarding the integrity of the election process. *Young v. Red Clay Consolidated School*, 159 A.3d 713, 758, 763 (Del. Ch. 2017).

Even more apt, two states, Illinois and Kentucky, have long traditions regarding the application and interpretation of their elections clauses. In an early Illinois decision, the Illinois Supreme Court, considering a challenge to a congressional apportionment statute, cited to the Illinois Constitution and concluded: "[a]n election is free where the voters are exposed to no intimidation or improper influence and where each voter is allowed to cast his ballot as his own conscience dictates. Elections are equal when the vote of each voter is equal in its influence upon the result to the vote of every other elector—where each ballot is as effective as every other ballot." *Moran v. Bowley*, 179 N.E. 526, 531 (Ill. 1932). Similarly, in an early Kentucky decision involving the lack of printed ballots leaving numerous voters unable to exercise the franchise, that state's high court offered that "[t]he very purpose of elections is to obtain a full, fair, and free expression of the popular will upon the matter, whatever it may be, submitted to the people for their approval or rejection; and when any substantial number of legal voters are, from any cause, denied the right to vote, the election is not free and equal, in the meaning of the [Kentucky] Constitution." *Wallbrecht v. Ingram*, 175 S.W. 1022, 1026 (Ky. 1915).

Thus, other states with identical constitutional provisions have considered and applied their elections clauses to a variety of election challenges, providing important protections for their voters. While those states whose constitutions have identical "free and equal" language to that of the Pennsylvania Constitution have not addressed the identical issue before us today, they, and other states, have been willing to consider and invigorate their provisions similarly, providing an equal right to each citizen, on par with every other citizen, to elect their representatives.

in power to give the party in power a lasting electoral advantage. By placing voters preferring one party's candidates in districts where their votes are wasted on candidates likely to lose (cracking), or by placing such voters in districts where their votes are cast for candidates destined to win (packing), the non-favored party's votes are diluted. It is axiomatic that a diluted vote is not an equal vote, as all voters do not have an equal opportunity to translate their votes into representation. This is the antithesis of a healthy representative democracy. Indeed, for our form of government to operate as intended, each and every Pennsylvania voter must have the same free and equal *opportunity* to select his or her representatives. As our foregoing discussion has illustrated, our Commonwealth's commitment to neutralizing factors which unfairly impede or dilute individuals' rights to select their representatives was borne of our forebears' bitter personal experience suffering the pernicious effects resulting from previous electoral schemes that sanctioned such discrimination. Furthermore, adoption of a broad interpretation guards against the risk of unfairly rendering votes nugatory, artificially entrenching representative power, and discouraging voters from participating in the electoral process because they have come to believe that the power of their individual vote has been diminished to the point that it "does not count." A broad and robust interpretation of Article I, Section 5 serves as a bulwark against the adverse consequences of partisan gerrymandering.

### 5. Conclusion

The above analysis of the Free and Equal Elections Clause – its plain language, its history, the occasion for the provision and the circumstances in which it was adopted, the case law interpreting this clause, and consideration of the consequences of our interpretation – leads us to conclude the Clause should be given the broadest interpretation, one which governs all aspects of the electoral process, and which

provides the people of this Commonwealth an equally effective power to select the representative of his or her choice, and bars the dilution of the people's power to do so.

## B. Measurement of Compliance with Article I, Section 5

We turn now to the question of what measures should be utilized to assess a dilution claim under the Free and Equal Elections Clause of the Pennsylvania Constitution. Neither Article 1, Section 5, nor any other provision of our Constitution, articulates explicit standards which are to be used in the creation of congressional districts. However, since the inclusion of the Free and Equal Elections Clause in our Constitution in 1790, certain neutral criteria have, as a general matter, been traditionally utilized to guide the formation of our Commonwealth's legislative districts in order to prevent the dilution of an individual's vote for a representative in the General Assembly. These standards place the greatest emphasis on creating representational districts that both maintain the geographical and social cohesion of the communities in which people live and conduct the majority of their day-to-day affairs, and accord equal weight to the votes of residents in each of the various districts in determining the ultimate composition of the state legislature.

Significantly, the framers of the 1790 constitution who authored the Free and Equal Elections Clause also included a mandatory requirement therein for the legislature's formation of state senatorial districts covering multiple counties, namely that the counties must adjoin one another. Also, the architects of that charter expressly prohibited the division of any county of the Commonwealth, or the City of Philadelphia, in the formation of such districts. Pa. Const. of 1776, § 7. Thus, as preventing the dilution of an individual's vote was of paramount concern to that august group, it is evident that they considered maintaining the geographical contiguity of political

subdivisions, and barring the splitting thereof in the process of creating legislative districts, to afford important safeguards against that pernicious prospect.

In the eight-plus decades after the 1790 Constitution became our Commonwealth's fundamental plan of governance, many problems arose from the corruption of the political process by well-heeled special interest groups who rendered our representative democracy deeply dysfunctional by weakening the power of an individual's vote through, *inter alia*, their selection, and financial backing in the electoral process, of representatives who exclusively served their narrow interests and not those of the people as a whole. Gedid, *supra*, at 61-63. One of the methods by which the electoral process was manipulated by these interest groups to attain those objectives was the practice of gerrymandering, popular revulsion of which became one of the driving factors behind the populace's demand for the calling of the 1873 Constitutional Convention.

As noted by an eminent authority on Pennsylvania constitutional law, by the time of that convention, gerrymandering was regarded as "one of the most flagrant evils and scandals of the time, involving notorious wrong to the people and open disgrace to republican institutions." Thomas Raeburn White, *Commentaries on the Constitution of Pennsylvania* 61 (1907). Although the delegates to that convention did not completely eliminate this practice through the charter of governance which they adopted, and which the voters subsequently approved, they nevertheless included significant protections against its occurrence through the explicit adoption of certain requirements which all state legislative districts were, thereafter, required to meet: (1) the population of such districts must be equal, to the extent possible; (2) the district that is created must be comprised of compact and contiguous geographical territory; and (3) the district respects the boundaries of existing political subdivisions contained therein, such that

the district divides as few of those subdivisions as possible.  Pa. Const. of 1874, art. 2, § 16.  Given the great concern of the delegates over the practice of gerrymandering occasioned by their recognition of the corrosive effects on our entire democratic process through the deliberate dilution of our citizenry's individual votes, the focus on these neutral factors must be viewed, then, as part of a broader effort by the delegates to that convention to establish "the best methods of representation to secure a just expression of the popular will."  Branning at 59 (quoting Wayne Mac Veach, *Debates of the Convention to Amend the Constitution of Pennsylvania*, Volume I at 45 (1873)).  Consequently, these factors have broader applicability beyond setting standards for the drawing of electoral districts for state legislative office.

The utility of these requirements to prevent vote dilution through gerrymandering retains continuing vitality, as evidenced by our present Constitution, adopted in 1968.  In that charter, these basic requirements for the creation of senatorial districts were not only retained, but, indeed, were expanded by the voters to govern the establishment of election districts for the selection of their representatives in the state House of Representatives.  Pa. Const., art. 2, § 16.

Because these factors are deeply rooted in the organic law of our Commonwealth, and continue to be the foundational requirements which state legislative districts must meet under the Pennsylvania Constitution, we find these neutral benchmarks to be particularly suitable as a measure in assessing whether a congressional districting plan dilutes the potency of an individual's ability to select the congressional representative of his or her choice, and thereby violates the Free and Equal Elections Clause.  In our judgment, they are wholly consistent with the overarching intent of the framers of the 1790 Constitution that an individual's electoral power not be diminished through any law which discriminatorily dilutes the power of his

or her vote, and, thus, they are a measure by which to assess whether the guarantee to our citizenry of "free and equal" elections promised by Article, I Section 5 in the selection of their congressional representative has been violated. Because the character of these factors is fundamentally impartial in nature, their utilization reduces the likelihood of the creation of congressional districts which confer on any voter an unequal advantage by giving his or her vote greater weight in the selection of a congressional representative as prohibited by Article I, Section 5. Thus, use of these objective factors substantially reduces the risk that a voter in a particular congressional district will unfairly suffer the dilution of the power of his or her vote.

Moreover, rather than impermissibly lessening the power of an individual's vote based on the geographical area in which the individual resides – which, as explained above, Article I, Section 5 also prohibits – the use of compactness, contiguity, and the maintenance of the integrity of the boundaries of political subdivisions maintains the strength of an individual's vote in electing a congressional representative. When an individual is grouped with other members of his or her community in a congressional district for purposes of voting, the commonality of the interests shared with the other voters in the community increases the ability of the individual to elect a congressional representative for the district who reflects his or her personal preferences. This approach inures to no political party's benefit or detriment. It simply achieves the constitutional goal of fair and equal elections for all of our Commonwealth's voters. Finally, these standards also comport with the minimum requirements for congressional districts guaranteed by the United States Constitution, as interpreted by the United States Supreme Court. *See Wesberry v. Sanders*, 376 U.S. 1, 18 (1964) (holding that the plain objective of the United States Constitution is to make "equal representation for equal numbers of people the fundamental goal for the House of Representatives.").

Consequently, for all of these reasons, and as expressly set forth in our Order of January 22, 2018, we adopt these measures as appropriate in determining whether a congressional redistricting plan violates the Free and Equal Elections Clause of the Pennsylvania Constitution. Therefore, an essential part of such an inquiry is an examination of whether the congressional districts created under a redistricting plan are:

> composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population.

Order, 1/22/19, at ¶ "Fourth."[72]

We recognize that other factors have historically played a role in the drawing of legislative districts, such as the preservation of prior district lines, protection of incumbents, or the maintenance of the political balance which existed after the prior reapportionment. *See*, *e.g.*, *Holt I,* 38 A.3d at 1235. However, we view these factors to be wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts. These neutral criteria provide a "floor" of protection for an individual against the dilution of his or her vote in the creation of such districts.

When, however, it is demonstrated that, in the creation of congressional districts, these neutral criteria have been subordinated, in whole or in part, to extraneous considerations such as gerrymandering for unfair partisan political advantage, a congressional redistricting plan violates Article I, Section 5 of the Pennsylvania Constitution. We note that, consistent with our prior interpretation of Article I, Section 5,

---

[72] Nothing herein is intended to suggest that congressional district maps must not also comply with federal law, and, most specifically, the Voting Rights Act, 52 U.S.C. § 10301.

*see In re New Britain Borough School District*, *supra*, this standard does not require a showing that the creators of congressional districts intentionally subordinated these traditional criteria to other considerations in the creation of the district in order for it to violate Article I, Section 5; rather, it is sufficient to establish a violation of this section to show that these traditional criteria were subordinated to other factors.

However, this is not the exclusive means by which a violation of Article I, Section 5 may be established. As we have repeatedly emphasized throughout our discussion, the overarching objective of this provision of our constitution is to prevent dilution of an individual's vote by mandating that the power of his or her vote in the selection of representatives be equalized to the greatest degree possible with all other Pennsylvania citizens. We recognize, then, that there exists the possibility that advances in map drawing technology and analytical software can potentially allow mapmakers, in the future, to engineer congressional districting maps, which, although minimally comporting with these neutral "floor" criteria, nevertheless operate to unfairly dilute the power of a particular group's vote for a congressional representative. *See* N.T. Trial, 12/13/17, at 839-42 (Dr. Warshaw discussing the concept of an efficiency gap based on the number of "wasted" votes for the minority political party under a particular redistricting plan). However, as the case at bar may be resolved solely on the basis of consideration of the degree to which neutral criteria were subordinated to the pursuit of partisan political advantage, as discussed below, we need not address at this juncture the possibility of such future claims.[73]

---

[73] In her dissenting opinion, Justice Mundy inexplicably contends that our allowance for the possibility that a *future* challenge to a *future* plan might show dilution even though the neutral redistricting criteria were adhered to "undermines the conclusion" that there is a violation *in this case*. Dissenting Opinion (Mundy, J.) at 3. However, as we state above, and as we discuss further below, assessment of those criteria fully, and solely, supports our conclusion in this case.

We are confident, however, that, technology can also be employed to aid in the expeditious development of districting maps, the boundaries of which are drawn to scrupulously adhere to neutral criteria. Indeed, as this Court highlighted in *Holt I*, "the development of computer technology appears to have substantially allayed the initial, extraordinary difficulties in" meeting such criteria. *Holt I*, 38 A.3d at 760; *see also id.* at 750 (noting that, since 1991, technology has provided tools allowing mapmakers to "achieve increasingly 'ideal' districts") (citing Gormley, Legislative Reapportionment, at 26–27, 45–47); *see also Larios v. Cox*, 305 F.Supp.2d. 1335, 1342 (N.D. Ga. 2004) ("given recent advances in computer technology, constitutional plans can be crafted in as short a period as one day"). As this Court views the record in this case, in the context of the computer technology of 2018, this thesis has clearly been proven.

### C. Application to the 2011 Plan

Having established the means by which we measure a violation of Article I, Section 5, we now apply that measure to the 2011 Plan. Doing so, it is clear, plain, and palpable that the 2011 Plan subordinates the traditional redistricting criteria in the service of partisan advantage, and thereby deprives Petitioners of their state constitutional right to free and equal elections. *See West Mifflin Area School District,* 4 A.3d at 1048. Indeed, the compelling expert statistical evidence presented before the Commonwealth Court, in combination with and illustrated by an examination of the Plan itself and the remainder of the evidence presented below, demonstrates that the Plan cannot plausibly be directed at drawing equally populous, compact, and contiguous districts which divide political subdivisions only as necessary to ensure equal population.

Perhaps the most compelling evidence concerning the 2011 Plan derives from Dr. Chen's expert testimony. As detailed above, Dr. Chen created two sets of 500

computer-simulated Pennsylvania redistricting plans, the first of which – Simulated Set 1 – employed the traditional redistricting criteria of population equality, compactness, contiguousness, and political-subdivision integrity – *i.e.*, a simulation of the potential range of redistricting plans attempting to apply the traditional redistricting criteria. Dr. Chen's Simulated Set 1 plans achieved population equality and contiguity; had a range of Reock Compactness Scores from approximately .31 to .46, which was significantly more compact than the 2011 Plan's score of .278; and had a range of Popper-Polsby Compactness Scores from approximately .29 to .35, which was significantly more compact than the 2011 Plan's score of .164. Further, his simulated plans generally split between 12-14 counties and 40-58 municipalities, in sharp contrast to the 2011 Plan's far greater 28 county splits and 68 municipality splits. In other words, all of Dr. Chen's Simulated Set 1 plans, which were, again, a simulation of the potential range of redistricting plans attempting to apply the traditional redistricting criteria, were more compact and split fewer political subdivisions than the 2011 Plan, establishing that a process satisfying these traditional criteria would not lead to the 2011 Plan's adoption. Thus, Dr. Chen unsurprisingly opined that the 2011 Plan subordinated the goals of compactness and political-subdivision integrity to other considerations.[74] Dr. Chen's testimony in this regard establishes that the 2011 Plan did not primarily consider, much less endeavor to satisfy, the traditional redistricting criteria.[75]

---

[74] Dr. Chen also credibly rebutted the notion that the 2011 Plan's outlier status derived from a hypothetical attempt to protect congressional incumbents – which attempt still, in any event, subordinated the traditional redistricting factors to others – or an attempt to establish the 2011 Plan's majority African-American district.

[75] Indeed, the advent of advanced technology and increased computing power underlying Dr. Chen's compelling analysis shows such technology need not be employed, as the record shows herein, for illicit partisan gerrymandering. As discussed above, such tools will, just as powerfully, aid the legislature in performing its redistricting function in comportment with traditional redistricting factors and their constituents' (continued…)

Dr. Chen's testimony in this regard comports with a lay examination of the Plan, which reveals tortuously drawn districts that cause plainly unnecessary political-subdivision splits. In terms of compactness, a rudimentary review reveals a map comprised of oddly shaped, sprawling districts which wander seemingly arbitrarily across Pennsylvania, leaving 28 counties, 68 political subdivisions, and numerous wards, divided among as many as five congressional districts, in their wakes. Significantly, these districts often rend municipalities from their surrounding metropolitan areas and quizzically divide small municipalities which could easily be incorporated into single districts without detriment to the traditional redistricting criteria. As Dr. Kennedy explained below, the 7th Congressional District, pictured above, has been referred to as resembling "Goofy kicking Donald Duck," and is perhaps chief among a number of rivals in this regard, ambling from Philadelphia's suburbs in central Montgomery County, where it borders four other districts, south into Delaware County, where it abuts a fifth, then west into Chester County, where it abuts another district and travels northwest before jutting out in both northerly and southerly directions into Berks and Lancaster Counties. Indeed, it is difficult to imagine how a district as Rorschachian and sprawling, which is contiguous in two locations only by virtue of a medical facility and a seafood/steakhouse, respectively, might plausibly be referred to as "compact." Moreover, in terms of political subdivision splits, the 7th Congressional District splits each of the five counties in its path and some 26 separate political subdivisions between multiple congressional districts. In other words, the 7th Congressional District is itself responsible for 17% of the 2011 Plan's county splits and 38% of its municipality splits.

---

(…continued)
constitutional rights, as well as aiding courts in their evaluations of whether the legislature satisfied its obligations in this regard.

The 7th Congressional District, however, is merely the starkest example of the 2011 Plan's overall composition.  As pictured above, and as discussed below, many of the 2011 Plan's congressional districts similarly sprawl through Pennsylvania's landscape, often contain "isthmuses" and "tentacles," and almost entirely ignore the integrity of political subdivisions in their trajectories.[76]  Although the 2011 Plan's odd shapes and seemingly arbitrary political subdivision splits are not themselves sufficient to conclude it is not predicated on the traditional redistricting factors, Dr. Chen's cogent analysis confirms that these anomalous shapes are neither necessary to, nor within the ordinary range of, plans generated with solicitude toward, applying traditional redistricting considerations.

The fact that the 2011 Plan cannot, as a statistical matter, be a plan directed at complying with traditional redistricting requirements is sufficient to establish that it violates the Free and Equal Elections Clause.  Nevertheless, we acknowledge the multitude of evidence introduced in the Commonwealth Court showing that its deviation from these traditional requirements was in service of, and effectively works to, the unfair partisan advantage of Republican candidates in future congressional elections and, conversely, dilutes Petitioners' power to vote for congressional representatives who represent their views.  Dr. Chen explained that, while his simulated plans created a range of up to 10 safe Republican districts with a mean-median vote gap of 0 to 4%, the 2011 Plan creates 13 safe Republican districts with a mean-median vote gap of 5.9%.

---

[76] Indeed, the bulk of the 2011 Plan's districts make then-Massachusetts Governor Elbridge Gerry's eponymous 1812 partisan redistricting plan, criticized at the time for its salamander-like appearance – hence, "Gerry-mander" – and designed to dilute extant Federalist political power, appear relatively benign in comparison.  *See generally* Jennifer Davis, "Elbridge Gerry and the Monstrous Gerrymander," https://blogs.loc.gov/law/2017/02/elbridge-gerry-and-the-monstrous-gerrymander (Feb. 10, 2017).

Dr. Chen also credibly rejected the notion that the 2011 Plan's outlier status in this regard was attributable to an attempt to account for Pennsylvania's political geography, to protect incumbent congresspersons, or to establish the 2011 Plan's majority-African American district. Indeed, he explicitly concluded that the traditional redistricting criteria were jettisoned in favor of unfair partisan gain. Dr. Warshaw's testimony similarly detailed how the 2011 Plan not only preserves the modest natural advantage, or vote efficiency gap, in favor of Republican congressional candidates relative to Republicans' statewide vote share – which owes to the fact that historically Democratic voters tend to self-sort into metropolitan areas and which he testified, until the 2011 Plan, was "never far from zero" percent – but also creates districts that increase that advantage to between 15 to 24% relative to statewide vote share. In other words, in its disregard of the traditional redistricting factors, the 2011 Plan consistently works toward and accomplishes the concentration of the power of historically-Republican voters and, conversely, the corresponding dilution of Petitioners' power to elect their chosen representatives.

Indeed, these statistical analyses are illustrated to some degree by Dr. Kennedy's discussion of the 2011 Plan's particulars. Dr. Kennedy, for example, explained that, at the district-by-district level, the 2011 Plan's geospatial oddities and divisions of political subdivisions and their wards effectively serve to establish a few overwhelmingly Democratic districts and a large majority of less strong, but nevertheless likely Republican districts. For example, the 1st Congressional District, beginning in Northeast Philadelphia and largely tracking the Delaware River, occasionally reaches "tentacles" inland, incorporating Chester, Swarthmore, and other

historically Democratic regions.[77]  Contrariwise, although the 3rd Congressional District formerly contained traditionally-Democratic Erie County in its entirety, the 2011 Plan's 3rd and 5th Congressional Districts now divide that constituency, making both districts likely to elect Republican candidates.[78]  Additionally, it is notable that the 2011 Plan's accommodation for Pennsylvania's loss of one congressional seat took the form of redrawing its 12th Congressional District, a 120-mile-long district that abuts four others and pitted two Democratic incumbent congressmen against one another in the next cycle's primary election, after which the victor of that contest lost to a Republican candidate who gleaned 51.2% of the general election vote.  These geographic idiosyncrasies, the evidentiary record shows, served to strengthen the votes of voters inclined to vote for Republicans in congressional races and weaken those inclined to vote for Democrats.

In sum, we conclude that the evidence detailed above and the remaining evidence of the record as a whole demonstrates that Petitioners have established that the 2011 Plan subordinates the traditional redistricting criteria in service of achieving unfair partisan advantage, and, thus, violates the Free and Equal Elections Clause of the Pennsylvania Constitution.  Such a plan, aimed at achieving unfair partisan gain, undermines voters' ability to exercise their right to vote in free and "equal" elections if the term is to be interpreted in any credible way.

---

[77]  Notably, in the last three congressional elections, voters in the 1st Congressional District elected a Democratic candidate with 84.9%, 82.8%, and 82.2% of the vote, respectively.

[78]  In the 2012 and 2014 congressional elections, voters in the 3rd Congressional District elected a Republican candidate with 57.1% and 60.6% of the vote, respectively, and, by 2016, the Republican candidate ran unopposed.

An election corrupted by extensive, sophisticated gerrymandering and partisan dilution of votes is not "free and equal." In such circumstances, a "power, civil or military," to wit, the General Assembly, has in fact "interfere[d] to prevent the free exercise of the right of suffrage." Pa. Const. art. 1, § 5.

## VI. Remedy

Having set forth why the 2011 Plan is constitutionally infirm, we turn to our January 22, 2018 Order which directed a remedy for the illegal plan. Therein, our Court initially invited our sister branches – the legislative and executive branches – to take action, through the enactment of a remedial congressional districting plan; however, recognizing the possibility that the legislature and executive would be unwilling or unable to act, we indicated in our Order that, in that eventuality, we would fashion a judicial remedial plan:

> Second, should the Pennsylvania General Assembly choose to submit a congressional districting plan that satisfies the requirements of the Pennsylvania Constitution, it shall submit such plan for consideration by the Governor on or before **February 9, 2018**. If the Governor accepts the General Assembly's congressional districting plan, it shall be submitted to this Court on or before **February 15, 2018**.

> Third, should the General Assembly not submit a congressional districting plan on or before **February 9, 2018**, or should the Governor not approve the General Assembly's plan on or before **February 15, 2018**, this Court shall proceed expeditiously to adopt a plan based on the evidentiary record developed in the Commonwealth Court. In anticipation of that eventuality, the parties shall have the opportunity to be heard; to wit, all parties and intervenors may submit to the Court proposed remedial districting plans on or before **February 15, 2018**.

Order, 1/22/18, at ¶¶ "Second" and "Third."

As to the initial and preferred path of legislative and executive action, we note that the primary responsibility and authority for drawing federal congressional legislative districts rests squarely with the state legislature. *See* U.S. Const. art. I, § 4; *Butcher,* 216 A.2d at 458 ("[W]e considered it appropriate that the Legislature, the organ of government with the primary responsibility for the task of reapportionment, be afforded an additional opportunity to enact a constitutional reapportionment plan."); *Growe v. Emison*, 507 U.S. 25, 34 (1993) (stating that "the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts"); *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978); *Reynolds*, 377 U.S. at 586. Thus, in recognizing this foundational tenet, but also considering both the constitutionally infirm districting plan and the imminent approaching primary elections for 2018, we requested that these sister branches enact legislation regarding a new districting plan, providing a deadline to do so approximately three weeks from the date of our Order. Indeed, if the legislature and executive timely enact a remedial plan and submit it to our Court, our role in this matter concludes, unless and until the constitutionality of the new plan is challenged.

When, however, the legislature is unable or chooses not to act, it becomes the judiciary's role to determine the appropriate redistricting plan. Specifically, while statutes are cloaked with the presumption of constitutionality, it is the duty of this Court, as a co-equal branch of government, to declare, when appropriate, certain acts unconstitutional. Indeed, matters concerning the proper interpretation and application of our Commonwealth's organic charter are at the end of the day for this Court — and only this Court. *Pap's II*, 812 A.2d at 611 (noting Supreme Court has final word on meaning of Pennsylvania Constitution). Further, our Court possesses broad authority to craft

meaningful remedies when required.  Pa. Const. art. V, §§ 1, 2, 10; 42 Pa.C.S. § 726 (granting power to "enter a final order or otherwise cause right and justice to be done").

Thus, as an alternative to the preferable legislative route for creating a remedial redistricting plan, in our Order, we considered the possibility that the legislature and Governor would not agree upon legislation providing for a remedial plan, and, thus, we allowed for the prospect of a judicially-imposed remedial plan.  Our narrowly crafted contingency, which afforded all parties and Intervenors a full and fair opportunity to submit proposed remedial plans for our consideration, was well within our judicial authority, and supported by not only our Constitution and statutes as noted above, but by Commonwealth and federal precedent, as well as similar remedies provided by the high courts of other states acting when their sister branches fail to remedy an unconstitutional plan.

Perhaps the clearest balancing of the legislature's primary role in districting against the court's ultimate obligation to ensure a constitutional plan was set forth in our decision in *Butcher*.  In that matter, our Court, after concluding a constitutionally infirm redistricting of both houses of the General Assembly resulted in an impairment of our citizens' right to vote, found it prudent to allow the legislature an additional opportunity to enact a legal remedial plan.  *Butcher*, 216 A.2d at 457-58.  Yet, we also made clear that a failure to act by the General Assembly by a date certain would result in judicial action "to ensure that the individual voters of this Commonwealth are afforded their constitutional right to cast an equally weighted vote."  *Id.* at 458-59.  After the deadline passed without enactment of the required statute, we fashioned affirmative relief, after the submission of proposals by the parties.  *Id.* at 459.  Our Order in this matter, cited above, is entirely consistent with our remedy in *Butcher*.  *See also Mellow v. Mitchell*, 607 A.2d 204, 205-06 (Pa. 1992) (designating master in wake of legislative failure to

remedy redistricting of seats for the Pennsylvania House of Representatives which was held to be unconstitutional).

Our approach is also buttressed by, and entirely consistent with, the United States Supreme Court's landmark ruling in *Baker v. Carr*, 369 U.S. 186 (1962), and more recent decisions from the United States Supreme Court which make concrete the state judiciary's ability to formulate a redistricting plan, when necessary. *See, e.g., Growe*; *Scott v. Germano*, 381 U.S. 407 (1965) (*per curiam*). As described by the high Court in *Wise*, "Legislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the 'unwelcome obligation,' *Conner v. Finch*, [431 U.S. 407, 415 (1977)], of the federal court to devise and impose a reapportionment plan pending later legislative action." *Wise*, 437 U.S. at 540. The same authority to act is inherent in the state judiciary.

Specifically, in *Growe*, the United States Supreme Court was faced with the issue of concurrent jurisdiction between a federal district court and the Minnesota judiciary regarding Minnesota's state legislative and federal congressional districts. The high Court, in a unanimous decision authored by Justice Scalia, specifically recognized the role of the state judiciary in crafting relief: "In the reapportionment context, the Court has required federal judges to defer [to] consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself." *Growe*, 507 U.S. at 33 (emphasis original). As an even more pointed endorsement of the state judiciary's ability to craft appropriate relief – indeed, encouraging action by the state judiciary – the *Growe* Court quoted its prior decision in *Scott*:

> The power of the judiciary of a State to require valid reapportionment *or to formulate a valid redistricting plan* has not only been recognized by this Court but appropriate

> action by the States in such cases has been specifically
> encouraged.

*Id.* at 33 (quoting *Scott*, 381 U.S. at 409) (emphasis added).

Thus, the *Growe* Court made clear the important role of the state judiciary in ensuring valid reapportionment schemes, not only through an assessment of constitutionality, but also through the enactment of valid legislative redistricting plans. Pursuant to *Growe,* therefore, although the legislature has initial responsibility to act in redistricting matters, that responsibility can shift to the state judiciary if a state legislature is unable or unwilling to act, and then to the federal judiciary *only* once the state legislature or state judiciary have not undertaken to remedy a constitutionally infirm plan.

Finally, virtually every other state that has considered the issue looked, when necessary, to the state judiciary to exercise its power to craft an affirmative remedy and formulate a valid reapportionment plan. *See, e.g., People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1229 (Colo. 2003) (offering, in addressing the issue of how frequently the legislature can draw congressional districts, that United States Supreme Court is clear that states have the primary responsibility in congressional redistricting, and that federal courts must defer to the states, including state courts, especially in matters turning on state constitution); *Hippert v. Richie*, 813 N.W.2d 374, 378 (Minn. 2012) (explaining that, as legislature and Governor failed to enact a legislative redistricting plan by deadline, it was up to the state judiciary to prepare a valid legislative plan and order its adoption, citing *Growe* as "precisely the sort of state judicial supervision of redistricting" that the United States Supreme Court has encouraged); *Brown v. Butterworth*, 831 So.2d 683, 688-89 (D.C. App. Fla 2002) (emphasizing constitutional power of state judiciary to require valid reapportionment); *Stephenson v. Bartlett*, 562 S.E.2d 377, 384 (N.C. 2002) (noting that it is only the Supreme Court of North Carolina that can answer state

constitutional questions with finality, and that, "within the context of state redistricting and reapportionment disputes, it is well within the 'power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan'" (quoting *Germano*, 381 U.S. at 409)); *Wilson v. Fallin*, 262 P.3d 741, 745 (Okla. 2013) (holding that three decades after *Baker v. Carr*, the United States Supreme Court in *Growe* was clear that state courts may exercise jurisdiction over legislative redistricting and that federal courts should defer to state action over questions of state redistricting by state legislatures and state courts); *Alexander v. Taylor*, 51 P.3d 1204, 1208 (Okla. 2002) ("It is clear to us that [*Baker* and *Growe*], . . . stand for the proposition that Art. 1, § 4 does not prevent either federal or state courts from resolving redistricting disputes in a proper case."); *Boneshirt v. Hazeltine*, 700 N.W.2d 746, 755 (S.D. 2005) (Konenkamp, J., concurring) (opining that the Supreme Court recognized that "[t]he power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged" and that both "[r]eason and experience argue that courts empowered to invalidate an apportionment statute which transgresses constitutional mandates cannot be left without the means to order appropriate relief."); *Jensen v. Wisconsin Board of Elections*, 639 N.W.2d 537, 542 (Wis. 2002) (*per curiam*) (noting deference of federal courts regarding "consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself" and that "any redistricting plan judicially 'enacted' by a state court (just like one enacted by a state legislature) would be entitled to presumptive full-faith-and-credit legal effect in federal court."); *but see Maudlin v. Branch*, 866 So.2d 429 (Miss. 2003) (finding, under Mississippi statute, no Mississippi court had jurisdiction to draw plans for congressional districting).

Thus, it is beyond peradventure that it is the legislature, in the first instance, that is primarily charged with the task of reapportionment. However, the Pennsylvania Constitution, statutory law, our Court's decisions, federal precedent, and case law from our sister states, all serve as a bedrock foundation on which stands the authority of the state judiciary to formulate a valid redistricting plan when necessary. Our prior Order, and this Opinion, are entirely consistent with such authority.[79]

## VII. Conclusion

For all of these reasons, the Court entered its Order of January 22, 2018, striking as unconstitutional the Congressional Redistricting Act of 2011, and setting forth a process assuring that a remedial redistricting plan would be in place in time for the 2018 Primary Elections.

Justices Donohue, Dougherty and Wecht join the opinion.

Justice Baer files a concurring and dissenting opinion.

Chief Justice Saylor files a dissenting opinion in which Justice Mundy joins.

---

[79] Justice Mundy, in her dissent, seemingly reads the federal Elections Clause in a vacuum, and, to the extent that she suggests an inability, or severely circumscribed ability, of state courts generally, or of our Court *sub judice*, to act, this approach has not been embraced or suggested by the United States Supreme Court or the Pennsylvania Supreme Court for over a half century. Indeed, to read the federal Constitution in a way that limits our Court in its power to remedy violations of our Commonwealth's Constitution is misguided and directly contrary to bedrock notions of federalism embraced in our federal Constitution, and evinces a lack of respect for state rights. In sum, and as fully set forth above, in light of interpretations of the Elections Clause like that found in *Growe* – which encourage federal courts to defer to state redistricting efforts, including congressional redistricting, and expressly permit the judicial creation of redistricting maps when a legislature fails to act – as well as essential jurisprudential concepts of comity and federalism, it is beyond peradventure that state courts possess the authority to grant equitable remedies for constitutional violations, including the drawing of congressional maps (of course, subject to federal safeguards and, principally, the Voting Rights Act).

Justice Mundy files a dissenting opinion.

# Appendix A



Pennsylvania Congressional Districts
Act 131 of 2011

SOURCE: http://www.redistricting.state.pa.us/Resources/GISData/Districts/Congressional/2011/PDF/2011-PA-Congressional-Map.pdf)

# EXHIBIT G

# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, CARMEN FEBO SAN MIGUEL, JAMES SOLOMON, JOHN GREINER, JOHN CAPOWSKI, GRETCHEN BRANDT, THOMAS RENTSCHLER, MARY ELIZABETH LAWN, LISA ISAACS, DON LANCASTER, JORDI COMAS, ROBERT SMITH, WILLIAM MARX, RICHARD MANTELL, PRISCILLA MCNULTY, THOMAS ULRICH, ROBERT MCKINSTRY, MARK LICHTY, LORRAINE PETROSKY, | : | No. 159 MM 2017 |
| | : | |
| Petitioners | : | |
| | : | |
| v. | : | |
| | : | |
| THE COMMONWEALTH OF PENNSYLVANIA; THE PENNSYLVANIA GENERAL ASSEMBLY; THOMAS W. WOLF, IN HIS CAPACITY AS GOVERNOR OF PENNSYLVANIA; MICHAEL J. STACK III, IN HIS CAPACITY AS LIEUTENANT GOVERNOR OF PENNSYLVANIA AND PRESIDENT OF THE PENNSYLVANIA SENATE; MICHAEL C. TURZAI, IN HIS CAPACITY AS SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; JOSEPH B. SCARNATI III, IN HIS CAPACITY AS PENNSYLVANIA SENATE PRESIDENT PRO TEMPORE; ROBERT TORRES, IN HIS CAPACITY AS ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JONATHAN M. MARKS, IN HIS CAPACITY AS COMMISSIONER OF THE BUREAU OF COMMISSIONS, ELECTIONS, AND LEGISLATION OF | : | |

THE PENNSYLVANIA DEPARTMENT OF        :
STATE,                                :
                                      :
              Respondents             :


### DISSENTING OPINION


**CHIEF JUSTICE SAYLOR**                    **FILED:  February 7, 2018**


I incorporate by reference my dissenting statement to the Order of January 22, 2018, per which the majority invalidated Pennsylvania's current congressional districting scheme.  In summary, I believe that:  the present exercise of extraordinary jurisdiction was improvident; this Court's review would benefit from anticipated guidance from the Supreme Court of the United States; awaiting such guidance is particularly appropriate given the delay, until 2017, of Petitioners' challenge to a 2011 redistricting plan; and the appropriate litmus for judicial review of redistricting should take into account the inherently political character of the work of the General Assembly, to which the task of redistricting has been assigned by the United States Constitution.  *See League of Women Voters of Pa. v. Commonwealth*, ___ Pa. ___, ___, ___ A.3d ___, ___, 2018 WL 496907, *1 (Jan. 22, 2018) (mem.) (Saylor, C.J., dissenting).

Further, I respectfully disagree with the majority opinion in many other material respects.  Initially, I certainly have no cause to differ with the broader strokes comprising the bulk of the opinion, including the historical accounts and the confirmation of "a voter's right to equal protection in the electoral process for the selection of his or her representatives in government," Majority Opinion, *slip op.* at 100, which is a right that is also recognized under federal constitutional law.  *See Vieth v. Jubelirer*, 541 U.S. 267, 292, 124 S. Ct. 1769, 1785 (2004) (plurality) (expressing agreement with a dissenting

Justice that severe partisan gerrymanders are inconsistent with democratic principles and may violate the Equal Protection Clause, albeit maintaining that the judiciary is incapable of devising manageable standards for the assessments of degree).

The Supreme Court of the United States has also emphasized, however, that redistricting is committed to the political branch and is inherently political.[1]   In this regard, the application of constitutional principles governing individual rights in the context of legislative redistricting is *sui generis*, given the inevitable tension between the power allocated to the Legislature to make political choices and the individual rights of voters relative to the exercise of the franchise.[2]   Moreover, in terms of the individual-rights component – and contrary to the majority's perspective – there is no right to an "equally effective power" of voters in elections, Majority Opinion, *slip op.* at 110.   *Cf. Vieth*, 541 U.S. at 288, 124 S. Ct. at 1782 ("[T]he [federal] Constitution . . . guarantees equal protection of the law to persons, not equal representation in government to equivalently sized groups.   It nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers.").   For example, the phenomenon of "packing,"

---

[1] *See generally Vieth*, 541 U.S. at 274-77, 124 S. Ct. at 1774-76 (discussing the history of political gerrymandering in the United States); *id.* at 285, 124 S. Ct. at 1781 ("The Constitution clearly contemplates districting by political entities, and unsurprisingly that turns out to be root-and-branch a matter of politics."); *id.* at 344, 124 S. Ct. at 1815 (Souter, J.) (observing "some intent to gain political advantage is inescapable whenever political bodies devise a district plan, and some effect results from the intent"); *id.* at 358, 124 S. Ct. at 1823 (Breyer, J.) (explaining that "political considerations will likely play an important, and proper, role in the drawing of district boundaries"); *Gaffney v. Cummings*, 412 U.S. 735, 753, 93 S. Ct. 2321, 2331 (1973) ("Politics and political considerations are inseparable from districting and apportionment.").

[2] *Cf. Vieth*, 541 U.S. at 360, 124 S. Ct. at 1824 (Breyer, J., dissenting) (depicting traditional or historically based voting-district boundaries as "an uneasy truce, sanctioned by tradition, among different parties seeking political advantage").

and the corresponding dilution of the effect of some votes, will occur naturally as a result of population distribution, particularly in urban areas where there is often an aggregation of similar-minded voters. *See Vieth*, 541 U.S. at 290-91, 124 S. Ct. at 1783; *id.* at 359, 124 S. Ct. at 1824 (Breyer, J., dissenting).

Given the political character of redistricting, the pervading question relating to partisan considerations, with which courts have had great difficulty, is "how much is too much?" *Id.* at 298, 124 S. Ct. at 1788 (quoting *id.* at 344, 124 S. Ct. at 1815 (Souter, J., dissenting)); *accord id.* at 313, 124 S. Ct. at 1796 (Kennedy, J., concurring) (commenting on the search for "suitable standards with which to measure the burden a gerrymander imposes on representational rights"). Rather than engaging this question in these conventional terms, the majority proceeds to overlay factors delineated by the Pennsylvania Constitution in relation to state-level reapportionment upon congressional redistricting. *See* Majority Opinion, *slip op.* at 119-124 (prioritizing the factors delineated in Article II, Section 16 of the Pennsylvania Constitution). Since these considerations are not constitutional commands applicable to congressional redistricting, the majority's approach amounts to a non-textual, judicial imposition of a prophylactic rule.

In this regard, it is significant that the majority's new rule is overprotective, in that it guards not only against intentional discrimination, but also against legislative prioritization of any factor or factors other than those delineated in Article II, Section 16, including legitimate ones. *See generally Duckworth v. Eagan*, 492 U.S. 195, 209, 109 S. Ct. 2875, 2883 (1989) (O'Connor, J., concurring) (explaining that prophylactic rules "overprotect[]" the value at stake). Significantly, such additional factors include other traditional districting criteria appropriate to political consideration -- such as the preservation of communities of interest, avoidance of pitting incumbents against each

other, and maintenance of the core of prior district lines. *See League of Women Voters*, ___ Pa. at ___, ___ A.3d at ___, 2018 WL 496907, *1 (Saylor, C.J., dissenting) (citing *Evenwel v. Abbott*, ___ U.S. ___, ___, 136 S. Ct. 1120, 1124 (2016), *Karcher v. Daggett*, 462 U.S. 725, 740, 103 S. Ct. 2653, 2663 (1983), and *Holt v. 2011 Legislative Reapportionment Comm'n*, 620 Pa. 373, 422-23, 67 A.3d 1211, 1241 (2013)).[3]

I do not dispute that prophylactic rules may be legitimate in certain contexts. But they are, by their nature, vulnerable to claims of illegitimacy. *See, e.g.*, *Dickerson v. United States*, 530 U.S. 428, 465, 120 S. Ct. 2326, 2348 (2000) (Scalia, J., dissenting) (depicting a prophylactic rule imposed by the Supreme Court of the United States as an

---

[3] I am in no way suggesting that the factors prioritized by the majority are not traditional districting criteria or that they lack relevance to the claims of discrimination. My concern is with the manner in which the majority rigidifies these factors in the congressional redistricting context.

In this regard, the majority's standard would seem to operate more stringently than that suggested by Petitioners themselves, who urge this Court to set forth a test under Article I, Section 5 embodying a more conventional equal protection litmus – that is, one in which a challenger may prevail by demonstrating an intent to discriminate combined with a discriminatory effect. *See* Brief for Petitioners at 68 (stating this Court should adopt a standard whereby the challenger must show "intentional discrimination plus [a changed] outcome of an actual congressional election").

It is also not clear whether the requirement devised by the majority, as applied to state legislative reapportionment, would alter the review in the relevant line of cases. For example, I suspect that the state congressional redistricting plan approved in this Court's *Holt* decision would fail under the new regime imposed by the majority, since, there, the Court found that the challengers had not established that a reapportionment plan encompassing numerous political-subdivision splits violated Article II, Section 16 of the Pennsylvania Constitution. *See Holt*, 620 Pa. at 383, 67 A.3d at 1217 (explaining that the unsuccessful challenge to the 2012 state legislative reapportionment plan was brought by voters "who live in the Commonwealth's wards, municipalities, and counties the [2012 Final Plan] split, often multiple times, to form Senate and House of Representatives Districts"). This circumstance appears particularly troublesome because, although the state charter speaks directly to the constraints for state legislative districts, it does not mention congressional districts at all.

example of "judicial overreaching").  The consideration of whether this sort of rule should be imposed by the judiciary upon a process committed by the federal Constitution to another branch of government seems to me to require particular caution and restraint.  *Accord Vieth*, 541 U.S. at 301, 124 S. Ct. at 1789 (discussing the drawbacks of "insertion of the judiciary into districting," including "the delay and uncertainty [it] brings to the political process and the partisan enmity it brings upon the courts"); *id.* at 291, 124 S. Ct. at 1784 (alluding to the interests in "meaningfully constrain[ing] the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking").

Quite clearly, the character of redistricting, and concomitant separation-of-powers concerns, warrant special caution on the part of the judiciary in considering regulation and intervention.  *See generally Colo. Gen. Assembly v. Salazar*, 541 U.S. 1093, 1095, 124 S. Ct. 2228, 2229 (2004) (Rehnquist, C.J., dissenting from denial of *certiorari*) (observing, in the context of a state supreme court's broad insertion of the judiciary into the redistricting process, that the constitutional "words, 'shall be prescribed in each State by the *Legislature* thereof' operate as a limitation on the State" (emphasis in original)).  Indeed, as Justice Kennedy of the Supreme Court of the United States has opined:  "A decision ordering the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process[,]" yielding "substantial intrusion into the Nation's political life."  *Vieth*, 541 U.S. at 306, 124 S. Ct. at 1792-93 (Kennedy, J., concurring).[4]

---

[4] Notably, this Court has previously recognized the more limited significance of the Article II, Section 16 factors relative to congressional redistricting.  *See Erfer v. Commonwealth*, 568 Pa. 128, 142 n.4, 794 A.2d 325, 334 n.4 (2002).

From my point of view, the majority opinion fails to sufficiently account for the fundamental character of redistricting, its allocation under the United States Constitution to the political branch, and the many drawbacks of constitutionalizing a non-textual judicial rule.  For my own part, I would abide by the Court's previous determination, in the redistricting setting, that the Free and Equal Elections Clause provides no greater protection than the state charter's Equal Protection Clauses, which have been deemed coterminous with the protection provided by the United States Constitution.  *See Erfer v. Commonwealth*, 568 Pa. 128, 138-39, 794 A.2d 325, 332 (2002).  I find that the majority's focus on a limited range of traditional districting factors allocates too much discretion to the judiciary to discern violations in the absence of proof of intentional discrimination.  Instead, I believe that, under the state and federal charters, the discretion belongs to the Legislature, which should be accorded appropriate deference and comity, as reflected in the majority's initial articulation of the presumption of constitutionality and the heavy burden borne by challengers.  *See* Majority Opinion, *slip op.* at 96.

As I said in my previous dissenting statement, I appreciate that the recommended factual findings of Judge Brobson of the Commonwealth Court suggest that the Court may be faced with a scenario involving extreme partisan gerrymandering.  Were the present process an ordinary deliberative one, I would proceed to sift through the array of potential standards to determine if there was one which I could conclude would be judicially manageable.  *See generally Vieth*, 541 U.S. at 292, 124 S. Ct. at 1784 (observing that, among the expressions of the four dissenting Justices in *Vieth*, three different standards had emerged).  In my judgment, however, the acceptance of Petitioners' entreaty to proceed with extreme exigency presents too great of an

impingement on the deliberative process to allow for a considered judgment on my part in this complex and politically-charged area of the law.

Finally, as to the remedy, I disapprove of the imposition of a judicially-drawn map for the above reasons. Furthermore, as Justice Baer discusses at length, the *per curiam* Order inviting the Legislature to redraw Pennsylvania's congressional districts provided very little time and guidance in the enterprise. *See* Concurring and Dissenting Opinion, *slip op.* at 3, 8-11 (Baer, J.). Although I do not dispute that judicial intervention may possibly be appropriate – where a constitutional violation is established based on the application of clear standards pertaining to intentional discrimination and dilution of voting power, and the Legislature has been adequately apprised of what is being required of it and afforded sufficient time to comply – regrettably, I submit that this is simply not what has happened here.

Justice Mundy joins this dissenting opinion.

# EXHIBIT H

LEAGUE OF WOMEN VOTERS OF
PENNSYLVANIA, CARMEN FEBO SAN
MIGUEL, JAMES SOLOMON, JOHN
GREINER, JOHN CAPOWSKI,
GRETCHEN BRANDT, THOMAS
RENTSCHLER, MARY ELIZABETH
LAWN, LISA ISAACS, DON LANCASTER,
JORDI COMAS, ROBERT SMITH,
WILLIAM MARX, RICHARD MANTELL,
PRISCILLA MCNULTY, THOMAS
ULRICH, ROBERT MCKINSTRY, MARK
LICHTY, LORRAINE PETROSKY,

          Petitioners


          v.


THE COMMONWEALTH OF
PENNSYLVANIA; THE PENNSYLVANIA
GENERAL ASSEMBLY; THOMAS W.
WOLF, IN HIS CAPACITY AS
GOVERNOR OF PENNSYLVANIA;
MICHAEL J. STACK III, IN HIS CAPACITY
AS LIEUTENANT GOVERNOR OF
PENNSYLVANIA AND PRESIDENT OF
THE PENNSYLVANIA SENATE;
MICHAEL C. TURZAI, IN HIS CAPACITY
AS SPEAKER OF THE PENNSYLVANIA
HOUSE OF REPRESENTATIVES;
JOSEPH B. SCARNATI III, IN HIS
CAPACITY AS PENNSYLVANIA SENATE
PRESIDENT PRO TEMPORE; ROBERT
TORRES, IN HIS CAPACITY AS ACTING
SECRETARY OF THE
COMMONWEALTH OF PENNSYLVANIA;
JONATHAN M. MARKS, IN HIS
CAPACITY AS COMMISSIONER OF THE
BUREAU OF COMMISSIONS,
ELECTIONS, AND LEGISLATION OF

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 159 MM 2017

On the Recommended Findings of Fact
and Conclusions of Law of the
Commonwealth Court of Pennsylvania
entered on 12/29/18 at No. 261 MD
2017

ARGUED:  January 17, 2018

THE PENNSYLVANIA DEPARTMENT OF     :
STATE,                             :
                                   :
              Respondents          :

**DISSENTING OPINION**

**JUSTICE MUNDY**                          **FILED:  February 7, 2018**

I respectfully dissent.   Today the Majority announces that the Pennsylvania Congressional Redistricting Act of 2011 clearly, plainly and palpably violates the Pennsylvania Constitution on the basis of the Free and Equal Elections Clause.  *See generally* PA. CONST. art. I, § 5.  The claim here is not that voters were unable to cast their vote, but rather that the power of the individual voters was diluted, thus preventing them from electing candidates of their choice.  The Majority concedes, "[n]either Article 1, Section 5, nor any other provision of our Constitution, articulates explicit standards which are to be used in the creation of congressional districts."  Majority Op. at 119. Nevertheless, the Majority holds that "certain neutral criteria" are to be utilized in drawing congressional districts in this Commonwealth.  *Id.*

In *Erfer v. Commonwealth*, 794 A.2d 325 (Pa. 2002), a partisan gerrymandering case, this Court rejected the "[p]etitioners' claim that the Pennsylvania Constitution's free and equal elections clause provides further protection to the right to vote than does the Equal Protection Clause."  *Id.* at 332.  The Court further noted that the petitioners had failed to persuade us "why we should, at this juncture, interpret our constitution in such a fashion that the right to vote is more expansive than the guarantee found in the federal constitution."  *Id.*  Despite the fact that *Erfer* established the Free and Equal Elections Clause did not provide any heightened protections to Pennsylvania voters, the Majority fails to provide legal justification for its disapproval of *Erfer*, other than citing to

*Shankey v. Staisey*, 257 A.2d 897 (Pa. 1969), which pre-dates *Erfer* by 33 years. In my view, *stare decisis* principles require us to give *Erfer* full effect.

Recognizing that the Pennsylvania Constitution does not articulate explicit standards to be used in the creation of congressional districts, the Majority fashions a three part test: "(1) the population of such districts must be equal, to the extent possible; (2) the district that is created must be comprised of compact and contiguous geographical territory, and (3) the district respects the boundaries of existing political subdivisions contained therein, such that the district divides as few of those subdivisions as possible." Majority Op. at 120-121. These vague judicially-created "neutral criteria" are now the guideposts against which all future congressional redistricting maps will be evaluated, with this Court as the final arbiter of what constitutes too partisan an influence. *Id.* at 123.

In this regard, the Majority acknowledges that these "neutral criteria" only establish a constitutional floor. Majority Op. at 123. However, the Majority admits that it is possible for the General Assembly to draw a map that fully complies with the Majority's "neutral criteria" but still "operate[s] to unfairly dilute the power of a particular group's vote for a congressional representative." *Id.* at 124. This undermines the conclusion that there is a clear, plain, and palpable constitutional violation in this case.

As I explained in my January 22, 2018 Dissenting Statement, I also have grave concerns about the Majority's remedy. I agree with the Majority that we have the authority to direct the legislative and executive branches of our government to draw new maps to remedy any violation of law. However, I am troubled by the Majority's decision to strike down the 2011 congressional map on the eve of the 2018 midterm election. Particularly its disregard for precedent which supports deferring redistricting until after the 2018 election. *See generally Butcher v. Bloom*, 203 A.2d 556, 568 (Pa. 1964). I

further share the concerns expressed by the dissenting opinion of Chief Justice Saylor and the dissenting portion of the concurring and dissenting opinion of Justice Baer that this is a political process the General Assembly should be afforded the full opportunity and adequate time to address. I write further only to address the remedy suggested by the Majority of bestowing the task of drawing a new Congressional map onto itself in the face of a clear legislative alternative.[1]

The Majority states it fully supports the "preferred path of legislative and executive action," and concedes "that the primary responsibility and authority for drawing federal congressional legislative districts rests squarely with the state legislature." Majority Op. at 132. Notwithstanding this, the Majority declares its remedy "was well within our judicial authority, and supported by not only our Constitution and statutes . . . but by Commonwealth and federal precedent, as well as similar remedies provided by the high courts of other states acting when their sister branches fail to remedy an unconstitutional plan." *Id.* at 133.

The Majority cites *Butcher* as support for its remedy, but omits that the Court in *Butcher* granted the General Assembly 11 months to draft a new map before intervening, yet it nevertheless concludes its remedy is "entirely consistent with . . . *Butcher.*" *Id.* This Court has always had the pragmatic option to utilize the current congressional maps for the 2018 election, while allowing the General Assembly the appropriate amount of time to redraw our legislative districts. Further, as I discuss below, the magnitude and breadth of the Majority's remedy is inconsistent with the restraints imposed by federal law.

---

[1] The Majority does not say whether any Court-created map remains in effect just through the 2018 elections, also through 2020, and any special elections that may arise in between, until after the 2020 census, or some other point in time.

The Elections Clause of the Federal Constitution states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State *by the Legislature thereof*; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."[2]  U.S. CONST. art I, § 4, cl. 1 (emphasis added).  The Elections Clause at its core, grants the authority to draw a state's congressional districts to the state legislatures, Congress, or an independent redistricting commission.[3]  *Ariz. State Legislature v. Ariz. Indep. Redist. Comm'n*, 135 S. Ct. 2652, 2667-68 (2015).  As the Supreme Court of the United States recognized, "redistricting is a legislative function, to be performed in accordance with

---

[2] The Supreme Court has described the Elections Clause as broad in scope, but has also noted it is a specific grant of power to the States directly.  *Cook v. Gralike*, 531 U.S. 510, 523 (2001).  The power of the States to regulate federal elections does not arise as a power "reserved" to the States under the Tenth Amendment.  *Id.*; *see also, e.g.*, U.S. CONST. amend. X.  In other words, "the States may regulate the incidents of such elections . . . only within the exclusive delegation of power under the Elections Clause."  *Cook*, 531 U.S. at 523.

In discussing "state rights" and "federalism," the Majority appears to operate on the assumption that a state legislature's redistricting authority over federal elections is indeed such a Tenth Amendment power.  Majority Op. at 137 n.79.  However, other than the Elections Clause, "[n]o other constitutional provision gives the States authority over congressional elections, and no such authority could be reserved under the Tenth Amendment."  *Cook*, 531 U.S. at 522-23.  The Elections Clause is both an express grant of, and a limitation on, the power of state governments in federal elections, including the judiciary, and as I discuss *infra*, the cases cited by the Majority are not "concrete" and do not form "a bedrock foundation."  Majority Op. at 134, 137.  This is not reading the Elections Clause "in a vacuum."  *Id.* at 137 n.79.

[3] The Majority misconstrues my view of the Elections Clause.  *See* Majority Op. at 137 n.79.  If this Court concluded that a congressional map was unconstitutional, *and* if the General Assembly was given sufficient time to act (which is not the case here) and it fails to act, a circumstance may arise where this Court could draw a map on a temporary remedial basis pending further state or federal legislative action.  But it is quite another matter for this Court to put the General Assembly on a three-week timeline without articulating the complete criteria necessary to be constitutionally compliant.

the State's prescriptions for lawmaking, which may include the referendum and the Governor's veto." *Id.* at 2668. It is a truism that this Court possesses neither legislative function, nor authority. While this Court is certainly the final arbiter of the meaning of the Pennsylvania Constitution, it may not remedy any violations of our state charter, *in a manner*, that the Federal Constitution prohibits. After all, federal law is supreme. U.S. CONST. art. VI, cl. 2.

The Majority points to certain cases that in its view "make concrete the state judiciary's ability to formulate a redistricting plan, when necessary." Majority Op. at 134. At the outset, on this point, we can set aside *Butcher v. Bloom*, 216 A.2d 457 (Pa. 1966), which pertains to the state legislative districts of the General Assembly. *Butcher*, 216 A.2d at 457-58. The Elections Clause does not itself circumscribe this Court's authority in drawing a state legislative map, as the Elections Clause only refers to "[t]he Times, Places and Manner of holding Elections for Senators and Representatives[.]" U.S. CONST. art I, § 4, cl. 1; *see also Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (stating, that the power granted to the States under the Elections Clause "is matched by state control over the election process for state offices.").

Turning to the cases of the Supreme Court of the United States cited by the Majority, none of them support the remedy contemplated here. In *Scott v. Germano*, 381 U.S. 407 (1965), the Supreme Court issued an unsigned per curiam opinion pertaining to apportionment among the Illinois Senate and the Illinois House of Representatives, which is outside the purview of the Elections Clause.[4] *Scott*, 381 U.S. at 408.

---

[4] Indeed, the cases cited in *Scott* as examples of state judicial intervention only pertain to state legislative districts. *See Scott*, 381 U.S. at 409 (collecting cases).

Nor did the Court contemplate the Elections Clause in *Growe v. Emison*, 507 U.S. 25 (1993). In *Growe*, the Court, in an opinion authored by Justice Scalia, only considered the question of *Pullman* abstention.[5] Briefly, there was dueling federal and state litigation about Minnesota's state and federal legislative districts. *Growe*, 507 U.S. at 27-28. The Court held the federal district court should have deferred any judicial intervention until the Minnesota courts had fully resolved its case. The Elections Clause was not an issue in *Growe*, the Court merely observed what the Minnesota judiciary had done, and it did not hold it to be constitutionally valid.[6] The Court's opinion in *Growe* sheds no light on whether a state court may take on the task of drawing a federal congressional map in the first instance.[7]

The Court points out that in *Wise v. Lipscomb*, 437 U.S. 535 (1978), the Supreme Court stated, "[l]egislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the 'unwelcome obligation,' . . . of the federal court to devise and impose a reapportionment

---

[5] Generally, under *Pullman* abstention, named for *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941), a federal court is required to defer to pending state court litigation "when a constitutional issue in the federal action will be mooted or presented in a different posture following conclusion of the state-court case." *Growe*, 507 U.S. at 32.

[6] Indeed, the Court explicitly stated that after the Supreme Court of Minnesota adopted its own redistricting plan, the federal district court would then be permitted to resolve any and all claims regarding the state court's plan. *Growe*, 507 U.S. at 36.

[7] Eleven years later, Justice Scalia dissented from the Court denying certiorari in *Colo. Gen. Assembly v. Salazar*, 541 U.S. 1903 (2004), which presented this very question of whether the Elections Clause permits congressional maps drawn by state courts. While I recognize such dissents are of limited value, my point is only that it would seem odd for Justice Scalia to affirmatively wish for the Court to decide a constitutional question that he himself had supposedly just decided 11 years prior.

plan pending later legislative action." *Wise*, 437 U.S. at 540; *see also* Majority Op. at 134. The Majority's reliance on this sentence is misplaced for two reasons. First, like the other cases, *Wise* pertained to a Texas local districting scheme for the Dallas City Council, which is outside the Elections Clause's sphere of concern. *Id.* at 537-38; *see also* U.S. CONST. art I, § 4, cl. 1.

More importantly, *Wise* arose out of a federal court action.[8] As noted above, by its very text, the Elections Clause leaves the task of apportionment to state legislatures. However, the Clause also explicitly contemplates that *Congress* may override state legislatures as it wishes in this area. *See Ariz. State Legislature*, 135 S. Ct. at 2670 (stating, "[t]here can be no dispute that Congress itself may draw a State's congressional-district boundaries."); *accord Vieth v. Jubelirer*, 541 U.S. 267, 275 (2004) (plurality). Of course, that same Congress is empowered to shape the jurisdiction of the federal judiciary, with certain exceptions not relevant here. *See generally* U.S. CONST. art. III, § 1. It is therefore unsurprising that Congress may empower the federal judiciary to entertain civil suits and grant relief in a manner that overrides the maps drawn by state legislatures, where Congress may do the same directly through legislation. Indeed, the Court has expressly observed the Voting Rights Act of 1965 contemplates such relief. *See Branch v. Smith*, 538 U.S. 254, 268 (2003).[9]

---

[8] In *Agre v. Wolf*, ___ F. Supp. 3d ___, 2018 WL 351603 (E.D. Pa. Jan. 10, 2018), a federal court action was filed in the Eastern District of Pennsylvania, challenging the same congressional map that is before us in this case. On January 10, 2018, a three-judge district court entered judgment in favor of the state legislative and executive named defendants. There is an appeal currently pending.

[9] *Branch*, also authored by Justice Scalia, dealt with a federal court-authored congressional map for Mississippi's districts following the 2000 census. The Court observed that Congress enacted 2 U.S.C. § 2c to require single-member congressional districts, the boundaries of which "shall be established by law." 2 U.S.C. § 2c. *Branch* observed that this express congressional authorization, also authorized state and federal courts to enforce its mandate. *Branch*, 538 U.S. at 272. Interestingly, *Branch* (continued…)

For the foregoing reasons, I respectfully dissent.

---

# EXHIBIT I

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, CARMEN FEBO SAN MIGUEL, JAMES SOLOMON, JOHN GREINER, JOHN CAPOWSKI, GRETCHEN BRANDT, THOMAS RENTSCHLER, MARY ELIZABETH LAWN, LISA ISAACS, DON LANCASTER, JORDI COMAS, ROBERT SMITH, WILLIAM MARX, RICHARD MANTELL, PRISCILLA MCNULTY, THOMAS ULRICH, ROBERT MCKINSTRY, MARK LICHTY, LORRAINE PETROSKY, | : : : : : : : : : : : : : : : : | No. 159 MM 2017 |
| Petitioners | : : : | |
| v. | : : : | |
| THE COMMONWEALTH OF PENNSYLVANIA; THE PENNSYLVANIA GENERAL ASSEMBLY; THOMAS W. WOLF, IN HIS CAPACITY AS GOVERNOR OF PENNSYLVANIA; MICHAEL J. STACK III, IN HIS CAPACITY AS LIEUTENANT GOVERNOR OF PENNSYLVANIA AND PRESIDENT OF THE PENNSYLVANIA SENATE; MICHAEL C. TURZAI, IN HIS CAPACITY AS SPEAKER OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES; JOSEPH B. SCARNATI III, IN HIS CAPACITY AS PENNSYLVANIA SENATE PRESIDENT PRO TEMPORE; ROBERT TORRES, IN HIS CAPACITY AS ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JONATHAN M. MARKS, IN HIS CAPACITY AS COMMISSIONER OF THE BUREAU OF COMMISSIONS, ELECTIONS, AND LEGISLATION OF | : : : : : : : : : : : : : : : : : : : : : : : : : | |

THE PENNSYLVANIA DEPARTMENT OF       :
STATE,                               :
                                     :
              Respondents            :
                                     :

**CONCURRING AND DISSENTING OPINION**

**JUSTICE BAER**                     **FILED:  February 7, 2018**

I respectfully offer this response to the Court's opinion in support of its order of January 22, 2018 (January 22nd Order).  I continue to join the Majority's conclusion that the Pennsylvania Congressional Redistricting Act of 2011 (2011 Plan) violates the Pennsylvania Constitution, as originally set forth in the first sentence of Paragraph First of the Court's January 22nd Order.  Moreover, I concur with the Majority's erudite explication of Article I, Section 5 of the Pennsylvania Constitution (the Free and Equal Election Clause), PA. CONST. art. I, § 5,[1] and the Court's ultimate conclusion that the 2011 Plan violates the rights protected by that provision.

For the reasons explained below and similar to concerns expressed by Chief Justice Saylor and Justice Mundy, I diverge from the Majority, which I read to impose court-designated districting criteria on the Legislature.  I, nevertheless, conclude that Pennsylvania's Free and Equal Election Clause protects Pennsylvanians' right to vote from dilution resulting from extreme partisan gerrymandering.  As elucidated *infra*, I would hold that extreme partisan gerrymandering occurs when, in the creation of a districting plan, partisan considerations predominate over all other valid districting

---

[1] The Free and Equal Election Clause is set forth in full *infra* at 5.

criteria relevant to the voting community and result in the dilution of a particular group's vote.[2]

In conformity with the other dissenting justices, I additionally dissent from the portions of the Majority Opinion supporting the remainder of the January 22nd Order, which enjoin the use of the 2011 Plan for the 2018 election cycle and set forth a procedure for implementing a new map for the May 2018 primary.[3] In my view, as explained below, the Court's remedy threatens the separation of powers dictated by Article I, Section 4 of the United States Constitution[4] by failing to allow our sister branches sufficient time to legislate a new congressional districting map, potentially impinges upon the due process rights of the parties at bar as well as other interested parties, and foments unnecessary confusion in the current election cycle.[5]

---

[2] Petitioners' argument on the Free and Equal Elections Clause appears to be tethered to their claim that the 2011 Plan violates the equal protection guarantees of the Pennsylvania Constitution provided in Article I, Sections 1 and 26. That being said, it is clear that Petitioners allege a violation of the Free and Equal Elections Clause, and thus, such claim is before the Court. Accordingly, I offer this opinion in response to the Majority's analysis of that clause.

[3] As I would not apply the finding of unconstitutionality to the May 2018 primary, I concur in Paragraph Sixth of the Court's January 22nd Order allowing the March 2018 special election in Pennsylvania's 18th Congressional District to be held under the 2011 Plan.

[4] Article I, Section 4 of the United States Constitution is set forth in relevant part *infra* at 4.

[5] To be precise, I concur in the Majority's comprehensive recitation of the background of this case in Part I, the description of this action in Part II, Part III's summary of the thorough proceedings in the Commonwealth Court including the factual findings and conclusions of law of Judge Brobson, and the presentation of the parties' and *amici's* arguments in Part IV. As said, I concur with the Majority's analysis of the Free and Equal Election Clause in Part V. A. I dissent, however, from Part V. B, which I view as requiring the Legislature to utilize specified districting criteria in drafting a redistricting (…continued)

First, I address my concerns with the "measurement of compliance" discussion set forth in Part V. B, which I interpret as dictating criteria for the Legislature to utilize in redistricting.  Article I, Section 4 of the United States Constitution unambiguously provides state legislatures with the authority and responsibility for regulating the election of Senators and Representatives to the United States Congress, subject to any enactment by Congress.  Specifically, Article I, Section 4 provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators.

U.S. CONST. art. I, § 4.  Recently, the United States Supreme Court concluded that the "legislature" designated in Section 4 includes not only the state legislative assembly but also legislative acts of the people through referenda to amend their state constitutions, such as provisions for independent commissions to draw congressional election districts.

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2659 (2015).  Section 4's use of the term "legislature," however, clearly does not encompass the judicial branch, and thus, courts lack the authority to prescribe the "times, places, and manner of holding" congressional elections.

As reiterated by the Majority Opinion, this Court's January 22nd Order indicated the following:

> [T]o comply with this Order, any congressional districting plan shall consist of: congressional districts composed of compact and contiguous territory; as nearly equal in

---

(continued…)
map, and concur only in the holding of Part V. C that the 2011 Plan is unconstitutional. Finally, I dissent to the remedy provided in Part VI.

> population as practicable; and which do not divide any
> county, city, incorporated town, borough, township, or ward,
> except where necessary to ensure equality of population.

January 22nd Order, ¶ "Fourth." The Majority ably traces the history of the adoption of nearly identical criteria by the framers of the Pennsylvania Constitution for purposes of state senatorial and representative districts. PA. CONST. art. II, § 16. Indeed, the language was also incorporated in regard to municipal election districts. PA. CONST. art. IX, §11.

In contrast to the state legislative and municipal districts, the Constitution is silent in regard to the criteria to be applied by the Legislature in establishing congressional districts for Representatives to the United States Congress. The designated criteria are also notably absent from the Free and Equal Election Clause, which with elegant simplicity, provides as follows:

> Elections shall be free and equal; and no power, civil or
> military, shall at any time interfere to prevent the free
> exercise of the right of suffrage.

PA. CONST. art. I, § 5. This language obviously does not address the size or shape of districts. Moreover, there is nothing inherent in a compact or contiguous district that insures a free and equal election, as is evidenced by claims of unconstitutional gerrymandering raised in challenges to redistricting plans of other states which employ maps created in compliance with the traditional districting criteria of compact and contiguous territory, equality of population, and minimization of municipal line division. S*ee, e.g., Whitford v. Gill*, 218 F.Supp. 3d 837 (W.D. Wis. 2016).

Accordingly, I am unwilling to engraft into the Pennsylvania Constitution criteria for the drawing of congressional districts when the framers chose not to include such provisions despite unquestionably being aware of both the General Assembly's responsibility for congressional redistricting and the dangers of gerrymandering. It is

not this Court's role to instruct the Legislature as to the "manner of holding elections," including the relative weight of districting criteria.

I nonetheless agree with the Majority's holding that the Free and Equal Election Clause protects against the dilution of votes because "a diluted vote is not an equal vote." *Id.* at 118. Moreover, I adopt the Majority's explanation of how extreme partisan gerrymandering "dilutes the votes of those who in prior elections voted for the party not in power to give the party in power a lasting electoral advantage . . . [b]y placing voters preferring one party's candidates in districts where their votes are wasted on candidates likely to lose (cracking), or by placing such voters in districts where their votes are cast for candidates destined to win (packing)." Maj. Op. at 118. Accordingly, I concur with the Majority's holding that "[a]n election corrupted by extensive, sophisticated gerrymandering and partisan dilution of votes is not 'free and equal.'" Maj. Op. at 130. Therefore, I conclude that the Free and Equal Clause is violated by the use of extreme partisan gerrymandering by the Legislature and Governor because it constitutes unconstitutional interference by a civil power "to prevent the free exercise of the right to suffrage" through vote dilution. PA. CONST. art. I, § 5. [6]

To evaluate a challenge to a congressional districting plan, I would hold that a challenger has the burden to prove that the plan clearly, plainly, and palpably violates the Free and Equal Election Clause by demonstrating that the plan resulted from extreme partisan gerrymandering. *Stilp v. Commonwealth*, 905 A.2d 918, 939 (Pa. 2006) (holding that a "legislative enactment will not be deemed unconstitutional unless it clearly, palpably, and plainly violates the Constitution"). I propose that extreme partisan gerrymandering can, in turn, be proven by evidence that partisan considerations

_____

[6] I agree with the Majority that Pennsylvania's congressional districts must also meet the requirements set forth by the federal Constitution and related statutory enactments.

predominated over all other valid districting criteria relevant to the voting community and resulted in the dilution of a particular group's vote.

I further recognize that a fully developed record establishing the absence of traditional districting criteria is indicative of extreme partisan gerrymandering for purposes of vote dilution. As explained by the Majority, because traditional districting criteria are "fundamentally impartial in nature, their utilization reduces the likelihood of the creation of congressional districts which confer on any voter an unequal advantage by giving his or her vote greater weight in the selection of a congressional representative as prohibited by Article I, Section 5." Maj. Op. at 122. Moreover, I agree that the use of traditional districting criteria "substantially reduces the risk that a voter in a particular congressional district will unfairly suffer the dilution of the power of his or her vote." *Id.*

I do not view, however, the utilization of traditional districting criteria as dispositive in every redistricting case. A map may fail to satisfy all of the traditional criteria and yet pass constitutional muster under the Free and Equal Election Clause, such as where a district is less compact due to a dispersed community of interest. Similarly, traditional districting criteria could be satisfied in a particular case and yet a totality of the evidence could still demonstrate that partisan considerations predominated in the drawing of the map as a result of extreme partisan gerrymandering.

As occurred here, a petitioner may establish that partisan considerations predominated in the drawing of the map by, *inter alia*, introducing expert analysis and testimony that the adopted map is a statistical outlier in contrast with other maps drawn utilizing traditional districting criteria and that the adopted map was not the product of other legitimate districting considerations such as the need to protect communities of interest or promote other interests relevant to the voting community. The extensive

statistical evidence outlined in detail by Judge Brobson in the Commonwealth Court and recounted in the Majority Opinion demonstrates that the 2011 Plan resulted from extreme partisan gerrymandering and, in fact, establishes that this map is one of the most gerrymandered in the nation. On this basis, Petitioners in the case at bar clearly, plainly and palpably demonstrated that partisan considerations predominated over other relevant districting criteria in the drawing of the 2011 Plan and resulted in extreme partisan gerrymandering in violation of Pennsylvania's Free and Equal Election Clause.

As I join the Court's conclusion that the 2011 Plan violates the Pennsylvania Constitution's Free and Equal Election Clause, I turn next to the remedy provided by the Majority in the January 22nd Order, as explained in Part VI of the Majority Opinion. For the reasons set forth in my concurring and dissenting statement to the January 22nd Order, I object to the development of a new redistricting plan for the 2018 election cycle. I continue to suggest respectfully that the Court reconsider its decision given the substantial uncertainty, if not outright chaos, currently unfolding in this Commonwealth regarding the impending elections, in addition to the likely further delays that will result from the continuing litigation before this Court and, potentially, the United States Supreme Court, as well as from the map-drawing process and the litigation that process will inevitably engender.

The Majority correctly observes that "it is beyond peradventure that it is the legislature, in the first instance, that is primarily charged with the task of reapportionment." Maj. Op. at 136. Unfortunately, the Legislature does not have a fair opportunity to act "in the first instance" where it has less than three weeks to develop a plan. While it is true that the Legislature technically enacted the 2011 Plan in two weeks, it is naïve to think that the legislators created the map in that short period of time, as opposed to developing and negotiating details of the map over prior months. In

fact, the Majority observes that the Legislature began hearings on the districting map as early as May of 2011 before the December passage of the 2011 Plan, suggesting that the development of the map spanned at least eight months. Maj. Op. at 6.

Rather than providing the General Assembly a reasonable opportunity to create a map and pass legislation to adopt it, the Majority has taken steps in preparation for the "possible eventuality" that the Legislature cannot act in this compressed time frame. Order, 1/26/18. Over the objection set forth in Justice Mundy's dissent, the Majority posits that state courts have the authority under United States Supreme Court precedent "to devise and impose a reapportionment plan pending later legislative action" when the legislative bodies fail to act or when "the imminence of a state election makes it impractical for [the legislature] to do so." Maj. Op. at 134 (internal citations omitted). After reviewing precedent from our sister states and the federal courts, the Majority opines that the precedent serves "as a bedrock foundation on which stands the authority of the state judiciary to formulate a valid redistricting plan when necessary." *Id.* at 137.

Respectfully, the circumstances at present do not make it "necessary" for this Court to formulate a redistricting plan for the impending 2018 elections. Instead, the unambiguous grant of redistricting authority to the state legislature under Article I, Section 4 of the Federal Constitution mandates judicial restraint to allow a legislature a reasonable period of time, which should be measured in months rather than weeks, to redistrict following a determination of unconstitutionality by a court, which preferably would provide the legislative bodies with a clear understanding of the nature of the original plan's unconstitutionality.

This case does not present a situation where the election cannot go forward under the current map, such as presumably would occur if the plan provided for more

representatives than could be seated in Congress. Indeed, the current map has been utilized for three election cycles, and the Majority is allowing it to be employed again in the upcoming special election for the 18th District. It is, therefore, unnecessary to act prior to the 2018 elections.

In support of its decision to impose a judicially created map in the event that our sister branches fail to enact a plan by February 15th, my colleagues further rely upon this Court's decision in *Butcher v. Bloom,* 216 A.2d 457 (Pa. 1966). In *Butcher*, however, the Court in 1964 had provided the Legislature nearly one year to enact a valid map. *Butcher v. Bloom,* 203 A.2d 556, 573 (Pa. 1964). Only after the Legislature failed to pass a constitutional plan during that year did this Court impose a judicially-chosen map. In contrast, this Court has provided the Legislature three weeks from the initial order to produce a new map. In my view, this does not constitute a reasonable time for the Legislature to act.[7]

I also have grave concerns regarding the Court's procedure for drawing the map should the Legislature and Governor fail to produce one by the dates set forth in the January 22nd Order, and as supplemented by the January 26th Order, to which I filed a concurring and dissenting statement.[8] The Majority asserts that it has afforded all

---

[7] Indeed, Professor Nathaniel Persily, the expert this Court engaged in its Order of January 26th, has observed that "[a] quick plan, however, is not necessarily a good plan. Indeed, a computer can draw a statewide equipopulous plan by itself in a matter of hours or even minutes, but it is unlikely to be one a court (or anyone) would want to adopt." Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1147 (2005). A good redistricting plan takes time and thoughtful consideration by legislators who know the communities impacted by the plan.

[8] Despite my disagreement with the remedy provided, I concur with the Majority's clarification that, if the Legislature and the Governor agree to a plan, then this Court's "role in this matter concludes, unless and until the constitutionality of the plan is challenged." Maj. Op. at 132.

parties and Intervenors a "full and fair opportunity to submit proposed remedial plans for our consideration." Maj. Op. at 132-33. I do not agree that allowing parties to submit a map comports with due process absent their ability to respond to alternative plans, potentially by submitting additional evidence or cross-examining witnesses. Moreover, the Majority's remedy lacks any provision for the parties to object following the release of the Court's map, which may indeed be necessary to advise the Court of any potential oversights or infirmities in the map itself.[9]

Additionally, it is unclear from the Court's orders whether the Court will "adopt a plan based on the evidentiary record developed in the Commonwealth Court" as set forth in the January 22nd Order, Paragraph Third, or whether the Court will be adopting a map based upon additional evidence submitted by the parties pursuant to the January 26th Order, obtained from the Commonwealth's public databases, or from sources extrinsic to the record utilized by Professor Persily, which have not been subjected to the rigors of evidentiary challenges either for admissibility or accuracy, as tested through cross-examination. I object to the lack of transparency of this process and urge the Court to provide the parties and the public constitutionally-mandated due process by allowing an opportunity to object to any plan that the Court may adopt.

Finally, as noted in my original concurring and dissenting statement to the January 22nd Order, I have significant concerns that this Court's unnecessarily compressed timeframe may result in the "[s]erious disruption of orderly state election

_____

[9] In contrast, Professor Persily has previously recommended that an ideal timeframe would provide for a court to begin drawing a map three months prior to the beginning of ballot qualification, allowing one month for development of the map and one month for hearings on the proposed map. Persily, 73 Geo. Wash. L. Rev. at 1147-48. He additionally observes that a reasonable goal would provide for "releasing the final version of a plan one month prior to the beginning of the petitioning period" to "give potential candidates sufficient notice as to the location of their districts and a reasonable time to decide whether they wish to run." _Id._ at 1147 n.88.

processes and basic governmental functions." *Butcher*, 203 A.2d at 568-69. Indeed, I fear that candidates will be harmed by the shortened time period and that voters will be confused as to their district. The litigation and resulting confusion that has ensued since the release of the January 22nd Order confirm my initial concerns.

# EXHIBIT J

LEAGUE OF WOMEN VOTERS OF          :  No. 159 MM 2017
PENNSYLVANIA, CARMEN FEBO SAN      :
MIGUEL, JAMES SOLOMON, JOHN        :
GREINER, JOHN CAPOWSKI,            :
GRETCHEN BRANDT, THOMAS            :
RENTSCHLER, MARY ELIZABETH         :
LAWN, LISA ISAACS, DON LANCASTER,  :
JORDI COMAS, ROBERT SMITH,         :
WILLIAM MARX, RICHARD MANTELL,     :
PRISCILLA MCNULTY, THOMAS          :
ULRICH, ROBERT MCKINSTRY, MARK     :
LICHTY, LORRAINE PETROSKY,         :
                                   :
              Petitioners          :
                                   :
                                   :
              v.                   :
                                   :
                                   :
THE COMMONWEALTH OF                :
PENNSYLVANIA; THE PENNSYLVANIA     :
GENERAL ASSEMBLY; THOMAS W.        :
WOLF, IN HIS CAPACITY AS           :
GOVERNOR OF PENNSYLVANIA;          :
MICHAEL J. STACK III, IN HIS CAPACITY :
AS LIEUTENANT GOVERNOR OF          :
PENNSYLVANIA AND PRESIDENT OF      :
THE PENNSYLVANIA SENATE;           :
MICHAEL C. TURZAI, IN HIS CAPACITY :
AS SPEAKER OF THE PENNSYLVANIA     :
HOUSE OF REPRESENTATIVES;          :
JOSEPH B. SCARNATI III, IN HIS     :
CAPACITY AS PENNSYLVANIA SENATE    :
PRESIDENT PRO TEMPORE; ROBERT      :
TORRES, IN HIS CAPACITY AS ACTING  :
SECRETARY OF THE                   :
COMMONWEALTH OF PENNSYLVANIA;      :
JONATHAN M. MARKS, IN HIS          :
CAPACITY AS COMMISSIONER OF THE    :
BUREAU OF COMMISSIONS,             :
ELECTIONS, AND LEGISLATION OF      :

THE PENNSYLVANIA DEPARTMENT OF    :
STATE,                           :
                                 :
        Respondents              :

## OPINION AND ORDER

**PER CURIAM**                                    **Filed: February 19, 2018**

By Order dated January 22, 2018, this Court announced that the Pennsylvania Congressional Redistricting Act of 2011, 25 P.S. § 3596.101 *et seq.* (the "2011 Plan"), clearly, plainly and palpably violates the Pennsylvania Constitution. This adjudication was based upon the uncontradicted evidentiary record developed in the Commonwealth Court, wherein the Petitioners established that the 2011 Plan was a partisan gerrymander and that this gerrymander was extreme and durable. It was designed to dilute the votes of those who in prior elections voted for the party not in power in order to give the party in power a lasting electoral advantage. In stark contrast, Article I, Section 5 of our Constitution provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." Pa. Const. art. I, § 5. On this record, it is clear that the 2011 Plan violates Article I, Section 5, since a diluted vote is not an equal vote.

Having determined that the 2011 Plan violates our Constitution, the question of the appropriate remedy remained. This Court was compelled to decide whether to perpetuate an unconstitutional districting plan, which would result in the unlawful dilution of our citizens' votes in the impending election, or to rectify the violation of our Commonwealth's Constitution immediately. So stated, our choice was clear. As this Court has aptly recognized, the fundamental rights guaranteed by our organic charter "cannot lawfully be infringed, even momentarily." *Pap's A.M. v. City of Erie*, 812 A.2d 591, 607 (Pa. 2002) (internal quotation marks omitted).

In our January 22 Order,[1] this Court directed that, "should the Pennsylvania General Assembly choose to submit a congressional districting plan that satisfies the requirements" of that Order, the General Assembly was to submit such a plan to the Governor on or before February 9, 2018. If the Governor accepted the General Assembly's congressional districting plan, this Court ordered such plan to be submitted to the Court on or before February 15, 2018. Thus, the General Assembly had a full eighteen days to submit a plan to the Governor, and the Governor had five days to consider and approve or disapprove the General Assembly's plan.[2]

This Court recognized that the primary responsibility for drawing congressional districts rested squarely with the legislature, but we also acknowledged that, in the eventuality of the General Assembly not submitting a plan to the Governor, or the Governor not approving the General Assembly's plan within the time specified, it would

---

[1] Justice Baer filed a concurring and dissenting statement to the Order. Chief Justice Saylor filed a dissenting statement in which Justice Mundy joined, and Justice Mundy filed a dissenting statement.

[2] In fashioning the remedy and the timeline, this Court took into consideration the requests of the parties. At oral argument on January 17, 2018, counsel for the Petitioners stated, "Our request on the remedy is that . . . the map be declared unconstitutional and that the legislature be given two weeks to come up with another map, subject obviously to the Governor's review." He further stated, "The map can be done in a day." ". . . frequently legislatures are given short time frames. . . . Yes, it's a serious task, but no, we don't believe it's unreasonable."

Counsel for the Governor stated, "[W]e are recommending that, if the map is in place by February 20 or before, we can show you that we can run this election, we can run the congressional portion of the primary and all of the up and down ballot seats by May 15." This accords with the attestations by Commissioner of the Bureau of Commissions, Elections and Legislation, Jonathan Marks, that it would be possible to hold the primary on May 15, 2018 provided a plan was in place on or before February 20, 2018.

Counsel for Speaker Turzai and Senate President Pro Tempore Scarnati stated, "I think we would like at least three weeks." His co-counsel later opined that they "need a month."

fall to this Court expeditiously to adopt a plan based upon the evidentiary record developed in the Commonwealth Court.  We also offered the opportunity for parties and intervenors to submit proposed remedial districting plans to the Court on or before February 15, 2018.  The Court specified that, to comply with the January 22 Order, any remedial congressional districting plan, whether enacted by the General Assembly and Governor or submitted by the parties and intervenors, should consist of:

> congressional districts composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population.

Order of January 22, 2018, at Paragraph "Fourth".  Furthermore, the Court advised the Executive Branch Respondents to anticipate that a remedial congressional districting plan would be available by February 19, 2018, and they were directed to take all measures, including adjusting the election calendar if necessary, to ensure that the May 15, 2018 primary election would take place as scheduled under that remedial districting plan.

The Court issued a supplemental Order on January 26, 2018, in which the Court appointed Professor Nathaniel Persily as an advisor to assist the Court in adopting, if necessary, a remedial congressional redistricting plan.[3]  Moreover, in that Order, we directed the Pennsylvania General Assembly and/or its Legislative Data Processing Center to submit to the Court data files containing the current boundaries of all Pennsylvania municipalities and precincts.  In response, counsel for the General Assembly indicated no such current files existed.[4]

---

[3] Justice Baer filed a concurring and dissenting statement.  Chief Justice Saylor and Justice Mundy dissented.

[4] Specifically, by letter dated January 31, 2018, counsel for the General Assembly indicated that such files are not updated or maintained by the General Assembly for the (continued…)

Thereafter, on February 7, 2018, this Court filed its Opinion in support of the January 22 Order, setting forth its legal rationale for determining that the 2011 Plan is violative of our Constitution.[5]  In explaining the Court's rationale, we emphasized that nothing in the Opinion was intended to conflict with, or in any way alter, the mandate contained in the January 22 Order.

Neither the General Assembly nor the Governor sought an extension of the dates set forth in our January 22 Order.  The General Assembly failed to pass legislation for the Governor's approval, thereby making it impossible for our sister branches to meet the Court's deadline.  As a result, it has become the judiciary's duty to fashion an appropriate remedial districting plan, and this Court has proceeded to prepare such a plan, a role which our Court has full constitutional authority and responsibility to assume.[6]

---

(…continued)
years between each decennial Census.  Counsel for Speaker Turzai informed the Court by letter dated January 31, 2018 that Speaker Turzai "[had] no data or documents responsive to the [Court's Order]." and that Speaker Turzai "understands that the General Assembly has submitted a letter addressing the data and documents requested…"  Finally, by letter dated January 31, 2018, counsel for Senator Scarnati responded that "[i]n light of the unconstitutionality of the Court's Orders and the Court's plain intent to usurp the General Assembly's constitutionally delegated role of drafting Pennsylvania's congressional districting plan, Senator Scarnati will not be turning over any data identified in the Court's Orders," while also footnoting that Senator Scarnati "does not possess any documents responsive to paragraph "Fourth" of the Court's January 26 Order."

[5] In response thereto, Justice Baer filed a concurring and dissenting opinion.  Chief Justice Saylor filed a dissenting opinion, joined by Justice Mundy.  Finally, Justice Mundy filed a dissenting opinion.

[6] When the legislature is unable or chooses not to act, it becomes the judiciary's role to ensure a valid districting scheme.  As explained in our Opinion, our Court possesses broad authority to craft meaningful remedies when required.  Pa. Const. art. V, §§ 1, 2, 10; 42 Pa.C.S. § 726 (granting power to "enter a final order or otherwise cause right and justice to be done").  Thus, the prospect of a judicially-imposed remedial plan was well within our judicial authority, and is supported by our Constitution and laws.

Pursuant to the January 22 Order, certain parties, the intervenors, and several *amici* submitted to the Court proposed remedial districting plans for the Court's consideration, all of which were carefully reviewed by the Court.[7] Proceeding expeditiously, the Court prepared a constitutionally sound plan in accordance with our announced criteria.

After full deliberation and consideration, the Court hereby adopts this remedial plan ("Remedial Plan")[8], as specifically described below, which shall be implemented forthwith in preparation for the May 15, 2018 primary election.[9] The Remedial Plan is based upon the record developed in the Commonwealth Court, and it draws heavily upon the submissions provided by the parties, intervenors, and *amici*. It is composed of congressional districts which follow the traditional redistricting criteria of compactness, contiguity, equality of population, and respect for the integrity of political subdivisions. The Remedial Plan splits only 13 counties.[10] Of those, four counties are split into three

---

[7] The applications for leave to file amicus briefs, filed by Concerned Citizens for Democracy, Fair Democracy, Adele Schneider and Stephen Wolf, and the American Civil Rights Union, are hereby granted. Moreover, we accepted for filing a "Brief in Opposition to Proposed Remedial Congressional Districting Maps Submitted by Petitioners, Governor Wolf, Lieutenant Governor Stack, Democratic Caucus of the Pennsylvania Senate and Democratic Caucus of the Pennsylvania House of Representatives" filed by Speaker Turzai and Senator Scarnati. Finally, Petitioners' application for leave to file a reply to that brief is hereby granted.

[8] For this process, the Court utilized the 2011 U.S. Census population data, as adjusted by Pennsylvania, available at http://www.redistricting.state.pa.us/Data.cfm.

[9] Although we provide herein a brief description of the statistical measures used to analyze the Remedial Plan, a full, computer-generated report detailing additional statistical information is available on the Court's website at http://www.pacourts.us/news-and-statistics/cases-of-public-interest/league-of-women-voters-et-al-v-the-commonwealth-of-pennsylvania-et-al-159-mm-2017.

[10] An additional county split may appear in some GIS program calculations, but that is due to the fact that a non-contiguous Chester County census block with zero population is located inside Delaware County. That census block and its adjoining water is appropriately placed inside the district that contains Delaware County.