## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACOB CORMAN, in his official capacity as Majority Leader of the Pennsylvania Senate, MICHAEL FOLMER, in his official capacity as Chairman of the Pennsylvania Senate State Government Committee, | : : : : : : | No. 18-cv-00443-CCC *(filed electronically)* |
| LOU BARLETTA, RYAN COSTELLO, MIKE KELLY, TOM MARINO, SCOTT PERRY, KEITH ROTHFUS, LLOYD SMUCKER, and GLENN THOMPSON, | : : : : : : | THREE JUDGE COURT REQUESTED PURSUANT TO 28 U.S.C. § 2284(a) |
| Plaintiffs, | : : : | |
| v. | : : | |
| ROBERT TORRES, in his official capacity as Acting Secretary of the Commonwealth, and JONATHAN M. MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections, and Legislation, | : : : : : : : | |
| Defendants. | : : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.   INTRODUCTION......................................................................................1

II.  PROCEDURAL HISTORY .....................................................................2

III. STATEMENT OF FACTS .......................................................................2

IV.  STATEMENT OF QUESTION PRESENTED ...................................4

V.   ARGUMENT .............................................................................................4

    A. Defendants should be enjoined from implementing the Court Drawn Map--Plaintiffs are likely to succeed on their Elections Clause claims.....5

    B. Plaintiffs will Suffer Irreparable Harm in Absence of Injunctive Relief. .......................................................................................................................16

    C. Plaintiffs will Suffer Greater Injury from the Denial of Injunctive Relief Than Defendants will Suffer if Injunctive Relief is Granted. .......18

    D. Injunctive Relief Will not Adversely Affect the Public Interest. .........18

# TABLE OF AUTHORITIES

**Cases**

*Agre v. Wolf*, No. CV 17-4392, 2018 WL 351603 (E.D. Pa. Jan. 10, 2018)............8

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015).................................................................................................. 6, 9, 11

*BP Chemicals, Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254 (3d Cir. 2000) ...........................................................................................................5

*Branch v. Smith*, 538 U.S. 254 (2003) .....................................................................7

*Brown v. Sec'y of State of Florida*, 668 F.3d 1271 (11th Cir. 2012)........................7

*Bush v. Gore*, 531 U.S. 98 (2000) ...........................................................................9

*Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70 (2000)..............................9

*Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ...........18

*Loftus v. Twp. of Lawrence Park*, 764 F. Supp. 354 (W.D. Pa. 1991) ...................17

*LULAC v. Perry*, 548 U.S. 399 (2006) ...................................................................10

*Maryland v. King*, 133 S. Ct. 1 (2012) ...................................................................17

*McMahon v. Pennsylvania Turnpike Comm'n,* 491 F.Supp.2d 522 (M.D. Pa. 2007) ............................................................................................................................18

*Miller v. Skumanick,* 605 F.Supp.2d 634 (M.D. Pa. 2009)......................................5

*Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916)...........................................9

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ......................................................... 19, 21

*Reynolds v. Sims*, 377 U.S. 533 (1964)...................................................................19

*Scarnati v. Wolf*, 173 A.3d 1110 (Pa. 2017)..................................................... 11, 15

*Smiley v. Holm*, 285 U.S. 355 (1932) ...............................................................9, 11

i

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) ..........................................7

*U.S. v. Georgia*, 952 F.Supp.2d 1318 (ND Ga. 2103)............................................21

*Upham v. Seamon*, 456 U.S. 37 (1982) ....................................................... 10, 19

*Valenti v. Mitchell*, 962 F.2d 288 (3d Cir. 1992)....................................................10

*Watson v. Witkin*, 22 A.2d 17 (Pa. 1941)...............................................................6

*Williams v. Rhodes*, 393 U.S. 23 (1968) ...............................................................19

**Statutes**

52 U.S.C. § 20302(a)(8).............................................................................21

**Constitutional Provisions**

Pa. Const. art. II, § 16 ................................................................................7

U.S. CONST. art. I, § 4, cl. 1 ........................................................................5

Plaintiffs submit this Memorandum in support of their motion for preliminary injunction and temporary restraining order.

## I.   **INTRODUCTION**

This matter concerns a court's unprecedented decision to supplant a Federal Constitutional mandate under the guise of judicial constitution. Through a series of orders and rulings issued in rapid succession, the Pennsylvania Supreme Court has wholly arrogated the General Assembly's exclusive authority over Congressional districting—authority delegated by the U.S. Constitution's Elections Clause. Although foreshadowed by the Pennsylvania Supreme Court's January 22, 2018 *per curiam* order ("PCO"), which established that Congressional districting plans must comply with mandatory criteria found nowhere in Pennsylvania's Constitution, the constitutional affront was completed on February 19, 2018, when the court issued its own Congressional districting plan ("Court Drawn Plan") without first affording Pennsylvania's Legislature the federally-mandated "adequate opportunity" to craft a remedial plan.

The Pennsylvania Supreme Court's handling of this matter transcends mere judicial activism; the court transformed itself into a legislative body. While federal courts generally decline to inject themselves into state separation of powers disputes, where intrusion into a legislature's role is directed specifically at powers granted by the U.S. Constitution—as is the case with Congressional districting—it

1

is incumbent upon federal courts to restore the balance of power. Plaintiffs seek immediate relief: (1) enjoining Defendants from conducting the May Congressional primary under the Court Drawn Plan; and (2) ordering that such elections be conducted under the Pennsylvania Congressional Redistricting Act of 2011 ("2011 Plan").

## II.    PROCEDURAL HISTORY

Plaintiffs respectfully refer to the procedural history articulated within the Verified Complaint, contemporaneously filed with this Memorandum.

## III.    STATEMENT OF FACTS

In June 2017, an action was initiated in the Commonwealth Court of Pennsylvania, challenging the 2011 Plan on three discrete state constitutional grounds ("Challenge"). Compl. ¶ 29. After taking extraordinary steps expediting the Challenge, *see* Compl. ¶¶ 31-34, on January 22, 2018, the court entered the PCO invalidating the 2011 Plan and enjoining its continued use, except with regard to a special election in March 2018. Compl. Ex. B.[1]

However, the PCO did not offer any reasoning for the Court's determination, failing to even identify the constitutional provision(s) implicated. Rather, the PCO simply advised that an opinion would follow and, prescribed a remedy, whereby

---

[1] Chief Justice Saylor and Justices Mundy and Baer issued responsive statements disagreeing with aspects of the PCO (Exhibits C, D and E to the Complaint, respectively).

the Legislature was to "submit" a new plan for the Governor's "consideration" within 18 days (February 9); the Governor, in turn, had six days to assess any proposal and, if he approved, was directed to "submit" it to the Pennsylvania Supreme Court by February 15; if the Governor disapproved the Legislature's proposal, or if the foregoing deadlines were missed, the court indicated it would adopt its own plan. Additionally, the court instructed the parties to "anticipate" a new Congressional districting plan by February 19 and directed Defendants to make necessary revisions to the election calendar "to ensure that the … primary takes place as scheduled[.]" Compl. Ex. B at 3.

On February 7—16 days after the 2011 Plan was invalidated—and only two days before the Legislature was required to submit its remedial map to the Governor, the court issued its opinion ("Majority Opinion"). Compl. Ex. F. On February 9, in compliance with the PCO's deadline, the Legislature's leaders submitted a proposed plan to the Governor, who rejected the plan. This rejection prompted the court to craft the Court Drawn Plan. Compl. Ex. J. Meanwhile, candidates, including Congressional Plaintiffs, have been campaigning for months reasonably anticipating that Congressional boundaries would not be entirely overhauled in the days prior to the scheduled May 15 primary. Indeed, ordinarily, the period for circulating Nominating Petitions would begin on February 13, 2018 and end on March 6. But, based on the revised schedule adopted by the court, the

first day to circulate such petitions is February 27–only days away. Compl. Ex. J., App. C. By literal judicial fiat, the Court Drawn Plan has now created a sea-change in nearly every District, materially prejudicing Federal Plaintiffs' and causing precisely the chaos Justice Baer forecast. Compl. Ex. M, at 2 (lamenting "the substantial uncertainty, if not outright chaos, currently unfolding in this Commonwealth regarding the impending elections")**.**

## IV. STATEMENT OF QUESTION PRESENTED

Does implementing the Court Drawn Map violate the Elections Clause, where it was devised outside the lawmaking process and with no legislative input and no reasonable opportunity to act?

## V. ARGUMENT

This Court should enjoin the use of the Court Drawn Plan for two fundamental reasons, each an independent violation of the Elections Clause: (1) the 2011 Plan was invalidated by application of mandatory criteria found nowhere within Pennsylvania's Constitution or legislative scheme, i.e. the Pennsylvania Supreme Court's improper arrogation of the legislative function delegated exclusively to the General Assembly; and (2) the Court Drawn Plan was issued without affording the Legislature the requisite "adequate opportunity" to craft a remedial plan. Because conducting the May primary under the Court Drawn Plan would constitute a clear violation of the Elections Clause, this Court's

immediate action is necessary. Moreover, given the election's imminence and the absence of any other validly enacted plan, Defendants should be directed to conduct the upcoming primary under the 2011 Plan.

As detailed below, Plaintiffs are entitled to immediate injunctive relief because they demonstrate that all of the requirements for such relief— (1) likelihood of success on the merits, (2) risk of imminent, irreparable harm, (3) balance of equities, and (4) the public interest—weigh in favor of granting such relief to maintain the status quo and fealty to the U.S. Constitution. *See BP Chemicals, Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 263 (3d Cir. 2000) (identifying standard for injunctive relief).[2]

> ### A. Defendants should be enjoined from implementing the Court Drawn Map--Plaintiffs are likely to succeed on their Elections Clause claims.

There is a reasonable probability that Plaintiffs will succeed on their Elections Clause claims. As relevant herein, the Elections Clause provides: "The Times, Places and Manner" of holding congressional elections "shall be prescribed in each State by the *Legislature* thereof[.]" U.S. CONST. art. I, § 4, cl. 1. While the precise contours of this provision have been occasionally reassessed, one fundamental precept has remained inviolate: Congressional redistricting is a "*legislative* function," and the Elections Clause mandates its "perform[ance] in

---

[2] A TRO is governed by the same standard as a preliminary injunction. *Miller v. Skumanick,* 605 F.Supp.2d 634, 641 (M.D. Pa. 2009).

accordance with the State's prescriptions for *lawmaking*[.]" *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015) (emphasis added).

Preliminarily, by engrafting criteria that must be satisfied when drawing a Congressional districting plan—mandatory criteria found nowhere within Pennsylvania's Constitution or legislative scheme for Congressional districting—the Pennsylvania Supreme Court has usurped authority the Elections Clause expressly and exclusively delegates to Pennsylvania's Legislature.

Second, even assuming *arguendo* the court could impose these criteria, Defendants should be enjoined from implementing the Court Drawn Plan as it was devised entirely outside Pennsylvania's lawmaking process and without first affording the Legislature its federally-mandated "adequate opportunity" to enact a remedial plan.

### i. Usurpation of the Legislature's Authority.

The Pennsylvania Supreme Court violated the Elections Clause by fashioning restrictions on the Legislature's redistricting authority so far divorced from any prescription governing the Legislature or the lawmaking process that they amount to nothing more than an improper exercise of the legislative prerogative.

It is axiomatic that the Pennsylvania Supreme Court does not exercise a legislative function. *Watson v. Witkin*, 22 A.2d 17, 23 (Pa. 1941). Yet, the rigid

criteria that the court used to invalidate the 2011 Plan, which the Legislature apparently must now satisfy when drawing a Congressional districting plan, e.g. contiguity, compactness, equal population, and limiting subdivision splits, *see* Compl. Ex. B, at 3; Compl. Ex. F, at 123, plainly amount to formulaic criteria of the type typically found in a legislatively enacted elections code or, as relevant here, Pennsylvania's Constitution. Indeed, because mandatory criteria for drawing Congressional districts are among the "Regulations" contemplated by the Elections Clause, *see, e.g.*, *Branch v. Smith*, 538 U.S. 254, 266 (2003); *Brown v. Sec'y of State of Florida*, 668 F.3d 1271, 1273-85 (11th Cir. 2012), they must emanate from only a state's legislative process or Congress. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995).

But no Pennsylvania legislative process—not the General Assembly itself, not a constitutional convention, not a referendum, not even an administrative agency with delegated rulemaking authority—adopted or ratified these newly-hatched mandatory criteria. Rather, as acknowledged in the Majority Opinion, although the state constitution contains redistricting criteria for state *legislative* districts, Pa. Const. art. II, § 16, there are no corresponding requirements relative to *Congressional* district plans. And the court's wholesale application of these

nonexistent criteria to Congressional districting is legislative action in its truest sense, albeit cloaked as an exercise in judicial review.[3]

Indeed, Chief Justice Saylor and Justice Mundy consistently highlighted the mounting Elections Clause concerns at every step of the proceedings. Compl. Ex. G, at 6-7 (urging "particular caution and restraint" when "constitutionalizing a non-textual judicial rule" and mandating in a "a process committed by the federal Constitution to [the legislature]"); Compl. Ex. H, at 6 (same). Chief Justice Saylor provided a particularly cogent exposition of the unmistakably legislative character of the State Supreme Court's proceedings:

> The latest round includes: the submission, within the past few days, of more than a dozen sophisticated redistricting plans; the lack of an opportunity for critical evaluation by all of the parties; the adoption of a judicially created redistricting plan apparently upon advice from a political scientist who has not submitted a report as of record nor appeared as a witness in any court proceeding in this case; and the absence of an adversarial hearing to resolve factual controversies arising in the present remedial phase of this litigation.

Compl. Ex. K, at 2.

Judicial overreach by a state court might ordinarily be beyond this Court's purview, but when the intrusion concerns the "legislative function" delegated by the Elections Clause, this Court then is the proper arbiter of that federal question.

---

[3] In *Agre v. Wolf*, No. CV 17-4392, 2018 WL 351603 (E.D. Pa. Jan. 10, 2018), a parallel action where a federal court rejected a similar constitutional challenge, Chief Judge Smith provided a detailed expose on the Elections Clause–including its origins and history–ultimately concluded that it proscribed judicial legislation of this nature.

*Ariz. State Legis.*, 135 S. Ct. at 2668; *see Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (where legislation concerns Presidential Electors, the legislature is exercising federal constitutional authority, not merely acting as the state's lawmaking body). Indeed, it is settled that in the "few exceptional cases in which the Constitution imposes a duty or confers a power on a particular branch of a State's government" the "text of the election law itself, and not just its interpretation by the courts of the States, takes on independent significance," thereby requiring this Court to make its own review of what Pennsylvania's lawmakers have written. *See Bush v. Gore*, 531 U.S. 98, 112 (2000) (Rehnquist, C.J., concurring) (where state statutes affect state legislature's exercise of duty or authority conferred by the U.S. Constitution, the provision itself assumes independent significance and must be interpreted, irrespective of state court interpretation). In fact, federal courts have reviewed the decisions of state courts on this very question. *See Smiley v. Holm*, 285 U.S. 355, 367 (1932); *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916).

### ii. Failure to afford adequate opportunity to remedy violation.

Even setting aside the foregoing violation, Defendants should be enjoined from implementing the Court Drawn Plan because it was issued without first affording the Legislature the requisite "adequate opportunity" to enact a remedial plan addressing the perceived constitutional infirmity—a separate Elections Clause

9

violation. While the Elections Clause does not foreclose judicial review of legislatively enacted Congressional redistricting plans, it limits a court's power to itself draw a remedial map; a court must first afford the legislature an "adequate opportunity" to enact a remedial redistricting plan, and may impose its own plan only if the legislature fails to timely act. *Upham v. Seamon*, 456 U.S. 37, 41 (1982); *accord Valenti v. Mitchell*, 962 F.2d 288, 298 (3d Cir. 1992); *LULAC v. Perry*, 548 U.S. 399, 415 (2006) ("[D]rawing lines for congressional districts is one of the most significant acts a State can perform to ensure citizen participation in republican self-governance."). Failure to afford this adequate opportunity violates the Elections Clause.

Here, the Legislature was not given an "adequate opportunity" to address the 2011 Plan's purported defect for at least two reasons. *First,* the number of days afforded by the court was less than the number of days **required** by Pennsylvania's Constitution for legislative enactments and, thus, this "opportunity" was *per se* inadequate. *Second*, the PCO ordered the implementation of a plan outside of the legislative process, thereby depriving the Legislature of an opportunity to pass districting legislation altogether.

Considering the court's actions against the backdrop of the Pennsylvania State Constitution, it becomes clear that the Legislature was not provided an adequate opportunity to act. To begin, a bill cannot—as a function of simple

arithmetic—become law until ***at least*** six days after it is introduced. Pa. CONST. art. III, § 4 ("Every bill shall be considered on three different days in each House."). Yet here, the Majority Opinion was issued on February 7—only ***two*** days before the PCO's prescribed plan submission deadline. Moreover, a bill may not become law without affording the Governor—"an integral part of the lawmaking power of the state"—***ten*** days to decide whether to exercise his executive prerogative. *Scarnati v. Wolf*, 173 A.3d 1110, 1120 (Pa. 2017) (internal citations and quotation marks omitted).[4] And although precedent does not specifically delineate what constitutes an "adequate opportunity," logic surely dictates that a legislature must be afforded at least the amount of time its State Constitution requires for a bill to become law.

Additionally, the only guidance that could be gleaned from the PCO's instruction, totaling 49 words, was that Congressional districts must be "compact and contiguous[,]" and that municipalities may not be divided, "except where necessary to ensure equality of population[.]" Compl. Ex. B, at 3. Accordingly, without the benefit of the rationale and benchmarks contained in the extensive

---

[4] Under settled Elections Clause jurisprudence, if the State Constitution contemplates a gubernatorial veto (and Pennsylvania's does), "the legislative action in districting the state for congressional elections shall be subject to the veto power … as in other cases of the exercise of the lawmaking power." *Smiley*, 285 U.S. at 373; *accord Arizona State Legislature*, 135 S. Ct. at 2668. *Smiley* is remarkably apposite here, as the U.S. Supreme Court in that case reversed a State Supreme Court decision that overlooked a Governor's veto power in the context of Congressional redistricting.

Majority Opinion, the Legislature simply could not begin formulating a cogent and compliant redistricting plan.

Most fundamentally, prior to Majority Opinion's issuance the Legislature could not have known the constitutional grounds for the 2011 Plan's invalidation. And because the standard for assessing each of the three claimed violations are palpably distinct, understanding the constitutional violation underlying the decision was a necessary prerequisite for devising a conforming plan. For example, the Free and Equal Elections (the sole basis for invalidating the 2011 Plan) was the only claim advanced in the Challenge that does not require an intentional act, and the Court recognized the importance of this distinction. *See* Compl. Ex. F, at 123-124. Surely, drawing new Congressional boundaries to comply with a novel constitutional paradigm, without knowing the lens through which its constitutionality will be assessed upon enactment—*i.e.*, subjective intent versus objective factors—would require an exercise in clairvoyance.

The Majority Opinion also identified—for the first time—the specific features of the 2011 Plan that rendered it unconstitutional. Specifically, the court concluded that a Congressional plan violates the Pennsylvania Constitution's Free and Equal Elections Clause when: (1) it splits 28 counties and 68 municipalities, *id.* at 126, 128, 130; (2) its "mean-median vote gap" is 5.9% or higher (as an acceptable range is between 0 and 4%), *id.* at 128, 130; and (3) its "efficiency gap"

is between 15% and 24% relative to statewide vote share. *Id.* at 128, 129, 130. Additionally—and, again, for the first time—the Majority Opinion described the proper interplay between the Free and Equal Elections Clause and other factors, explaining that "the preservation of prior district lines, protection of incumbents, or the maintenance of the political balance which existed after the prior reapportionment[,]" while subordinate to the newly-discerned constitutional precepts, may nevertheless be properly considered in a constitutional redistricting plan. *Id.* at 123.

As evidenced by the countless statistics and figures recited and relied upon by the Majority Opinion, legislative map-making is often a highly technical exercise. *See generally id.; see also* Exhibit 1 (order appointing a special advisor to assist the court in crafting a redistricting plan). The Legislature surely could not have been expected to effectively undertake this task based on a 49-word nebulous instruction, particularly when it calls for the application of a novel principle.

Finally, assuming *arguendo*, that the sparse instructions contained in the PCO were somehow sufficient to enable the Legislature to begin devising a remedial map, the process promulgated by the court nevertheless violates the Elections Clause in another, independent way. The PCO purports to reserve for the right to craft a judicial plan as a last resort, but, by limiting the Governor's veto power and ignoring the Legislature's concomitant override authority, it

unambiguously circumvents the legislative process to which it allegedly defers. In *Scarnati*, the Pennsylvania Supreme Court declared that Article IV, Section 15 (governing the gubernatorial veto) reflected three "manifest" tenets:

> [T]o provide the Governor with suitable time to consider the legislation, to provide the public with notice of the status of legislation via the legislative journal, and to provide the legislature with the opportunity to reconsider the legislation in light of the executive's objections.

*Id.* at 1125. All three principles, though "enshrined in our Charter," *id.* at 1120, were violated by the PCO, which: (1) severely limited the amount of time that the Governor had to consider a bill; (2) divested the Legislature of its authority to reconsider a bill in the event of a veto; and (3) deprived the public of its constitutionally guaranteed right to a record of the legislative process.

The first defect is self-evident: the PCO afforded the Governor only six days to consider a redistricting plan "submitted" to him by the Legislature. *Contra id.* at 1120 ("Section 15 entrusts [the Governor] with the obligation both to examine the provisions of the legislation within the ten days … and to either approve it or return it, disapproved, for . . . reconsideration.").

Second, the PCO provided that if the Governor did not approve a map submitted by the Legislature in the first instance, the court would assume the map-making responsibility. *Contra id.* (explaining that the Legislature has "***reciprocal obligations to*** record the Governor's objections upon the legislative journal and

*reconsider the bill*"); *see also id.* at 1139 (Baer, J., concurring and dissenting) (positing that the veto provision "epitomizes the checks and balances of our bicameral legislature and tripartite system of government").

Third, compounding the first two defects, the PCO disregarded another mandate: the Legislature's duty to maintain a record of the lawmaking process in a legislative journal. *Scarnati* is instructive:

> Legislative journals provide a clear, accurate, verifiable, public record of the legislative process by which a bill becomes law, and they demonstrate whether a bill has been enacted by the legislature, has been vetoed by the Governor, and, if so, whether the legislature has overridden the veto.

*Id.* at 1125. Indeed, *Scarnati* expressly rejects the notion that Pennsylvania's Constitution permits anything less than literal compliance with Section 15. Admonishing the intermediate court for "reduce[ing] a constitutional mandate to a negligible informality[,]" *id.* at 1135, the Pennsylvania Supreme Court cautioned:

> [C]larity is achieved through formality, a principle that prevents the attachment of constitutional significance to informal political communications conveyed in sundry formats.

*Id.* at 1133-34.

The Pennsylvania Supreme Court simply lacks the power to redesign the legislative process. And the fact that the PCO's directive to the political branches somewhat resembles an expedited version of the legislative process is unavailing because reformulated a quasi-legislative process plainly violates the Elections

Clause. *Smiley*, 285 U.S. at 367 (under the Elections Clause, "the exercise of the [legislative] authority must be in accordance with the method which the state has prescribed for legislative enactment."). Where the usurpation of authority is directed specifically–and exclusively–at legislative authority delegated by the Elections Clause, it is this Court's duty to reestablish the balance of power. Indeed, Plaintiffs' concerns are shared by three of the seven Pennsylvania Supreme Court justices who recognized that the Court Drawn Map squarely results in an Elections Clause violation. *See* Compl. Ex. M, at 2 ("I continue to conclude that the compressed schedule failed to provide a reasonable opportunity for the General Assembly to legislate a new map in compliance with the federal Constitution's delegation of redistricting authority to state legislatures."); Compl. Ex. K, at 2 ("[T]he displacement to the judiciary of the political responsibility for redistricting—which is assigned to the General Assembly by the United States Constitution—appears to me to be unprecedented."); Compl. Ex. L, at 2 ("I cannot agree that the Legislature was afforded the time necessary to accomplish the immense task of redistricting in accordance with the criteria imposed by this Court.").

### B. Plaintiffs will Suffer Irreparable Harm in Absence of Injunctive Relief.

Plaintiffs and all Pennsylvanians will be irreparably harmed if injunctive relief is not promptly granted. Preliminarily, invalidating enacted legislation

alone is irreparable injury because when a State is prevented from "effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012). Moreover, since the Court Drawn Plan will alter voting districts and election results, the potential harm to candidates is, by definition, irreparable. *Loftus v. Twp. of Lawrence Park*, 764 F. Supp. 354, 359 (W.D. Pa. 1991) ("The election is a single event incapable of repetition, and it is of such paramount importance to both the candidate and his community, that denying a candidate his effective participation in it is … of great, immediate, and irreparable harm") (internal quotation marks omitted).

The primary is in less than three months. Thus, if the Court Drawn Plan is implemented, Congressional Plaintiffs will be forced to campaign under radically altered circumstances in an unreasonable time period, thereby subjecting them to imminent and irreparable harm. Congressional Plaintiffs have expended considerable time and resources on the 2018 campaign in reasonable reliance on the boundaries established by the 2011 Plan. If the upcoming elections proceed in accordance with the Court Drawn Plan those same individuals will now be forced to expend additional time and money becoming acquainted with their new district's voters. Put simply, the Congressional Plaintiffs stand to suffer particularized and irreparable injury. *See* Mot. Prelim. Inj. & TRO Ex. A-C; Compl. ¶¶ 13-20. These pernicious consequences are not merely inconvenient, but rather, implicate core

principles of the political system. A full and vigorous campaign is central to any democracy, as it forces discussion of issues important to the electorate. *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989). Legislative Plaintiffs too will incur injury; implementation of the Court Drawn Plan entirely usurps their unique power as legislators to devise and pass a Congressional districting plan.

### C. Plaintiffs will Suffer Greater Injury from the Denial of Injunctive Relief Than Defendants will Suffer if Injunctive Relief is Granted.

The third consideration requires an assessment of whether an injunction would do more harm than good weighing all parties' interests. *McMahon v. Pennsylvania Turnpike Comm'n,* 491 F.Supp.2d 522, 529 (M.D. Pa. 2007). The preliminary injunction sought here is necessary to avoid the greater harm. If injunctive relief is not granted, Plaintiffs face the imminent risk of voter chaos and confusion, uncertainty in campaigns and election results, and wholesale usurpation of their roles as legislators, each resulting in deprivation of fundamental constitutional rights. Conversely, if injunctive relief is granted, the upcoming primary will be held under a plan in existence, and unchallenged, since 2011.

### D. Injunctive Relief Will not Adversely Affect the Public Interest.

The requested injunctive relief is in the public interest, which is best served when elections are conducted consistent with constitutional dictates and when the

people's representative body is afforded its Constitutionally-guaranteed opportunity to enact redistricting legislation without interference by the judiciary.

Court orders affecting elections can result in voter confusion and an incentive to remain away from the polls. The PCO will undoubtedly cause voter confusion and depress turnout given the imminence of the election. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (explaining voter confusion is an "incentive to remain away from the polls" and, hence, a sound basis for abstaining from invalidating electoral districts as the election approaches); *Williams v. Rhodes*, 393 U.S. 23, 35 (1968) (acknowledging constitutional violation in state election statute, but refraining from ordering a last minute change that would risk confusion).

With this in mind, it is easy to understand the U.S. Supreme Court's aversion to reflexive and immediate invalidation of electoral districts, even where a constitutional infirmity is discernable:

> In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

*Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see Upham,* 456 U.S. at 44 (reasoning that "[n]ecessity" sometimes requires "permit[ting] elections to be held pursuant to

apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements").

In addition, two unique circumstances further amplify the potential confusion. The first arises from the March 13, 2018 special election to fill the vacancy in the 18th congressional district. Under the PCO, that election will proceed in accordance with 2011 Plan's boundaries. While at first glance, excluding the special election from the operation of the PCO appears to make the ruling more manageable, the PCO's handling of this issue, further exacerbates the confusion. Candidates from the 18th district likely will be forced to run in a reconfigured version of the 18th district a mere two months after the special election. At the same time, Congressional candidates whose new district may include areas currently in the 18th district will be forced to campaign alongside the current candidates for the special election. Voters will be eligible to vote for one of the candidate in March, and another candidate in May because they will be, in effect, eligible voters in *two different districts at the same time*. On the other hand, voters who had no part in the March special election will be asked to vote in a primary that includes the candidates from that election in May. As detailed in the Complaint, Justice Baer's dissent specifically addressed this issue. Compl. ¶¶ 44-45; Compl. Ex. E., at 3.

Further adding to the disarray is the fact that challenges to the 2011 Plan proceeded in three separate actions filed in state and federal courts with divergent results. As a result, the public has certainly received information that is ostensibly inconsistent. *See* note 3 *supra*. As explained in *Purcell*, "[c]ourt orders affecting elections, *especially conflicting orders*, can themselves result in voter confusion and consequent incentive to remain away from the polls." 549 U.S. at 5.

Separately, military personnel and overseas voters' rights will be uniquely imperiled by revising the election calendar. Under the Federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), states are required to "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter … not later than 45 days before the election[.]" 52 U.S.C. § 20302(a)(8). This 45-day transmission deadline for military and overseas ballots is mandatory, such that technical compliance, whereby the state simply sends any ballot, is insufficient. *U.S. v. Georgia*, 952 F.Supp.2d 1318, 1329 (ND Ga. 2103) ("The UOCAVA] voter is, at the very least, entitled to a ballot that allows the voter to effectively exercise his or her right to vote in a runoff election, as well as to have the same information on his or her ballot that the voter who is stateside has . . .."). Yet, according to the Revised Calendar, the candidates whose names will appear on the Congressional ballots for the May 2018 primary election will not be finalized until April 4, 2018, several days after the deadline for transmitting ballots

to military and overseas voters. Compl. Ex. J., App. C. As such, county boards of election tasked with providing absentee ballots face an untenable choice: either send unsettled ballots, or violate federal statutory law by sending ballots after the statutory deadline. Either choice risks the distinct possibility of disenfranchisement inconsistent with the purpose of UOCOVA.

Finally, it is against public interest to conduct the May 2018 primary under a judicial redistricting plan that, if Plaintiffs succeed on the merits of their claims, will be abrogated prior to the next scheduled Congressional election, or even prior to the upcoming general election. An immediate injunction will restore order and provide certainty concerning the impending elections and, thus, will not only render practical assistance to the parties, but will also serve the public interest by restoring order in the Congressional election process.

Respectfully submitted,

Matthew H. Haverstick
  (PA 85072)
Mark E. Seiberling (PA 91256)
Paul G. Gagne (PA 42009)
Shohin H. Vance (PA 323551)
KLEINBARD LLC
One Liberty Place, 46th Floor
1650 Market Street
Philadelphia, PA 19103
Ph: (215) 568-2000
Email: mhaverstick@kleinbard.com
mseiberling@kleinbard.com
pgagne@kleinbard.com
svance@kleinbard.com

/s/ Brian S. Paszamant
Brian S. Paszamant (PA 78410)
Jason A. Snyderman (PA 80239)
BLANK ROME LLP
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Ph: (215) 569-5791
Fax: (215) 832-5791
Email: paszamant@blankrome.com
snyderman@blankrome.com

Joshua J. Voss (PA 306853)
KLEINBARD LLC
115 State Street, 2nd Floor
Harrisburg, PA 17101
Ph: (717) 836-7492
Fax: (215) 568-0140
Email: jvoss@kleinbard.com
*Counsel for Federal Plaintiffs*

Jason Torchinsky (*pro hac vice
application pending*)
Shawn Sheehy (*pro hac vice
application pending*)
HOLTZMAN VOGEL JOSEFIAK
TORCHINSKY PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Ph: (540) 341-8808
Fax: (540) 341-8809
Email: jtorchinsky@hvjt.law
ssheehy@hvjt.law
*Counsel for State Plaintiffs*

Dated: February 22, 2018

## <u>WORD COUNT CERTIFICATION</u>

I hereby certify that the foregoing brief complies with the word-count limit set forth in LR 7.8(b). Based on the word count feature of the word-processing system used to prepare this brief, I certify that it contains 4997 words, exclusive of the cover pages, tables, and the signature block.

Dated: February 22, 2018                    <u>/s/ Brian Paszamant</u>

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing brief to be served upon the persons and in the manner set forth below.

*VIA EMAIL AND FEDERAL EXPRESS*
Mark Alan Aronchick
Claudia De Palma
Michele D. Hangley
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
maronchick@hangley.com
cdp@hangley.com
mhangley@hangley.com

Timothy Eugene Gates
Ian Blythe Everhart
Kathleen Marie Kotula
DEPARTMENT OF STATE, OFFICE OF CHIEF COUNSEL
306 North Office Building
Harrisburg, PA 17120
tgates@pa.gov
ieverhart@pa.gov
kkotula@pa.gov

*Attorneys for Defendants*


Dated: February 22, 2018                    /s/ Brian Paszamant

# EXHIBIT 1

LEAGUE OF WOMEN VOTERS OF
PENNSYLVANIA, CARMEN FEBO SAN
MIGUEL, JAMES SOLOMON, JOHN
GREINER, JOHN CAPOWSKI,
GRETCHEN BRANDT, THOMAS
RENTSCHLER, MARY ELIZABETH
LAWN, LISA ISAACS, DON LANCASTER,
JORDI COMAS, ROBERT SMITH,
WILLIAM MARX, RICHARD MANTELL,
PRISCILLA MCNULTY, THOMAS
ULRICH, ROBERT MCKINSTRY, MARK
LICHTY, LORRAINE PETROSKY,

           Petitioners

             v.

THE COMMONWEALTH OF
PENNSYLVANIA; THE PENNSYLVANIA
GENERAL ASSEMBLY; THOMAS W.
WOLF, IN HIS CAPACITY AS
GOVERNOR OF PENNSYLVANIA;
MICHAEL J. STACK III, IN HIS CAPACITY
AS LIEUTENANT GOVERNOR OF
PENNSYLVANIA AND PRESIDENT OF
THE PENNSYLVANIA SENATE;
MICHAEL C. TURZAI, IN HIS CAPACITY
AS SPEAKER OF THE PENNSYLVANIA
HOUSE OF REPRESENTATIVES;
JOSEPH B. SCARNATI III, IN HIS
CAPACITY AS PENNSYLVANIA SENATE
PRESIDENT PRO TEMPORE; ROBERT
TORRES, IN HIS CAPACITY AS ACTING
SECRETARY OF THE
COMMONWEALTH OF PENNSYLVANIA;
JONATHAN M. MARKS, IN HIS
CAPACITY AS COMMISSIONER OF THE
BUREAU OF COMMISSIONS,
ELECTIONS, AND LEGISLATION OF

    No. 159 MM 2017

THE PENNSYLVANIA DEPARTMENT OF     :
STATE,                             :
                                   :
                Respondents        :

## ORDER

**PER CURIAM**

**AND NOW**, this 26th day of January, 2018, in furtherance of this Court's Order of January 22, 2018, and in anticipation of the possible eventuality that the General Assembly and the Governor do not enact a remedial congressional districting plan by the time periods specified in that Order, the Court orders as follows.

Pursuant to Paragraph "Third" of our Order of January 22, 2018:

First, this Court appoints Professor Nathaniel Persily as an advisor to assist the Court in adopting, if necessary, a remedial congressional redistricting plan.

Second, the Pennsylvania General Assembly shall submit to the Court, or direct the Legislative Data Processing Center to submit to the Court, no later than **January 31, 2018 at noon**, ESRI shape files that contain the current boundaries of all Pennsylvania municipalities and precincts.

Third, any redistricting plan the parties or intervenors choose to submit to the Court for its consideration shall include the following:

a.     A 2010 Census block equivalency and ESRI shape file expressing the plan.

b.     A report detailing the compactness of the districts according to each of the following measures:  Reock; Schwartzberg; Polsby-Popper; Population Polygon; and Minimum Convex Polygon.

2

c.     A report detailing the number of counties split by each district and split in the plan as a whole.

d.     A report detailing the number of municipalities split by each district and the plan as a whole.

e.     A report detailing the number of precincts split by each district and the plan as a whole.

f.     A statement explaining the proposed plan's compliance with this Court's Order of January 22, 2018.

Fourth, the parties and intervenors shall submit to the Court, no later than **January 31, 2018 at noon**, a 2010 Census block equivalency and ESRI shape file for the maps which formed the basis for the expert testimony and reports offered into evidence in the proceedings before the Commonwealth Court. All such maps shall be labeled consistently with the parties' or intervenors' exhibits and descriptions therein.

Justice Baer files a Concurring and Dissenting Statement.

Chief Justice Saylor and Justice Mundy dissent.