# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACOB CORMAN, et al., | : | No. 1:18-cv-00443-CCC |
| Plaintiffs, | : | |
| v. | : | Circuit Judge Jordan |
| | : | Chief Judge Conner |
| ROBERT TORRES, et al., | : | Judge Simandle |
| Defendants, | : | (*filed electronically*) |
| and | : | |
| CARMEN FEBO SAN MIGUEL, et al., | : | |
| Intervenor-Defendants. | : | |

**PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (DOC. 87) AND INTERVENOR-DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. 90)**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................1

COUNTER-STATEMENT OF FACTS & PROCEDURAL HISTORY ................6

LEGAL ARGUMENT ...................................................................................11

    I.      Standard of Review .....................................................................11

    II.    *Rooker-Feldman* Does Not Bar This Case..........................................12

           A.      Plaintiffs Were Not Parties To The *LOWV* Action..................13

           B.      Plaintiffs' Claims Are Not An "Appeal" Of The Pennsylvania Supreme Court's Decision.................................15

    III.   Plaintiffs Are Not Collaterally Estopped From Bringing This Action; Issue Preclusion Does Not Apply To Plaintiffs' Claims .......16

           A.      The Issues In This Case Were Not Decided In The *LOWV* Action.........................................................................17

           B.      Plaintiffs Were Not Parties To Or In Privity With The Parties in the *LOWV* Action.......................................18

           C.      Plaintiffs Did Not Have A Full And Fair Opportunity To Litigate The Issues In This Case In The *LOWV* Action ..........23

           D.      The Court Cannot Apply Issue Preclusion Because The Underlying Decision Is Unconstitutional .................................24

    IV.   Judicial Estoppel Does Not Apply .....................................................25

    V.    Plaintiffs Have Sufficiently Alleged Standing...................................29

           A.      State Plaintiffs Have Standing .................................................29

           B.      Federal Plaintiffs Have Standing .............................................35

            C.      Plaintiffs' Injuries Are Redressable .........................................38

    VI.   The Abstention Principles Of *Colorado River* Are Inapplicable Here .................................................................................................41

    VII.  *Younger* Abstention Under *Pennzoil* Does Not Apply ......................45

    VIII. Plaintiffs Have Stated Valid Claims ................................................50

           A.      The Pennsylvania Supreme Court Engaged In Legislation, Not "Interpretation" .........................................................50

i

B.    Defendants' Attempt To Recast The Facts Alleged In The Complaint Contradicts The Record, And Is Inappropriate When Considering The Pending Motions ...........................................56

CONCLUSION ......................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Johnson,*
    521 U.S. 74 (1997)...........................................................................58

*ACRA Turf Club, LLC v. Zanzuccki,*
    748 F.3d 127 (3d Cir. 2014) ....................................................47, 48

*Agre v. Wolf,*
    No. 17-4392, U.S. Dist. LEXIS 4316 (E.D. Pa. Jan. 10, 2018) .....4, 5, 37, 48, 51

*Alaska Legis. Council v. Babbitt,*
    181 F.3d 1333 (D.C. Cir. 1999).........................................................30

*Arizona State Legis. v. Arizona Indep. Redistricting Comm'n,*
    135 S. Ct. 2652 (2015)........................................1, 34, 39, 48, 52, 53

*Arizonans for Official English v. Ariz.,*
    520 U.S. 43 (1997)............................................................................29

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...........................................................................12

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)...........................................................................12

*Benavidez v. Eu,*
    34 F. 3d 825 (9th Cir. 1994) ..............................................................45

*Bergdoll v. Com.,*
    858 A.2d 185 (Pa. Commw. Ct. 2004) ..............................................20

*Branch v. Smith,*
    538 U.S. 254 (2003)....................................................................39, 51

*Brown v. Sec'y of State of Florida,*
    668 F.3d 1271 (11th Cir. 2012) ........................................................51

*Bush v. Palm Beach Cnty. Canvassing Bd.,*
    531 U.S. 70 (2000)...............................................................................4

*Caprio v. Healthcare Revenue Recovery Grp., LLC,*
    709 F.3d 142 (3d Cir. 2013) ............................................................12

*City of Philadelphia v. Klutznick,*
    503 F. Supp. 663 (E.D. Pa. 1980) ..................................................36

*Coleman v. Miller,*
    307 U.S. 433 (1939)..............................................30, 31, 33, 34

*Collins v. E.I. DuPont de Nemours & Co.,*
    34 F.3d 172 (3d Cir. 1994) ............................................................21

*Colorado River Water Conservation District v. United States,*
    424 U.S. 800 (1976).............................................................41, 42

*Common Cause v. Rucho,*
    1:16-CV-1026 (M.D.N.C.) ............................................................40

*Cook v. Gralike,*
    531 U.S. 510 (2001).............................................................36, 51

*Dennis v. Luis,*
    741 F.2d 628 (3d Cir. 1984) ......................................................31, 32

*Diamond v. Torres,*
    5:17-cv-05054-MMB (E.D. Pa. 2017)..........................25, 26, 27, 28

*Doran v. Salem, Inn, Inc.,*
    422 U.S. 922 (1975).............................................................45, 46

*EEOC v. U.S. Steel Corp.,*
    921 F.2d 489 (3d Cir. 1990) ............................................................20

*Erfer v. Commonwealth,*
    794 A.2d 325 (Pa. 2002) ..............................................................1, 56

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,*
    544 U.S. 280 (2005)......................................................................13

*Franco v. D.C.,*
    422 F. Supp. 2d 216 (D.D.C. 2006)................................................45

*Great Western Mining & Mineral Co. v. Fox Rothschild LLP*,
    615 F.3d 159 (3d Cir. 2010) ............................................................13

*Greenway Ctr., Inc. v. Essex Ins. Co.*,
    475 F.3d 139 (3d Cir. 2007) ....................................................26, 28

*Guy v. Miller*,
    No. 11 OC 00042 1B, 2011 Nev. Dist. LEXIS 32 (Nev. Dist. Oct.
    14, 2011) ............................................................................................54

*Hicks v. Miranda*,
    422 U.S. 332 (1975)..........................................................................46

*Hollingsworth v. Perry*,
    558 U.S. 183 (2010)............................................................................3

*In Re Michael C. Turzai, Speaker of the Pennsylvania House of
    Representatives, et al.*,
    No. 17-631 (U.S.) ..............................................................................51

*Johnson v. Mortham*,
    915 F. Supp. 1529 (N.D. Fla. 1995) ................................................35

*Kelly v. Maxum Specialty Ins. Grp.*,
    868 F.3d 274 (3d Cir. 2017) ....................................................42, 43

*Kennedy v. Sampson*,
    511 F.2d 430 (D.C. Cir. 1974)..........................................................30

*Kilgarlin v. Hill*,
    386 U.S. 120 (1967)..........................................................................41

*Kremer v. Chem. Constr. Corp.*,
    456 U.S. 461 (1982)..........................................................................24

*Lance v. Coffman*,
    549 U.S. 437 (2007)..........................................................................37

*Lance v. Dennis*,
    546 U.S. 459 (2006)....................................................................13, 14

*Larios v. Cox*,
    5 F. Supp. 2d 1335 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004) .....................58

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
884 F.2d 185 (5th Cir.1989) ..............................................35

*League of Women Voters of Fla. v. Detzner*,
172 So. 3d 363 (Fla. 2015) ..............................................55

*Loc. 194, Int'l. Fed'n of Prof'l and Tech. Engineers, AFL-CIO v. N.J. Turnpike Auth.*,
No. 11-cv-1653, 2011 WL 1547473 (D.N.J. Apr. 21, 2011) ...........46

*Loeper v. Mitchell*,
506 U.S. 828 (1992).....................................................58

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).....................................................29

*LULAC v. Perry*,
548 U.S. 399 (2006)....................................................5, 34

*Mellow v. Mitchell*,
607 A.2d 204 (Pa. 1992)................................................54

*Metro. Edison Co. v. Pa. Pub. Util. Comm'n*,
767 F.3d 335 (3d Cir. 2014) ................................16, 17, 23

*Morris v. Rumsfeld*,
No. CIV.A. 101-CV-1729, 2007 WL 951450 (M.D. Pa. Mar. 27, 2007) ...............................................................26

*N.J. Carpenters & the Trustees Thereof v. Tishman Constr. Corp. of N.J.*,
760 F.3d 297 (3d Cir. 2014) ........................................11, 35

*Nat'l Collegiate Athletic Ass'n v. Corbett*,
25 F. Supp. 3d 557 (M.D. Pa. 2014).....................................42

*Nat'l Collegiate Athletic Ass'n v. Corbett*,
79 F. Supp. 3d 536 (M.D. Pa. 2015).....................................24

*Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*,
571 F.3d 299 (3d Cir. 2009) ...........................18, 19, 42, 43

*New Hampshire v. Maine,*
532 U.S. 742 (2001)..................................................................26

*New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church*
*v. New Jersey State Bd. of Higher Educ.,*
654 F.2d 868 (3d Cir. 1981) .............................................46

*New Orleans Public Service, Inc. v. Council of City of New Orleans,*
491 U.S. 350 (1989)..................................................................47

*Pearson v. Koster,*
367 S.W.3d 36 (Mo. 2012) ................................................55

*Pennzoil Co. v. Texaco, Inc.,*
481 U.S. 1 (1987)..............................................45, 47, 48, 49

*Perez-Guzman v. Gracia,*
346 F.3d 229 (1st Cir. 2003)..............................................21

*R.S. by R.D.S. v. Butler Cty., Pa.,*
700 Fed. App'x 105 (3d Cir. 2017) ..................................14

*Raines v. Byrd,*
521 U.S. 811 (1997)..............................................32, 33, 34

*Reynolds v. Sims,*
377 U.S. 533 (1964)..................................................24, 41

*Robinson v. Stovall,*
646 F.2d 1087 (5th Cir. 1981) .........................................45

*Russell v. DeJongh,*
491 F.3d 130 (3d Cir. 2007) .............................................30

*Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,*
81 F.3d 355 (3d Cir.1996) ................................................28

*Ryan v. Johnson,*
115 F.3d 193 (3d Cir. 1997) .............................................42

*Semerenko v. Cendant Corp.,*
223 F.3d 165 (3d Cir. 2000) .............................................11

*Sprint Communications, Inc. v. Jacobs*,
134 S. Ct. 584 (2013) .........................................................................47

*Storer v. Brown*,
415 U.S. 724 (1974) ..........................................................................35

*Sullivan v. City of Pittsburgh*,
811 F.2d 171 (3d Cir. 1987) .......................................................45, 46

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ......................................................................19, 20

*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
812 F.3d 294 (3d Cir. 2016) ..............................................................11

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995) ..........................................................................51

*Upham v. Seamon*,
456 U.S. 37 (1982) ................................................................2, 40, 57

*Vote Choice, Inc. v. DiStefano*,
4 F.3d 26 (1st Cir. 1993) ...................................................................36

*Warth v. Selden*,
422 U.S. 490 (1975) ..........................................................................37

*Watson v. Witkin*,
22 A.2d 17 (Pa. 1941) ........................................................................53

*Wells v. Rockefeller*,
394 U.S. 542 (1969) ..........................................................................40

*Williams v. State Bd. of Elections*,
696 F. Supp. 1563 (N.D.Ill.1988) ....................................................35

*Wittman v. Personhuballah*,
136 S. Ct. 1732 (2016) ......................................................................35

*Zedner v. United States*,
547 U.S. 489 (2006) ..........................................................................26

**Statutes**

2 U.S.C. § 2a(c)..................................................................38, 39, 40, 41

**Other Authorities**

Pa. Const. art. II, § 9 ...............................................................22

Pa. Const. art. II, § 16 .............................................................55

Pa. Const. art. II, § 17 .............................................................22

Pa. Const. art. IV, § 14............................................................22

U.S. Const. art. I, § 4, cl. 1.................................................1, 51

## PRELIMINARY STATEMENT

"Redistricting involves lawmaking in its essential features and most important aspect." *Arizona State Legis. v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2667 (2015) (internal quotation marks omitted). But for the first time in United States history, a state court, assuming the role of "lawmaker," has invalidated a congressional districting plan absent that plan's violation of either (1) the U.S. Constitution or (2) specific districting criteria located within a state's constitutional or legislative framework.

In this action, Plaintiffs assert that Article I, Section 4 of the U.S. Constitution limits the ability of the Pennsylvania Supreme Court to invalidate the 2011 Plan[1] based solely upon such Plan's purported violation of "mandatory" criteria found nowhere within Pennsylvania's Constitution or statutory scheme. Not only does the Pennsylvania Supreme Court's legislation through reliance upon such nonexistent criteria directly violate the U.S. Constitution's Elections Clause, U.S. CONST. art. I, § 4, it directly contravenes an earlier decision by that same court (when assessing Pennsylvania's 2001 Congressional plan) expressly *disclaiming* the applicability of any such requirements to Pennsylvania Congressional districts. *See Erfer v. Commonwealth*, 794 A.2d 325, 334 n.4 (Pa. 2002).

---

[1] Capitalized terms used herein shall have the meanings afforded such terms within Plaintiffs' Verified Complaint (Doc. 1; the "Complaint").

But, the Pennsylvania Supreme Court's derogation of the Elections Clause and federal law did not end with its unconstitutional invalidation of the 2011 Plan. To the contrary, the court compounded its constitutional violation by first failing to afford Pennsylvania's Legislature an "adequate opportunity" to craft a remedial plan, *see Upham v. Seamon*, 456 U.S. 37, 41 (1982), and then by using the aforementioned "mandatory" criteria to craft the Court Drawn Plan. As Pennsylvania legislators possessing a direct and principal role in the crafting of any necessary remedial legislation, and U.S. Congressional incumbents, Plaintiffs have been directly, personally, and significantly harmed by the state court's actions, and pursue this action to vindicate these harms.

Executive Defendants in their motion to dismiss (Doc. 88), and Intervenors in their motion for judgment on the pleadings (Doc. 91),[2] assail Plaintiffs' claims with a coordinated smokescreen. First, they attempt to alter the landscape of this litigation by repeating – frequently, and in unison[3] – that Plaintiffs' Election Clause claims are really a "collateral attack" on a state court judgment, and thereby attempt to excuse

---

[2] Executive Defendants and Intervenors are collectively, "Defendants."

[3] The lockstep and redundant nature of Defendants' briefs – in which they make identical and overlapping arguments notwithstanding this Court's admonition, *see* Executive Defendants' Memo. of Law in Support of Motion to Dismiss ("Def. Br.") at 8, n.1 (Doc. 88) – evidences Defendants' shared agenda and entirely overlapping interests.

the Pennsylvania Supreme Court's actions as a mere "interpretation" of a state constitutional issue.[4]  Next, Defendants proclaim that this case involves the same claims and same parties as the state court action – denouncing Plaintiffs as mere "deputies" and "proxies" of the legislative defendants in the state court action (even though none of Plaintiffs here were parties thereto) – and thereby conclude that Plaintiffs' Complaint should be dismissed based upon the *Rooker-Feldman* doctrine, issue preclusion, claim preclusion, various abstention doctrines, judicial estoppel, and lack of standing.  Finally, Defendants contend that Plaintiffs' Elections Clause claims are meritless.  In actuality, Defendants' arguments, although numerous, are unfounded.[5]

---

[4] *See* Def. Br. at 7 ("Plaintiffs ask this court to sit in judgment on the propriety of the Pennsylvania Supreme Court's determination that a Pennsylvania redistricting law violates the Pennsylvania Constitution, and they ask this Court to second guess the Pennsylvania Supreme Court's remedy for this state constitutional violation."); *id.* at 20 (Plaintiffs' case "amounts to nothing more than a claim that the Pennsylvania Supreme Court has incorrectly interpreted the Pennsylvania Constitution."); *see also* Intervenors' Brief In Support of Motion For Judgment On The Pleadings Or Alternatively To Dismiss ("Int. Br."; Doc. 91) at 1, 7, 13, 15.

[5] Defendants also reference two stay applications brought by the legislative defendants in the state court action (the first of which was denied, the second of which is pending), in an effort to imply that Plaintiffs' claims herein are meritless. Of course, these stay applications do not reflect upon the propriety of Plaintiffs' claims advanced here, given, *inter alia*, the disparate standards applicable to Defendants' pending Motions versus those applications.  *See Hollingsworth v. Perry*, 558 U.S. 183 (2010) (identifying standard for securing emergency stay from U.S. Supreme Court).

For starters, Plaintiffs' claims are viable; the Pennsylvania Supreme Court violated the Elections Clause by: (1) employing criteria found nowhere within Pennsylvania's Constitution or legislative scheme to invalidate the 2011 Plan; (2) failing to afford Pennsylvania's Legislature an "adequate opportunity" to craft a remedial plan; and (3) using the aforementioned non-existent criteria to craft the new, Court Drawn Plan. *See* Compl., ¶¶ 98-114. The Elections Clause prohibits this arrogation of legislative power by a state judicial branch; under this Clause, "the legislature is not acting solely under the authority given it by the people of the State, but by virtue of a direct grant of authority" from the federal Constitution. *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76 (2000).

A court's proper and very limited role in congressional districting was recently reaffirmed in *Agre v. Wolf*, No. 17-4392, U.S. Dist. LEXIS 4316 (E.D. Pa. Jan. 10, 2018), a case also challenging the 2011 Plan. Writing for the majority, Third Circuit Chief Judge Smith declined a similar invitation to legislate congressional districting criteria (and crystalized the issue presented here) observing:

> State legislatures exercise the discretionary power afforded to them by the Elections Clause when those legislatures draw election districts. Similarly, Congress exercises the discretion afforded to it by the Elections Clause when Congress decides against upsetting those State regulations. Yet Plaintiffs ask this Court to assume the roles of state and federal legislatures, urging us to exercise the *discretion* that has been explicitly reserved to those political bodies. Accepting Plaintiffs' invitation to do so would require this Court to declare that the current political climate calls for action rather than inaction – a political

declaration that Article III of the Constitution constrains us from making.

*Id.* at *10-*11.  Also, as noted above, while federal law unequivocally requires that a state legislature be afforded an adequate opportunity to enact a remedial map, the Pennsylvania Supreme Court stripped the Legislature of any such reasonable opportunity here.  *See also LULAC v. Perry*, 548 U.S. 399, 415-16 (2006) ("[D]rawing lines for congressional districts is one of the most significant acts a State can perform to ensure citizen participation in republican self-governance….As the Constitution vests redistricting responsibilities foremost in the *legislatures of the States* and in Congress, a lawful, legislatively enacted plan should be preferable to one drawn by the courts." (emphasis added)).

Defendants' various doctrinal, abstention, and standing arguments are equally misdirected, many for similar, if not identical, reasons.  For example, Plaintiffs' claims were not litigated – and could not have been litigated – in the state court action, because they did not arise until the conclusion of that action.  Nor is there commonality between Plaintiffs in this action and certain parties in the state court action – either in name, or as "proxies" – thus precluding dismissal by application of *Rooker-Feldman*, issue preclusion, claim preclusion, and abstention.  Finally, Plaintiffs, individuals directly and significantly harmed by the Pennsylvania Supreme Court's constitutional violations, have standing to advance their claims.

In the end, Defendants advance a slew of arguments aimed at insulating the Pennsylvania Supreme Court's constitutional violations from any and all assault. But, such activity is incapable of insulation, and Defendants' Motions do not justify any other conclusion.

**<u>COUNTER-STATEMENT OF FACTS & PROCEDURAL HISTORY</u>**

Plaintiffs herein are (1) two Pennsylvania state senators – Senate Majority Leader Jacob Corman, and Senator Michael Folmer ("State Plaintiffs"), and (2) eight Pennsylvania Congressmen who are currently running for reelection ("Federal Plaintiffs"). *See* Compl., ¶¶ 11-20. As Majority Leader, Senator Corman serves as the head of the 34-16 majority controlling Pennsylvania's Senate, one of two chambers vested with legislative authority, including the passage of congressional districting legislation. Senator Folmer serves as head of the Senate State Government Committee, the Senate committee entrusted with passage of congressional districting legislation. *Id.*, ¶¶ 11-12. Federal Plaintiffs are each incumbent Congressmen who have expended large sums and great effort in connection with their reelection campaigns, and whose Districts have been greatly and adversely impacted by the Pennsylvania Supreme Court's unconstitutional actions. *Id.*, ¶¶ 13-20.

In June 2017, Intervenors brought an action in the Commonwealth Court of Pennsylvania challenging the 2011 Plan, alleging that it violated three provisions of

the Pennsylvania Constitution ("*LOWV* Action"). Prior to the *LOWV* Action, seven elections had been held under the 2011 Plan. *Id.*, ¶¶ 25-29. Among the named respondents in the *LOWV* Action were Joseph Scarnati, III, President Pro Tempore of the Pennsylvania Senate, and Michael Turzai, Speaker of the Pennsylvania House of Representatives (collectively, "*LOWV* Legislative Parties"). *Id.*, ¶ 27. Plaintiffs herein were not parties in that litigation.

A trial in the *LOWV* Action was held before the Commonwealth Court, and on December 29, 2017, that court submitted a report finding that while the 2011 Plan was driven by certain partisan motives, the Plan complied with the Pennsylvania Constitution. That court also held that a judicially manageable standard for differentiating between permissible and impermissible partisan considerations had not been identified, and that further review of the 2011 Plan was therefore inappropriate. *Id.*, ¶ 33. The Pennsylvania Supreme Court thereafter assessed the Commonwealth Court's finding on an expedited basis, and on January 22, 2018, issued the PCO, holding that the 2011 Plan violated the Pennsylvania Constitution, and enjoining its use in connection with the upcoming May 2018 primary elections. *Id.*, ¶¶ 34-35.

The PCO afforded Pennsylvania's General Assembly only 18 days (14 business days) to submit to Pennsylvania's Governor "a congressional districting plan that satisfies the requirements of the Pennsylvania Constitution…,"

requirements the court would not explain in more detail until a later opinion. In the meantime, the PCO advised that any new plan must consist of "congressional districts composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population." *Id.*, ¶ 38. If the Legislature was able to "submit" a remedial plan within the limited time afforded by the Pennsylvania Supreme Court, the Governor would then have 6 days to accept the plan and submit it to the Court. On the other hand, if a new plan was not passed by the Legislature and signed by the Governor by February 15, 2018, the court advised that it would create its own plan. *Id.*, ¶¶ 36-38.

Two justices dissented, pointing out, *inter alia*, the PCO's lack of clear guidance, and the serious federal constitutional concerns the court's majority's proposed remedy raised. A third justice dissented as to the remedy, and noted the possibility of "chaos" if the 2011 Plan was not used. *Id.*, ¶ 39-45.

The PCO's requirement that the Legislature pass a law in only 18 days created an impossible task. *Id.*, ¶ 48. Worse yet, the court did not issue its detailed, 137-page Majority Opinion until the evening of February 7, 2018 – after 16 of the 18 allotted days had elapsed. *Id.*, ¶ 65. As a result, the Legislature did not know the criteria – and indeed, the process – that any new congressional districting plan would have to satisfy until only 2 days before the Legislature was required to pass

legislation containing that plan, or even what constitutional provision had been violated. *Id.*, ¶ 109. The court's delay was significant, as the Majority Opinion applied – for the first time – what it termed "mandatory" criteria, albeit criteria memorialized nowhere within Pennsylvania's Constitution or legislative scheme for use in connection with congressional districting. *Id.*, ¶ 68. The Majority Opinion also identified for the first time that it was the Pennsylvania Constitution's Free and Equal Elections Clause that served to invalidate the 2011 Plan, and provided for the first time previously absent guidance concerning proper compliance with that clause and these newly-established criteria. *Id.*, ¶¶ 66-67, 69.

In his attendant dissent, Chief Justice Saylor articulated his profound concerns regarding the majority's unilateral grafting of criteria applicable to Pennsylvania's legislative districts onto congressional districting in contravention of the Elections Clause. *Id.*, ¶ 71. He warned: "The consideration of whether this sort of rule should be imposed by the judiciary upon *a process committed by the federal Constitution* to another branch of government seems to me to require particular caution and restraint." *Id.*, ¶ 72 (emphasis added). Justice Mundy, in her attendant dissent, highlighted her concerns about not only the clear violation of the Elections Clause through the imposition of mandatory criteria found nowhere within Pennsylvania's Constitution or statutes governing congressional redistricting, but also the extremely limited timeframe afforded the General Assembly to enact a substitute plan. *Id.*, ¶

74. Justice Baer echoed these concerns, noting that the Elections Clause does not imbue courts with legislative authority, and that because Pennsylvania's "Constitution is silent in regard to the criteria to be applied by the Legislature in establishing congressional districts," he was "unwilling to engraft into the Pennsylvania Constitution criteria for drawing congressional districts when the framers chose not to include such provisions[.]" *Id.*, ¶ 81. He also criticized three weeks as not being a "fair opportunity" for the General Assembly to create a map and pass legislation to adopt it. *Id.*, ¶ 83.

With only two days left before the court's deadline, the Legislature was unable to pass a new districting bill. *Id.*, ¶¶ 64, 111.[6]

On February 19, 2018, the Pennsylvania Supreme Court issued the Court Drawn Plan, and ordered that it be used in the upcoming primary and general elections. *Id.*, ¶ 86. The Court Drawn Plan does not appear to comply with the court's own criteria, and is riddled with pro-Democratic partisan considerations. *Id.*, ¶¶ 89-91. Defendants are charged with implementing the Court Drawn Plan. *Id.*, ¶ 92.

---

[6] On February 9, 2018, *LOWV* Legislative Parties presented Governor Wolf with a new congressional districting plan per his request. Four days later, the Governor rejected that plan and advised that he would veto it, even if the Legislature passed it. *Id.*, ¶¶61-63.

Plaintiffs commenced this action and filed their Motion for Preliminary Injunction on February 22, 2018. Plaintiffs contend that the Pennsylvania Supreme Court directly violated the Elections Clause in the ways detailed above. *Id.*, ¶¶ 98-114. Plaintiffs request that the 2011 Plan be used for the 2018 elections, since (1) Federal Plaintiffs have already expended substantial time, money, and resources in reliance, and their constituencies will be dramatically altered if the Court Drawn Plan is allowed to go forward, *id.*, ¶¶ 11-20; and (2) permitting the 2018 elections to proceed under the Court Drawn Plan in the face of these Elections Clause violations would be palpably improper, and could only serve to encourage similar violations in the future.

**LEGAL ARGUMENT**

## I.    Standard of Review

Under Fed. R. Civ. P. 12(b)(6), the movant bears the burden of establishing that the complaint has failed to sufficiently state a claim. *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 299 n.4 (3d Cir. 2016). "A court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *N.J. Carpenters & the Trustees Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014). The question on such a motion is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Semerenko v. Cendant*

*Corp.*, 223 F.3d 165, 173 (3d Cir. 2000). To overcome such a motion, a complaint must only contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"[A] motion for judgment on the pleadings based on the theory that the plaintiff failed to state a claim is reviewed under the same standards that apply to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Caprio v. Healthcare Revenue Recovery Grp., LLC*, 709 F.3d 142, 146–47 (3d Cir. 2013).

Plaintiffs' Complaint contains sufficient factual matter to state a claim to relief, and Defendants' Motions must be denied.

## II. ***Rooker-Feldman* Does Not Bar This Case**

Defendants argue that the *Rooker-Feldman* doctrine precludes this Court from hearing this case. In so arguing, they claim Plaintiffs are "counterparts" of the named defendants in the *LOWV* Action and are "asking this Court to undo the Pennsylvania Supreme Court's judgment…." Def. Br. at 9; *see* Int. Br. at 28 (adopting Executive Defendants' position). This is untrue factually (as the Complaint discloses) and legally.

A defendant asserting the *Rooker-Feldman* doctrine must prove that "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complains of injuries caused by the state-court judgments'; (3) those judgments were rendered before the federal suit

was filed; **and** (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010) (emphasis added) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).  Defendants cannot satisfy the doctrine's first or fourth prongs; Plaintiffs were not parties to the *LOWV* Action, and they are challenging the Pennsylvania Supreme Court's overreach in direct violation of the Elections Clause – an issue not litigated in the *LOWV* Action (indeed, an issue that did not arise until, at the earliest, the state court's issuance of the PCO).  The U.S. Supreme Court faced a similar situation in *Lance v. Dennis*, 546 U.S. 459, 462 (2006), and rejected this precise argument.

## A.    Plaintiffs Were Not Parties To The *LOWV* Action

Defendants do not contend that any of Plaintiffs were parties to the *LOWV* Action, nor could they.  Instead, they contend – on the basis of two statements in the press (absent from the pleadings) – that State Plaintiffs are nothing more than mere "deputies" of Senator Scarnati and Speaker Turzai, who they contend are the "real" plaintiffs in this case.  *See* Def. Br. at 10.  Defendants' argument is unfounded.[7]

---

[7] Although Defendants assert that *LOWV* Legislative Parties are the "counterparts" of Federal Plaintiffs, Def. Br. at 9, they advance no basis supporting such conclusion.

Defendants cannot impute *LOWV* Legislative Parties' participation in the *LOWV* Action to State Plaintiffs here, as their "privity" argument has been expressly addressed and rejected by the U.S. Supreme Court in an Elections Clause case. *See Dennis*, 546 U.S. at 462. In *Dennis*, involving an Elections Clause challenge to a redistricting plan created by the Colorado Supreme Court, the Court held "[t]he *Rooker-Feldman* doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." *Id.* at 466.[8] This ends the inquiry.

Defendants admit the *Rooker-Feldman* doctrine's reach has been tightened by the U.S. Supreme Court in recent years. Def. Br. at 10. However, they claim that the Court "left open the possibility that in certain 'limited' circumstances '*Rooker-Feldman* may be applied against a party not named in an earlier state proceeding.'" *Id.* (citing *Dennis*, 546 U.S. at 466 n.2). But Defendants leave out that the Court identified what type of "limited" situation it was contemplating: "where an estate takes a *de facto* appeal in a district court of an earlier state decision involving the decedent." *Dennis*, 546 U.S. at 466 n.2. This plainly does not apply here. *See R.S. by R.D.S. v. Butler Cty., Pa.*, 700 Fed. App'x 105, 108 (3d Cir. 2017) (rejecting privity argument for *Rooker-Feldman* purposes).

---

[8] The Court did not find that the plaintiffs in *Dennis* were in privity with the plaintiffs from the underlying litigation. It simply found that a privity argument does not apply in the *Rooker-Feldman* context.

Further, the press statements Defendants identify in their briefs do not establish that *LOWV* Legislative Parties are the "real" plaintiffs. Simply put, statements that "House and Senate Republican leadership will be initiating action" in federal court surely does not equate with Senator Scarnati or Speaker Turzai doing so. *See* Def. Br. at 11 (citing Jonathan Lai (@Elaijuh), Twitter (Feb. 21, 2018, 11:08 AM), *available at* https://twitter.com/Elaijuh/status/966389198923157506).[9] Defendants cannot satisfy *Rooker-Feldman*'s first prong.

**B.    Plaintiffs' Claims Are Not An "Appeal" Of The Pennsylvania Supreme Court's Decision**

Defendants incorrectly assert that Plaintiffs are "using this suit as a vehicle to collaterally attack the judgment of the Pennsylvania Supreme Court." Def. Br. at 9. The *LOWV* Action was about whether the 2011 Plan violated Pennsylvania's Constitution. Although Plaintiffs disagree with the state court's determination that the 2011 Plan violated Pennsylvania's Constitution, they are not now asking this Court to assess the 2011 Plan's constitutionality. What Plaintiffs *are* challenging are Elections Clause violations resulting in the Court Drawn Plan which Defendants are currently implementing. These violations include the Pennsylvania Supreme Court's (1) use of criteria found nowhere within Pennsylvania's Constitution or legislative scheme to invalidate the 2011 Plan, (2) failure to afford the Legislature

---

[9] This presupposes that these outside-the-pleadings statements could even be considered.

an "adequate opportunity" to craft a remedial map, and (3) use of their phantom criteria to craft the Court Drawn Plan, all in direct violation of the Elections Clause. Compl., ¶¶ 98-114. None of these issues were litigated in the *LOWV* Action; indeed, none of these issues could have been properly litigated in the *LOWV* Action because the court's actions giving rise to these violations and resulting claims did not occur until, at the earliest, the court's issuance of the PCO on January 22, 2018. *Id.*, ¶¶ 65-92. Hence, *Rooker-Feldman*'s fourth prong is not satisfied.

## III. Plaintiffs Are Not Collaterally Estopped From Bringing This Action; Issue Preclusion Does Not Apply To Plaintiffs' Claims

Defendants assert that Plaintiffs' claims are barred by issue preclusion, arguing Plaintiffs "are in privity with the legislative defendants in the state court action – defendants who previously presented the same Elections Clause arguments and lost." Int. Br. at 20. In claimed support, Defendants note that Plaintiffs' counsel represented Senator Scarnati in the state court action, and cite the aforementioned press statements by Senator Scarnati and Speaker Turzai as proof that they "planned this lawsuit for weeks." *Id.* at 21. Defendants' desired loose application of issue preclusion law should be rejected.

Federal courts apply Pennsylvania preclusion principles when assessing the preclusive effects of a Pennsylvania judgment. *See Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 767 F.3d 335, 350 (3d Cir. 2014). Under Pennsylvania law, issue preclusion applies when:

(1) the issue decided in the prior case is identical to the one presented in the later action;

(2) there was a final adjudication on the merits;

(3) the party against whom the plea is asserted was a party or in privity with a party in the prior case;

(4) the party…against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; ***and***

(5) the determination in the prior proceeding was essential to the judgment.

*Id.* at 351 (emphasis added). Defendants cannot satisfy these requirements.

## A. The Issues In This Case Were Not Decided In The *LOWV* Action

Defendants claim that "the Elections Clause 'issues decided' by the Pennsylvania Supreme Court are 'identical to' the ones Plaintiffs have presented in this action." Def. Br. at 14; *see* Int. Br. at 19 (alleging the state court "squarely ruled" on the same issues as presented here). This is patently false as explained above; the Pennsylvania Supreme Court's actions giving rise to the Elections Clause claims being pursued in this matter arose subsequent to trial in the *LOWV* Action and, at the earliest, with the issuance of the PCO.

Faced with this reality, Defendants are left to rely solely on a footnote on page 137 of the Majority Opinion as support that the Pennsylvania Supreme Court addressed the Elections Clause claims being advanced in this action. Int. Br. at 19; Def. Br. at 14. But, this reliance only underscores the flawed nature of Defendants' argument, because the Elections Clause violations at issue in this action arise, in large part, from the "mandatory" districting criteria fashioned for the first time *in*

*that very opinion*.  Moreover, Defendants offer absolutely no explanation as to how the state court has addressed Plaintiffs' claim that the Legislature was divested of an "adequate opportunity" to enact a remedial plan.

Put simply, it is nonsensical to suggest that the Elections Clause issues advanced in this action are, or even could be, identical to those issues assessed in the *LOWV* Action when all such issues did not even arise until that matter's conclusion. This reality should serve to end any issue preclusion analysis.[10]

**B.      Plaintiffs Were Not Parties To Or In Privity With The Parties in the *LOWV* Action**

But even if the issues raised in this action were somehow deemed identical to those raised in the *LOWV* Action, issue preclusion would not prevent this action from proceeding because no privity exists between Plaintiffs and *LOWV* Legislative Parties.  To establish privity, Defendants must demonstrate one of the six traditional categories.  *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 312-13 (3d Cir. 2009).  Defendants plainly cannot satisfy this requirement.

Instead, Defendants argue that Plaintiffs here were "adequately represented" by *LOWV* Legislative Parties because they share the same interests as all members of the Legislature, and that Plaintiffs have brought this suit "as the designated

---

[10] Even setting the foregoing aside, accepting Defendants' argument is tantamount to appointing the Pennsylvania Supreme Court judge, jury, and executioner.  It is entirely illogical that the court would be left the sole arbiter of its own Elections Clause violations; this is surely not the law.

representative[s] of" *LOWV* Legislative Parties.  Int. Br. at 19-20.  Using terms like "adequate representation" and "designated representatives," Defendants are, in fact, advancing a "virtual representation" argument of privity – a concept rejected by the Third Circuit and U.S. Supreme Court.  *Nationwide*, 571 F.3d at 312; *Taylor v. Sturgell*, 553 U.S. 880, 885 (2008).

"Under the 'virtual representation' version of privity, a nonparty may be estopped in a second action where a party acted as the 'virtual representative of the non-party,' meaning that 'there is such an identification of interest between the two as to represent the same legal right.'"  *Nationwide*, 571 F.3d at 311.  This is a nebulous and fact-driven concept (and therefore inappropriate for resolution on a motion to dismiss), resulting in preclusion when "the relationship between a party and non-party is 'close enough' to bring the second litigant within the judgment."  *Id.* at 312.  In *Nationwide*, the Third Circuit rejected the virtual representation theory notwithstanding the application of Pennsylvania preclusion law, following the U.S. Supreme Court's "emphatic[]" statement that it "disapprove[d] the doctrine of preclusion by 'virtual representation.'"  *Id.* at 312 (quoting *Taylor*, 553 U.S. at 885).  In fact, the U.S. Supreme Court recognized the theory's "amorphous balancing test" could violate due process and rejected the doctrine.  *Taylor*, 553 U.S. at 898, 901.

Despite this clear denouncement, Defendants nevertheless seek to invoke the "virtual representation" theory, contending that privity will be found when the party

and the non-party "share 'such an identification of interest … with another as to represent the same legal right.'" Int. Br. at 19 (citing *Bergdoll v. Com.*, 858 A.2d 185, 197 (Pa. Commw. Ct. 2004)); *see also id.* (citing *EEOC v. U.S. Steel Corp.*, 921 F.2d 489, 493 (3d Cir. 1990) for the proposition that privity means that "the relationship between one who is on the record and another *is close enough* to include that other within the res judicata") (emphasis added)). But, this is the very definition of virtual representation, and this Court is compelled to reject Defendants' theory.

Additionally, even if this Court were inclined to determine the question of whether Plaintiffs were "adequately represented" in the *LOWV* Action or if they are the "designated representatives" of *LOWV* Legislative Parties, the answer is clearly "no" to both. To demonstrate "adequate representation," Defendants must show (1) the interests of the nonparty and the alleged representative are "aligned" and (2) "either the party understood [themselves] to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Taylor*, 553 U.S. at 900. Defendants cannot establish either.

In the *LOWV* Action, Legislative Parties' interests were in defending the 2011 Plan against attack. The case revolved around the constitutionality of the 2011 Plan and *LOWV* Legislative Parties defended that Plan's constitutionality on the merits. Plaintiffs here, by contrast, are not arguing that the 2011 Plan was constitutional or that the state court lacked authority to assess its constitutionality. Rather, Plaintiffs

challenge that court's unconstitutional usurpation of the Pennsylvania Legislature's legislative powers in imposing new "mandatory" (albeit nonexistent) districting criteria, failing to provide the Legislature an adequate opportunity to enact remedial legislation, and drawing a replacement plan utilizing the new criteria.

Separately, Defendants argue that there was "adequate representation" of Federal Plaintiffs because counsel for Federal Plaintiffs, Mr. Haverstick, also represented Senator Scarnati in the *LOWV* Action. Int. Br. at 21. This reeks of desperation; lawyers frequently represent different clients with divergent interests in different litigations. Further, federal courts routinely refuse to find privity or substantial control over the litigation merely because a nonparty retained the same attorney who represented a party to the earlier action. *See, e.g.*, *Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 178 (3d Cir. 1994) (holding the fact that plaintiff "had the same attorney as the plaintiffs in the first suit" did not make preclusion appropriate); *Perez-Guzman v. Gracia*, 346 F.3d 229, 234 (1st Cir. 2003) (finding no inference of control over litigation when plaintiff's attorney also represented his political party in prior litigation).

Additionally, Defendants claim that Federal Plaintiffs "are acting in a 'representative capacity' for, or 'as designated representatives' of, Speaker Turzai and Senator Scarnati in this case." Int. Br. at 21. Yet, the only alleged "proof" cited is that Speaker Turzai and Senator Scarnati commented on the possibility of a

lawsuit being filed in federal court and that their lawyers filed a stay application raising similar arguments to those asserted by Plaintiffs here. Here again, this at best circumstantial evidence, located entirely outside the pleadings, should not be considered by the Court, and surely does not demonstrate that Plaintiffs agreed to represent *LOWV* Legislative Parties' interests here.

Finally, State Plaintiffs also do not represent *LOWV* Legislative Parties' interests. Each Pennsylvania State Senator is independently elected from his or her own senate district. No Senator is – under the Pennsylvania Constitution – a servant or deputy of another Senator. Each casts an equal vote when the State Senate is considering legislation. Moreover, the role of the President Pro Tempore ("Pro Tem") is distinct from that of the Senate Majority Leader, with different responsibilities. The Pro Tem is an institutional office created by the Pennsylvania Constitution, whereas the Senate Majority Leader is the elected leader of the Republican Caucus, selected by his colleagues. While the Senate Majority Leader is responsible for the Caucus, the Pro Tem serves both Republicans and Democrats and has the duties and authority of the office set forth by the Pennsylvania Constitution, Senate Rules, and the Legislative Officers and Employes [sic] Law. *See* Pa. Const. art. II, §§ 9, 17(b); art. IV, § 14; Rules of the Senate of Pa., *available at* http://www.pasen.gov/rules/2017SenRules.pdf; Act of Jan. 10, (1968) 1967, P.L.

925, No. 417. State Plaintiffs are not the "designated representatives" of *LOWV* Legislative Parties.

### C. Plaintiffs Did Not Have A Full And Fair Opportunity To Litigate The Issues In This Case In The *LOWV* Action

Issue preclusion is also not applicable here because there was not a full and fair opportunity to litigate this case in the *LOWV* Action. The Third Circuit has held that a "full and fair opportunity" includes the opportunity to be represented by counsel in the original action, file briefs and evidence, and participate at any oral argument held. *See Metro. Edison Co. v. Pa. Pub. Util. Comm'n*, 767 F.3d 335, 351 (3d Cir. 2014) (finding fair opportunity when parties were "represented by counsel, filed multiple briefs, pointed to evidence from the [underlying administrative] hearing, and presented oral argument to the [court]"). Defendants do not even attempt to show that there was a full and fair opportunity to litigate the instant issues in the *LOWV* Action – because there was not one.

As described above, the issues in this case – *i.e.*, the Elections Clause violations alleged here – each occurred *after* the trial. They did not arise until the state court issued its orders and opinions, and *LOWV* Legislative Parties therefore simply could not have litigated these issues. Accordingly, even assuming privity between *LOWV* Legislative Parties and Plaintiffs, Plaintiffs plainly did not have a full and fair opportunity to litigate the issues in the state court action.

**D.    The Court Cannot Apply Issue Preclusion Because The Underlying Decision Is Unconstitutional**

The U.S. Supreme Court has instructed that "[a] State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state *and federal courts* are not required to accord full faith and credit to such a judgment." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982) (emphasis added); *see also Nat'l Collegiate Athletic Ass'n v. Corbett* ("*Corbett II*"), 79 F. Supp. 3d 536, 542 n.5 (M.D. Pa. 2015) (noting "federal courts need not afford preclusive effect to state judgments that are…constitutionally defective" on due process grounds).

Here, Plaintiffs claim that the Pennsylvania Supreme Court's actions violate the Elections Clause in several ways, but each subsumed within that court's judgment. As such, Defendants are simply not permitted to rely upon that unconstitutionally infirm judgment to bar Plaintiffs' claims. Of course, this makes perfect sense: were the result otherwise, state courts (particularly the highest court in any state) could simply insulate their actions from further review based upon issue preclusion principles even if those actions resulted in a judgment violating the U.S. Constitution. The U.S. Constitution's Supremacy Clause countenances no such result. *See Reynolds v. Sims*, 377 U.S. 533, 584 (1964) (holding provisions of a state constitution were unconstitutional under the Supremacy Clause of the U.S. Constitution because the provisions violated the Equal Protection Clause).

In addition to being "constitutionally infirm," the state court's failure to provide the Legislature with an adequate opportunity to create a remedial plan violates due process principles. Justice Baer, who joined in the court's majority holding that the 2011 Plan was unconstitutional, dissented from the court's "remedial" actions, expressing his concern that the remedy encroaches on due process rights. *See* Compl., Ex. I at 3 (stating "the Court's remedy threatens the separation of powers dictated by Article I, Section 4 of the United States Constitution by failing to allow our sister branches sufficient time to legislate a new congressional districting map, potentially impinges upon the due process rights of the parties at bar as well as other interested parties, and foments unnecessary confusion in the current election cycle."); *id.* at 11 (objecting to remedy as violating "constitutionally-mandated due process").

## IV. Judicial Estoppel Does Not Apply

Intervenors contend that Plaintiffs' claims are barred by judicial estoppel because *LOWV* Legislative Parties argued to stay *Diamond v. Torres*, 5:17-cv-05054-MMB (E.D. Pa. 2017) ("*Diamond* Action") pending the Pennsylvania Supreme Court's decision in the previously-filed *LOWV* Action. Int. Br. at 22-26. Specifically, Intervenors argue that *LOWV* Legislative Parties' argument in *Diamond* – that the Pennsylvania Supreme Court should be given the opportunity to adjudicate the *LOWV* Action – is "clearly inconsistent" with Plaintiffs' claims in this

action, and that judicial estoppel therefore applies. Intervenors are wrong for multiple reasons.

First, judicial estoppel applies only if "the party against whom it is sought has taken a position inconsistent with a position previously taken." *Greenway Ctr., Inc. v. Essex Ins. Co.*, 475 F.3d 139, 151 (3d Cir. 2007). *See also New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) ("a party's later position must be 'clearly inconsistent' with its earlier position"). As detailed above, Plaintiffs are not Speaker Turzai and Senator Scarnati (the parties in the *Diamond* Action); they are not in privity with Speaker Turzai or Senator Scarnati; nor did they take any prior inconsistent position in the *Diamond* Action. Moreover, the facts that Defendants advance to propel their theory that Plaintiffs are "closely aligned" with Speaker Turzai and Senator Scarnati and are their "proxies," Int. Br. at 14-15, 22, reside outside the pleadings, and thus cannot be considered.

Second, judicial estoppel would not apply even if *LOWV* Legislative Parties were parties to this action because the position that they advanced in the *Diamond* Action is not "clearly inconsistent" with Plaintiffs' position here. *See New Hampshire*, 532 U.S. at 750; *Zedner v. United States*, 547 U.S. 489, 506 (2006) (no judicial estoppel where positions were not "clearly inconsistent"); *Morris v. Rumsfeld*, No. CIV.A. 101-CV-1729, 2007 WL 951450, at *3 (M.D. Pa. Mar. 27, 2007) (same). In fact, they are not inconsistent at all.

Plaintiffs claim that the state court usurped the authority granted to the Pennsylvania Legislature by the Elections Clause by legislating new criteria and issuing the Court Drawn Plan. Conversely, *LOWV* Legislative Parties argued that the *Diamond* Action should be stayed because the state court had by that point already exercised jurisdiction over virtually identical gerrymandering challenges to the 2011 Plan, demanding the same relief, *i.e.*, invalidation of the 2011 Plan under the (as then-understood) coterminous federal and state gerrymandering standards. Under such circumstances, they argued, *Growe v. Emison* counsels the state court should take the lead in *adjudicating* the case and applying existing standards to the facts. *Diamond*, 5:17-cv-05054-MMB, Doc. 26-4, at 3, 25-26 (E.D. Pa. 2017). At that time, the federal and state standards were "coterminous," and *LOWV* Legislative Parties argued before the Pennsylvania Supreme Court that they should remain coterminous. But, in seeking a stay of the *Diamond* Action, *LOWV* Legislative Parties never contended, much less conceded, that the Pennsylvania Supreme Court was free to *legislate* a new standard completely untethered from any legislative act. Quite the opposite; they contested before both the Pennsylvania Supreme Court and Commonwealth Court that state courts lack the right under the Elections Clause to

adopt any criteria not ratified in a bona fide legislative process. *See* Compl., Ex. F at 93-94.[11]

Further, when *LOWV* Legislative Parties sought continuance of the stay in the *Diamond* Action in January 2018, it was not because they endorsed the state court's decision, but rather because the Pennsylvania Supreme Court had granted the remedy sought in the *Diamond* Action: striking down the 2011 Plan.

Third, judicial estoppel requires a showing of bad faith and "is an 'extraordinary remedy'" that should be employed only "when a party's inconsistent behavior would otherwise result in a miscarriage of justice." *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir.1996); *Greenway*, 475 F.3d at 151 (inapplicable because no evidence party acted in bad faith). In this context, bad faith means, for instance, deliberate concealment of material information in a bankruptcy proceeding. *See Ryan Operations*, 81 F.3d at 362-63 ("An inconsistent argument sufficient to invoke judicial estoppel must be

---

[11] Although *LOWV* Legislative Parties argued in the *LOWV* Action that the Elections Clause vests exclusive rights in the state legislature the parties did not fully and fairly litigate the issue before the Pennsylvania Supreme Court, nor could they have. First, the *LOWV* Action focused almost entirely on the First and Fourteenth Amendments and their corresponding Pennsylvania provisions – not the Elections Clause. Second, and more importantly, the violations that give rise to Plaintiffs' claims and the specific issues presented in this case – the Pennsylvania Supreme Court's creation of new districting criteria and issuance of the Court Drawn Plan – occurred *after* argument, precluding any opportunity to fully and fairly litigate it.

attributable to intentional wrongdoing.").  Intervenors have not made any showing of bad faith on Plaintiffs' part.

## V.    **Plaintiffs Have Sufficiently Alleged Standing**

Defendants argue that State Plaintiffs and Federal Plaintiffs lack standing to bring this action because (1) the rights asserted are not personal, but really belong to the Legislature; (2) Plaintiffs cannot prove injury-in-fact; (3) Plaintiffs have not pled causation; and (4) Plaintiffs' injuries are not redressable.  *See* Def. Br. at 16-19; Int. Br. at 5-13.  Defendants' arguments are unfounded.

### A.    **State Plaintiffs Have Standing**

"To qualify as a party with standing to litigate, a person must show, first and foremost, 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent.'" *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 64 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  As leaders of the Pennsylvania Senate, State Plaintiffs have suffered and will continue to suffer particularized injury by the Pennsylvania Supreme Court's issuance, and the Executive Defendants' enforcement of, the Court Drawn Plan.  Specifically, State Plaintiffs were deprived of (1) their legislative authority to apportion congressional districts; and (2) the federally-mandated "adequate opportunity" to craft a remedial plan — both violations of the Elections Clause.

Defendants contend that State Plaintiffs lack individual standing because they are not the General Assembly. *See* Int. Br. at 6-7. But, this position is unfounded. With respect to a legislator's standing, "[t]he courts have drawn a distinction … between a public official's mere disobedience of a law for which a legislator voted – which is not an injury in fact – and an official's 'distortion of the process by which a bill becomes a law' by nullifying a legislator's vote or depriving a legislator of an opportunity to vote – which is an injury in fact." *Russell v. DeJongh*, 491 F.3d 130, 135 (3d Cir. 2007).

Here, State Plaintiffs are similarly situated to those in *Coleman v. Miller*, 307 U.S. 433 (1939). In *Coleman*, a group of Kansas state senators, whose votes would have been sufficient to defeat a resolution ratifying a proposed federal constitutional amendment, challenged the state lieutenant governor's tie-breaking vote. *Id*. at 446. The Court held they had "an interest in the proceeding" sufficient for standing. *Id*. The Court reasoned:

> Here, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes.

*Id*. at 438; *see also Alaska Legis. Council v. Babbitt*, 181 F.3d 1333, 1337 (D.C. Cir. 1999) ("[L]egislators have a judicially recognized, personal interest in maintaining the 'effectiveness of their votes.'"); *Kennedy v. Sampson*, 511 F.2d 430, 436 (D.C.

Cir. 1974) ("No more essential interest could be asserted by a legislator" than to vindicate the effectiveness of his vote).

Similarly, in *Dennis v. Luis*, 741 F.2d 628 (3d Cir. 1984), legislators of the Virgin Islands were held to have standing when they brought suit after the Governor ignored their rejection of his choice for commissioner of commerce and appointed him "acting" commissioner anyway. *Id.* at 629. The legislators argued that the effect of the appointment was "to usurp the doctrine of separation of powers and circumvent the process of advice and consent, thus violating a basic constitutional power conferred upon the Legislature ... by the United States Congress." *Id.* at 629-630. The court reasoned that the allegation that the legislators' right had been usurped by the Governor was sufficiently personal to constitute injury in fact and satisfied the minimum constitutional requirements of standing. *Id.* at 631.

As in *Coleman* and *Luis*, State Plaintiffs here have a plain, direct, and adequate interest in maintaining not only their votes, but also their responsibilities as leaders of the Pennsylvania Senate to craft a remedial plan. Senator Folmer is Chairman of the Senate State Government Committee, and is responsible for setting and managing the committee agenda for the crafting of a remedial plan and eventually reporting it out of committee. *See* Compl., ¶ 12. Similarly, Senator Corman, as Majority Leader (of a 34-16 majority), acts as chief spokesperson for the majority party in the Senate, oversees the committee chairmen, and sets the floor agenda

regarding any remedial plan — as well as acting to pass it. *See id.*, ¶ 11. In these roles, they are primarily and particularly responsible for passage of a remedial plan, and maintain responsibility for any districting legislation. Indeed, these Senators serve as the "tip of the spear" for any remedial plan.

Consequently, the implementation of the Court Drawn Plan will distinctly harm State Plaintiffs by depriving them of rights guaranteed to them by the Elections Clause, by usurping their authority to establish congressional districting criteria, and affording them less than an "adequate opportunity" to craft, vote for, and enact a remedial plan. *Id.*, ¶¶ 4-5. Thus, they have alleged facts sufficient for Article III standing, injury-in-fact, and causation.[12] *See Luis*, 741 F.2d at 631.

Defendants argue that State Plaintiffs have suffered no injury-in-fact, citing *Raines v. Byrd*, 521 U.S. 811 (1997), for the proposition that individual legislators lack standing to sue over purported usurpations of legislative power unless they personally could have changed the legislative outcome but-for the usurpation. Def. Br. at 17-18; Int. Br. at 8. *Raines* is not controlling here.

In *Raines*, four Senators and two Congressmen challenged the Line Item Veto Act, which afforded the President the authority to "cancel" certain spending and tax

---

[12] Defendants' causation argument appears focused on Federal Plaintiffs, and does not articulate if and how State Plaintiffs have failed to plead causation. But even assuming *arguendo* such an argument is being advanced, the Complaint makes clear that State Plaintiffs' rights as legislators and Senate leaders were harmed by the Pennsylvania Supreme Court's actions. *See id.*, ¶¶ 98-114.

benefit measures after he has signed them into law. 521 U.S. at 814. The legislators argued, *inter alia*, that the Act injured them in their official capacities. *Id.* at 815. Noting it had "never had occasion to rule on the question of legislative standing presented here," *id.* at 820, the Court held the legislators lacked standing to challenge the Act, because they did not have a sufficient personal stake in the dispute. *Id.* at 830. The Court reasoned that to allow legislators standing anytime an act resulted in a diminution of authority would mean that several Presidents, Attorneys-General, and other federal office-holders throughout U.S. history would have had standing to challenge various congressional acts. The Court was unwilling to extend the role of courts under Article III in such an instance. *Id.* at 826-828.

Significantly, the Court in *Raines* took into account its prior holding in *Coleman*, which it summarized as follows:

> [O]ur holding in *Coleman* stands … for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified.

521 U.S. at 823. The Court, however, distinguished *Coleman* because in *Raines* the federal legislators' votes were given full effect; "[t]hey simply lost the vote." *Id.* at 824. Moreover, because there was "a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged here", the Court declined to extend *Coleman*. *Id.* at 826.

The situation presented here squarely reflects the vote nullification scenario present in *Coleman*. The Pennsylvania Supreme Court's actions – in usurping the Legislature's districting role, and in not granting the Legislature sufficient time to pass a remedial plan – have effectively nullified State Plaintiffs' votes, and ability to lead the enactment of a remedial plan. *See LULAC*, 548 U.S. at 415-16 ("As the Constitution vests redistricting responsibilities foremost in the *legislatures of the States* and in Congress, a lawful, legislatively enacted plan should be preferable to one drawn by the courts….Underlying this principle is the assumption that to prefer a court-drawn plan to a legislature's replacement would be contrary to the ordinary and proper operation of the political process." (emphasis added)). Thus, *Raines* – which involved the "abstract dilution of institutional legislative power" and separation of powers concerns, and where the Act in question was actually passed by the legislature, 521 U.S. at 826 – is inapposite. *See Ariz. State Legis.*, 135 S. Ct. at 2664-66 (applying *Coleman* rather than *Raines*, and finding standing for Elections Clause claim brought by state legislature).

But even assuming *arguendo* that *Raines* controls, State Plaintiffs still meet the *Coleman*-based exception articulated in *Raines*, because their votes and efforts, if they were provided an "adequate opportunity," likely would have sufficed to enact remedial legislation. Senator Corman, as Senate Majority Leader, presides over a 34-16 advantage in the Pennsylvania Senate – a majority more than sufficient to pass

a new districting plan, or if necessary, garner the two-thirds vote needed to override any veto by the Governor.[13]  And, given the standard applicable to these Motions, State Plaintiffs are entitled to the benefit of any doubt that this is so.  *N.J. Carpenters*, 760 F.3d at 302.

## B.    Federal Plaintiffs Have Standing

Federal Plaintiffs have also alleged sufficient individualized harm to establish standing.[14]  Courts have long recognized that "[e]lected officials have personal interests in their office sufficient to give them standing when the district they represent is subject to a constitutional challenge." *Johnson v. Mortham*, 915 F. Supp. 1529, 1537-38 (N.D. Fla. 1995) (citing *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 188 (5th Cir.1989)); *Williams v. State Bd. of Elections*, 696 F. Supp. 1563, 1569-73 (N.D.Ill.1988)); *c.f. Wittman v. Personhuballah*, 136 S. Ct. 1732, 1737 (2016) (finding lack of standing to pursue appeal because no intervenor member of Congress was seeking re-election in the challenged district).

The U.S. Supreme Court and Third Circuit have also recognized the particular interest that candidates have in the regulation of elections.  *See Storer v. Brown*, 415

---

[13]  Consequently, Plaintiffs' injury-in-fact is not predicated upon the legislature agreeing with the Governor, as Defendants claim.  Int. Br. at 10-11.

[14]  Defendants' filings do not appear to allege that Federal Plaintiffs lack "prudential standing;" thus this point is not in dispute.

U.S. 724, 728 n.9 (1974) (recognizing standing of candidates for office who sought to have declared unconstitutional statutes which required candidates to be politically disaffiliated for at least one year prior to the immediately preceding primary election); *Cook v. Gralike*, 531 U.S. 510, 531 (2001) (Rehnquist, C.J., concurring) ("Actions such as the present one challenging ballot provisions have in most instances been brought by the candidates themselves, and no one questions the standing of respondents … to raise a First Amendment challenge to such laws."); *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26 (1st Cir. 1993) (candidate had standing to challenge to a state financing law).[15]

Plaintiffs allege that each of Federal Plaintiffs' current districts is radically altered by the Court Drawn Plan. *See* Compl., ¶¶ 13-20. Pursuant to the Court Drawn Plan, Federal Plaintiffs will no longer represent a substantial percentage of their prior constituents, destroying any incumbency advantage they once possessed. *Id.* Moreover, Federal Plaintiffs have invested time and energy campaigning to voters who are no longer in their districts, and incurred significant expense in running for reelection in their current districts. *Id.* The benefits of those expenditures

---

[15] Defendants' reliance upon *City of Philadelphia v. Klutznick*, 503 F. Supp. 663 (E.D. Pa. 1980) is misplaced. *Klutznick* involved allegations of improprieties with a city census, and three of the plaintiffs, who were legislators, were merely concerned that the undercount "would result in an inaccurate reapportionment of Congressional and legislative districts." *See id.* at 672. Unlike here, no curtailment of legislative rights and duties was at issue in *Klutznick*.

will be severely curtailed, if not lost entirely if the Court Drawn Plan is implemented.[16] *See* Amicus Brief, Brian McCann et al. (Doc. 66), at 4.

These allegations notwithstanding, Defendants nonetheless contend that Federal Plaintiffs have not alleged a causal connection between the radical changes in their districts created by the Court Drawn Plan, and the resulting harm and waste Federal Plaintiffs are incurring as a result. Intervenors postulate that "Plaintiffs could establish causation only if the General Assembly would have passed a new plan, and the Governor would have signed it, had the General Assembly been given more time." Int. Br. at 10. Yet, not surprisingly, Intervenors fail to cite even a single case for this proposition.[17]

---

[16] Consequently, *Lance v. Coffman*, which involved a generalized grievance claim brought by voters, 549 U.S. 437, 441-442 (2007), is inapposite. Here, Federal Plaintiffs have suffered real and personal harm not shared generally by others. *See* Compl. ¶¶ 13-20. *See also Agre*, 2018 U.S. Dist. LEXIS 4316 at *112-*113 (distinguishing *Coffman* because plaintiff-voters identified personal harms).

Further, Defendants' argument that Federal Plaintiffs did not specify in their affidavits that they expended personal monies is beside the point; the Complaint clearly alleges that they incurred these campaign expenses. *E.g.*, Compl., ¶¶ 14-17. As all well-pleaded allegations as to standing are assumed to be true, Defendants' attempt to twist the Complaint's language should be rejected. *Warth v. Selden*, 422 U.S. 490, 501 (1975). It is also self-evident that Federal Plaintiffs have expended personal time seeking re-election under the 2011 Plan.

[17] Defendants' argument is basically that no one has standing – or authority – to assess the Pennsylvania Supreme Court's unconstitutional actions, save perhaps for the U.S. Supreme Court if and when it chooses to act. In the meantime, Defendants' preferred unconstitutional map is "good enough," as they see it. This

Simply stated, causation here is evident: the state court's actions were hasty, ill-advised, and unconstitutional – and have caused Federal Plaintiffs harm. The harm described in the Complaint shows that this harm flows directly from the improper invalidation of the 2011 Plan, and unconstitutional imposition of the Court Drawn Plan. *See* Compl., ¶¶ 9-20. By way of example, with respect to Plaintiff Congressman Scott Perry's district: "Under the Congressional districting plan recently crafted by the Pennsylvania Supreme Court, Congressman Perry will only represent 59% of the voters form his previous district. As such, *the new map destroys any incumbent advantage he enjoyed under the previous plan*." *Id.*, ¶ 17. No case requires Federal Plaintiffs to speculate at the pleading stage (as Defendants suggest) to what extent they might have been harmed if a different map had been properly and constitutionally adopted. Defendants' causation argument fails.

As Federal Plaintiffs have alleged concrete, particularized and imminent harm that can be redressed by this Court, they have standing.

## C. Plaintiffs' Injuries Are Redressable

Defendants argue that Plaintiffs' injuries are not redressable because 2 U.S.C. § 2a(c) supposedly bars this Court from ordering use of a map that was not enacted

is nonsense – and is exactly why injunctive relief is available and appropriate in these situations.

"in the manner provided by [state] law." Int. Br. at 12-13. Defendants' argument is specious.

For starters, the case upon which Defendants rely clarifies that the mapmaking process is left to the redistricting procedures adopted by the state, which here is Pennsylvania's Legislature and Pennsylvanians – not the courts. *See Ariz. State Legis.*, 135 S. Ct. at 2670. That, of course, is not what happened given the Pennsylvania Supreme Court's usurpation. Surely, a state court has not acted properly – even if it operated "in the manner provided by state law" – when in doing so it has violated the U.S. Constitution, as the court did here. Defendants' implication that U.S. constitutional violations are permissible so long as one follows state law flies in the face of both the Supremacy Clause and common sense.

But more importantly, 2 U.S.C. § 2a(c) is an arcane and obscure statute that seldom, if ever, applies. *See Branch v. Smith*, 538 U.S. 254, 273 (2003); *Ariz. State Legis.*, 135 S. Ct. at 2670. In fact, the Court has held that a court may invoke Section 2a(c)'s stopgap provision only when an election is so imminent that redistricting pursuant to state law cannot be completed without disrupting the election process. *Branch*, 538 U.S. at 273-275.[18] Surely this is not the case here. As Justice Wecht pointed out during oral argument before the Pennsylvania Supreme Court, primary

---

[18] Plaintiffs have not discovered any situation where § 2a(c) was employed.

elections here can be pushed back at least as far as August 2018 – possibly even September – and Defendants' counsel agreed this was possible. *LOWV* Oral Argument Tr. 35:6-38:7 (Mr. Aronchick noting the Executive Branch has "complete power, to order moving the primary," and agreeing to work with Justice Wecht's suggestion of August or later).[19] Thus, allowing the legislative districting process to proceed – as it should have in the first instance – is still very much a viable option, and Section 2a(c) simply does not apply.[20]

Further, federal courts have repeatedly ruled that holding elections under an unconstitutional districting plan is preferable to disrupting the election process. *See, e.g.*, *Upham*, 456 U.S. at 44 ("It is true we have authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements."); *Wells v. Rockefeller*, 394 U.S. 542, 547 (1969) (affirming conduct of elections under

---

[19] The full transcript of the January 17, 2018 oral argument before the Pennsylvania Supreme Court was provided to this Court as Exhibit A to Intervenors' Brief In Opposition To Plaintiffs' Motion For A Preliminary Injunction.

[20] Common Cause has submitted an *amicus* brief wherein it identifies its position as a "lead plaintiff" in *Common Cause v. Rucho*, 1:16-CV-1026 (M.D.N.C.), *see* Doc. 99 at 2, and argues for the application of § 2a(c). *Id.* at 4-6. Curiously, a review of the filings in the North Carolina matter discloses that Common Cause never argued for the application of § 2a(c) there. Given that the districting plan in that matter was struck very close in time to election activities, one can only wonder why not.

an invalidated map because the "primary election was only three months away."); *Kilgarlin v. Hill*, 386 U.S. 120, 121 (1967) (affirming a district court's order conducting state legislative elections under the current "constitutionally infirm" apportionment law).[21]

With the foregoing in mind, it is axiomatic that using the 2011 Plan (in place for seven years) for the upcoming 2018 elections will cause the least amount of disruption, while allowing the Legislature ample time to pass a new districting plan. Alternatively, this Court should not be reticent to enjoin the Court Drawn Plan and allow the Legislature an appropriate timeframe to enact a new plan, as sufficient time still remains for it to do so, particularly in light of the Executive Branch's aforementioned concessions. Failing that, this Court is free to draft its own temporary plan. *Reynolds v. Sims*, 377 U.S. 533 (1964). Any of these three foregoing options would be preferable, if not required from a constitutional standpoint, over permitting the unlawful Court Drawn Plan to be implemented or resorting to Section 2a(c). Plaintiffs' claims are redressable.

## VI.   The Abstention Principles Of *Colorado River* Are Inapplicable Here

Defendants argue that this Court should abstain from hearing this case under the U.S. Supreme Court's ruling in *Colorado River Water Conservation District v.*

---

[21] Common Cause's *amicus* brief fails to cite any of this precedent in arguing that the 2011 Plan is a legal nullity and therefore cannot be used, and instead relies exclusively on state court decisions for this infirm position. *See* Doc. 99 at 3-4.

*United States*, 424 U.S. 800, 817 (1976).  Specifically, they argue that the *LOWV*

Action is a "parallel state proceeding that raises substantially identical claims and

nearly identical allegations and issues" and there are extraordinary circumstances

meriting abstention.  Def. Br. at 12.  Intervenors, while feigning fealty to the Court's

instruction to avoid duplicative arguments, advance the same point.  *See* Int. Br. at

26-27.  But, *Colorado River* abstention is inapplicable to this case.

As Defendants note, the threshold inquiry for *Colorado River* abstention is

whether the state and federal proceedings are "parallel" and "raise substantially

identical claims and nearly identical allegations and issues."  Def. Br. at 12 (citing

*Nationwide*, 571 F.3d at 307).  "The proceedings must involve substantially similar

*parties and claims* at the time the federal court is deciding whether to abstain."  *Kelly*

*v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 285 (3d Cir. 2017) (emphasis added).

*See also Ryan v. Johnson*, 115 F.3d 193, 196 (3d Cir. 1997) ("Generally, cases are

parallel when they involve the same parties and claims.").

Here, neither the parties nor the claims are identical to those in the *LOWV*

Action.  As discussed above, neither State Plaintiffs nor Federal Plaintiffs were

parties to the *LOWV* Action.  This alone means that the "threshold requirement for

*Colorado River* abstention is not met."  *Nat'l Collegiate Athletic Ass'n v. Corbett*

("*Corbett I*"), 25 F. Supp. 3d 557, 572 (M.D. Pa. 2014) (finding cases not parallel

because the two suits included "different parties, as well as identical parties in different procedural postures").

Furthermore, the claims in this action are distinct from those in the *LOWV* Action. Indeed, as explained above, none of the issues involved in this action even could have been at issue in the *LOWV* Action, as they only arose by virtue of the Pennsylvania Supreme Court's orders and opinions disposing of that case. Additionally, Defendants' claims regarding the possibility of a petition for *certiorari* to the U.S. Supreme Court raising similar arguments is premature, speculative, and irrelevant. *Kelly*, 868 F.3d at 285 (collecting decisions holding that the "parallelism" analysis must focus "on matters as they currently exist, not as they could be modified"). *Colorado River* abstention only applies when there is a parallel *state* court action, and does not apply "just because there is the potential that issues" will overlap. *Id.* (emphasis in original).

But even setting this aside, there are no "extraordinary circumstances meriting abstention." *Nationwide*, 571 F.3d at 307-08. In this regard, Defendants assert that (1) a federal forum is inconvenient; (2) abstention would avoid piecemeal litigation; (3) the fact that the state courts obtained jurisdiction first weighs in favor of abstention; and (4) Plaintiffs are forum-shopping. *See* Def. Br. at 12-13. Defendants' assertions are misdirected.

This federal forum clearly is not inherently or practically inconvenient when the claims in the Complaint concern violations of the U.S. Constitution and Executive Defendants are located in Harrisburg. Second, the argument that piecemeal litigation will result because a petition for *certiorari* to the U.S. Supreme Court may be filed soon is misdirected. Surely there is no guarantee that any such petition will be granted. Moreover, nothing substantive remains pending before the state court and no federal policy exists preferring the disposition of federal claims in state court. Third, even though the state courts obtained jurisdiction first, this is immaterial given the substantive difference in claims. Finally, Plaintiffs are not forum-shopping by bringing Elections Clause claims in federal court. These are new claims which were not, and could not have been, adjudicated in the state court in the first instance. No grounds for *Colorado River* abstention exist.[22]

---

[22] Intervenors also request that this Court stay this action "until the conclusion of U.S. Supreme Court review." Int. Br. at 27. As even Executive Defendants note, the "certiorari process often takes months, and if the Supreme Court grants review, the parallel proceedings may remain pending for more than a year." Def. Br. at 12. During the pendency of this months-long delay, the harms described in the Complaint will be made permanent by the intervening primary and general elections. Indeed, even if a stay of this case is granted until the Court decides Speaker Turzai and Senator Scarnati's emergency application for a stay, the election process will continue, causing more chaos. This Court should not allow a violation of the Elections Clause, affecting millions of Pennsylvanians, to continue while the U.S. Supreme Court embarks upon its deliberative process. Doing so could only entice challenges to congressional maps close in time to elections in the hopes that a state court will unconstitutionally create its own map, leaving the losing party without relief due to the timing associated with a petition for *certiorari*.

**VII.   *Younger* Abstention Under *Pennzoil* Does Not Apply**

Defendants argue that this Court must abstain under *Younger* and *Pennzoil* because it is "inappropriate for the federal court to proceed on an injunctive claim to render [a] state judgment nugatory." Def. Br. at 14 n. 5; Int. Br. at 15-17. Defendants misread *Younger* and *Pennzoil*, and for several reasons, *Younger* abstention does not apply.

To begin, not one of Plaintiffs is a party to the *LOWV* Action. This is fatal to the application of *Younger*. In fact, in attempting to shoehorn Plaintiffs' case into *Younger* abstention, Defendants utterly elide this rule: "*Younger*'s scope is closely circumscribed to parties actually involved in state litigation; even the presence of co-plaintiffs representing identical interests in state proceedings does not extend *Younger* to parties not actually involved in those proceedings." *Benavidez v. Eu*, 34 F. 3d 825, 832 (9th Cir. 1994) (finding *Younger* abstention inapplicable to parties challenging California Supreme Court's redistricting plan where federal parties were not state court parties, citing *Doran v. Salem, Inn, Inc.*, 422 U.S. 922, 927-29 (1975)); *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 177 (3d Cir. 1987) ("As the Supreme Court made clear in [*Doran*], where the plaintiff in a federal action is not a party to the state proceeding, *Younger* concerns about federal adjudication do not arise."); *see also Robinson v. Stovall*, 646 F.2d 1087, 1090-91 (5th Cir. 1981); *Franco v. D.C.*, 422 F. Supp. 2d 216, 223 (D.D.C. 2006). Just because Federal

Plaintiffs may have similar interests to State Plaintiffs, they should not be "thrown into the same hopper for Younger purposes[.]" *Doran*, 422 U.S. at 928.

Instead, federal parties who are nonparties to the relevant state proceedings are subject to "derivative preclusion" *only* in the "limited" circumstances where there is "an identity of economic activities and interests" between the two sets of plaintiffs. *See, e.g.*, *New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Bd. of Higher Educ.*, 654 F.2d 868, 878 (3d Cir. 1981) ("*Bible Presbyterian*"); *Sullivan*, 811 F.2d at 178 (citing *Bible Presbyterian*). The only examples of this are "an employer's federal suit when its employees assert identical interests in state court," and cases where federal plaintiffs are "too intertwined with the state defendants 'in terms of ownership, control and management[.]'" *Bible Presbyterian*, 654 F.2d at 878 (citing *Hicks v. Miranda*, 422 U.S. 332, 348-49 (1975), and *Doran*, 422 U.S. at 929); *Sullivan*, 811 F.2d at 178 ("This Court specifically interpreted *Doran* as requiring unitary treatment under *Younger* only where there exists "'an identity of economic activities and interests.'"); *see also Loc. 194, Int'l. Fed'n of Prof'l and Tech. Engineers, AFL-CIO v. N.J. Turnpike Auth.*, No. 11-cv-1653, 2011 WL 1547473, at *3 (D.N.J. Apr. 21, 2011) (Linares, J.) (citing and applying *Sullivan*).

Intervenors fail to cite the limited reach of derivative preclusion. Instead, they rely on readily distinguishable out-of-circuit decisions to claim that Plaintiffs are

barred from federal court. *See* Int. Br. at 17. Yet, as required by the Third Circuit, Intervenors did not, because they cannot, show any identity of *economic* activities and interests between these Plaintiffs and those parties in the *LOWV* Action, especially with regard to Federal Plaintiffs, who are plainly independent of any involved state officials. This is fatal to Defendants' *Younger* defense.[23]

Additionally, *Younger* abstention is substantively unjustified. As a preliminary matter, when the Supreme Court recently reset the rampant expansion of *Younger* abstention by lower courts, it reminded that "*Younger* extends to the three '*exceptional circumstances*' identified in [*New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989)], *but no further*." *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584, 593-94 (2013) (emphasis added). The chief fallout from this is a "forceful reminder of the longstanding principle that federal courts have a 'virtually unflagging' obligation to hear and decide cases within their jurisdiction." *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 138 (3d Cir. 2014) (citing *Sprint*).

Against this backdrop, Intervenors misguidedly argue that abstention is warranted under *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987). That brand of

---

[23] Intervenors' argument that Plaintiffs' claims are "intertwined with" and "essentially derivative" of *LOWV* Legislative Parties is conclusory and suspect. In the very same brief, they undermine this claim by arguing that State Plaintiffs lack prudential standing entirely because only the General Assembly has standing to assert harm. Int. Br. at 6.

*Younger* abstention prevents federal courts from interfering with state "'civil proceedings involving certain orders … uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *ACRA*, 748 F.3d at 136-37. Abstention like this is a "unique breed" that has only been applied twice by the Supreme Court: to proceedings involving civil contempt and proceedings involving the posting of a bond pending state court appeal. *Id.* at 138 n.8. Of course, neither situation is present here.

In *Pennzoil*, the Court held that when a litigant challenging the constitutionality of a state court procedural mechanism (in *Pennzoil*, the requirement to post bond pending appeal) had the opportunity to present its federal claims in the state court but failed to do so, the federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to contrary. 481 U.S. at 107.

This case is nothing like *Pennzoil* for several reasons. First, this case is not about a typical state court judgment and it is not a constitutional challenge to a regular state court procedure. This case is about violations of the Elections Clause. It impacts congressional districts, items for which the Elections Clause vests exclusive power in the state legislatures and the people of the state. *Ariz. State Legis.*, 135 S. Ct. at 2677; *Agre*, 2018 U.S. Dist. LEXIS 4316, at 30-31 (Smith, C.J.). Defendants have cited no case applying *Pennzoil* in remotely similar circumstances.

Second, key to *Pennzoil*'s holding was that the plaintiff therein could have raised its constitutional challenge in the state court proceeding, but failed to do so. In the *LOWV* Action, by contrast, the state court created new criteria for districting and issued the Court Drawn Plan *after trial*, depriving *LOWV* Legislative Parties of any opportunity to challenge their actions on U.S. constitutional grounds. Simply stated, there was no opportunity in the *LOWV* Action to challenge the state court's violation of the U.S. Constitution.

Intervenors' suggestion that the only recourse now should be direct review by the U.S. Supreme Court ignores these critical distinctions and is unrealistic. Indeed, if the Elections Clause could be read to afford a state court the right to trample upon it simply because the challenge was asserted in state court, the power of the state court to interfere with congressional elections would be essentially unchecked. Thus, a state's highest court could unilaterally and explicitly hold, for example, that 75% of congressional districts must be drawn to ensure the election of a Republican, but thereafter avoid review by a federal court because, after all, that court is the ultimate arbiter of that state's laws. Surely this cannot be the case, but it is the logical and inevitable outcome if a federal court cannot, as Defendants' contend, step in to

remedy a violation of the U.S. Constitution.[24]   Where does a state court's power

end?[25]

## VIII.  Plaintiffs Have Stated Valid Claims

### A.    The Pennsylvania Supreme Court Engaged In Legislation, Not "Interpretation"

Defendants attempt to excuse the state court's usurpation of the General

Assembly's legislative authority by characterizing those actions as an

"interpretation" of the state constitution, and contending that Plaintiffs' claims are

merely an unsupported attempt to challenge that "interpretation."  Def. Br. at 20-23;

Int. Br. at 29.  Both the record and the law establish that this was not an act of

"interpretation," but rather, overt *legislation* by the state court, in violation of the

Elections Clause.

---

[24] Campaign Legal Center ("CLC") has submitted an *amicus* brief dedicated primarily to extolling the purported virtues of the Court Drawn Plan.  *See* Doc. 100 at 10.  But, as explained herein the Pennsylvania Supreme Court violated the Elections Clause in various ways prior to and during deployment of the Court Drawn Plan.  Hence, that such Plan may be to CLC's liking is inapposite.

[25] Commentators quickly acknowledged that the Pennsylvania Supreme Court "gave state courts a blueprint to strike down political gerrymandering" by resorting to "interpretations" of state constitutions without reference to or regard for the U.S. Constitution or federal court precedent.  *See* Mark Joseph Stern, *How to Kill Partisan Gerrymandering*, SLATE (Feb. 11, 2018), https://slate.com/news-and-politics/2018/02/pennsylvania-gave-state-courts-a-blueprint-to-strike-down-partisan-gerrymandering.html.

The Elections Clause provides that "[t]he Times, Places and Manner" of congressional elections "shall be prescribed in each State by the Legislature thereof" unless "Congress" should "make or alter such Regulations." U.S. CONST. art. I, § 4, cl. 1. Put simply, the Elections Clause vests authority over congressional elections in two locations: (1) the state legislature and (2) Congress. State courts enjoy none of this delegated authority.[26]

Thus, mandatory criteria governing the drawing of congressional districts are among the "Regulations" this provision delegates to "the Legislature" and Congress. *See, e.g.*, *Branch*, 538 U.S. at 266; *Brown v. Sec'y of State of Florida*, 668 F.3d 1271, 1273-85 (11th Cir. 2012). And any such rules that do not emanate from a state's legislative process or Congress are *ultra vires*. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995) (holding that state constitutional amendment barring candidate from ballot if he or she had already served a set number of terms violated Elections Clause); *Gralike*, 531 U.S. at 523 (holding that state constitutional

---

[26] The Elections Clause was a source of significant debate during the Constitutional Convention, and its allocation of authority is not an accident. *See Agre*, 2018 U.S. Dist. LEXIS 4316, at *9 (Smith, C.J.) (quoting and citing THE FEDERALIST NO. 59 (A. Hamilton)). As noted in *Agre*, "the States' authority to redistrict is a power delegated by Art. I, § 4, and not a power reserved by the Tenth Amendment." *Id.* at *22 (analyzing decisions from this Court in so concluding). The *Agre* decision has been appealed to the U.S. Supreme Court. *Agre v. Wolf*, 2:17-cv-4392-MMB (Doc. 214-15) (*In Re Michael C. Turzai, Speaker of the Pennsylvania House of Representatives, et al.*, No. 17-631 (U.S.)).

provision requiring asterisk next to candidate's name on ballot if he or she failed to pledge support for term limits violated the Elections Clause).

Consistent with that plain language, the U.S. Supreme Court has held "that redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking." *Ariz. State Legis.*, 135 S. Ct. at 2668. While five Justices in *Arizona State Legislature* construed "prescriptions for lawmaking" broadly enough to include "the referendum," and four believed only the state's formal *legislature* qualifies, (*compare id.*, *with id.* at 2677-92 (Roberts, C.J., dissenting)), *all* the Justices agreed that redistricting is *legislative* in character. Most importantly for present purposes, no Justice suggested that state courts might share in that legislative function.

The majority opinion in *Arizona State Legislature* drove home the legislative nature of redistricting in holding that the initiative process that established a new redistricting regime in Arizona was justified as "[d]irect law*making* by the *people*." 135 S. Ct. at 2659 (emphasis added). Specifically, the majority opinion held that the "Clause doubly empowers *the people*" to "control the State's law*making* processes in the first instance" or to "seek Congress' correction of regulations prescribed by state legislature." *Id.* at 2677 (emphasis added); *id.* at 2671-72 (emphasizing "*the people* of Arizona"); *see also id.* at 2658 (emphasizing the "endeavor by *Arizona voters*"), *id.* at 2659 (emphasizing the "[d]irect lawmaking by the people"); *id.* at

2659 n.3 (emphasizing "the people's sovereign right to incorporate themselves into a State's lawmaking apparatus"); *id.* at 2660 (emphasizing "direct lawmaking" under the "initiative and referendum provisions" of the Arizona Constitution); *id.* (emphasizing the role of the "electorate of Arizona as a coordinate source of legislation"); *id.* at 2661 (emphasizing "the people's right…to bypass their elected representative and make laws directly"). *Arizona State Legislature* surely does not support the notion that a state judiciary, an antonym of both "people" and "legislature," may seize the lawmaking power from both.

It is beyond dispute that the Pennsylvania Supreme Court does not exercise a legislative function when it decides cases. *See Watson v. Witkin*, 22 A.2d 17, 23 (Pa. 1941) ("[T]he duty of courts is to interpret laws, not to make them."). Yet, that court has now *legislated* criteria the Pennsylvania Legislature must satisfy when drawing a congressional districting plan, such as contiguity, compactness, equal population,[27] and limiting subdivision splits, *see* Compl. Ex. B at 3, Ex. F at 123, and has seized upon these previously non-existent criteria to invalidate the 2011 Plan. *See id.*, ¶¶ 67-69; Ex. F at 121 (relying upon application of such criteria to assess violation of the Free and Equal Elections Clause); *see also id.* at 128 (same).

---

[27] The PCO actually requires districts be drawn "as nearly equal in population as practicable." Ex**.** B at 3.

These standards plainly amount to mandatory redistricting criteria of the type typically found in a legislatively enacted elections code. But no Pennsylvania legislative process — not the Legislature, not a constitutional convention, not a referendum, not even an administrative agency with delegated rulemaking authority — adopted or ratified those criteria. Rather, the Pennsylvania Supreme Court wove them from whole cloth. *See id.*, Ex. F at 123 ("These neutral criteria provide a 'floor' of protection for an individual against the dilution of his or her vote in the creation of such districts."); *id.* ("When … it is demonstrated that, in the creation of congressional districts, these neutral criteria have been subordinated, in whole or in part, to extraneous considerations such as gerrymandering for unfair partisan advantage, a congressional districting plan violates [the Free and Equal Elections Clause] of the Pennsylvania Constitution."); *id.* at 124 ("[T]his standard does not require a showing that the creators of congressional districts intentionally subordinated these traditional criteria to other considerations in the creation of the district in order for it to violate [the Free and Equal Elections Clause]; rather, it is sufficient to establish a violation of this section to show that these traditional criteria were subordinated to other factors.").[28]

---

[28] In prior litigation, state courts have reviewed congressional districting only in limited circumstances where a statutory or constitutional provision plainly empowered such review. *See e.g.*, *Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992) (implementing a congressional redistricting plan when the political branches failed to adopt a map following the 1990 census); *Guy v. Miller*, No. 11 OC 00042 1B,

In fact, the Pennsylvania Constitution *does* enumerate very similar redistricting criteria, which were carefully crafted by the Pennsylvania Constitutional Convention of 1968, for state *legislative* districts, but not *congressional* districts:

> The Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. Each senatorial district shall elect one Senator, and each representative district one Representative. Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be divided in forming either a senatorial or representative district.

*Compare* Pa. Const. art. II, § 16, *with* Compl., Ex. B at 3:

> [T]o comply with this Order, any congressional districting plan shall consist of: congressional districts composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city incorporated town, borough, township, or ward, except where necessary to ensure equality of population.

But no criteria or other restrictions on the General Assembly's legislative power to enact congressional district plans exist in the Pennsylvania Constitution, and have never existed. Indeed, the Pennsylvania Supreme Court itself has

---

2011 Nev. Dist. LEXIS 32 (Nev. Dist. Oct. 14, 2011) (outlining procedure for state court review of proposed plans for congressional districts following the political branches failure to adopt a map following the 2010 census); *League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363 (Fla. 2015) (holding that congressional plan violated the "Fair Districts" amendment to the state constitution); *Pearson v. Koster*, 367 S.W.3d 36 (Mo. 2012) (upholding congressional maps under a challenge asserting a violation of the state constitutional requirements for compactness of Congressional districts).

confirmed that, in the "context of Congressional reapportionment," there are "*no analogous, direct textual references to such neutral apportionment criteria.*" *Erfer*, 794 A.2d at 334 n.4 (emphasis added). Yet now, a decade and a half later, the Pennsylvania Supreme Court has found that they have magically appeared in the state constitution. But, in reality, the court's imposition of nearly identical criteria to those duly enacted by Pennsylvania's "prescriptions for lawmaking" was simply legislation from the bench. And, in this context, such judicial activism violates the Elections Clause.

It follows that the Complaint alleges facts sufficient for an Elections Clause violation, Compl., ¶¶ 35-47, 65-92, and Defendants' argument that this was merely an "interpretation" of Pennsylvania law should be rejected.

### B. Defendants' Attempt To Recast The Facts Alleged In The Complaint Contradicts The Record, And Is Inappropriate When Considering The Pending Motions

Defendants argue – amazingly – that there is "*no* support" for the fact that the remedial process ordered by the Pennsylvania Supreme Court violated the Elections Clause; that the U.S. Supreme Court has "accepted" court-drawn maps following similarly constrained timelines in the past; and that the Legislature had plenty of time and guidance from the Court to enact a new plan. Def. Br. at 24-28; *accord* Int. Br. at 30-31. None of Defendants' assertions are accurate.

Far from there being no support, the Pennsylvania Supreme Court violated the Elections Clause by adopting new congressional districting criteria from whole cloth *and* also by implementing a remedial phase that did not give the Legislature an "adequate opportunity" to enact a new map. *See Upham*, 456 U.S. at 41. This ensured that the court would get to draw the map it wanted, instead of a map being crafted through the legislative process. *See, e.g.*, Compl., Ex. D (Mundy, J., dissenting) (noting the majority put the General Assembly on a three-week timeline "without articulating the complete criteria necessary to be constitutionally compliant"); *id.*, Ex. E (Baer, J., dissenting) (compressed schedule failed to provide a reasonable opportunity for General Assembly to legislate a new map in compliance with the Elections Clause).

First, the court's January 22 PCO provided the Legislature a mere 18 days to pass a new plan. But a redistricting plan, like any other statute, must go through the normal legislative process, which involves the time-consuming political process of obtaining enough votes in both chambers, and the back-and-forth, give-and-take negotiations required to reach the necessary compromises. Eighteen days was utterly inadequate in light of these realities – particularly given the court's failure to issue its full opinion until 2 days prior to the court-imposed deadline.[29] The General

---

[29] The cases cited by Defendants do not show that the U.S. Supreme Court has "accepted" court-drawn maps following similar constrained timelines in the past. The denial of a petition for *certiorari* does not signify the Court's blessing. *E.g.*,

Assembly was therefore left to speculate on exactly which provision of the Pennsylvania Constitution the 2011 Plan purportedly violated – which was important knowledge, since the court's finding would largely dictate how such violation(s) could be remedied in any new map. Under these unprecedented and unreasonable constraints, it is little wonder that the Legislature was unable to pass a new map. Defendants' characterization that the Legislature did not "get to work on a new map" in good faith, Def. Br. at 1, is both unfair and a disingenuous misrepresentation of the facts.

Further, although the January 22 PCO articulated creation of the newly-mandated criteria, it was silent on exactly how those criteria needed to be applied and how they would be evaluated. For example, the January 22 PCO stated that a political subdivision could only be split for population equality. But what if such a split was necessary to comply with the Voting Rights Act?

---

*Loeper v. Mitchell*, 506 U.S. 828 (1992) (denying *certiorari* with no analysis). Further, they are distinguishable from the present situation. For instance, in *Abrams v. Johnson*, the district court enacted its own plan only after giving the legislature time to develop a new one, and ultimately being informed by the legislature that it was deadlocked. 521 U.S. 74, 82 (1997); *Larios v. Cox*, 5 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004) (hearing a motion to stay application in the middle of the 19-day deadline, and where a court-drawn map could occur only if the plaintiffs petitioned the court after the deadline), *aff'd*, 542 U.S. 947, 949 (2004) (declining invitation to weaken the one-person, one-vote standard by creating a safe harbor for population deviations of less than 10%, and not addressing 19-day court-imposed deadline). Most of all, none of these cases involved a situation where the court failed to issue its opinion on what the constitutional violations were, and how to cure them, until only 2 days before the court-appointed deadline.

In fact, it was not until the court's February 7 Majority Opinion where the court indicated that a showing of compactness or split subdivisions was "not the exclusive means by which a violation of [the Free and Equal Elections Clause] may be established." Compl., Ex. F at 124. The Court's Majority Opinion also for the first time imposed the notion of proportional representation – a requirement that would greatly dictate how the lines can be drawn. Other newly-minted guidelines included:

- "When … it is demonstrated that, in the creation of congressional districts, these neutral criteria have been subordinated, in whole or in part, to extraneous considerations such as gerrymandering for unfair partisan advantage, a congressional districting plan violates [the Free and Equal Elections Clause] of the Pennsylvania Constitution." *Id*.;

- "[T]his standard does not require a showing that the creators of congressional districts intentionally subordinated these traditional criteria to other considerations in the creation of the district in order for it to violate [the Free and Equal Elections Clause]; rather, it is sufficient to establish a violation of this section to show that these traditional criteria were subordinated to other factors." *Id*.;

- A congressional plan violates the Free and Equal Elections Clause when it splits 28 counties and 68 municipalities. *Id*. at 126, 128, 130;

- A congressional plan violates the Free and Equal Elections Clause when its "mean-median vote gap" is 5.9% or higher (as an acceptable range is between 0 and 4%). Id. at 128, 130; and

- A congressional plan violates the Free and Equal Elections Clause when its "efficiency gap" is between 15% and 24% relative to statewide vote share. *Id*. at 128, 129, 130.

Compl., ¶ 69.

But the seizure of the process from the Legislature and State Plaintiffs herein in violation of the Elections Clause did not stop there. The PCO further indicated that even if the Legislature were to pass a plan that the Governor signed, it still needed to be submitted to the court for review. *Id.*, Ex. B at 2.

Separately, while the court allowed the parties to submit proposed remedial maps, it appears the court never had the intention of giving them any meaningful review. The court's PCO required proposed plans to be submitted by February 15, but indicated that a new redistricting plan would be available February 19, just four days later. The court in fact adopted its own map on February 19, just 10 days after *LOWV* Legislative Parties submitted their plan and 4 days after the other parties submitted their proposed plans. The court's February 19 Order does not indicate that any of the proposed plans failed to meet the court's criteria; it only summarily concludes that its plan was "superior." *Id.*, Ex. J at 7. As Chief Justice Saylor described it in his dissenting opinion:

> The latest round includes: the submission, within the past few days, of more than a dozen sophisticated redistricting plans; the lack of an opportunity for critical evaluation by all of the parties; the adoption of a judicially created redistricting plan apparently upon advice from a political scientist who has not submitted a report as of record nor appeared as a witness in any court proceeding in this case; and the absence of an adversarial hearing to resolve factual controversies arising in the present remedial phase of this litigation. In these circumstances, the displacement to the judiciary of the political responsibility for redistricting – which is assigned to the General

Assembly by the United States Constitution – appears to me to be unprecedented.

*Id.*, Ex. G (Saylor, C.J., dissenting) at 2.

In short, although the court acknowledged that the primary responsibility for drawing congressional districts rests with the legislature, *id.*, Ex. B at 3, its orders were issued in a calculated manner to avoid just that. The court's actions ensured that the judiciary would draw the lines. In failing to provide the Legislature a meaningful opportunity to re-draw the congressional districts, the court violated the Elections Clause. Certainly on a motion to dismiss/judgment on the pleadings, the allegations in the Complaint are complete enough to state a claim, and any disagreement by Defendants about the adequacy of the time allotted is, at a minimum, a fact question subject to discovery.

## CONCLUSION

Defendants' Motions should be denied.

Dated: March 7, 2018

Brian S. Paszamant (PA 78410)
Jason A. Snyderman (PA 80239)
BLANK ROME LLP
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Ph: (215) 569-5791
Fax: (215) 832-5791
Email: paszamant@blankrome.com
snyderman@blankrome.com

Jason Torchinsky*
Shawn Sheehy*
Phillip M. Gordon*
HOLTZMAN VOGEL JOSEFIAK
TORCHINSKY PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Ph: (540) 341-8808
Fax: (540) 341-8809
Email: jtorchinsky@hvjt.law
ssheehy@hvjt.law
pgordon@hvjt.law

*Counsel for State Plaintiffs*

*\* admitted pro hac vice*

Respectfully submitted,

/s/Matthew H. Haverstick
Matthew H. Haverstick
  (PA 85072)
Mark E. Seiberling (PA 91256)
Paul G. Gagne (PA 42009)*
Shohin H. Vance (PA 323551)
KLEINBARD LLC
One Liberty Place, 46th Floor
1650 Market Street
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Email: mhaverstick@kleinbard.com
mseiberling@kleinbard.com
pgagne@kleinbard.com
svance@kleinbard.com

Joshua J. Voss (PA 306853)
KLEINBARD LLC
115 State Street, 2nd Floor
Harrisburg, PA 17101
Ph: (717) 836-7492
Fax: (215) 568-0140
Email: jvoss@kleinbard.com

*Counsel for Federal Plaintiffs*

## **WORD COUNT CERTIFICATION**

I hereby certify that the foregoing brief complies with the word-count limitation set forth in this Court's Order dated March 5, 2018 (Doc. 98), granting Plaintiffs leave to file a single omnibus brief in opposition to Executive Defendants' Motion to Dismiss and Intervenors' Motion for Judgment on the Pleadings, totaling 15,000 words.  Based on the word count feature of the word-processing system used to prepare this brief, I certify that it contains 14,918 words, exclusive of the cover page, tables, and the signature block.

Dated: March 7, 2018                           /s/Matthew H. Haverstick_____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 7, 2018, a true and correct copy of the foregoing Plaintiffs' Omnibus Brief in Opposition to Defendants' Motion to Dismiss (Doc. 87) and Intervenor-Defendants' Motion For Judgment on the Pleadings (Doc. 90) was electronically filed with the Court and served upon all counsel and parties of record via the CM/ECF system.

Dated: March 7, 2018                    /s/Matthew H. Haverstick