# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACOB CORMAN, in his official
capacity as Majority Leader of the
Pennsylvania Senate, *et al.,*

     Plaintiffs

v.

ROBERT TORRES, in his official
capacity as Acting Secretary of the
Commonwealth, *et al.,*

     Defendants

and

CARMEN FEBO SAN
MIGUEL, *et al.,*

     Intervenor-Defendants.

CIVIL ACTION NO.
1:18-CV-443-CCC-KAJ-JBS


Three-Judge Panel Convened
Pursuant to 28 U.S.C. § 2284(a)

---

## *AMICUS CURIAE* BRIEF OF THE AMERICAN CIVIL RIGHTS UNION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..............................................................................iii

STATEMENT OF INTEREST......................................................................1

INTRODUCTION.............................................................................................2

FACTS...............................................................................................................3

ARGUMENT.....................................................................................................4

I.   THE PENNSYLVANIA SUPREME COURT'S
     REDISTRICTING PLAN VIOLATED ITS OWN
     STANDARDS. ............................................................................................4

     A.  The Pennsylvania court's map is a partisan map.........................4

     B.  The court's map did not maximize its own criteria.. ..................11

II.  THE PENNSYLVANIA SUPREME COURT ACTED
     LIKE A LEGISLATURE, NOT A COURT....................................14

     A  By imposing proportional representation, the court made
        political — not remedial — choices...................................14

     B.  In creating the map, the Pennsylvania Supreme Court
         employed highly flawed procedures....................................19

CONCLUSION .............................................................................................21

CERTIFICATION OF COMPLIANCE WITH WORD LIMIT ............23

CERTIFICATE OF SERVICE .......................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chapman v. Meier,*
420 U.S. 1 (1975) ............................................................................................. 18

*City of Mobile v. Bolden,*
446 U.S. 55 (1980) ........................................................................................... 18

*Gaffney v. Cummings,*
412 U.S. 735 (1973) ......................................................................................... 16

*League of United Latin American Citizens v. Perry,*
548 U.S. 399 (2006) ......................................................................................... 18

*League of Women Voters of Pennsylvania, et al. v. Pennsylvania, et al.,*
No. 159 MM 2017 (Pa. Feb. 7, 2018) ............................................................... 4

*Perry v. Perez,*
565 U.S. 388 (2012) ......................................................................................... 17

*Upham v. Seamon,*
456 U.S. 37 (1982) ........................................................................................... 17

*Vieth v. Jubelirer,*
541 U.S. 267 (2004) ......................................................................................... 18

*White v. Regester,*
412 U.S. 755 (1973) ......................................................................................... 18

**Constitutional Authorities**

United States Constitution Article I, § 4 ...................................................... 2, 3

**Other Authorities**

Andrew Prokop, *What Pennsylvania's new congressional map means for 2018,*
Vox (February 21, 2018), https://www.vox.com/policy-and-
politics/2018/2/21/17032936/pennsylvania-congressional-districts-
2018 ................................................................................................................. 9

David Wasserman, *New Pennsylvania Map Is a Major Boost for Democrats*,
The Cook Political Report, February 20, 2018,
https://www.cookpolitical.com/ analysis/house/pennsylvania-
house/new-pennsylvania-map-major-boost-democrats ...................................... 10, 14

David Wasserman, Twitter, (February 19, 2018),
https://twitter.com/Redistrict....................................................................... 15

Elena Schneider, *New Pennsylvania map gives Democrats big boost in midterms*,
Politico (February 19, 2018),
https://www.politico.com/story/2018/02/19/pennsylvania-
redistrict-democrats-midterms-354432 ......................................................... 10

Nate Cohn, *Democrats Didn't Even Dream of This Pennsylvania Map. How Did
It Happen?,* The New York Times: The Upshot (February 21, 2018),
https://www.nytimes.com/2018/02/21/upshot/gerrymandering-
pennsylvania-democrats-republicans-court.html ....................................*passim*

Nate Cohn, *Hundreds of Simulated Maps Show How Well Democrats Fared in
Pennsylvania*, The New York Times: The Upshot (February 26, 2018),
https://www.nytimes.com/2018/02/26/upshot/democrats-did-
better-than-on-hundreds-of-simulated-pennsylvania-maps.html (last
visited March 4, 2018) ................................................................................. 5, 6

Nate Cohn, Matthew Bloch, and Kevin Quealy, *The New Pennsylvania
Congressional Map, District by District*, The New York Times: The
Upshot (February 19, 2018),
https://www.nytimes.com/interactive/2018/02/19/
upshot/pennsylvania-new-house-districts-gerrymandering.html ............................ 10

Steven Wolf, *Pennsylvania's groundbreaking new congressional map isn't just
nonpartisan—it's fair*, The Daily Kos (February 19, 2018).
https://www.dailykos.com/stories/2018/2/19/1742930/-
Pennsylvania-Supreme-Court-implements-fair-congressional-map-
after-striking-down-GOP-gerrymander ......................................................... 15

United States Census Bureau, *Geographic Terms and Concepts - Voting
Districts*, https://www.census.gov/geo/reference/gtc/gtc_vtd.html ..................... 13

## STATEMENT OF INTEREST

Amicus Curiae American Civil Rights Union (ACRU) is a non-partisan 501(c)(3) tax-exempt organization dedicated to protecting the civil rights of all Americans by publicly advancing a Constitutional understanding of our essential rights and freedoms. It was founded in 1998 by long time policy advisor to President Reagan, and the architect of modern welfare reform, Robert B. Carleson.  Carleson served as President Reagan's chief domestic policy advisor on federalism, and originated the concept of ending the federal entitlement to welfare by giving the responsibility for those programs to the states through finite block grants. Since its founding, the ACRU has filed amicus curiae briefs on various constitutional and election issues in cases nationwide, including redistricting cases.

The ACRU's Policy Board sets the ACRU's priorities. The Board's members include some of the nation's most distinguished statesmen and practitioners on matters of election law. The Board's members are former U.S. Attorney General Edwin Meese III; former Assistant Attorney General for Civil Rights William Bradford Reynolds; former Assistant Attorney General for the Office of Legal Counsel Charles J. Cooper;  John M. Olin Distinguished Professor of Economics at George Mason University Walter E. Williams; former Ambassador to Costa Rica Curtin Winsor, Jr.; former Ohio Secretary of State J. Kenneth Blackwell; former Voting Rights Section attorney, U.S.

Department of Justice, J. Christian Adams; former Counsel to the Assistant Attorney General for Civil Rights and former member of the Federal Election Commission Hans von Spakovsky. Chris Coates is a member of the Policy Board as is Doug Bandow, former Special Assistant for Policy Development in the Reagan Administration.

## INTRODUCTION

This case involves a fundamental question of legislative versus judicial authority in the redistricting context. After overturning the Pennsylvania legislature's 2011 redistricting map, the Pennsylvania Supreme Court gave the legislature extremely limited time to develop a new map. And because the legislature was unable to meet the court's timeline, the court took it upon itself to draw a map for Pennsylvania's congressional districts.

It is valuable for this Court to understand what the Pennsylvania Supreme Court did in drawing a new map. Redistricting is a legislative process under Article I, § 4 of the United States Constitution. For well over two centuries, state legislatures have been frequently criticized for using partisan considerations and for having deficient procedures — and redistricting is no different.

But while taking it upon itself to develop a redistricting map, the Pennsylvania Supreme Court's exhibited these same deficiencies. That court did not follow to its own standards to refrain from partisan gerrymandering, and it

did not adhere to its own redistricting criteria for drawing a new map. It made political decisions in order to impose proportional representation, and alarmingly it disregarded efforts to rely upon admissible evidence, refused to allow parties to comment on its map, and refused to explain how it arrived at such a momentous decision. In short, these procedures did not befit a court of law.

The Pennsylvania Supreme Court's map was not a judicial remedy in any traditional sense, but rather grew from activity similar to a legislative process.

## FACTS

On February 22, 2018, multiple plaintiffs filed a *Verified Complaint* in this Court, seeking relief under U.S. Const. Art. I § 4. On that same day, the plaintiffs filed their *Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction,* and the next day they filed a *Memorandum of Law* in support of their *Motion.* Also on February 23, 2018, this Court scheduled a hearing on *Plaintiffs' Motion for Temporary Restraining Order and Preliminary* Injunction for March 9, 2018. Over the next week, multiple parties filed motions to join as intervenors or motions to file amicus briefs, many of which this Court granted. On March 2, 2018 several parties and intervenors filed; (1) motions opposing *Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction*, (2) motions to dismiss, and (3) motions for judgment on the pleadings. Currently the plaintiffs may file their opposition to any *Motion to Dismiss*, opposition to the pending

3

*Motion for Judgment on the Pleadings*, and a reply in support of their *Motion for Preliminary Injunction*, no later than 12:00 noon, March 7, 2018. A hearing is scheduled for plaintiffs' *Motion for Preliminary Injunction* on March 9, 2018.

## ARGUMENT

## I.   THE PENNSYLVANIA SUPREME COURT'S REDISTRICTING PLAN VIOLATED ITS OWN STANDARDS.

### A.   The Pennsylvania court's map is a partisan map.

In striking down the Pennsylvania General Assembly's redistricting map, the Pennsylvania Supreme Court relied heavily on the analysis of an expert, Dr. Jowei Chen; "Perhaps the most compelling evidence concerning the 2011 Plan derives from Dr. Chen's expert testimony."[1] Briefly stated, Dr. Chen ran two simulated series of 500 redistricting plans each, one of which used only the "traditional criteria" of population equality, compactness and minimization of county and municipality splits. (The other simulation included incumbency protection).[2] From the first simulated series, Dr. Chen answered three questions:

> (1) whether partisan intent was the predominant factor in the drawing of the Plan; (2) if so, what was the effect of the Plan on the number of congressional Democrats and Republicans elected from Pennsylvania; and (3) the effect of the Plan on the ability of the 18 individual Petitioners to elect a Democrat or Republican

---

[1] *League of Women Voters of Pennsylvania, et al. v. Pennsylvania, et al.*, No. 159 MM 2017, Op. at 125 (Pa. Feb. 7, 2018).

[2] *League of Women Voters of Pa.*, Op. at 40 (Pa. Feb. 7, 2018).

candidate for congress from their respective districts.[3]

The court rejected the 2011 legislative map because it was an extreme outlier that advantaged Republicans. But the court's own plan also fails Dr. Chen's analysis.

After the court made its plan available to the public, analysis showed that the court's map failed the second and third prong of Dr. Chen's analysis. The plan produced "overall Democratic performance" that "arguably would have been better than" every single one of Dr. Chen's simulations, as shown by the following chart (the court's plan is labeled "adopted plan"):[4]

---

[3] *League of Women Voters of Pa.*, Op. at 39-40 (Pa. Feb. 7, 2018).

[4] Nate Cohn, *Hundreds of Simulated Maps Show How Well Democrats Fared in Pennsylvania*, The New York Times: The Upshot (February 26, 2018), https://www.nytimes.com/2018/02/26/upshot/democrats-did-better-than-on-hundreds-of-simulated-pennsylvania-maps.html (last visited March 4, 2018).

## New Map Favored Democrats Compared With Simulations

Republican advantage in the median congressional district compared with the average 2016 statewide popular vote in 500 simulations and the map adopted by the court.



By The New York Times | Source: Upshot analysis of Jowei Chen simulations, election results from Nathaniel Kelso and Michal Migurski.

Furthermore, the same analysis shows that the court's plan resulted in a greater number of Democratic congressional victories than 499 out of 500 of Dr. Chen's simulations:[5]

---

[5] *Id.*



How Many Districts Democrats Would Have Won.
Democrats won more districts in only one simulation.

Number of Democratic wins in the average 2016 statewide election in 500 simulated maps and the new adopted map.



Source: Upshot analysis of Jowei Chen simulations, election results from Nathaniel Kelso and Michal Migurski.

Even though the court relied heavily on Dr. Chen's statistical analysis to strike down the Pennsylvania legislature's 2011 map, it failed to subject its own map to that same analysis – an analysis that shows the court's map would likely fail under its own standards.

Following a discussion of Dr. Chen's testimony, the court buttressed his conclusions by noting that "Dr. Chen's testimony in this regard comports with a lay examination of the Plan,"[6] By that same standard, the map's heavy Democratic bias "widely comports with a lay examination." In public, the

---

[6] *League of Women Voters of Pa.*, Op. at 127 (Pa. Feb. 7, 2018).

court's map has been strongly condemned or praised as heavily tilting the
playing field to create a partisan map. First, the court's map provides a better
partisan advantage than the partisans themselves requested. "[T]he new map is
better for Democrats — by nearly every measure — than the maps that
Democrats themselves proposed."[7] Indeed, the following chart illustrates how
the court gifted an unexpected windfall to Democratic partisans:[8]

---

[7] Nate Cohn, *Democrats Didn't Even Dream of This Pennsylvania Map. How Did It Happen?,* The New York Times: The Upshot (February 21, 2018), https://www.nytimes.com/2018/02/21/upshot/gerrymandering-pennsylvania-democrats-republicans-court.html (last visited on March 4, 2018).
[8] *Id.*

The New Pennsylvania Map Is Even Better for Democrats Than the
Democratic Proposals

| Districts won by Democrats in the ... | Current Map | Proposed Democratic Plans | | | | New Map |
|---|---|---|---|---|---|---|
| | | Governor | Lt. Gov. | Senate | House | |
| 2016 pres. race | 6 | 7 | 7 | 7 | 7 | **8** |
| 2016 Senate race | 4 | **7** | **7** | 6 | **7** | 5 |
| Any 2016 race | 9 | 9 | 10 | 10 | **11** | **11** |
| Average of all 2016 races | 5.4 | 7.4 | 8.0 | 7.8 | 8.2 | **8.4** |
| Median 2016 Democratic pres. margin | -8.9 | -10.6 | -9.7 | -9.6 | -7.8 | **-5.7** |

Second, respected commentators and articles have endorsed the identical

conclusion – that the court's map greatly helps Democrats:

- "And the new map is positively fantastic news for Democrats in their

  effort to take back the House this fall."[9]

- "Democrats couldn't have asked for much more from the new map. It's

  arguably even better for them than the maps they proposed

---

[9] Andrew Prokop, *What Pennsylvania's new congressional map means for 2018*,
Vox, (February 21, 2018), https://www.vox.com/policy-and-
politics/2018/2/21/17032936/pennsylvania-congressional-districts-2018.

themselves."[10]

- The map, drawn by a court-appointed special master, doesn't just undo the gerrymander that's produced a 13-5 seat GOP edge since 2012. It goes further, actively compensating for Democrats' natural geographic disadvantage in the state.[11]

- "The new map left Democrats celebrating on Monday."[12]

Finally, the Pennsylvania court criticized the 2011 legislative map because its congressional districts "often contain 'isthmuses' and 'tentacles,'"[13] Yet the court's map was guilty of the same problems. "*Every* potentially competitive Republican-held district juts out to add Democratic areas, like adding York to the 10th District, Lansdale to the First District, Reading to the Sixth District, Stroudsburg to the Seventh District, South Philadelphia to the Fifth District, or Mount Lebanon and Penn Hills to the 17th."[14]

---

[10] Nate Cohn, Matthew Bloch, and Kevin Quealy, *The New Pennsylvania Congressional Map, District by District*, The New York Times: The Upshot (February 19, 2018), https://www.nytimes.com/interactive/2018/02/19/ upshot/pennsylvania-new-house-districts-gerrymandering.html.

[11] David Wasserman, *New Pennsylvania Map Is a Major Boost for Democrats*, The Cook Political Report, February 20, 2018, https://www.cookpolitical.com/ analysis/house/pennsylvania-house/new-pennsylvania-map-major-boost-democrats.

[12] Elena Schneider, *New Pennsylvania map gives Democrats big boost in midterms*, Politico (February 19, 2018), https://www.politico.com/story/2018/02/19/pennsylvania-redistrict-democrats-midterms-354432.

[13] *League of Women Voters of Pa.*, Op. at 128 (Pa. Feb. 7, 2018).

[14] Nate Cohn, *Democrats Didn't Even Dream of This Pennsylvania Map. How*

10

## B.   The court's map did not maximize its own criteria

And the Pennsylvania Supreme Court's map violates its standards in

another way, by failing to meet its own standards for creating a new map.

According to the Pennsylvania Supreme Court:

> any congressional districting plan shall consist of: congressional
> districts composed of compact and contiguous territory; as nearly
> equal in population as practicable; and which do not divide any
> county, city, incorporated town, borough, township, or ward,
> except where necessary to ensure equality of population.[15]

Accordingly the court required the parties to submit the following relevant

information:

> b. A report detailing the compactness of the districts according to
>    each of the following measures: Reock; Schwartzberg; Polsby-
>    Popper; Population Polygon; and Minimum Convex Polygon.
> c. A report detailing the number of counties split by each district
>    and split in the plan as a whole.
> d. A report detailing the number of municipalities split by each
>    district and the plan as a whole.
> e. A report detailing the number of precincts split by each district
>    and the plan as a whole.[16]

In its order dated February 19, 2018, the Pennsylvania Supreme Court

stated that the remedial map is "superior or comparable" to all plans submitted

---

*Did It Happen?*, The New York Times: The Upshot (February 21, 2018)
(emphasis supplied),
https://www.nytimes.com/2018/02/21/upshot/gerrymandering-
pennsylvania-democrats-republicans-court.html.

[15] *League of Women Voters of Pa.*, Order at 3 (Pa. Jan. 22, 2018).

[16] *League of Women Voters of Pa.*, Order at 2-3 (Pa. Jan. 26, 2018).

by the parties, intervenors, and *amici*.[17] But ACRU respectfully disagrees. The court produced a map that did not optimize its traditional redistricting criteria, as demonstrated by comparing the court's map to the map submitted by ACRU in its amicus brief before the Pennsylvania Supreme Court. (**Exhibit B**).

In developing its map, ACRU did not include *any* political or partisan data. It disregarded entirely partisan voting performance and voters' partisan affiliation — whether voters were Republicans, Democrats, or unaffiliated. As a result, the ACRU map effectively optimized the court's published criteria, and it outperforms the court's map. Both the ACRU and court maps achieved population equality and contiguity. But in the critical factors – compactness and splits of political subdivisions — the ACRU map is plainly a better map.

First, with respect to compactness tests, the ACRU proposal outperforms the court's map on four out of five measures, when taking the average of all districts. ACRU's map scores higher on the two most widely accepted measures of compactness (Polsby-Popper and Roeck), scores higher on the two polygon-based measures (Population Polygon and Minimum Convex Polygon), and scores slightly lower on the perimeter-based test (Schwartzberg), as shown by the following chart (better scores are highlighted in bold):

---

[17] *League of Women Voters of Pa.*, Order at 5-6 (Pa. Feb. 19, 2018).

| Compactness Test | Court Map Average | ACRU Map Average |
|---|---|---|
| Polsby-Popper | 0.3344 | **0.3722** |
| Roeck | 0.4583 | **0.4694** |
| Population Polygon | 0.7433 | **0.7789** |
| Minimum Convex Polygon | 0.7911 | **0.8128** |
| Schwartzberg | **1.6672** | 1.5761 |

These measurements take the average of each test, and importantly four out of five tests show that ACRU's map better meets the court's criteria.

Second, the ACRU map also scores better with respect to political subdivision splits. The ACRU map has fewer overall splits; it splits fewer municipalities and Voting Districts.[18] The court plan splits one less county than the ACRU map, as shown by the following chart (better scores are highlighted in bold):

| Political Subdivision | Number of splits, court map | Number splits, ACRU map |
|---|---|---|
| Counties | **14** | 15 |
| Municipalities | 19 | **17** |
| Voting Districts | 33 | **17** |
| Total | 66 | **49** |

---

[18] "Voting Districts (VTDs) refer to the generic name for geographic entities, such as precincts, wards, and election districts, established by state governments for the purpose of conducting elections." United States Census Bureau, *Geographic Terms and Concepts - Voting Districts*, https://www.census.gov/geo/reference/gtc/gtc_vtd.html.

13

To be fair, the court in its order argues that it only split 13 counties.[19] This does not, however, change the above analysis. Overall, the ACRU map has substantially fewer total splits, outperforming the court's plan.

## II.   THE PENNSYLVANIA SUPREME COURT ACTED LIKE A LEGISLATURE, NOT A COURT.

### A.   By imposing proportional representation, the court made political — not remedial — choices.

The court had before it ACRU's map (and many other maps), yet it developed a map that did not optimize the traditional criteria. Further, it repeatedly made choices that consistently benefited one political party over another. That means the court was not limited to the traditional criteria that it published, but rather something else drove the process.

That something else was proportional representation.

Pennsylvania currently has 18 congressional seats, and the universal consensus is that the court's map does not merely undo a perceived political gerrymander. Rather,

> [i]t goes further, actively compensating for Democrats' natural geographic disadvantage in the state. Under the new lines, Democrats have an excellent chance to win at least half the state's 18 seats.[20]

---

[19] *League of Women Voters of Pa.*, Order at 6, n. 10 (Pa. Feb. 19, 2018).

[20] David Wasserman, *New Pennsylvania Map is a Major Boost for Democrats*, The Cook Political Report (February 20, 2018), https://www.cookpolitical.com/analysis/house/pennsylvania-house/new-pennsylvania-map-major-boost-democrats.

14

As the same analyst made clear, the court map:

> is a ringing endorsement of the 'partisan fairness' doctrine: that parties should be entitled to same proportion of seats as votes. However, in PA (and many states), achieving that requires conscious pro-Dem mapping choices.[21]

Those who support the court's map readily recognize that it imposes

proportional representation on Pennsylvania's congressional delegation:

> But most interestingly, the court appears to have deliberately adopted a map that should give both parties a shot at winning an equitable number of seats, as befits Pennsylvania's swing-state status.[22]

And those who neither cheer nor condemn the court's map have also

concluded that the court imposed proportional representation; "Over all, the

new court-ordered map comes very close to achieving partisan symmetry in an

evenly divided state."[23]

The court's imposition of proportional representation was a political

decision, without legal authority. A legislature may freely develop a redistricting

map that achieves proportional representation (provided the map adheres to

---

[21] David Wasserman, Twitter, (February 19, 2018), https://twitter.com/Redistrict.

[22] Steven Wolf, *Pennsylvania's groundbreaking new congressional map isn't just nonpartisan—it's fair*, The Daily Kos (February 19, 2018). https://www.dailykos.com/stories/2018/2/19/1742930/-Pennsylvania-Supreme-Court-implements-fair-congressional-map-after-striking-down-GOP-gerrymander.

[23] Nate Cohn, *Democrats Didn't Even Dream of This Pennsylvania Map. How Did It Happen?*, The New York Times: The Upshot (February 21, 2018), https://www.nytimes.com/2018/02/21/upshot/gerrymandering-pennsylvania-democrats-republicans-court.html.

federal law). Indeed, a state may "allocate political power to the parties in accordance with their voting strength."[24] These types of political compromises and political decisions often occur within state legislatures. Redistricting is fundamentally a political process, subject to the political give and take in our representative democracy.

To be sure, some believe proportional representation is a worthy goal, and that all redistricting should reflect that principle. Others firmly believe that local communities of interest — particularly those expressed within political subdivisions — should take precedence over a statewide proportional scheme. Ultimately, any governing body must make these policy choices and resolve conflicting values. And elected legislatures do just that. Voters send representatives that share their policy objectives. A legislature often achieves political compromise, and legislators face accountability through frequent, local district elections. In short, whether a state should redistrict to achieve proportional representation is an issue for the legislature, not a court.

By contrast, courts do not have any legal authority to impose proportional representation, absent guidance from the legislature. Here, neither the Pennsylvania constitution nor the Pennsylvania statute gives any court authority to impose proportional representation through the redistricting process. The Pennsylvania Supreme Court itself recognized that the state

---

[24] *Gaffney v. Cummings*, 412 U.S. 735, 754 (1973).

16

constitution provided no standards for redistricting,[25] and it could point to no statute.

Next, the Pennsylvania Supreme Court disregarded entirely the legislature's 2011 map. But a court needs to ground its decision in some standards, and a legislative map provides those standards. Indeed, the U.S. Supreme Court has stated that a court:

> should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature.[26]

Accordingly, a legislative map, even if defective:

> provides important guidance that helps ensure that the district court appropriately confines itself to drawing interim maps that comply with the Constitution and the Voting Rights Act, without displacing legitimate state policy judgments with the court's own preferences.[27]

But the Pennsylvania Supreme Court's map did not follow any policies contained in the legislature's 2011 map, and the legislature's map certainly did not endorse proportional representation.

Further, U.S. Supreme Court decisions make clear that federal law provides no authority to allow a court to impose proportional representation. Plainly stated, a group is not constitutionally entitled to a redistricting map that

---

[25] *League of Women Voters of Pa.*, Op. at 119 (Pa. Feb. 7, 2018).

[26] *Upham v. Seamon*, 456 U.S. 37, 41 (1982).

[27] *Perry v. Perez*, 565 U.S. 388, 394 (2012).

grants it "legislative seats in proportion to its voting potential."[28] Likewise, the Constitution "nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers."[29] The Court has been clear: "there is no constitutional requirement of proportional representation,"[30] "there is no constitutional requirement of proportional representation,"[31] and:

> "[t]he Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization. . . . [P]olitical groups [do not] themselves have an independent constitutional claim to representation . . ."[32]

The Pennsylvania Supreme Court had no state constitutional or state statutory authority to impose proportional representation. It had no federal authority to impose proportional representation. In short, it acted like a legislature, making policy and political choices to implement a proportional representation scheme.

Finally, even beyond a proportional representation scheme, the court made other policy choices. To be sure, the court relied on several traditional redistricting standards, such as compactness and minimizing political subdivision splits. These are relatively uncontroversial standards. But the court

---

[28] *White v. Regester*, 412 U.S. 755, 765-66 (1973).

[29] *Vieth v. Jubelirer*, 541 U.S. 267, 288 (2004) (plurality op.).

[30] *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 419 (2006) (plurality op.).

[31] *Chapman v. Meier*, 420 U.S. 1, 17 (1975).

[32] *City of Mobile v. Bolden*, 446 U.S. 55, 75-76 (1980).

rejected other traditional standards, such as incumbency protection, solely because the court viewed them as "wholly subordinate" to other, "neutral" criteria.[33] Beyond this short phrase, the court offered no evidence, no rational, and no explanation for its policy choices.

**B.    In creating the map, the Pennsylvania Supreme Court employed highly flawed procedures.**

As noted above, the Pennsylvania Supreme Court did not adhere to its own standards, made blatantly political choices, and picked and chose among the standards it would follow. But the court made several other, flawed choices.

First, it refused to explain how it arrived at its map, beyond saying it was "superior or comparable" to other maps. It did not explain which parties' or *amici* briefs it found helpful. It did not explain how its map was "comparable" to others. It did not explain why it made certain political choices and not others. And it did not explain why it arrived at the map it did. This is particularly problematic in a high-profile, important, and controversial case like this.

Creating even more suspicion, however, the Pennsylvania court has barred its special master from even discussing the map he drew for the court.[34]

---

[33] *League of Women Voters of Pa.*, Op. at 123 (Pa. Feb. 7, 2018).

[34] Nate Cohn, *Democrats Didn't Even Dream of This Pennsylvania Map. How Did It Happen?*, The New York Times: The Upshot (February 21, 2018), https://www.nytimes.com/2018/02/21/upshot/gerrymandering-

This has thrust litigants and the American public into the position of former Sovietologists, searching two sentences in the middle pages of the latest issue of *Pravda* to infer the true motives behind a decision.

Second, the court did not accept evidence — such as testimony or expert analysis — to develop a record to support its decisions. To be sure, the court accepted proposals. But this is much different than developing a record based on admissible evidence, subject to cross examination and close scrutiny. Courts do not — and should not — simply take in proposals and make decisions absent evidence. It is within a legislature's plenary power to do just that. But the Pennsylvania Supreme Court did the same thing. It could have deferred to the lower trial court to develop a remedial plan based upon evidence. And the commonwealth court was capable of moving quickly — it worked with "commendable speed, thoroughness, and efficiency" to develop a record for the gerrymandering claims.[35] That same court could — and should — have held appropriate hearings to develop a map, which the Pennsylvania Supreme Court could then review.

Finally, the court was overly eager to exercise control over mapmaking. Following an application from petitioners, the Pennsylvania Supreme Court

---

pennsylvania-democrats-republicans-court.html (last visited on March 4, 2018).

[35] *League of Women Voters of Pa.*, Op. at 34 (Pa. Feb. 7, 2018).

exercised "extraordinary jurisdiction" over the proceeding.[36] It did not allow the district court to develop a remedial map. It did not allow extensive party input into the new remedial map. In developing a remedial map, it acted as the fact-finder, the adjudicator, and the reviewer, all rolled into one.

Overall, these three flaws are not minor procedural errors. They go to the heart of what a court system should do. The Pennsylvania Supreme Court should articulate standards for all litigants to follow. A trial court should take those standards, develop evidence, and craft a remedy. Then the Pennsylvania Supreme Court should have the opportunity to review that remedy for legal error. But instead, this court eagerly short-circuited the very procedures and policies that result in good decision-making and engender public respect for our courts. It then imposed a proportional representation map, without evidence, without explanation, and without legal authority.

---

[36] *League of Women Voters of Pa.*, Op. at 33 (Pa. Feb. 7, 2018).

## CONCLUSION

ACRU respectfully requests that this court grant the relief requested by

plaintiffs in this matter.

Respectfully submitted this 7th day of March 2018,

> *s/Linda A. Kerns*
> Linda A. Kerns, Esquire
> LAW OFFICES OF LINDA A. KERNS, LLC
> 1420 Locust Street, Suite 200
> Philadelphia, PA 19102
> PA Atty ID 84495
> Tel: (215) 731-1400
> Fax: (215) 701-4154
> linda@lindakernslaw.com
> *General admission scheduled for March 9, 2018
> Attorney for Amicus Curiae,
> The American Civil Rights Union

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I hereby certify that this brief complies with L.R. 7.8(b)(2) because the total word count for the body of the brief, including headings and footnotes is 3,891.

Dated this 7th day of March, 2018.

*s/Linda A. Kerns*
Linda A. Kerns

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of March, 2018, the foregoing

**AMICUS CURIAE BRIEF OF THE AMERICAN CIVIL**

**RIGHTS UNION** was electronically filed with the Clerk of the Court via the CM/ECF system, which will send notice of the electronic filing to all counsel of record.

Dated this 7th day of March, 2018.

*s/Linda A. Kerns*
Linda A. Kerns