# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACOB CORMAN, in his official capacity as Majority Leader of the Pennsylvania Senate, MICHAEL FOLMER, in his official capacity as Chairman of the Pennsylvania Senate State Government Committee, LOU BARLETTA, RYAN COSTELLO, MIKE KELLY, TOM MARINO, SCOTT PERRY, KEITH ROTHFUS, LLOYD SMUCKER, and GLENN THOMPSON,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>ROBERT TORRES, in his official capacity as Acting Secretary of the Commonwealth; JONATHAN M. MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections, and Legislation,<br><br>　　　　　　　　Defendants. | CIVIL ACTION<br><br>No. 1:18-cv-00443-CCC-KAJ-JBS<br><br>Three-Judge Panel<br>Pursuant to 28 U.S.C. § 2284(a)<br><br>Circuit Judge Kent Jordan<br>Chief Judge Christopher Conner<br>District Judge Jerome Simandle |

**SURREPLY BRIEF IN OPPOSITION TO PLAINTIFFS'**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

**I.    PLAINTIFFS' NEW AND DIFFERENT CLAIMS FOR RELIEF** .........1

**II.   PLAINTIFFS' NEW CONTENTION THAT THE ELECTIONS CLAUSE ENTITLES LEGISLATURES TO TAKE MONTHS TO PURSUE AN IDEALIZED FORM OF THE LEGISLATIVE PROCESS** ..............................................................................................5

**III.  PLAINTIFFS' LEGAL FICTION THAT THE 2011 PLAN IS THE "STATUS QUO" DOES NOT CHANGE THE REAL WORLD FACT THAT GRANTING THE RELIEF PLAINTIFFS SEEK WILL BE ENORMOUSLY DISRUPTIVE** ....................................9

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bennington Foods LLC v. St. Croix Renaissance Corp., LLP*,
  528 F. 3d 176 (3d Cir. 2008) ...............................................................................9

*Vieth v. Pennsylvania*,
  188 F. Supp. 2d 532 (M.D. Pa. 2002) .................................................................7

**Statutes**

52 U.S.C. § 20302(g) ................................................................................................3

Plaintiffs' Reply Brief in Support of their Motion for Preliminary Injunction (the "Reply") goes far beyond addressing the points made in the Responses to their Motion for Preliminary Injunction; it makes entirely new arguments and claims for relief, attaching new evidence to support these new points. For example, Plaintiffs change the theory underlying Claim II of their Complaint, now arguing that the Election Clause requires courts to give legislatures an unspecified number of months to engage in an optimally inclusive and reasoned version of the democratic process. They request new forms of relief, which require Defendants and the Court to readjust their analysis of the balance of the equities. Finally, they provide 16 declarations and affidavits, many of which raise new issues. In light of the structure of this proceeding, in which all evidence is entering the record via declaration and affidavit, Defendants believe that they should be given the opportunity to counter in writing Plaintiffs' new arguments and evidence. Therefore, Defendants respectfully submit this short Surreply Brief and attached Supplemental Affidavit.

## I.   PLAINTIFFS' NEW AND DIFFERENT CLAIMS FOR RELIEF

In their Motion for Preliminary Injunction, Plaintiffs ask the Court to order that the May 2018 primary take place under the 2011 Plan. In the face of Defendants' demonstration that the relief they seek is simply impossible, Plaintiffs cast about for alternatives. But none of these alternatives is a viable option either;

each of them will prejudice Defendants, the 182 congressional candidates who are now circulating petitions, candidates for the three statewide positions and hundreds of other positions at stake in the May 2018 primary, and, critically, voters and the integrity of the election itself.

First, Plaintiffs attach a Declaration of Carol Aichele, a former Secretary of the Commonwealth.  Former Secretary Aichele states, without any detail, that if this Court orders reinstatement of the 2011 Plan by March 16, the May 15 primary can go ahead with congressional candidates on the ballot.  As explained in the attached Supplemental Affidavit of Jonathan Marks, Former Secretary Aichele is incorrect.  *See* Supplemental Affidavit of Jonathan M. Marks ("Marks Suppl. Aff.") attached hereto as Ex. 1, at ¶¶ 2-24.

Second, Plaintiffs contend that "Counsel for Executive Defendants represented before the Pennsylvania Supreme Court at oral argument that congressional primaries could be held as late as September."  Reply at 25.  This is an extraordinary mischaracterization of what Defendants' counsel, Mark Aronchick, actually said.[1]  When asked whether the primary could be held in August, Defendants' counsel replied, "if it became necessary to think about August, we'll go back to the drawing board and figure out if we can get this all

---

[1] Plaintiffs also quote Defendants' counsel as saying that Defendants have "complete power, to order moving the primary." Reply at 25.  Counsel actually stated that the court had that power.

done if the primary was the beginning of August." *See* Pennsylvania Supreme Court Oral Argument Transcript Excerpts ("Tr."), attached hereto as Ex. 2, at 37:23-38:2; *see also* Tr. 64:11-16 ("You can change [the primary date] we believe safely, not a problem, until July 31 call it. If you say go back . . . and figure out whether there's more time into August, we will sit down and come back to you and tell you that with an addendum to our affidavit. . . .").

Third, Plaintiffs suggest that this Court "has the power to adjust the timelines imposed on the state by the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA")." Reply at 25. Tellingly, however, they cite no authority for that power. Federal courts have altered UOCAVA deadlines in litigation between the United States and individual states over compliance with UOCAVA. *See* Cases Raising Claims under the Uniformed and Overseas Citizens Absentee Voting Act, https://www.justice.gov/crt/cases-raising-claims-under-uniformed-and-overseas-citizen-absentee-voting-act. But Defendants are aware of no authority for a federal court to excuse a state's compliance with UOCAVA in a case where the United States is not a party. The text of the statute itself suggests that such exemptions must be requested from the executive branch, not the judiciary. 52 U.S.C. § 20302(g) (setting forth procedures for requesting a hardship exemption).

Defendants have consistently taken the position that the primary could be postponed until July (not September). However, they have also consistently warned that any postponement of the primary, especially one that bifurcates the congressional races from other races (as Plaintiffs appear to contemplate), will have enormous drawbacks. *See* Defs PI Opp. at 13-14. Plaintiffs ignore these consequences in their brief. They also ignore the warnings of their own allies, the intervenors in the state court litigation ("State Court Intervenors"), who argued to the Pennsylvania Supreme Court that the added costs and logistical challenges of moving the primary would "constitute serious disruption of orderly state election processes and an inordinate expense for the individual taxpayer who ultimately carries the burden." State Court Intervenors' Br. (Pa. Jan. 10, 2018) at 10-11; 29-30. In their effort to obtain a stay from the U.S. Supreme Court, State Court Intervenors specifically criticized the implementation of a two-track circulation period, claiming that this bifurcation would not only result in "chaos" but "violat[ed] the equal protection rights of candidates for Congress." *See, e.g.*, State Court Intervenors' App. for Stay (U.S. Jan. 26, 2018) at 2, 17. At oral argument before the Pennsylvania Supreme Court, State Court Intervenors' counsel further argued:

> Having people have primaries in July and August, Your Honor, could end up with people on vacations. You can't – there is – you change and split this, you are actually making political determinations as to the outcome of the

> election and who will be the candidates. . . . Other than the vacation schedule, there's another good reason [for not holding a bifurcated primary in July or August]. To run for Congress, it takes a long time and unfortunately an enormous amount of money. If I think to myself I don't even know if I'm going to be the candidate until September and then I'm going to have to go out and raise $10 million, I may not choose to run for office because of that. You are changing – this Court would change the calculus of the entire election process.

Defs. PI Opp., Hangley Decl., Ex. 1 at 139:20-141:16.

## II. PLAINTIFFS' NEW CONTENTION THAT THE ELECTIONS CLAUSE ENTITLES LEGISLATURES TO TAKE MONTHS TO PURSUE AN IDEALIZED FORM OF THE LEGISLATIVE PROCESS

Throughout this case, Plaintiffs have conceded that eighteen days was enough time for the Pennsylvania General Assembly to draft and vote on a remedial plan. *See* Defs. PI Opp. at 5-10. They contend, however, that the General Assembly could not begin drafting until it received the Pennsylvania Supreme Court's Opinion. *See, e.g.*, Reply at 9-12. This argument has many pitfalls, including that the January 22 Order contained clear criteria that the Opinion did not change, the January 22 Order did not suggest that the General Assembly should wait for an Opinion, the General Assembly would have been able to pass legislation by at least the February 15 deadline even if it had not started until the Opinion issued on February 7 (eight days earlier), and the General Assembly neither asked the Pennsylvania Supreme Court for clarification of the January 22 Order before the Opinion issued, nor asked the court for additional time

after the Opinion issued.  *See* Defs. PI Opp. at 17-20; Defs. MTD Reply at 17-20; *see also* PI Mot. at 11.  Indeed, Plaintiffs have not submitted any evidence about the Pennsylvania legislative process to contradict Defendants' submissions in opposition to Plaintiffs' Motion.  *See* Defs. PI Opp., Ex. A (Dermody Aff.); Ex. D (Costa Aff.).

Perhaps because of these pitfalls, Plaintiffs' Reply introduces a new theory of what the Elections Clause requires: "months" of bipartisan drafting, debate, negotiation, and public input.  In support of this theory, they attach a Declaration of Mark Corrigan, former Secretary-Parlamentarian of the Senate.  *See* Reply Ex. B.  Mr. Corrigan concedes, as he must, that "18 days is mechanically and legalistically sufficient time to pass legislation."  Corrigan Decl. ¶ 23.  He opines, however, that 18 days is nonetheless "not enough time for legislation of this nature (or, really, any well-thought-out legislation) to become law," because it does not allow for "the democratic process of legislation."  *Id.* ¶¶ 22, 24.  He states that every instance of Congressional redistricting legislation that he observed "required months of hearings, debate, negotiation and drafting."  *Id.* ¶ 24.  This process, he observes, includes "a constant back and forth between legislators with different interests," "debate and negotiation . . . between and among members of the two political parties," and "thorough and open debate and analysis – through committee hearings, public meetings and other means [in order] to allow an interested public

the opportunity to weigh in on public policy by influencing the language of putative legislation." *Id.* ¶¶ 12-13, 15.

Mr. Corrigan's vision of the democratic ideal, while appealing, has no resemblance to the Pennsylvania General Assembly's actual redistricting legislation, including that passed while Mr. Corrigan was in office. There was no inter-party negotiation or public debate of the 2011 Plan, which was rammed through the legislative process in 16 days with no public participation. *See* Defs. PI Opp. at 7. The process in 2001 fell similarly short of Mr. Corrigan's Athenian ideal; according to the plaintiffs who challenged the 2001 congressional redistricting plan,

> [P]rominent national figures in the Republican party . . . began pressuring Governor Schweiker, a Republican, and the Republican members of the General Assembly to adopt the Senate redistricting plan as a punitive measure against Democrats for having enacted apparently pro-Democrat redistricting plans in other states. In response, Republican members of the state House and Senate began working together to reach an agreement. In the process, *they effectively ignored all Democratic members of the General Assembly, including members of the Conference Committee appointed to resolve the impasse between the competing plans*. . . . The Democratic members of the Conference Committee had no input on [the final version of the plan]. . . . . [A]ll Democratic members of the Conference Committee voted against the version, and all Republicans voted in favor.

*Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 535 (M.D. Pa. 2002) (emphasis added). And in 2018, President Pro Tempore Scarnati and Speaker Turzai appear

- 7 -

to have been perfectly satisfied with the prospect of a redistricting plan that represented the input of only two men – hardly the deliberative legislative process that Mr. Corrigan appears to have in mind.[2]

Plaintiffs' new argument that the Elections Clause requires a court to give the General Assembly an unspecified number of months to engage in reasonable deliberation, public outreach, and bipartisan cooperation (an ideal that appears to have no resemblance to the General Assembly's reality) simply makes Defendants' point: Plaintiffs' Elections Clause "adequate opportunity" theory is necessarily a fact-specific inquiry for which Plaintiffs have offered *no* workable standards. "Nor have Plaintiffs yet explained why federal courts are better suited to the task than state courts, which have greater knowledge of the intricacies of the state political process and elections system." Defs. MTD Reply at 17, n.5.

---

[2] In the Declaration attached to the Reply as Exhibit A, President Pro Tem Scarnati attempts to blame Governor Wolf for the General Assembly's failure to pass legislation as contemplated by the January 22 Order, stating that Governor Wolf "indicated that the [January 22 Order] did not require the General Assembly to present [Governor Wolf] with actual legislation adopting a new Congressional plan." Reply Ex. A ¶ 4. Even if Governor Wolf had said this –Defendants do not believe that he did – it would not be relevant. Governor Wolf does not speak for the Pennsylvania Supreme Court, and has no authority to overrule its Orders. If President Pro Tempore Scarnati and Speaker Turzai had any doubt about what the January 22 Order meant, they should have raised it with the court, not with the Governor. Moreover, two paragraphs later in the same Declaration, President Pro Tempore Scarnati makes it clear that he understood exactly what the January 22 Order meant. *See id.* ¶ 6 ("[I]n a good faith effort to begin the process of *enacting a new Congressional [map] as instructed by the [January 22 Order]* . . . .") (emphasis added).

### III. PLAINTIFFS' LEGAL FICTION THAT THE 2011 PLAN IS THE "STATUS QUO" DOES NOT CHANGE THE REAL WORLD FACT THAT GRANTING THE RELIEF PLAINTIFFS SEEK WILL BE ENORMOUSLY DISRUPTIVE

Plaintiffs argue that the Court should treat the 2011 Plan as the "status quo" because it was "the last, peaceable, uncontested status of the parties." Reply at 30. But that language, like nearly all of Plaintiffs' citations regarding the "status quo," comes from cases weighing a question that is academic here: whether the burden for granting a preliminary injunction should be extremely high or even higher than that. *See, e.g., Bennington Foods LLC v. St. Croix Renaissance Corp., LLP,* 528 F. 3d 176, 179 (3d Cir. 2008). It does not mean that a court must disregard reality when deciding whether an injunction will harm the public interest by derailing an election. Here, the reality is that the Current Plan is in place, and replacing it will disrupt the 2018 primary election.[3]

---

[3] Plaintiffs argue that the Current Plan is causing confusion and chaos, Reply at 27, 31-32, but provide paltry support for that contention. Exhibit E1 to the Reply is the affidavit of a political consultant who pored over 8 million voter records to find the relative handful of records that – as the Department has acknowledged – had not yet been captured in counties' database updates. *See* Marks Suppl. Aff. ¶¶ 27-29. The affiant is the *only* person, out of the tens of thousands of people involved in the upcoming election, to have complained about this lag in certain database updates. *Id.* ¶ 37. And it blinks reality to suggest, as Plaintiffs do, that making *another* change to the congressional map and to the election schedule at this late date would *reduce* such confusion rather than multiplying it.

| | |
|---|---|
| Dated: March 8, 2018 | */s/ Mark A. Aronchick* |
| | Mark A. Aronchick |
| Thomas P. Howell | Michele D. Hangley |
| Office of General Counsel | Hangley Aronchick Segal Pudlin & Schiller |
| 333 Market Street, 17th Floor | One Logan Square, 27th Floor |
| Harrisburg, PA 17101 | Philadelphia, PA 19103 |
| Tel: (717) 783-6563 | Tel: (215) 568-6200 |
| Fax: (717) 787-1788 | Fax: (215) 568-0300 |
| thowell@pa.gov | maa@hangley.com |
| | mdh@hangley.com |
| Timothy E. Gates | |
| Kathleen M. Kotula | Neal Kumar Katyal *(admitted pro hac vice)* |
| Pennsylvania Department of State | Colleen Roh Sinzdak *(admitted pro hac vice)* |
| Office of Chief Counsel | Reedy C. Swanson *(admitted pro hac vice)* |
| 306 North Office Building | Hogan Lovells US LLP |
| Harrisburg, PA 17120 | 555 Thirteenth Street NW |
| Tel: (717) 783-0736 | Washington, DC 20004 |
| tgates@pa.gov | Tel: (202) 637-5600 |
| kkotula@pa.gov | neal.katyal@hoganlovells.com |

Thomas P. Schmidt *(admitted pro hac vice)*
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022

Sara Solow *(admitted pro hac vice)*
Hogan Lovells US LLP
1735 Market St., 23rd Floor
Philadelphia, PA 19103

*Attorneys for Acting Secretary Torres and Commissioner Marks*

## **CERTIFICATE OF SERVICE**

I, Mark A. Aronchick, certify that on March 9, 2018, a true and correct copy of the foregoing Surreply Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction was electronically filed with the Court and served via the CM/ECF system which will provide notice to all counsel and parties of record.

*/s/ Mark A. Aronchick*
Mark A. Aronchick