# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JACOB CORMAN, in his official capacity as Majority Leader of the Pennsylvania Senate, MICHAEL FOLMER, in his official capacity as Chairman of the Pennsylvania Senate State Government Committee, LOU BARLETTA, RYAN COSTELLO, MIKE KELLY, TOM MARINO, SCOTT PERRY, KEITH ROTHFUS, LLOYD SMUCKER, and GLENN THOMPSON,** | : : : : : : : : : : : | **CIVIL ACTION NO. 1:18-CV-443** <br><br> **Three Judge Panel Convened Pursuant to 28 U.S.C. § 2284(a)** |
| **Plaintiffs** | : : | |
| **v.** | : : | |
| **ROBERT TORRES, in his official capacity as Acting Secretary of the Commonwealth, and JONATHAN M. MARKS, in his official capacity as Commissioner of the Bureau of Commissions, Elections, and Legislation,** | : : : : : : : | |
| **Defendants** | : : | |
| **v.** | : : | |
| **CARMEN FEBO SAN MIGUEL, JAMES SOLOMON, JOHN GREINER, JOHN CAPOWSKI, GRETCHEN BRANDT, THOMAS RENTSCHLER, MARY ELIZABETH LAWN, LISA ISSACS, DON LANCASTER, JORDI COMAS, ROBERT SMITH, WILLIAM MARX, RICHARD MANTELL, PRISCILLA McNULTY, THOMAS ULRICH, ROBERT McKINSTRY, MARK LICHTY, and LORRAINE PETROSKY,** | : : : : : : : : : : : : | |
| **Intervenor-Defendants** | : : | |

## MEMORANDUM OPINION

**BEFORE**: Kent A. Jordan, Circuit Judge, *United States Court of Appeals for the Third Circuit*; Christopher C. Conner, Chief District Judge, *United States District Court for the Middle District of Pennsylvania*; Jerome B. Simandle, District Judge, *United States District Court for the District of New Jersey*.

*Per Curiam*                                                                                   March 19, 2018

## I.    Introduction

This case has its genesis in a hard-fought congressional redistricting battle waged in state and federal courts across the Commonwealth of Pennsylvania.  The various antecedent lawsuits engaged Republican members of the Pennsylvania General Assembly, Democratic elected and appointed officials of the Commonwealth, Democrat and Republican activists, and numerous interested parties from within and outside the Commonwealth.  The most recent events in that redistricting affray – namely, the Pennsylvania Supreme Court's decision invalidating the 2011 districting map as an unconstitutional partisan gerrymander under the Commonwealth's constitution and its further decision to issue a court-drawn map – are the subjects of the present lawsuit.  The Pennsylvania Supreme Court granted the General Assembly an abbreviated period of time to enact remedial legislation, subject to the court's newly adopted legislative redistricting criteria.  When the General Assembly failed to do so, the court imposed its own remedial redistricting map.  *League of Women Voters v. Commonwealth*, No. 159 MM 2017, 2018 WL 936941, at *4 (Pa. Feb. 19, 2018).

The Plaintiffs – Senator Jacob Corman, in his official capacity as Majority Leader of the Pennsylvania Senate; Senator Michael Folmer, in his official capacity as Chairman of the Pennsylvania Senate State Government Committee (the "State Legislative Plaintiffs"); and eight Republican members of Pennsylvania's delegation to the United States House of Representatives

(the "Federal Congressional Plaintiffs,"[1] and together with the State Legislative Plaintiffs, the

"Plaintiffs") – contend that the Pennsylvania Supreme Court's decisions to strike the 2011 map

and to issue its own replacement map violate the Elections Clause of the United States

Constitution.  The Plaintiffs claim that the Pennsylvania Supreme Court usurped the General

Assembly's authority to develop congressional districts and effectively gave the General

Assembly only two days to pass remedial legislation.  Unsurprisingly, the Defendants have a

decidedly different view.  They assert that the Pennsylvania Supreme Court gave the General

Assembly precisely the amount of time it requested: three weeks to enact a replacement map.

The substance and timing of the Pennsylvania Supreme Court's orders are the focus of the

Plaintiffs' claims against Defendants Robert Torres, in his capacity as Acting Secretary of the

Commonwealth of Pennsylvania, and Jonathan Marks, in his capacity as Commissioner of the

Bureau of Commissions, Elections, and Legislation of the Pennsylvania Department of State

(together, the "Executive Defendants").  The issues presented in this case touch on questions of

high importance to our republican form of government.  As the 2018 election cycle quickly

progresses, these issues are of particular salience to the voters of the Commonwealth.  The

Plaintiffs' frustration with the process by which the Pennsylvania Supreme Court implemented

its own redistricting map is plain.  But frustration, even frustration emanating from arduous time

constraints placed on the legislative process, does not accord the Plaintiffs a right to relief.

The Plaintiffs seek an extraordinary remedy: they ask us to enjoin the Executive

Defendants from conducting the 2018 election cycle in accordance with the Pennsylvania

---

[1]  The Federal Congressional Plaintiffs are Congressman Lou Barletta (11th District); Congressman Ryan Costello (6th District); Congressman Mike Kelly (3rd District); Congressman Thomas Marino (10th District); Congressman Scott Perry (4th District); Congressman Keith Rothfus (12th District); Congressman Lloyd Smucker (16th District); and Congressman Glenn Thompson (5th District).

Supreme Court's congressional redistricting map and to order the Executive Defendants to conduct the cycle using the map deemed by the Pennsylvania Supreme Court to be violative of the Commonwealth's constitution.  In short, the Plaintiffs invite us to opine on the appropriate balance of power between the Commonwealth's legislature and judiciary in redistricting matters, and then to pass judgment on the propriety of the Pennsylvania Supreme Court's actions under the United States Constitution.  These are things that, on the present record, we cannot do.

## II.     Background[2]

Following the 2010 decennial census mandated by Article I, Section 2 of the United States Constitution, Pennsylvania's congressional delegation to the United States House of Representatives was reduced from nineteen seats to eighteen seats.  The Pennsylvania General Assembly thereafter adopted a new congressional redistricting map, which was passed in December 2011 and signed into law by former Pennsylvania Governor Tom Corbett that same month (the "2011 Map").  The 2011 Map governed three primary elections, three general elections, and one special election, until January 22, 2018, when the Pennsylvania Supreme Court declared it to be "clearly, plainly and palpably" violative of the Commonwealth's constitution and hence invalid.  (Compl. Ex. B. at 2.)

The Pennsylvania Supreme Court's rulings came in a lawsuit filed in June 2017 in the Commonwealth Court of Pennsylvania by the League of Women Voters[3] and eighteen individual

---

[2]  The facts and procedural history described here are derived from the Plaintiffs' verified complaint, attachments thereto, and matters of public record, such as judicial proceedings, of which we can take judicial notice for purposes of the pending motions.  *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) ("In addition to the complaint itself, the court can review [on a Rule 12 motion] documents attached to the complaint and matters of public record, and a court may take judicial notice of a prior judicial opinion." (internal citation omitted)).  We view those facts in the light most favorable to the Plaintiffs.  *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

Pennsylvania voters (the "state-court petitioners").  Prior to the filing of that action, the 2011

Map had not been the subject of suit in federal or state court, though it was later challenged in

two federal cases, *Agre v. Wolf*, --- F. Supp. 3d ---, 2018 WL 351603 (E.D. Pa. Jan. 10, 2018),

and *Diamond v. Torres*, No. 17-5054 (E.D. Pa.).[4]  The state-court petitioners named as

respondents the Commonwealth; Michael Turzai, in his capacity as Speaker of the Pennsylvania

House of Representatives; Joseph Scarnati, in his capacity as Pennsylvania Senate President *Pro

Tempore* (together with Turzai, the "state legislative respondents"); the Pennsylvania General

Assembly; Thomas Wolf, in his capacity as Governor of Pennsylvania; Michael Stack, III, in his

capacity as Lieutenant Governor of Pennsylvania and President of the Pennsylvania Senate; and

the Executive Defendants before us now.  The eighteen individual plaintiffs – all registered

Democrats – claimed that the 2011 Map was an impermissible partisan gerrymander that

intruded on their rights under numerous provisions of the Pennsylvania Constitution.  They

specifically asserted that the 2011 Map violated the state constitution's guarantees of free

expression, free association, and equal protection, in addition to its Free and Equal Elections

---

[3]  The Commonwealth Court dismissed the League of Women Voters for lack of standing.  *League of Women Voters v. Commonwealth*, --- A.3d ---, No. 159 MM 2017, 2018 WL 750872, at *1 n.3 (Pa. Feb. 7, 2018).  The eighteen individual plaintiffs remained as plaintiffs throughout the state-court proceedings.

[4]  In *Agre*, a group of Pennsylvania residents brought suit seeking a declaratory judgment that the Pennsylvania General Assembly exceeded its authority under the federal Elections Clause by enacting the 2011 Map with the intent that it favor Republican candidates over Democratic candidates.  2018 WL 351603, at *1.  Following a four-day trial, a split three-judge panel entered judgment in favor of the defendants (who largely overlapped with the defendants in the state-court action).  *Id.* at *2 n.6, *3.

In *Diamond*, a separate group of Pennsylvania residents challenged the 2011 Map under the United States Constitution, alleging that it violated the First and Fourteenth Amendments, as well as the Elections Clause.  The three-judge *Diamond* panel initially stayed that case pending the disposition in *Agre* and subsequently stayed the case indefinitely in light of the Pennsylvania Supreme Court's January 22 Order declaring the 2011 Map invalid.

Clause.  *League of Women Voters v. Commonwealth*, --- A.3d ---, No. 159 MM 2017, 2018 WL 750872, at *8 (Pa. Feb. 7, 2018).

The Commonwealth Court stayed the matter pending an anticipated decision by the United States Supreme Court in a case alleging partisan gerrymandering.  *Id.* at *9.  On November 9, 2017, the Pennsylvania Supreme Court granted a request by the state-court petitioners for extraordinary relief, assumed plenary jurisdiction over the matter, lifted the stay, and instructed the Commonwealth Court to develop a factual record and issue proposed findings of fact and conclusions of law by December 31, 2017.  *Id.*  The Commonwealth Court proceeded as instructed, overseeing a flurry of pretrial activity, presiding over a five-day trial, and submitting recommended findings and conclusions to the Pennsylvania Supreme Court on December 29, 2017.  *Id.*  In the end, the Commonwealth Court concluded that "partisan considerations [were] evident in the enacted 2011 [Map]" and that, with use of "neutral, or nonpartisan, criteria *only*, it is possible to draw alternative maps that are not as favorable to Republican candidates as is the 2011 [Map]."  Recommended Findings of Fact and Conclusions of Law, *League of Women Voters v. Commonwealth*, No. 261 MD 2017 (Pa. Commw. Ct. Dec. 29, 2017) at 126.  But, the court said, the state-court petitioners had "not articulated a judicially manageable standard" to measure whether the 2011 Map "crosse[d] the line between permissible partisan considerations and unconstitutional partisan gerrymandering under the Pennsylvania Constitution."  *Id.* at 126-27.  It thus concluded that the state-court petitioners "failed to meet their burden of proving that the 2011 [Map], as a piece of legislation, clearly, plainly, and palpably violate[d] the Pennsylvania Constitution."  *Id.* at 127.

The Pennsylvania Supreme Court took the matter up immediately.  It ordered expedited briefing and, when that was completed, held oral argument on January 17, 2018.  Five days later,

on January 22, 2018, it issued a two-page *per curiam* order striking the 2011 Map for "clearly, plainly and palpably violat[ing]" the Pennsylvania Constitution and enjoining "its further use in elections for Pennsylvania seats in the United States House of Representatives[.]"  (Compl. Ex. B. at 2.)  Five of the seven justices agreed that the 2011 Map violated the Pennsylvania Constitution, but only four of seven agreed that the proper course of action, given the temporal proximity to the 2018 election cycle, was to enjoin use of the 2011 Map for the 2018 primary and general elections.  The court established the following timeline:

- February 9, 2018 – deadline for the General Assembly to submit a remedial congressional redistricting map to the Governor;

- February 15, 2018 – deadline for the Governor to approve or reject a proposed remedial congressional redistricting map and for the Governor to submit an approved map to the Pennsylvania Supreme Court;

- February 15, 2018 – deadline for all interested parties to submit proposed remedial congressional redistricting maps to the Pennsylvania Supreme Court if the General Assembly did not pass, or the Governor did not sign, a proposed remedial congressional redistricting map;

- February 19, 2018 – deadline by which the Pennsylvania Supreme Court would adopt its own remedial congressional redistricting map if the General Assembly did not pass, or the Governor did not sign, a proposed remedial congressional redistricting map.

The order excluded from its injunction against further use of the 2011 Map a special election for Pennsylvania's 18th Congressional District, which was held on March 13, 2018.  It further instructed that any new congressional redistricting map had to "consist of: congressional districts composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population."  (Compl. Ex. B at 3.)

The Pennsylvania Supreme Court indicated in its January 22 order that an opinion would follow.  On February 7, 2018, two days before the General Assembly's February 9, 2018,

deadline to submit a remedial redistricting map to the Governor, a 137-page majority opinion issued.  The opinion announced the specific provision of the Pennsylvania Constitution violated by the 2011 Map – the Free and Equal Elections Clause.[5]  *League of Women Voters*, 2018 WL 750872, at *1.  It then set out a litany of statistical measures that it said demonstrated the 2011 Map subordinated the "traditional redistricting requirements" announced in the January 22 order to other motivations.[6]  *Id.* at *50.  The court held that finding alone was "sufficient to establish" that the 2011 Map contravened the Pennsylvania Constitution.[7]  *Id.*

Pennsylvania's Republican-dominated General Assembly and Democratic Governor were unable to agree on remedial congressional redistricting legislation by the deadlines mandated in the January 22 order.  Consequently, in the absence of a legislatively-approved redistricting plan, the Pennsylvania Supreme Court formulated its own congressional redistricting map with the assistance of an appointed advisor.  The court implemented its map by order of February 19, 2018.  Although the parties and several *amici* submitted a number of proposed remedial maps, the court determined that its own remedial map was "superior or comparable to all plans submitted by the parties, the intervenors, and *amici*[.]"  (Compl. Ex. J. at 7.)

---

[5]  The state constitution's Free and Equal Elections Clause provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."  Pa. Const. art. I, § 5.

[6]  The court's conclusions in that regard were rooted in expert evidence that had been adduced in the evidentiary hearing before the Commonwealth Court.

[7]  Dissents were written by Chief Justice Saylor and Justice Mundy, which, in part, questioned the wisdom of opining on the inherently political nature of congressional redistricting and criticized the majority for giving the General Assembly "very little time and guidance" for enacting remedial legislation.  *League of Women Voters*, 2018 WL 750872, at *63.  Justice Baer concurred in part and dissented in part.  He agreed with the majority that the 2011 Map violated the Pennsylvania Constitution, but disagreed with the majority's adoption of specific redistricting criteria and its failure to afford a "reasonable time for the Legislature to act."  *Id.* at *58.

The Plaintiffs commenced this action on February 22, 2018, with the filing of a verified complaint and contemporaneous motion for emergency injunctive relief.  They assert that the Pennsylvania Supreme Court's actions constitute a twofold violation of the Elections Clause of the United States Constitution.  Specifically, they allege in Count I that the Pennsylvania Supreme Court's imposition of mandatory redistricting criteria violated the Elections Clause by usurping congressional redistricting authority vested exclusively in the General Assembly, and, in Count II, they allege that the court further violated the Elections Clause when it developed its own remedial map without providing the General Assembly an adequate opportunity to do so.  The Plaintiffs entreat this Court to enjoin the Executive Defendants from implementing the Pennsylvania Supreme Court's remedial map for the upcoming election and to require the Executive Defendants to conduct the 2018 election cycle under the 2011 Map.

We denied the Plaintiffs' request for a temporary restraining order and deferred consideration of the request for a preliminary injunction pending an expedited evidentiary hearing.  Following a scheduling hearing on March 1, 2018, we granted the eighteen individual state-court petitioners (the "Intervenor-Defendants") leave to intervene and participate in this action.  The General Assembly is not a party to this suit, and it has not moved to intervene.  The Executive Defendants moved to dismiss the verified complaint for lack of jurisdiction and for failure to state a claim upon which relief can be granted under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  The Intervenor-Defendants (together with the Executive Defendants, the "Defendants") moved for judgment on the pleadings on the same grounds under Rule 12(c).  The Defendants' Rule 12 motions contend that we lack subject matter jurisdiction over the action because (i) the Plaintiffs do not have constitutional or prudential standing to bring their Elections Clause claims, and (ii) the *Rooker-Feldman* doctrine bars the Plaintiffs from attacking in our

Court the judgment of the Pennsylvania Supreme Court.  The Defendants also urge us to abstain

from exercising jurisdiction over this case under the *Colorado River* and *Younger* abstention

doctrines because the state-court proceedings are currently pending before the United States

Supreme Court as a result of the state legislative defendants' emergency application to stay the

Pennsylvania Supreme Court's judgment.  The Defendants further argue in their Rule 12 motions

that the Plaintiffs have failed to state a claim because (i) issue preclusion prohibits the Plaintiffs

from litigating issues already decided by the Pennsylvania Supreme Court, (ii) judicial estoppel

precludes the Plaintiffs from raising arguments inconsistent with ones raised by related parties in

*Diamond*, a separate federal action challenging the constitutionality of the 2011 Map, and

(iii) the Pennsylvania Supreme Court did not usurp the General Assembly's authority under the

Elections Clause when it decided to remedy a violation of the Pennsylvania Constitution.

On March 9, 2018, we conducted a full hearing on those motions and on the Plaintiffs'

motion for a preliminary injunction.

## III.    Legal Standards

A court must grant a motion to dismiss made under Federal Rule of Civil Procedure

12(b)(1) when it lacks subject matter jurisdiction.  *In re Schering Plough Corp. Intron/Temodar

Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).  Such jurisdictional challenges take

two forms: (1) parties may make a "factual" attack, arguing that one or more of the pleading's

factual allegations are untrue, removing the action from the court's jurisdiction; or (2) they may

assert a "facial" challenge, which assumes the veracity of the complaint's allegations but

nonetheless argues that a claim is not within the court's jurisdiction.  *Lincoln Benefit Life Co. v.

AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (quoting *CNA v. United States*, 535 F.3d 132,

139 (3d Cir. 2008)).  In either instance, it is the plaintiff's burden to establish jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).  A motion for judgment on the pleadings brought under Rule 12(c) is analyzed under the same standards that govern a motion under Rule 12(b)(6). *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017).

## IV.    Discussion

As already described, the Executive Defendants and Intervenor-Defendants have collectively raised several jurisdictional, justiciability, abstention, preclusion, and merits arguments in answer to the Plaintiffs' verified complaint.  Because standing "is always an antecedent question," *Hamilton v. Bromley*, 862 F.3d 329, 334 (3d Cir. 2017), our analysis begins with examination of the Plaintiffs' standing to bring suit.[8]  That is also where the case ends.

### A.    Article III Standing

Article III, Section 2 of the United States Constitution limits the jurisdiction of the federal courts to resolving only "cases" and "controversies."  U.S. Const. art. III, § 2; *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  "No principle is more important to the [federal] judiciary's proper role in our system of government than [that] constitutional limitation[.]" *Raines*, 521 U.S. at 818 (citation omitted).  When subject matter jurisdiction is lacking, our only remaining

---

[8]  "[I]t is familiar law that a federal court always has jurisdiction to determine its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002).

function "is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).

There can be no "case" or "controversy" if the party seeking relief does not have standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The standing requirement guards against abuse of federal jurisdiction and limits which litigants may seek legal redress in our courts. *Id.* The standing analysis thus focuses on whether the particular parties before the court are "the proper part[ies] to bring [the] suit[.]" *Raines*, 521 U.S. at 818.

To establish Article III standing, a party seeking relief must establish that it has suffered injury to a legally protected interest, which injury is "fairly traceable to the challenged action and redressable by a favorable ruling." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (internal quotation marks and citations omitted). These elements are often referred to by the labels "injury-in-fact," "causation," and "redressability." *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193-94 (3d Cir. 2016). The party invoking jurisdiction bears the burden of establishing standing. *Spokeo*, 136 S. Ct. at 1547.

### 1.    *The State Legislative Plaintiffs*

The State Legislative Plaintiffs initiated this lawsuit in their official capacities as Pennsylvania state senators. The verified complaint, however, does not allege an injury specific to those two plaintiffs. On the contrary, the claims in the complaint rest solely on the purported usurpation of the Pennsylvania General Assembly's exclusive rights under the Elections Clause of the United States Constitution. We do not gainsay that these Senate leaders are in some sense aggrieved by the Pennsylvania Supreme Court's actions. But that grievance alone does not carry them over the standing bar. United States Supreme Court precedent is clear – a legislator suffers

no Article III injury when alleged harm is borne equally by all members of the legislature. *Raines*, 521 U.S. at 821.

The principles governing a legislator's standing to bring suit to vindicate a purported institutional injury are set forth in three cases: *Raines v. Byrd*, 521 U.S. 811 (1997); *Coleman v. Miller*, 307 U.S. 433 (1939); and *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015). *Raines* involved a challenge by four United States senators and two United States congressmen to the federal Line Item Veto Act. 521 U.S. at 813-14. The Supreme Court concluded that the legislators lacked personal standing to sue because the injury they alleged was an "institutional injury (the diminution of legislative power), which necessarily damage[d] all Members of Congress … equally." *Id.* at 821. The Court emphasized that the individual legislators were not "deprived of something to which they *personally* [were] entitled," and that they were claiming an injury in their "official capacities." *Id.* It reasoned that the injury ran with the position, not the person, and had the plaintiff legislators retired the next day, their injury would evanesce. *Id.*

The *Raines* Court contrasted the facts before it with the Court's earlier decision in *Coleman*. In *Coleman*, a bloc of twenty state legislators voted against adoption of a proposed amendment to the federal constitution. 307 U.S. at 435-36. The forty-person legislature split evenly on the vote, and the state's lieutenant governor, as presiding officer of the state senate, cast a decisive tie-breaking vote to pass the amendment. *Id.* at 436. The legislators challenged the lieutenant governor's right to cast a tie-breaking vote. *Id.* The Supreme Court held that the legislators had standing because they had an "interest in maintaining the effectiveness of their votes," which collectively could have defeated ratification, had the lieutenant governor not cast his vote. *Id.* at 438, 441. The Court later cautioned, when deciding *Raines*, that *Coleman* is a

case of limited application, which "at most" stands "for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823.

The Supreme Court applied those principles in *Arizona State Legislature* to uphold the standing of the entire Arizona legislature to challenge a state constitutional amendment, adopted by popular initiative, that placed sole authority for congressional redistricting in an independent redistricting commission. 135 S. Ct. at 2658, 2665. The Court distinguished *Raines* as involving only six individual legislators, and analogized the Arizona legislature to the bloc of senators in *Coleman*. *Id.* at 2664-65. The state constitutional amendment at issue, the Court said, "would 'completely nullify' any vote by the Legislature, now or 'in the future,' purporting to adopt a redistricting plan." *Id.* at 2665 (quoting *Raines*, 521 U.S. at 823-34) (alteration omitted).

The State Legislative Plaintiffs' allegations fit squarely within *Raines*'s explicit limitation on legislative standing. They bear little resemblance to the facts of *Coleman* or *Arizona State Legislature*. The State Legislative Plaintiffs are only two of 253 members of the Pennsylvania General Assembly, just as the plaintiffs in *Raines* were only six out of 535 members of the United States Congress. Two votes could not on their own have defeated or enacted any proposed remedial redistricting legislation that might have – but did not – come up for a final vote in the Pennsylvania Senate.

The State Legislative Plaintiffs rejoin that their respective leadership roles in the state senate overcome that math and bring their interests within the purview of *Coleman*. That assertion is flawed in two significant respects. First, the Pennsylvania Senate is only one of two chambers of the General Assembly. Bicameralism is meaningful, and the Pennsylvania Senate

cannot pass legislation or override a gubernatorial veto by itself. *See* Pa. Const. art. III, § 4 ("No bill shall become a law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor."); Pa Const. art. IV, § 15 (requiring two-thirds of each chamber of the Pennsylvania General Assembly to vote to override a gubernatorial veto).  The State Legislative Plaintiffs do not allege that either senator can command the two-thirds majority necessary in both chambers to override a gubernatorial veto. Second, and meaning no disrespect to any legislative leader, we can find no support – and none has been offered – for the implied proposition that the Republican Caucus is obligated to vote in line with a leader's suggestion.  That they may vote in unison in a matter of great importance is perhaps a reasonable guess, but it is still just a guess.

Furthermore, the State Legislative Plaintiffs themselves frame their alleged injury as the deprivation of "their legislative authority to apportion congressional districts" and "the federally-mandated 'adequate opportunity' to craft a remedial plan[.]"  (Pl. Opp. Br. at 29.)  That injury is indistinguishable from the claimed "diminution of legislative power" the *Raines* Court explained affects all members of the legislative institution equally.  521 U.S. at 821.  The Pennsylvania Supreme Court's alleged usurpation of the General Assembly's power did not deprive Senator Corman or Senator Fulmar of any rights vested personally in them by the Elections Clause.  Any responsibilities afforded the State Legislative Plaintiffs by nature of their respective leadership positions in the Pennsylvania Senate derive from state law.  Their claimed injury thus does not emanate from the federal Elections Clause.

In short, Supreme Court precedent compels dismissal of the State Legislative Plaintiffs' claims.  Their two votes are inadequate as a matter of law to allow a lawsuit premised on an

institutional injury to the General Assembly.  Accordingly, the State Legislative Plaintiffs lack standing to bring the Elections Clause claims asserted in the verified complaint.

### 2. *The Federal Congressional Plaintiffs*

The Federal Congressional Plaintiffs fare no better, albeit for different reasons.  The Defendants' attack all three of the underpinnings of the Federal Congressional Plaintiffs' standing: injury-in-fact, causation, and redressability.

### i. **Injury-In-Fact**

To satisfy the injury-in-fact requirement, a plaintiff must allege a violation of a legally protected interest that is "actual or imminent."  *Finkelman*, 810 F.3d at 193 (citation omitted).  The Federal Congressional Plaintiffs allege that they were doubly injured by the Pennsylvania Supreme Court's purported disregard of the Elections Clause, asserting, first, that their current congressional districts are "radically altered," thereby reducing their incumbency advantage, and, second, that they have already invested time, energy, and resources campaigning in their current districts.  (Pl. Opp. Br. at 36.)  We address each of those claimed injuries in turn.

Case law strongly suggests that a legislator has no legally cognizable interest in the composition of the district he or she represents.  In *City of Philadelphia v. Klutznick*, 503 F. Supp. 663 (E.D. Pa. 1980), for example, certain state and federal legislators challenged the 1980 decennial census conducted in the City of Philadelphia.  *Id.* at 669.  The legislators claimed that an undercounting of the city's population could lead to inaccurate congressional and legislative reapportionment.  *Id.* at 672.  The court disagreed that the legislators had a basis for complaint, holding that elected officials suffer no cognizable injury when their district boundaries are adjusted.  *Id.*  That interest, the court observed, belongs to the voters, "if [to] anyone[.]"  *Id.*  The Supreme Court recently echoed this theme in *Arizona State Legislature* when it said, a "core

principle of republican government" is "that the voters should choose their representatives, not the other way around."  135 S. Ct. at 2677 (citation omitted); *cf. Moore v. U.S. House of Representatives.*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring) ("In my view no officers of the United States … exercise their governmental powers as personal prerogatives in which they have a judicially cognizable private interest.").

The several cases cited by the Federal Congressional Plaintiffs do not persuade us otherwise.  (*See* Pl. Opp. Br. at 35-36 (collecting cases).)  Those cases are distinguishable on the law, the facts, or both.  *Johnson v. Mortham*, for example, is situated on a questionable legal premise.  915 F. Supp. 1529 (N.D. Fla. 1995).  The court there allowed a congresswoman to intervene in her individual capacity to address a challenge to the constitutionality of her district under the Equal Protection Clause of the United States Constitution.  *Id.* at 1533, 1538.  In deciding that the congresswoman had standing, the court cited the decision of the United States Court of Appeals for the Fifth Circuit in *LULAC, Council No. 4434 v. Clements*, 884 F.2d 185 (5th Cir. 1989).  But *LULAC* itself made the point that "[a] voting rights case challenges the election process rather than the individuals holding office," emphasizing that "government officials [in their *official* capacities] . . . have *no* legally protectable interest in redistricting."  884 F.2d at 188 (emphasis added).  The remaining cases cited by the Federal Congressional Plaintiffs concern allegedly unconstitutional rules or regulations affecting rights of a candidate for office.[9] None stand for the proposition that an elected representative has a legally cognizable interest in the composition of his or her electoral district.

---

[9] *See Cook v. Gralike*, 531 U.S. 510, 531 (2001) (Rehnquist, J., concurring) (explaining that candidates have standing to bring First Amendment challenges to ballot provisions); *Storer v. Brown*, 415 U.S. 724, 738 & n.9 (1974) (candidates have standing to challenge statute burdening "their access" to get their names on a ballot); *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 36-37 (1st Cir. 1993) (candidates have standing to challenge public financing law).

Setting aside whether the Federal Congressional Plaintiffs' argument that already invested campaign resources will now be wasted bears on an injury that inheres to the candidate or the candidate's campaign organization or both, the issue of injury-in-fact becomes irrelevant when one considers, as we do in the following section, the question of causation. Even if the wasted investment of resources were a legally cognizable injury, the Federal Congressional Plaintiffs still lack standing because they cannot establish that such an injury was caused by the Elections Clause violations alleged in the verified complaint. The cost of shifting district boundaries – in terms of both campaign funding and constituent fealty – is surely appreciable. But the Federal Congressional Plaintiffs have identified no legal principle tethering that cost to a legally cognizable interest in the composition of their electoral districts under the Elections Clause of the Constitution.

## ii.     Causation

Article III's causation element is satisfied when an alleged injury is "fairly traceable to the challenged action[.]" *Finkelman*, 810 F.3d at 193 (citation omitted). The Third Circuit has described the causation requirement as "akin to 'but for' causation[.]" *Id.* at 193 (internal citation omitted). Even an "indirect causal relationship" may suffice when a plaintiff adequately establishes a "fairly traceable connection between" a claimed injury and an alleged violation. *Id.* at 193-94 (internal quotation marks and citation omitted). Here, the injuries of which the Federal Congressional Plaintiffs complain are not fairly traceable to the claims asserted in the verified complaint, namely that the Pennsylvania Supreme Court unlawfully imposed mandatory redistricting criteria (Count I) and failed to provide the General Assembly an adequate opportunity to pass a remedial congressional redistricting map (Count II).

The Federal Congressional Plaintiffs' injuries, to the extent they have any, fail this causation requirement as to both Count I and Count II because their alleged harm is not rooted in the claims they have pled. The Pennsylvania Supreme Court's decision to review the 2011 Map is not itself the basis of either Count I or Count II. Indeed, the Plaintiffs readily concede that the Pennsylvania Supreme Court has the authority to review redistricting legislation for compliance with the Pennsylvania Constitution. That is a sensible concession. *See Ariz. State Legislature*, 135 S. Ct. at 2673 ("Nothing in [the Elections] Clause instructs, nor has this Court ever held, that a state legislature may prescribe regulations on the time, place, and manner of holding federal elections in defiance of provisions of the State's constitution."); *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420, 510 (1837) ("The laws and constitutions of the states belong solely to the state courts to expound."). The Federal Congressional Plaintiffs' "injury" is that the 2011 Map did not survive, and that is plainly what all of the Plaintiffs dislike, but it is not their legal complaint.

The record reflects an unbridgeable gap in the causal chain between the Federal Congressional Plaintiffs' claimed injuries and the alleged Elections Clause violations. That is, even if the Pennsylvania Supreme Court had simply ordered that a new redistricting map be drawn, but had given the General Assembly free substantive rein (Count I) and a few months' time (Count II) to accomplish that objective, the Federal Congressional Plaintiffs' injury would persist. In that circumstance, the court would not have committed any of the improprieties alleged in the verified complaint, but district boundaries would still have changed. At bottom, the Federal Congressional Plaintiffs' injuries are traceable only to the court's decision to invalidate the 2011 Map and its mandate that a new map be adopted – acts that the Plaintiffs concede are "undoubtedly" within the state court's authority. (*See* Pl. Reply Br. at 2-3

(commenting that it is "undoubtedly true" that "a state court ... has the authority to invalidate a congressional districting plan that violates state law").)  Their injuries are not fairly traceable to the substantive decision that the redistricting map be drawn according to specific criteria or to the process that actually led to the court-drawn map.  The alleged violations of the Elections Clause, as framed by the Plaintiffs themselves, relate only to those significant but limited points. Accordingly, the Federal Congressional Plaintiffs have not established Article III standing.[10]

###    B.    Prudential Standing: Third-Party Standing[11]

Distinct from Article III's immutable standing requirements are the judge-made prudential limitations on standing.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *Bennett v. Spear*, 520 U.S. 154, 162 (1997).  Those limitations include "the general prohibition on a litigant's raising another person's legal rights[.]"  *Lexmark Int'l*, 134 S. Ct. at 1386 (citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499-500 (1975).[12]

---

[10]  Because the Plaintiffs' standing arguments fail at either the injury-in-fact or the causation stage of an Article III standing analysis, we do not address Article III's redressability requirement.

[11]  The Intervenor-Defendants' motion for judgment on the pleadings argued that "[a]ll Plaintiffs lack prudential standing because their claims 'rest … on the legal rights or interests of third parties.'"  (Int. Def. Br. in Supp. MJP at 6 (citation omitted).)  The Federal Congressional Plaintiffs did not respond to that argument at all, representing to us at the March 9 hearing that they did not "appreciate the fact that [the Intervenor-Defendants] were raising a prudential standing argument[.]"  (Mar. 9, 2018 Hr'g Tr. at 74:7-8.)  The Intervenor-Defendants therefore have a colorable argument that the Federal Congressional Plaintiffs forfeited their arguments on prudential standing.  *See Griswold v. Coventry First LLC*, 762 F.3d 264, 274 n.8 (3d Cir. 2014) (explaining that a party had waived an argument "having neglected to properly brief the issue and having conceded as much at oral argument").  Given the frenetic pace of briefing in this matter, however, we will overlook the Federal Congressional Plaintiffs' potential forfeiture and resolve the prudential standing issue on its merits.

[12]  Third-party standing is understood as one of the doctrines of "prudential standing." *Lexmark Int'l*, 134 S. Ct. at 1387 n.3.  The Supreme Court recently discussed the overarching concept of prudential standing in *Lexmark International, Inc. v. Static Control Components, Inc.*, and clarified that, although several doctrines are usually analyzed under that label, those

Review of the Plaintiffs' verified complaint reflects that their claims fail the prudential standing prong as well.

A party that meets Article III's standing requirements generally must rest its claim for relief on a violation of its own rights and not the rights of a third party. *The Pitt News v. Fisher*, 215 F.3d 354, 361-62 (3d Cir. 2000). An exception to that limitation exists when the third party "asserting the right has a 'close' relationship with the person who possesses the right … [and when] there is a 'hindrance' to the possessor's ability to protect his own interests," *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted), and "[t]he litigant [has] suffered an 'injury-in-fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute," *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (internal quotation marks and citation omitted). Absent a "hindrance" to the third-party's ability to defend its own rights, this prudential limitation on standing cannot be excused. *Kowalski*, 543 U.S. at 130; *accord Barrows v. Jackson*, 346 U.S. 249, 257 (1953) (permitting third-party standing because "it would be

---

doctrines may not implicate ideas about Article III "standing" at all. For instance, the Court suggested that the "zone of interests" test is better understood as assessing whether a particular plaintiff states a claim, rather than whether that plaintiff has standing. *Id.* at 1386-87. In contrast, the "rule barring adjudication of generalized grievances" implicates Article III standing concerns. *Id.* at 1386. Third-party standing, however, is "harder to classify" but may be "closely related to the question whether a person in the litigant's position will have a right of action on the claim[.]" *Id.* at 1387 n.3 (citation omitted). The *Lexmark* Court noted that the case did not present a question of third-party standing and left "consideration of that doctrine's proper place in the standing firmament [to] await another day." *Id.*

While *Lexmark* took note that for a court to decline jurisdiction "on grounds that are 'prudential,' rather than constitutional[,] ... is in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging," *id.* at 1386 (internal question marks and citation omitted), the Court nevertheless continues to apply that doctrine of third-party standing. *See, e.g.*, *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (conducting third-party standing analysis to conclude that son could rest claim for relief on legal rights of his deceased father). So too will we.

difficult if not impossible for the persons whose rights are asserted to present their grievance before any court").

The Elections Clause vests authority to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives … in each State by the Legislature thereof[.]" U.S. Const. art. I, § 4, cl. 1.  The Supreme Court interprets the words "the Legislature thereof," as used in that clause, to mean the lawmaking processes of a state.  *Ariz. State Legislature*, 135 S. Ct. at 2673.  The Elections Clause, therefore, affirmatively grants rights to state legislatures, and under Supreme Court precedent, to other entities to which a state may, consistent with the Constitution, delegate lawmaking authority.  *See id.* at 2668.  The Plaintiffs are neither the Pennsylvania General Assembly nor a group to which Pennsylvania has delegated the Commonwealth's lawmaking power.  As far as we can tell on this record, the Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the Pennsylvania General Assembly.

Assuming *arguendo* that the Plaintiffs could fashion a cognizable claim to assert the prerogatives of the General Assembly, they can only do so if the General Assembly faces a hindrance to vindicating its own rights.  That is demonstrably not the case.  The General Assembly was an independent party to the state-court proceedings, was represented by its own counsel, and filed its own brief to protect its institutional interest in legislative privilege.  Its co-respondents in that case – the state legislative respondents – presently have an emergency stay application pending before the United States Supreme Court seeking to enjoin implementation of the Pennsylvania Supreme Court's judgment.  *See Turzai v. League of Women Voters of Pa.*, No. 17A909 (filed Feb. 27, 2018).  The General Assembly undertook a fight that is in fact still going on.

The Plaintiffs argue that, because the General Assembly lost in that fight and cannot re-litigate the matter, it truly is hindered and cannot assert its own rights. That line of argument, however, could always be made by someone associated with a losing party. It is untenable in light of multiple doctrines protecting the finality of judgments. *See, e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (issue preclusion); *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 10, 14 (1987) (*Younger* abstention); *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163-64 (3d Cir. 2010) (*Rooker-Feldman* doctrine); *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 307 (3d Cir. 2009) (*Colorado River* abstention). We need not analyze the applicability of those doctrines. It is enough that the Plaintiffs themselves acknowledge that one or more of them would block the General Assembly's path. That is meant to be the end of it, unless the United States Supreme Court chooses to take up the case.

The Plaintiffs have not presented us with any reason to believe the General Assembly could not vigorously defend its rights in that forum. We therefore conclude that none of the Plaintiffs has prudential standing to assert claims for relief premised on rights granted to the Pennsylvania General Assembly by the federal Elections Clause.

## V.    Conclusion

We hold that the federal Elections Clause violations that the Plaintiffs allege are not the Plaintiffs' to assert. Because fundamental principles of constitutional standing and judicial restraint prohibit us from exercising jurisdiction, we have no authority to take any action other than to dismiss the Plaintiffs' verified complaint. Moreover, the deficiencies identified herein are legal rather than factual in nature. Accordingly, we conclude that leave to amend would be futile. For the foregoing reasons, the Plaintiffs' verified complaint will be dismissed, and Plaintiffs' motion for preliminary injunction will be denied.

**FOR THE COURT:**

  s/   Kent A. Jordan
Kent A. Jordan, Circuit Judge
*United States Court of Appeals*
*for the Third Circuit*

  s/   Christopher C. Conner
Christopher C. Conner, Chief District Judge
*United States District Court*
*for the Middle District of Pennsylvania*

  s/   Jerome B. Simandle
Jerome B. Simandle, District Judge
*United States District Court*
*for the District of New Jersey*